IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY, AXA NETWORK, LLC & AXA NETWORK OF TEXAS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD EHRLICH <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 1:08-CV-01972-MGC

## MEMORANDUM IN SUPPORT OF DEFENDANT RICHARD EHRLICH'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY LITIGATION

Defendant Richard Ehrlich ("Mr. Ehrlich") submits this memorandum of law in support of his motion to dismiss without prejudice the complaint filed by Plaintiffs AXA Equitable Life Insurance Company, AXA Network, LLC and AXA Network of Texas, Inc. (collectively, "AXA") pursuant to Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6) or, in the alternative, to stay the litigation.

## I.    PRELIMINARY STATEMENT

In this litigation, AXA seeks a refund of commissions that it paid to Mr. Ehrlich for his role in selling four life insurance policies. AXA contends the commission refund is owed under the terms of a contract between AXA and Mr. Ehrlich. The contract in question, however, imposes an express condition precedent on any obligation that Mr. Ehrlich may have to refund his commissions: AXA must first refund the premiums it received for the life insurance policies. Although AXA has attempted to refund the premiums, its efforts were rebuffed by the owner of the policies. As a result, AXA has brought an action in the United States District Court for the Northern District of Georgia

to rescind the policies. Until AXA has refunded the premiums, its request for a commission refund is fatally flawed. Accordingly, this matter is not yet ripe for resolution by the court and should be dismissed. Indeed, if this matter is not dismissed, there is a substantial risk of inconsistent outcomes in this litigation and the Georgia litigation that could produce a windfall from AXA.

Alternatively, if this matter is not dismissed, the matter should be stayed so that material issues, including whether the premiums will ever be refunded, can be resolved by the United States District Court for the Northern District of Georgia, in which AXA has brought an action to rescind the policies in question.

## II. MATERIAL ALLEGATIONS OF THE COMPLAINT[1]

### A. The Broker Agreement Between Mr. Ehrlich And AXA

On or around May 1, 2006, Mr. Ehrlich entered into an agreement with AXA (the "Broker Agreement") that provided for the payment of commissions on insurance policies and other products offered by AXA that were sold by Mr. Ehrlich. (*See* Complaint ¶ 10; *see also* Complaint, Ex. 1 (copy of agreement).) In addition to providing for the payment of commissions for sales of insurance policies, the agreement also contains a provision requiring that "[s]hould [AXA] for any reason refund any premium or consideration on any policy or contract hereunder, the Broker shall refund to AXA Network upon demand any commission received on such premium or consideration." (Complaint, Ex. 1 ¶ 6.)

---

[1] By reciting the material allegations of the Complaint, Mr. Ehrlich does not concede the accuracy of any allegation nor does he waive his right to contest any such allegation in the future. To the contrary, Mr. Ehrlich only states what has been alleged by AXA and accepts the allegations as true only for the purposes of this motion to dismiss.

By its terms, the Broker Agreement is "subject to such additional rules and regulations as AXA Network has established or may hereafter establish covering the conduct of its business." (Complaint, Ex. 1 ¶ 19; *see also* Complaint ¶ 11.) AXA alleges that these regulations were stated, in relevant part, by Field Bulletins Nos. 00-014 and FB 06-198R (collectively, the "Field Bulletins"). (*See* Complaint ¶ 11; *see also* Complaint, Ex. 2 & 3 (copies of Field Bulletins).)

Field Bulletin FB 06-198R provides, in relevant part, as follows:

> [I]f AXA . . . or its subsidiary refunds any premium or consideration . . . any compensation paid or prepaid with respect to such premium will be unearned. As a result, AXA . . . may offset the same against any claim for compensation, to the extent the compensation is not offset, the same will, upon termination of the Financial Professional's or Broker's Agreement, become a personal indebtedness of the Financial Professional or broker, which AXA . . . may recover from the Financial Professional or broker, personally.

(Complaint, Ex. 3 at 2.)

B.    The Koenig Policies

On or about May 12, 2006, another financial professional named Gabriel Epstein submitted to AXA four life insurance applications on behalf of Mali and Benzion Koenig (collectively, the "Koenigs"). (*See* Complaint ¶ 14.) Mr. Ehrlich is alleged to have assisted in the submission of these life insurance applications. (*See id.*)

AXA issued four different life insurance policies to the Koenigs (the "Koenig Policies"). (*See id.* ¶ 14.) Each life insurance policy provided coverage in the amount of $10,000,000. (*See id.* ¶ 15.) The four Koenig Policies, combined, provided a total of $40,000,000 in coverage to the Koenigs. (*See id.*) For his role in selling the Koenig

Policies, Mr. Ehrlich was paid commissions in the total amount of $948,088. (*See id.* ¶ 17.)

AXA alleges that it subsequently came to believe that the certain representations made in the applications for the Koenig Policies were materially false. (*See id.* ¶ 18-19.) On December 22, 2006, AXA informed Wells Fargo Bank, the trustee of the Koenig Policies, of AXA's desire to rescind the Koenig Policies. (*See id.* ¶ 20; *see also* Complaint, Ex. 5 (rescission letters).)

C.    The Rescission Action

Although the Complaint does not discuss this fact, on March 1, 2007, AXA filed an action in the United States District Court for the Northern District of Georgia styled *AXA Equitable Life Insurance Company v. Wells Fargo Bank, N.A.*, Civil Action No. 1:07-cv-0512-MHS (the "Rescission Action"). A copy of the Second Amended Complaint (without exhibits), which is the currently operative complaint filed in the Rescission Action, is attached to this memorandum as Exhibit A.

In the Rescission Action, AXA seeks a declaration voiding and rescinding the Koenig Policies because of misrepresentations allegedly made in the applications for the Koenig Policies. (*See* Ex. A ¶ 1.) Notably, however, it is not suggested that Mr. Ehrlich knew of any misrepresentations made in the application for insurance.

AXA's Second Amended Complaint filed in the Rescission Action reveals that "[t]he refund checks issued by [AXA] . . . have not been cashed or deposited." (Ex. A ¶ 27.) Accordingly, AXA indisputably retains possession of the premiums paid for the Koenig Policies. However, in the Rescission Action, which is ongoing, AXA seeks a

4

judicial declaration that the Koenig Policies are void *ab initio* and have been rescinded. (*See* Ex. A at ¶¶ 33-34, 40.)

      D.    <u>The Present Litigation</u>

AXA filed the present litigation against Mr. Ehrlich in the Supreme Court of the State of New York for the County of New York on January 18, 2008.  In its Complaint, AXA claims that Mr. Ehrlich has wrongfully refused to refund the commissions he received in violation of the Broker Agreement and the Field Bulletins.  (*See* Complaint ¶¶ 1, 22.)  AXA purports to assert five counts alleging breach of contract (*see id.* ¶¶ 23-28), breach of the implied covenant of good faith and fair dealing (*see id.* ¶¶ 29-32), unjust enrichment (*see id.* ¶¶ 33-37), conversion (*see id.* ¶¶ 38-42), and replevin (*see id.* ¶¶ 43-45).  In each cause of action, AXA seeks payment of damages in the amount of the commissions received by Mr. Ehrlich, $948,088, plus interest.  (*See id.* ¶¶ 27, 31, 36, 39, 44.)  Each of these counts is premised on Mr. Ehrlich's obligation to provide a commission refund being due at this time.

Mr. Ehrlich removed this matter to this Court on February 27, 2008.  (*See* Notice of Removal, ECF No. 1.)  By agreement of the parties, Mr. Ehrlich's due date for a response was extended until May 28, 2008.

### III.    STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. *See Mashantucket Pequot Tribe v. Town of Ledyard*, No. 3:06cv1212, 2007 WL 1238338, at *1 (D. Conn. Apr. 25, 2007) (quoting 2A James W. Moore et. al., Moore's Federal Practice ¶ 12.07, at 12-49 (2d ed. 1994)); *Johnson v. State of Conn. Dept. of Children and Families,* No. Civ. 303CV151,

2004 WL 722237, at *3 (D. Conn. Mar. 26, 2004); *Heidsieck & Co. Monopole, S.A. v. Piper-Heidsieck*, No. 98 Civ 7741, 2001 WL 263029, at *3 (S.D.N.Y. Mar. 15, 2001); *see also* Fed. R. Civ. P. 12(b)(1).

"When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000); *see also Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("When considering a motion to dismiss for lack of subject matter jurisdiction . . . a court must accept as true all material factual allegations in the complaint."). However, the court's subject matter jurisdiction must be affirmatively proven and may not be shown by drawing favorable inferences from the pleadings. *See Drakos*, 140 F.3d at 131 ("[W]hen the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."). Moreover, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

The standard of review for a motion to dismiss under Rule 12(b)(6) is similar to that for a motion to dismiss under Rule 12(b)(1). *See Moore v. Painewebber, Inc.*, 189 F.3d 165, 169 n.3 (2d Cir. 1999) (describing the standard of review under Rule 12(b)(1) and 12(b)(6) as "identical"). A court generally may not consider matters outside the pleadings when resolving a motion to dismiss pursuant to Rule 12(b)(6) without converting the motion into motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

6

However, a court may consider public documents that are subject to judicial notice, such as filings made in another court, without converting the motion pursuant to Rule 12(b)(6) into a motion for summary judgment. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).

## IV.    ARGUMENT

A.    The Court Lacks Subject Matter Jurisdiction Over The Claims Raised By The Complaint Because A Necessary Condition Precedent To Any Contractual Duty Has Not Yet Occurred

Ripeness is a jurisdictional defect that is properly considered on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294 (S.D.N.Y. 2003). "Federal courts may adjudicate only those 'real and substantial controvers[ies] admitting of specific relief . . . as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Auerbach v. Bd. of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn,* 136 F.3d 104, 108 (2d Cir. 1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)) (alteration and omission in original). "Thus, when resolution of an issue turns on whether 'there are nebulous future events so contingent in nature that there is no certainty they will over occur,' the case is not ripe for adjudication." *Thomas v. City of N.Y.*, 143 F.3d 31, 34 (2d Cir. 1998) (quoting *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993)).

In this lawsuit, AXA seeks to obtain from Mr. Ehrlich, pursuant to the terms of the Broker Agreement and the Field Bulletins, the return of commissions he was paid for the sale of the Koenig Policies. Under New York law, "agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170

(N.Y. 2002). The best evidence of what parties to a written agreement intended is the

written agreement itself. *See Slamow v. Del Col.*, 594 N.E.2d 918, 919 (N.Y. 1992).

"Thus, a written agreement that is complete, clear and unambiguous on its face must be

enforced according to the plain meaning of its terms." *Greenfield*, 780 N.E.2d at 170.

The terms and conditions of the Broker Agreement and the Field Bulletins make

clear that Mr. Ehrlich has no obligation to return the commissions he received for the sale

of the Koenig Policies unless and until AXA first refunds premiums it received for the

Koenig Policies. The Broker Agreement provides that "[s]hould [AXA] for any reason

refund any premium or consideration on any policy or contract hereunder, the Broker

shall refund to AXA Network upon demand any commission received on such premium

or consideration." (Complaint, Ex. 1 ¶ 6.) Similarly, field bulletin FB 06-198R also

makes AXA's right to recover commissions contingent on AXA first refunding the

premiums paid:

> If any premium or consideration is not paid to AXA . . . or
> its subsidiary, or *if AXA . . . or its subsidiary refunds any
> premium or consideration,* . . . . AXA . . . may offset the
> same against any claim for compensation, to the extent the
> compensation is not offset, the same will, upon termination
> of the Financial Professional's or Broker's Agreement,
> become a personal indebtedness of the Financial
> Professional or a broker, which AXA . . . may recover from
> the Financial Professional or broker, personally.

(Complaint, Ex. 3 at 2.)

The language of the Broker Agreement and field bulletin FB 06-198R

demonstrates that AXA's refund of the premiums paid is a condition precedent to its right

to receive a refund of commissions paid. A condition precedent is defined by New York

law as "an event 'not certain to occur, which must occur, unless its non-occurrence is

8

excused, before performance under a contract becomes due.'"[2]  *I.R.V. Merchandising Corp. v. Jay Ward Prods.*, 856 F. Supp. 168, 174 (S.D.N.Y. 1994) (quoting *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081 (N.Y. 1084)).  It is a basic rule of contract law that there can be no action for breach of contract until a condition precedent specified in a contract has been performed.  *See Liberty Mut. Ins. Co. v. Thalle Constr. Co.*, 116 F. Supp. 2d 495, 503 (S.D.N.Y. 2000) ("Under basic contract principles, the failure of one party to perform a condition precedent excuses the performance of the other party."); *Navilia v. Windsor Wolf Rd. Props. Co.*, 671 N.Y.S.2d 184, 185-86 (N.Y. App. Div. 1998) ("It is well settled that no action for breach of contract lies where the party seeking to enforce the contract has failed to perform a specified condition precedent[.]"); *Sulner v. G.A. Ins. Co. of N.Y.*, 637 N.Y.S.2d 144, 145 (N.Y. App. Div. 1996) (plaintiff could not collect under insurance policy after having failed to perform condition precedent required by policy).  Indeed, where a contract contains an express condition precedent, as do both the Broker Agreement and field bulletin FB 06-198R, that condition must be literally performed.  *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995).

The Broker Agreement and field bulletin FB 06-198R each specify that the broker's obligation to refund the commissions he receives for the sale of insurance policies will arise only in the event that AXA refunds the premiums.  Although neither document defines the verb "refund," the meaning of the term may be ascertained by

---

[2] As a federal court exercising diversity jurisdiction, this Court applies the choice of law rules of the forum state, New York.  *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006).  New York follows the "center of gravity" or "grouping of contacts" test to resolve choice of law questions concerning contracts.  *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994).  Mr. Ehrlich assumes, for the limited purpose of this motion, that New York law applies because the complaint indicates that the Broker Agreement is strongly connected to New York.  (*See* Complaint ¶ 10.)

resort to dictionary definitions. *See, e.g., Citadel Equity Fund Ltd. v. Aquila, Inc.*, 371 F.

Supp. 2d 510, 517 (S.D.N.Y. 2005) (finding it appropriate, under New York law, to

consult dictionaries to determine the meaning of words used in a contract); *Mazzola v.*

*County of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988) (noting that "it is

common practice for the courts of this State to refer to the dictionary to determine the

plain and ordinary meaning of words to a contract[.]").  Dictionary definitions explain

that to "refund" is "to return (money) in restitution, repayment, or balancing of

accounts[.]"  Webster's Third New International Dictionary of the English Language

Unabridged 1910 (2002); *see also* Black's Law Dictionary 1307 (8th ed. 2004) (defining

a refund as "[t]he return of money to a person who overpaid, such as a taxpayer who

overestimated tax liability or whose employer withheld too much tax from earnings.").

If AXA, as the drafter of the Broker Agreement, had intended to make the

obligation to refund the commissions contingent on merely providing a check for the

premiums to the owner of the policy, it could have done so by providing that Mr. Ehrlich

must refund the premiums if AXA tenders a refund of the premiums.  To "tender" is

defined as "to proffer in satisfaction of an obligation or condition arising from a

relationship between parties" or "to present for acceptance."  Webster's Third New

International Dictionary of the English Language Unabridged 2355 (2002); *see also*

Black's Law Dictionary 1508 (8th ed. 2004) (definding "tender" as "something

unconditionally offered to satisfy a debt or obligation" or "[a]ttempted performance that

is frustrated by the act of the party for whose benefit it is to take place.").  AXA,

however, chose to make the return of commissions dependent on a refund of the policy

premiums, not a mere tender of a refund. AXA cannot escape the consequences of a contractual provision that it drafted.

Moreover, the contractual scheme adopted makes sense. If the obligation to refund commissions was contingent only on the tender of a refund for the policy premiums, then unreasonable results could occur. For example, the tender of premium refunds might be rejected, as it was here, and yet AXA might still receive an actual refund of the commissions.

AXA has not returned the premiums paid for the Koenig Policies. Indeed, since Wells Fargo Bank has rejected AXA's attempted rescission and not deposited the checks that AXA provided, AXA indisputably retains possession of all premiums paid. Because AXA retains all premiums paid, it has not refunded the premiums. Indeed, it is, at best, highly uncertain that AXA will ever refund the premiums. Whether the premium refund ever occurs depends on the outcome of the ongoing Rescission Action in the Northern District of Georgia. Unless and until the refund occurs, Mr. Ehrlich will have no duty to refund the commissions AXA paid him for his role in selling the policies. Accordingly, it cannot be known whether Mr. Ehrlich will breach the Broker Agreement or the requirements of the Field Bulletins by failing to refund the commissions unless and until the Rescission Action resolves the question of whether the premiums will be refunded.

*If* AXA eventually refunds the premiums for the Koenig Policies, then AXA *might* demand that Mr. Ehrlich refund the commissions he received for selling the Koenig Policies. Mr. Ehrlich *might* (or might not) refuse to refund the commissions he received from the sale of the Koenig Policies. If these three contingencies occurred, then a

justiciable controversy would probably exist. However, this set of facts is purely hypothetical.

Moreover, because of the unripeness of AXA's claims, there is a substantial risk that the present case and the Rescission Action could produce inconsistent outcomes. AXA might prevail in this case but not in the Rescission Action. AXA would then receive a windfall because it would retain the premiums for the Koenig Policies and also receive the commission refund. Moreover, it would be impossible for this Court to determine that AXA is entitled to receive a commission refund without resolving the question of whether the Koenig Policies were fraudulently obtained. This is the very question raised by the Rescission Action. This potential for inconsistent outcomes cannot be avoided until the Rescission Action is resolved.

"[A]n Article III court 'cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Thomas*, 143 F.3d at 34 (2d Cir. 1998) (quoting *Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 489 (7th Cir. 1988)) (internal quotation marks and additional citation omitted). The refund of premiums, which triggers Mr. Ehrlich's duty to refund his commissions, may never occur. Indeed, if this litigation proceeds, AXA could find itself retaining both the premiums paid for the Koenig Policies (if it loses in the Rescission Action) and also receiving a refund of the commissions it paid Mr. Ehrlich to sell the Koenig Policies (if it prevails in this litigation). This risk cannot be eliminated until it is known whether or not the premiums will ever be refunded. Accordingly, since this claim, which cannot be resolved until the issue of the premium refund has been

decided, is exactly the type of case that an Article III court cannot entertain. For that reason, this case should be dismissed without prejudice.

B.    Because AXA Has Not Refunded The Policy Premiums, It Cannot State A Claim For Relief Under The Broker Agreement

For the same reasons that this matter is unripe, the Complaint also fails to state a claim on which relief can be granted and should, therefore, be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Mr. Ehrlich's obligation to refund the commissions will not mature unless and until AXA refunds the premiums paid for the Koenig Policies.  Since AXA has not refunded the premiums, there is no set of facts that could be proven by which AXA could show that Mr. Ehrlich breached his duty to refund the premiums.  This is a further reason that this matter should be dismissed without prejudice.  *See* Fed. R. Civ. P. 12(b)(6).

C.    If The Court Denies The Motion To Dismiss This Matter, The Proceedings Should Stayed Pending The Outcome Of The Rescission Action

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its own docket with economy of time and effort for counsel and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  The decision of whether to do so is "'firmly within a district court's discretion.'" *Lasala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus.*, 885 F.Supp. 499, 502 (S.D.N.Y.1995)).  The factors to be considered in deciding whether to stay the proceedings are:

> "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests

13

>of the courts; (4) the interests of persons not parties to the
>civil litigation; and (5) the public interest."

*Lasala*, 399 F. Supp. 2d at 427 (quoting *Kappel v. Comfort*, 914 F. Supp. 1056, 1058

(S.D.N.Y. 1996)). "'Balancing these factors is a case-by-case determination, with the

basic goal being to avoid prejudice.'" *Kappel*, 914 F. Supp. at 1058 (quoting *Volmar*

*Distribs v. N.Y. Post Co.,* 152 F.R.D. 36, 39 (S.D.N.Y.1993)).

These factors clearly weigh in favor of staying the present litigation until the

Rescission Action has been resolved. AXA will not be prejudiced by a stay because,

until the Rescission Action has resolved the question of whether the Koenig Policies

premiums will be refunded, this breach of contract litigation is premature. Mr. Ehrlich's

contractual obligation to refund his commissions cannot be breached because the

condition that triggers his obligation to do so has not yet occurred and cannot occur until

the Rescission Action has been resolved.

Both AXA and Mr. Ehrlich, however, risk serious prejudice if this litigation is not

stayed because there of the substantial risk of inconsistent outcomes in the present case

and the Rescission Action, which could produce a windfall for one of the parties. This

potential for inconsistent outcomes cannot be avoided except by resolving the present

litigation only after the Rescission Action has been resolved.

Moreover, both the interests of the courts and the public interest counsel in favor

of staying this litigation because the key issues of fact, including whether AXA will

refund the premiums for the Koenig Policies and whether the Koenig Policies will ever

be rescinded, cannot be resolved except by awaiting the outcome of the Rescission

Action. Indeed, there is a high likelihood that the outcome of the Rescission Action will

moot the present litigation. If AXA does not prevail in the Rescission Action,

Mr. Ehrlich will have no obligation to refund his commissions. If AXA does prevail in the Rescission Action, AXA may obtain the commission refund it seeks under the terms of the Broker Agreement without litigation. The likelihood of this litigation being rendered moot by the outcome of the Rescission Action counsels very strongly in favor of staying this litigation if it is not dismissed. *See TM Park Ave. Assocs. v. W.E.A. Assocs.*, 214 F.3d 344, 349-50 (2d Cir. 2000) (ordering the district court not to rule on pending litigation where pending state court litigation would likely moot the federal case). Indeed, considerations of judicial economy suggest that there is no reason to decide this matter which may or may not ever ripen into an actual controversy. Similarly, the costs that might be incurred by the parties could prove to be wholly unnecessary if Mr. Ehrlich's contractual obligation to refund the commissions never becomes due.

Finally, the fourth factor, the interests of non-parties to the litigation, is neutral. No non-parties' interests are likely to be affected by a stay of the litigation.

Four of the five factors clearly favor staying the proceedings in this matter until the Rescission Action has been resolved. The remaining factor is neutral. Accordingly, Mr. Ehrlich requests that, if his motion to dismiss is denied, an order be entered staying all proceedings in this litigation pending the outcome of the Rescission Action.

## V.    CONCLUSION

For the foregoing reasons, Mr. Ehrlich respectfully requests that this Court enter an order dismissing this action without prejudice. In the alternative, Mr. Ehrlich requests that the Court stay this litigation pending the outcome of the Rescission Action.

Dated: May 28, 2008

Respectfully submitted,

_____/s/_____

David Gourevitch (Bar No. DG 8795)
Law Office Of David Gourevitch, P.C.
150 East 58th Street, 34th Floor
New York, NY 10155
Telephone: (212) 355-1300
Facsimile: (212) 317-2946
david@gourevitchlaw.com

Of Counsel:

Thomas J. Judge
M. David Maloney
Thompson, Loss & Judge, LLP
Two Lafayette Centre
1133 21st Street, N.W.
Suite 450
Washington, D.C. 20036
Telephone: (202) 778-4060
Facsimile: (202) 778-4099

*Counsel for Defendant Richard Erhlich*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) ) | NO.: 1:07-cv-0512-MHS |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUSTS A and B 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUSTS A and B 05/11/06, | ) ) ) ) ) ) | |
| Defendant. | ) | |

### SECOND AMENDED COMPLAINT

COMES NOW Plaintiff AXA Equitable Life Insurance Company ("Equitable") and for its Second Amended Complaint states as follows.

### Nature of the Action

1.

This Second Amended Complaint seeks a declaratory judgment with respect to Plaintiff Equitable's rights and obligations under four life insurance policies issued by Equitable to Defendant Wells Fargo Bank, N.A. ("Wells Fargo") and an order voiding the policies due to misrepresentations in the applications for these



policies. Equitable is in a position of legal uncertainty with respect to its rights and

obligations as to the life insurance policies and requests the Court to declare the

rights and obligations of the parties according to Georgia law.

## Parties

2.

Equitable issued the life insurance policies that are the subject of this action.

Equitable is a New York corporation, with its principal place of business located in

New York. Accordingly, Equitable is a citizen of the State of New York.

3.

Defendant Wells Fargo is the Trustee of certain life insurance trusts which

are the Owners and Beneficiaries of the subject life insurance policies. Wells

Fargo is a National Banking Association formed under the laws of the United

States with its principal place of business located in either California or South

Dakota. Accordingly, Wells Fargo is a citizen of the State of California or South

Dakota, and no other. Wells Fargo is authorized to transact business in Georgia.

-2-

## Jurisdiction and Venue

### 4.

Equitable and Wells Fargo are citizens of different states. Equitable seeks a declaratory judgment regarding its rights and obligations under insurance policies that total $40,000,000, so the amount in controversy exceeds $75,000. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Likewise, this Court has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is appropriate in this district and division because the insurance policies, which are the subject of this action, were issued and delivered to Wells Fargo in this division.

## Statement of Facts

### 5.

Equitable is a life insurance company.

### 6.

On May 12, 2006, Mali Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "First Application"). A true and correct copy of the First Application, which was submitted by Mali Koenig and Wells Fargo, is attached hereto as Exhibit 1 and is incorporated herein fully by reference. The First Application sought life insurance in the amount of ten million dollars ($10,000,000). The Owner of the policy, as identified in Section 3 of the

US2000 10318302.1

First Application, was the "Mali Koenig Insurance Trust B 05/11/06." The Beneficiary of the policy, as identified in Section 3 of the First Application, is the "Mali Koenig Insurance Trust A 05/11/06." The Trustee identified in Section 3 of the First Application was Wells Fargo Bank, N.A. In Section 1, Line P of the First Application, both Mali Koenig and Wells Fargo represented that Mali Koenig had a net worth of "$26 million." Additionally, in Section 2, Line G1 of the First Application, both Mali Koenig and Wells Fargo represented that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market." The First Application included the following statement: "Each signer of this application agrees that (1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application." (See Ex. 1, p. 3.) Mali Koenig signed the First Application. Wells Fargo's employee, Elizabeth T. Wagner, signed the First Application, "as Trustee" of the "Mali Koenig Insurance Trust B 05/11/06," and as the Owner of the policy. (Id. at p. 6.)

7.

On May 25, 2006, Mali Koenig and Wells Fargo submitted an amendment to the First Application (hereinafter "Amendment to the First Application"). See Ex.

-4-

US2000 10318302.1

1, p. 1.)   The Amendment to the First Application contained additional representations that there was no intention to finance the policy premiums nor was there any inducement offered to obtain the requested insurance:

- Do you intend to finance any of the premium required to pay for this policy through a financing agreement or loan agreement? (If yes, submit a copy of the financing or loan agreement)  ☑ No  ☐ Yes

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)      ☐ Yes ☑ No

(Id.)

8.

On May 12, 2006, Mali Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "Second Application"). A true and correct copy of the Second Application submitted by Mali Koenig and Wells Fargo is attached hereto as Exhibit 2 and is incorporated herein fully by reference. The Second Application sought life insurance in the amount of ten million dollars ($10,000,000). The Owner and Beneficiary of the policy, as identified in Section 3 of the Second Application, was the "Mali Koenig Insurance Trust B 05/11/06." The Trustee identified in Section 3 of the Second Application was Wells Fargo Bank, N.A. In Section 1, Line P of the Second Application, both Mali Koenig and Wells Fargo represented that Mali Koenig had a net worth of "$26 million."

-5-

Additionally, in Section 2, Line G1 of the First Application, both Mali Koenig and Wells Fargo represented that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market." The application included the following statement: "Each signer of this application agrees that (1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application." (See Ex. 2, p. 3.) Mali Koenig signed the application. Wells Fargo's employee, Elizabeth T. Wagner, signed the Second Application "as Trustee" of the "Mali Koenig Insurance Trust B 05/11/06," and as the Owner of the policy. (Id. at p. 6.)

9.

On May 25, 2006, Mali Koenig and Wells Fargo submitted an amendment to the Second Application (hereinafter "Amendment to the Second Application"). (See Ex. 2, p. 1.) The Amendment to the Second Application contained additional representations that there was no intention to finance the policy premiums nor was their any inducement offered to obtain the requested insurance:

- Do you intend to finance any of the premium required to pay for this policy through a financing agreement or loan agreement? (If yes, submit a copy of the financing or loan agreement) ☒ No ☐ Yes

-6-

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)    ☐ Yes ☑ No

(Id.)

10.

On May 12, 2006, Benzion Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "Third Application"). A true and correct copy of the Third Application submitted by Benzion Koenig and Wells Fargo is attached hereto as Exhibit 3 and is incorporated herein fully by reference. The Third Application sought life insurance in the amount of ten million dollars ($10,000,000). The Owner and Beneficiary of the policy, as identified in Section 3 of the Third Application, was the "Benzion Koenig Insurance Trust B 05/11/06." The Trustee identified in Section 3 of the Third Application was Wells Fargo Bank, N.A. In Section 1, Line P of the Third Application, both Benzion Koenig and Wells Fargo represented that Benzion Koenig had a net worth of "$26 million." Additionally, in Section 2, Line G1 of the Third Application, both Benzion Koenig and Wells Fargo represented that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market." The Third Application included the following statement: "Each signer of this

-7-

application agrees that (1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application." (See Ex. 3, p. 3.) Benzion Koenig signed the Third Application. Wells Fargo's employee, Elizabeth T. Wagner, signed the Third Application "as Trustee" of the "Benzion Koenig Insurance Trust B 05/11/06," and as the Owner of the policy.

11.

On May 12, 2006, Benzion Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "Fourth Application"). A true and correct copy of the Fourth Application submitted by Benzion Koenig and Wells Fargo is attached hereto as Exhibit 4 and is incorporated herein fully by reference. The Fourth Application sought life insurance in the amount of ten million dollars ($10,000,000). The Owner and Beneficiary of the policy, as identified in Section 3 of the Fourth Application, was the "Benzion Koenig Insurance Trust A 05/11/06." The Trustee, as identified in Section 3 of the Application, was Wells Fargo Bank, N.A. In Section 1, Line P of the Fourth Application, both Benzion Koenig and Wells Fargo represented that Benzion Koenig had a net worth of "$26 million." Additionally, in Section 2, Line G1 of the Fourth Application, both Benzion Koenig and Wells Fargo represented

-8-

that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market." The Fourth Application included the following statement: "Each signer of this application agrees that (1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application." (See Ex. 4, p. 3.) Benzion Koenig signed the Fourth Application. Wells Fargo's employee, Elizabeth T. Wagner, signed the Fourth Application "as Trustee" of the "Benzion Koenig Insurance Trust B 05/11/06," and as the Owner of the policy. Exhibits 1 through 4 are hereinafter referred to collectively as "the Applications."

12.

Wells Fargo, as the Owner of the four policies and the Trustee of the four life insurance trusts, exercised complete control over the policies. Each of the four policies stipulated as follows: The Owner of the policy is "entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy." (See Exs. 5-8, p. 5.)

-9-

13.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the First Application submitted by Mali Koenig and Wells Fargo. Specifically, Equitable relied on the statements made by Mali Koenig and Wells Fargo set forth above in Paragraphs 6-7 regarding the net worth of Mali Koenig, the absence of any intent to transfer the policy or finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable. In reliance on that information, Equitable issued Policy No. 156 212 029, which had a limit of $10,000,000 and contained a register date of May 19, 2006. The policy insured the life of Mali Koenig. The Trustee and Owner of the policy is Wells Fargo. A true and accurate copy of Policy No. 156 212 029 is attached hereto as Exhibit 5, and is incorporated herein fully by reference.

14.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the Second Application submitted by Mali Koenig and Wells Fargo. Specifically, Equitable relied on the statements made by Mali Koenig and Wells Fargo set forth above in Paragraphs 8-9 regarding the net worth of Mali Koenig, the absence of

-10-

any intent to transfer the policy or finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable. In reliance on that information, Equitable issued Policy No. 156 212 030, which had a limit of $10,000,000 and contained a register date of May 19, 2006. The policy insured the life of Mali Koenig. The Trustee and Owner of the policy is Wells Fargo. A true and accurate copy of Policy No. 156 212 030 is attached hereto as Exhibit 6, and is incorporated herein fully by reference.

15.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the Third Application submitted by Benzion Koenig and Wells Fargo. Specifically, Equitable relied on the statements made by Benzion Koenig and Wells Fargo set forth above in Paragraph 10 regarding the net worth of Benzion Koenig and the absence of any intent to transfer the policy. In reliance on that information, Equitable issued Policy No. 156 212 032, which had a limit of $10,000,000 and a register date of April 8, 2006. This policy insured the life of Benzion Koenig. Wells Fargo is the Trustee and Owner of the policy. A true and accurate copy of Policy No. 156 212 032 is attached hereto as Exhibit 7, and incorporated herein fully by reference.

-11-

16.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the Fourth Application submitted by Benzion Koenig and Wells Fargo. Specifically, Equitable relied on the statements made by Benzion Koenig and Wells Fargo set forth above in Paragraph 11 regarding the net worth of Benzion Koenig and the absence of any intent to transfer the policy. In reliance on that information, Equitable issued Policy No. 156 212 033, which had a limit of $10,000,000 and a register date of April 8, 2006. This policy insured the life of Benzion Koenig. Wells Fargo is the Trustee and Owner of the policy. A true and accurate copy of Policy No. 156 212 033 is attached hereto as <u>Exhibit 8</u>, and incorporated herein fully by reference.

17.

Each of the policies referenced in the preceding paragraphs provided that the contracts of insurance consisted of both the policies and their respective applications.

18.

Subsequent to issuing the policies, Equitable learned that Mali Koenig and Benzion Koenig (collectively the "Insureds") and Wells Fargo had misrepresented

-12-

the net worth of the Insureds on the Applications, the absence of their intent to finance the policy premiums, the absence of their intent to transfer the policies, and the absence of inducements for them to enter into a life insurance transaction with Equitable.

### 19.

Upon information and belief, and in accordance with the pleading requirements set forth in Fed. R. Civ. P. 9, the Insureds and Wells Fargo have either intentionally misrepresented the net worth of each Insured, the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable, or they have knowingly made these representations with reckless disregard for the truth. Further, the Insureds and Wells Fargo made those misrepresentations in the Applications which were submitted to Equitable with the intent to induce Equitable to provide the life insurance policies.

### 20.

Equitable reasonably relied on the representations by Wells Fargo and the Insureds on the Applications regarding the net worth of the Insureds, the absence of their intent to transfer the policy, the absence of their intent to finance the policy

-13-

premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable. For instance, Equitable performed various levels of investigation, both before, and after, the policies were issued to ascertain the basis for the representations regarding the net worth of the Insureds that were made on the Applications. In fact, Equitable had obtained information regarding the Insureds' alleged net worth before issuing the policies. Prior to issuing the policies, Equitable's agent contacted attorneys for the Insureds, whose names had been provided by the Insureds. Upon information and belief, at least one of those attorneys had been involved with the creation of the trusts at issue in this litigation, and the other attorney had provided estate planning advice to the Insureds. The attorneys stated that the Insureds owned significant real estate holdings in Florida, New York, Connecticut and Israel. The value of that real estate as represented by the attorneys was consistent with the stated net worth as represented by Wells Fargo and the Insureds in the Applications.

21.

Equitable did not learn of the misrepresentations in the Applications set forth above until after the policies were issued. Following further investigation into the real estate holdings, Equitable discovered that the net worth of the Insureds as represented by Wells Fargo and the Insureds in the Applications was untrue.

-14-

Additionally, following further investigation into the financing of the policy premiums learned that the representations made by the Insureds and Wells Fargo concerning the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were also untrue.

22.

In an effort to ascertain the basis for the representations about the net worth made by the Insureds and Wells Fargo in the Applications, Equitable sought further information from the Insureds after the polices were issued. Requests for specific information about the Insureds' assets and net worth were refused by the Insureds and their representatives. Additionally, as a direct result of discovery obtained in this litigation from third-parties, Equitable discovered that, before the Insureds and Wells Fargo executed the Applications, they had entered into a Stranger Owned Life Insurance Program ("SOLIP") that involved, among other things, the financing of the policy premiums, a transfer of the policies, and numerous inducements to their life insurance transaction with Equitable.

23.

In light of the investigation performed prior to issuing the policies, Equitable reasonably and justifiably relied on the representations in the

-15-

Applications concerning the Insureds' net worth, the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable when analyzing the nature and risk of the policies. Equitable would not have issued the life insurance policies in the total amount of $40,000,000 but for these representations in the Applications. In reliance on the representations made by Wells Fargo and the Insureds in the Applications, Equitable issued policies that it would not otherwise have issued had the misrepresentations been known and has therefore suffered harm.

24.

Through December 22, 2006, the premiums paid for Policy Nos. 156 212 029 and 156 212 030 totaled $2,503,480.00.

25.

Through December 22, 2006, the premiums paid for Policy Nos. 156 212 032 and 156 212 033 totaled $3,031,704.00.

26.

On December 22, 2006, Equitable mailed notices of rescission to the Trustee and Owner of the policies, Wells Fargo. The notices of rescission specifically identified the material misrepresentations contained within the Applications and

-16-

known to Equitable at that time.  True and accurate copies of these notices of rescission are attached hereto as Exhibits 9 and 10, and incorporated herein fully by reference.  Equitable enclosed a full refund of all of the premiums paid by Wells Fargo for the subject life insurance policies, with interest.

27.

The refund checks issued by the Equitable, in the total amount of $5,644,633.52, have not been cashed or deposited.

## COUNT I – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(1)

28.

Equitable incorporates by reference paragraphs 1-27 above, as if fully set forth herein.

29.

There is an actual and justiciable controversy between Equitable and Wells Fargo in this case growing out of the Equitable's rescission of the contracts of insurance on the basis of the Insureds' and Wells Fargo's false and material misrepresentations in the Applications.

30.

The above representations of material fact made by the Insureds and Wells Fargo regarding the net worth of the Insureds, the absence of their intent to transfer

-17-

the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were, upon information and belief, false. Upon information and belief, the Insureds and Wells Fargo knew, or alternatively should have known, that each such representation of material fact set forth above was false.

31.

Upon information and belief, Wells Fargo and the Insureds submitted the Applications and made the material misrepresentations with the intent to induce reliance by Equitable on such representations and to induce Equitable to issue the life insurance policies in the amount of $40,000,000 as described above.

32.

The misrepresentations and incorrect statements by Wells Fargo and the Insureds in the Applications were fraudulent and prevent recovery under the subject life insurance policies in accordance with O.C.G.A. § 33-24-7(b)(1) and applicable Georgia law.

33.

Although Equitable has sent Wells Fargo checks refunding the paid premiums with interest, Wells Fargo has refused to cash or deposit those funds. Based upon the foregoing, and upon information and belief, Equitable believes that

-18-

Wells Fargo, as Trustee of the subject Insurance Trusts, and as the Owner of the policies, disputes that rescission is valid or appropriate. Equitable seeks a declaration that the insurance policies as issued are void.

34.

The declaration of rights pursuant to 28 U.S.C. §§ 2201 and 2202 would alleviate the uncertainty facing Equitable as to whether the life insurance policies have been rescinded and are void *ab initio*, due to the misrepresentations.

### COUNT II – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(2)

35.

Equitable incorporates by reference paragraphs 1-27 above, as if fully set forth herein.

36.

There is an actual and justiciable controversy between Equitable and Wells Fargo in this case growing out of Equitable's rescission of the contracts of insurance on the basis of the Insureds' and Wells Fargo's false and material misrepresentations in the Applications.

37.

The above representations of material fact made by the Insureds and Wells Fargo regarding the net worth of the Insureds, the absence of their intent to transfer

-19-

the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were, upon information and belief, false. Upon information and belief, the Insureds and Wells Fargo knew, or alternatively should have known, that each such representation of material fact set forth above was false.

38.

Upon information and belief, Wells Fargo and the Insureds submitted the Applications and made the material misrepresentations with the intent to induce reliance by Equitable on such representations and to induce Equitable to issue the life insurance policies in the amount of $40,000,000, as described above.

39.

The misrepresentations and incorrect statements by Wells Fargo and the Insureds were material either to the acceptance of the risk or to the hazard assumed by Equitable and prevent recovery under the subject life insurance policies in accordance with O.C.G.A. § 33-24-7(b)(2) and applicable Georgia law.

40.

Although Equitable has sent Wells Fargo checks refunding the paid premiums with interest, Wells Fargo has refused to cash or deposit those funds. Based upon the foregoing, and upon information and belief, Equitable believes that

US2000 10318302.1

Wells Fargo, as Trustee of the subject Insurance Trusts, and as the Owner of the Policies, disputes that rescission is valid or appropriate. Equitable seeks a declaration that the insurance policies as issued are void.

### COUNT III – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(3)

41.

Equitable incorporates by reference paragraphs 1-27 above as if fully set forth herein.

42.

There is an actual and justiciable controversy between Equitable and Wells Fargo in this case growing out of Equitable's rescission of the contracts of insurance on the basis of the Insureds' and Wells Fargo's false and material misrepresentations in the Applications.

43.

The above representations of material fact made by the Insureds and Wells Fargo regarding the net worth of the Insureds, the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were, upon information and belief, false. Upon information and belief,

-21-

the Insureds and Wells Fargo knew, or alternatively should have known, that each
of such representations of material fact set forth above, was false.

44.

Upon information and belief, Wells Fargo and the Insureds submitted the
Applications and made the material misrepresentations with the intent to induce
reliance by Equitable on such representations and to induce Equitable to issue the
life insurance policies in the amount of $40,000,000, as described above.

45.

Absent the misrepresentations and incorrect statements by Wells Fargo and
the Insureds, Equitable would not have issued the policies, would not have issued
the policies in as large an amount, would not have issued the policies at the
premium rate as applied, and would not have provided coverage with respect to the
hazard if the true facts had been known as required by the Applications. The
misrepresentations and incorrect statements by Wells Fargo and the Insureds in the
Applications prevent recovery under the subject life insurance policies in
accordance with O.C.G.A. § 33-24-7(b)(3) and applicable Georgia law.

46.

Although Equitable has sent Wells Fargo checks refunding the paid
premiums with interest, Wells Fargo has refused to cash or deposit those funds.

-22-

Based upon the foregoing, and upon information and belief, Equitable believes that Wells Fargo, as Trustee of the subject Insurance Trusts, and as the Owner of the policies, disputes that rescission is valid or appropriate.    Equitable seeks a declaration that the insurance policies as issued are void.

WHEREFORE, Plaintiff respectfully prays that:

1.    Judgment be entered on Plaintiff's behalf declaring that the subject life insurance policies have been rescinded and are void *ab initio*.

2.    Plaintiff be awarded such other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of November, 2007.

|  |  |
|---|---|
| | /s/ James J. Leonard |
| KILPATRICK STOCKTON LLP | George L. Murphy, Jr. |
| Suite 2800, 1100 Peachtree Street | Georgia Bar No. 530376 |
| Atlanta, Georgia  30309-4530 | James J. Leonard |
| (404) 815-6500 | Georgia Bar No. 446655 |
| gmurphy@kilpatrickstockton.com | Michael A. Kaeding |
| jleonard@kilpatrickstockton.com | Georgia Bar No. 405779 |
| mkaeding@kilpatrickstockton.com | Adria L. Perez |
| aperez@kilpatrickstockton.com | Georgia Bar No. 141306 |

Attorneys for Plaintiff
AXA Equitable Life Insurance Company

-23-

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.: 1:07-cv-0512-MHS |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUSTS A and B 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUSTS A and B 05/11/06; | ) ) ) ) ) ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the within and foregoing **SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

> Jeffrey D. Horst, Esq.
> horst@khlawfirm.com
> David A. Sirna, Esq.
> sirna@khlawfirm.com
> Krevolin & Horst, LLC
> 1175 Peachtree Street, N.E.
> 100 Colony Square
> Suite 2150
> Atlanta, GA   30308

US2000 10318302.1

This 13th day of November, 2007.

KILPATRICK STOCKTON LLP          /s/ James J. Leonard
1100 Peachtree Street, Suite 2800     James J. Leonard
Atlanta, Georgia  30309               Georgia Bar No. 446655
Telephone: (404) 815-6500
Facsimile (404) 815-6555              Attorney for Plaintiff
Email:  mkaeding@kilpatrickstockton.com     AXA Equitable Life Insurance Company

US2000 10318302.1