**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AXA EQUITABLE LIFE INSURANCE
COMPANY, AXA NETWORK, LLC & AXA
NETWORK OF TEXAS, INC.,

                Plaintiffs,

     v.

RICHARD EHRLICH,

                Defendant.

Civil Action No. 08-1972 (MGC) (FM)

---

### PLAINTIFFS' ANSWERING MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR ALTERNATIVELY TO STAY

JOSEPH PETERSEN (JP 9071)
CHRISTOPHER LICK (CL 1391)
**KILPATRICK STOCKTON LLP**
31 West 52d Street, 14th Floor
New York, New York 10019
Phone:  (212) 775-8700
Fax:  (212) 775-8815

GEORGE L. MURPHY, JR. (Georgia Bar No. 530376) JAMES J.
LEONARD (Georgia Bar No. 446655)
MICHAEL A. KAEDING (Georgia Bar No. 405779)
(*pro hac vice* applications pending)
**KILPATRICK STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530
Phone: (404) 815-6500
Fax: (404) 815-6555

*Attorneys for Plaintiffs*

Table of Contents

Page

INTRODUCTION .......................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................... 4

      The Instant Action ............................................................................................ 4

      The Georgia Action ........................................................................................... 6

ARGUMENT AND CITATION OF AUTHORITY .................................................... 6

I.     AXA'S COMPLAINT SETS FORTH A JUSTICIABLE
       CONTROVERSY THAT STATES A VALID CLAIM FOR
       RELIEF. ............................................................................................................ 6

II.    EHRLICH CANNOT JUSTIFY A STAY OF THIS
       LITIGATION. ................................................................................................. 12

CONCLUSION ......................................................................................................... 16

Plaintiffs AXA Equitable Life Insurance Company ("AXA Equitable"), AXA Network, LLC ("AXA Network"), and AXA Network of Texas, Inc. ("AXA Texas") (AXA Equitable, AXA Network, and AXA Texas collectively "AXA") file this memorandum of law opposing the Motion to Dismiss or Alternatively to Stay filed by Defendant Richard Ehrlich ("Ehrlich"):

## INTRODUCTION

AXA seeks to recover from Ehrlich nearly $1 million dollars paid as commissions for $40 million in life insurance policies that, under controlling Georgia law, were void from their inception. AXA rescinded these policies shortly after they issued because it discovered the applications contained numerous misrepresentations, including the undisputed falsehood that the insureds had a net worth of $52 million. This claim could not have been further from the truth. According to their own testimony, the insureds are worth no more than $200,000.

In connection with its rescission, AXA mailed to the policies' owner rescission notices and checks totaling more than $5.64 million. These checks represented the total premiums paid to AXA plus interest. The owner accepted and retains possession of the refund checks but has chosen not to cash them.

With the owner possessing the refund checks and the original insureds advanced in age, AXA then filed a declaratory judgment action in the United States District Court for the Northern District of Georgia (the owner is a Georgia trustee) seeking a declaration of AXA's and the owner's rights and responsibilities respecting the rescinded policies. At the same time, AXA demanded Ehrlich return the unearned commission payments erroneously paid in connection with the void policies. Ehrlich refused and this lawsuit followed.

1

Given the certainty of the misrepresentations contained in the policy applications, Ehrlich (not surprisingly) seeks to delay these proceedings. Consistent with this strategy, his Motion to Dismiss argues that AXA's claims are not ripe for judicial review based on a strained interpretation of the word "refund" used in the parties' governing agreement — one that would equate the owner's failure to cash AXA's refund checks with a complete failure by AXA to deliver those checks to the owner. This position is inconsistent with both the common meaning of the term and the plain structure of the Broker Agreement which controls Ehrlich's right to receive and retain commissions paid by AXA — one that rewards brokers with commissions only for their securing valid policies that are treated as such by AXA. Because the very facts cited by Ehrlich in his Motion make clear that AXA physically delivered the refund checks to the policies' owner and that AXA has consistently treated the life insurance policies at issue as void, AXA has complied with all necessary conditions set forth in the Broker Agreement and this lawsuit presents a justiciable controversy that states a valid claim for relief under Federal Rules of Civil Procedure.

Even more remarkable is Ehrlich's request that this Court exercise its discretion to stay this litigation in order to promote judicial economy and to avoid prejudice to the litigants (including AXA). If these were Ehrlich's true concerns, he would be willing to tender the disputed commissions into the Court's registry and would agree unconditionally to be bound by the outcome of the Georgia action such that, if AXA prevailed, Ehrlich would surrender the commissions. Ehrlich's Motion makes clear he will not agree to such conditions.

2

Instead, Ehrlich seeks a stay in the hopes of benefiting from the potential collateral estoppel effect of a loss by AXA in the Georgia action while purportedly remaining free to relitigate the same issues here should AXA prevail. Ehrlich is not a party to the Georgia case and his Motion makes clear he will continue to oppose AXA's request for return of the unearned commissions even if the Georgia court declares that AXA correctly rescinded the policies:

> *If* AXA [wins the Georgia action], then AXA would *might* demand that Mr. Ehrlich refund the commissions he received [and] Mr. Ehrlich *might* (**or might not**) refuse to refund the commissions he received . . .
> .

> If AXA does not prevail in the Rescission Action, Mr. Ehrlich will have no obligation to refund his commissions. If AXA does prevail in the Rescission Action, AXA **may** obtain the commission refund it seeks under the terms of the Broker Agreement **without litigation**.

(Ehrlich Br. 11, 14-15 (italics in original and bolded emphasis supplied).) In short, Ehrlich's Motion seeks to force AXA to win twice, over as long a period of time as possible, before he will surrender the unearned commissions. Because Ehrlich seeks a delay of this litigation that will certainly prejudice AXA without the offsetting benefit of judicial economy, he cannot satisfy the elements necessary for this court to exercise its discretionary stay powers.

3

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Instant Action*[1]

Plaintiff AXA Equitable is a life insurance provider, and its affiliates AXA Network and AXA Texas are a life and health insurance brokerage and financial services company, respectively. (Compl. ¶ 9.) AXA commenced this action on or about January 18, 2008 in order to recover $948,088 in commission payments, plus interest, that AXA paid Ehrlich, an independent contractor broker, in connection with the issuance by AXA Equitable of four life insurance policies insuring the lives of two married individuals, 83 year old Mali Koenig and 86 year old Benzion Koenig (the "Koenigs"), in the total amount of $40,000,000 (the "Policies"). (*Id.* at ¶¶ 1-2.) The owners of the Policies are various Georgia trusts each of which names Wells Fargo Bank, N.A. as trustee ("Wells Fargo"). (Ex. A ¶ 3.) The Policies were delivered in Georgia and are expressly governed by Georgia law. (Ex. A at Exs. 6-8.)

Soon after it issued the Policies, AXA discovered that the Koenigs had materially misrepresented various facts contained in the applications, including the representation that the Koenigs' combined net worth was $52 million. (Compl. 15-16, 18-19.) In fact, the

---

[1] Where appropriate specific citations to record support for the assertions contained in this paragraph are made to several pleadings and depositions from the federal Georgia lawsuit relied upon by Ehrlich in support of his Motion. (*See* Ehrlich Br. 4-5.) That lawsuit was filed in the United States District Court for the Northern District of Georgia and is styled *AXA Equitable Life Insurance Company v. Wells Fargo Bank, N.A.*, Civil Action No. 1:07-cv-0512-MHS (the "Georgia Action"). A true and accurate copy of the Second Amended Complaint and Answer to the Second Amended Complaint filed in the Georgia Action are attached as Exhibits A and D, respectively. True and accurate copies of relevant excerpts from the third-party depositions of Benzion Koenig and Mali Koenig are attached as Exhibits B and C, respectively.

4

Koenigs have each testified in recent depositions that they were together worth no more than $200,000. (*See* Exs. B and C.)

In response to its discovery of these material misrepresentations, AXA issued notices of rescission to Wells Fargo, voiding the Policies *ab initio* and enclosing refund checks totaling more than $5.64 million. (Compl. 20; Ex. A. ¶¶ 26-27.) These checks represented the entire premiums paid by Wells Fargo for the Policies plus interest. (Compl. 20; Ex. A. ¶¶ 26-27.) Wells Fargo took possession of the refund checks but has through now failed to cash them. (*See* Ex. D ¶¶ 26-27.)

The Broker Agreement between AXA and Ehrlich provides for recovery by AXA of the commission paid to Ehrlich in connection with the Policies in the event that AXA "refunds" the premiums paid. (Compl. ¶ 25 and Exs. 1 and 3.) For this reason, upon rescission of the Policies and Wells Fargo's acceptance of the refund checks, AXA demanded that Ehrlich return the unearned commission. (Compl. 1.) Ehrlich refused. (*Id.*)

AXA originally filed its Complaint in the Supreme Court of the State of New York for the County of New York. The Complaint asserts five causes of action against Ehrlich: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) unjust enrichment; (4) conversion; and (5) replevin. (Compl. ¶¶ 23-45.) Among other relief, AXA seeks the following: (1) an order preliminarily enjoining Ehrlich from dissipating, transferring, conveying, or otherwise encumbering the commission received by him in connection with AXA's issuance of the Policies and (2) an award of compensatory damages in an amount no less than the amount of commissions paid to Ehrlich in connection with the Policies plus interest and costs. (Compl. 9.) On February 27, 2008, Ehrlich removed AXA's

5

lawsuit to this Court. (Notice of Removal, ECF No. 1.) Ehrlich's Motion to Dismiss or Alternatively to Stay followed.

### The Georgia Action

In light of Wells Fargo's acceptance of AXA's refund checks but failure to cash them, and given the Koenigs' advanced age, AXA commenced the Georgia Action on March 1, 2007. The only relief sought in the Georgia Action is a declaration that the Policies were properly rescinded and void *ab initio*. (*Id*. at 23.) The only defendant is Wells Fargo. (*Id*. at ¶ 3.)

## ARGUMENT AND CITATION OF AUTHORITY

### I. AXA'S COMPLAINT SETS FORTH A JUSTICIABLE CONTROVERSY THAT STATES A VALID CLAIM FOR RELIEF.

Ehrlich's ripeness and 12(b)(6) arguments rely entirely on the incorrect premise that, through the use of the word "refund," AXA intended its Broker Agreement to provide for recovery of commissions issued in connection with a rescinded policy under only one extreme condition: where the policy owner cashes a refund check it accepted from AXA. (*See* Ehrlich Br. 9-12.) Both the plain meaning of the term "refund" and the fundamental assumptions underlying the Broker Agreement prove Ehrlich wrong.

As an initial matter, application of the case facts to the very dictionary definitions cited by Ehrlich establishes that AXA has complied with the contractual requirements necessary to recover the commissions paid to Ehrlich in connection with the rescinded policies. Both the Broker Agreement and a pertinent AXA regulation require AXA brokers

6

to return commissions in the event of a "refund" by AXA of any premiums. (Compl. at Ex. 1, ¶ 6 and Ex. 3, p. 2.)

The common definition of "refund" means simply "to give or put back." Merriam-Webster's Collegiate Dictionary 983 (10th ed. 2002). Another definition, cited by Ehrlich, incorporates the first — "to return (money) in restitution, repayment, or balancing of accounts." *Id.* Under both definitions, a refund is accomplished by the physical return of the property in question. *See* Merriam-Webster's Collegiate Dictionary 493, 1001 (10th ed. 2002) (defining "return" as "to pass back to an earlier possessor" and "give" as "to put in the possession of another for his use") This same concept of physical delivery is present in the legal definitions given to the term — "to repay or restore; to return money in restitution or repayment; *e.g.*, to refund overpaid taxes; to refund the purchase price of returned goods." Black's Law Dictionary 1307 (8th ed. 2004).

Under any of these definitions, AXA has "refunded" the policy premiums (with interest) to Wells Fargo. AXA has physically transferred checks for the entire premium amounts paid by Wells Fargo in connection with the Policies: AXA mailed the checks to Wells Fargo and Wells Fargo acknowledges receiving them. (Ex. D ¶¶ 26-27.) At no time did Wells Fargo refuse possession of the checks or return them to AXA. (*See id.*)

The fact that Wells Fargo has not cashed the refund checks does not remove AXA's actions from the definition of refund. AXA's delivery was not, as Ehrlich wrongly contends, a mere "tender" of the premiums. (*See* Ehrlich Br. 10-11.) As proven by his own definitions, a "tender" is nothing more than the mere "proffer," "offer," "presentment," or "attempt" of a physical delivery. Webster's Third New International Dictionary of the

7

English Language Unabridged 1910 (2002) ("to *proffer* in satisfaction of an obligation or condition arising from a relationship between parties" or "to *present* for acceptance" (italics supplied)); Black's Law Dictionary 1307 (8th ed. 2004) ("something unconditionally *offered* to satisfy a debt or obligation" or "*[a]ttempted* performance that is frustrated by the act of the party for whose benefit it is to take place" (italics supplied)). Each of these definitions presumes that the offeree refuses actual delivery and, unlike the strained definitions advanced by Ehrlich, none is explained by reference to what the accepting party does with the goods following acceptance.[2]

Given Wells Fargo's physical acceptance of AXA's refund checks, AXA has complied with the Broker Agreement's "refund" condition and may demand the return of Ehrlich's unearned commissions. AXA has not simply offered or promised to return the premiums. It has returned them. What Wells Fargo has done with the checks it accepted from AXA is beyond AXA's control and simply irrelevant to AXA's fulfillment of the "refund" condition or the ripeness of the present lawsuit.

---

[2] Based on a common-sense application of these same definitions, a party to a real estate contract is held to have tendered the deed to property when the deed is *offered* to the other party, but *refused*. *See, e.g., Marino v. Nolan*, 21 N.Y.2d 738, 234 N.E.2d 840 (1968) ("defendants properly refused the tender of a deed"); *State v. Branham*, 53 Misc. 2d 346, 347, 278 N.Y.S.2d 494, 496 (N.Y. Sup. Ct. 1967) ("upon tender of deed of conveyance . . . defendant refused to accept the conveyance"). The same is true in the UCC context where a potential purchaser is *offered* but *refuses* delivery. *See, e.g., Nat'l v. Lyon*, 257 A.D. 273, 275, 13 N.Y.S.2d 1, 3 (1st Dep't 1939) ("under the common law of this State a seller of goods was permitted to recover the price where due tender of performance was made and the buyer refused to take the goods."). Similarly, the tax "refund" referenced by Black's Law Dictionary universally involves the issuance of a government check to the taxpayer who made the overpayment. According to Ehrlich's logic, the failure of the taxpayer to cash the government's check following receipt would constitute the government's failure to "refund" the overpayment. Ehrlich's proposed definition of the term refund fails under this hypothetical in the same manner it fails under the instant facts.

8

Moreover, there is nothing unreasonable about this commission structure. Ehrlich makes a great deal about the fact that AXA drafted the Broker Agreement and had control over the contract language used. (*See* Ehrlich Br. 10.)   As master of the contract terms, AXA was undoubtedly aware of the frequency with which life insurance policies must be rescinded following the discovery of material misrepresentations in the policy applications. It is a long established common law rule that an insurance policy issued in connection with application misrepresentations is void *ab initio*.  As a consequence, most states have codified these common law principles. *See, e.g.*, Ala. Code § 27-14-7; 18 Del. C. § 2711; O.C.G.A. § 33-24-7 (Georgia); I.C. § 41-1811 (Idaho).

This occurs most often in the context of misrepresentations concerning an insured's medical history, often discovered following their death. *See, e.g.*, *Mims v. Old Line Life Ins. Co. of America*, 46 F. Supp. 2d 1251 (M.D. Fla. 1999) (Florida law); *Gasaway v. Northwestern Mut. Life Ins. Co.*, 820 F. Supp. 1241 (D. Hawaii 1993) (Hawaiian law); *Massachusetts Mut. Life Ins. Co. v. Manzo*, 584 A.2d 190 (N.J. 1991) (New Jersey law).  It also happens, however, as it did here, where the applicant misrepresents his or her net worth in order to secure a policy that would otherwise have been unavailable. *See American General Life Ins. Co. v. Schoenthal Family, LLC*, __ F.R.D. __, 2008 WL 160630, at *9 (N.D. Ga. 2008) (Georgia law).  In both instances, the applicant or owner often refuses to go quietly and litigation is necessary to conclusively establish the correctness of the insurer's decision to rescind.

Possessing this knowledge, it makes little sense that AXA would have created a contractual situation where it could rescind a void policy but would be unable to recover the

9

substantial commissions paid in connection with that policy until it had won two separate lawsuits in staged proceedings — the first against the applicant and the second against the broker. This is especially so where the passage of time makes it exponentially more unlikely that AXA will be able to recover the commissions paid to (and likely spent by) the broker involved. More reasonable is the contractual structure actually adopted by AXA: allowing for the immediate recovery of unearned commission where AXA actually returns the full premiums in the form of checks issued to and accepted by the owner or applicant.

To the extent this Court can read the disputed language "in one sense the way plaintiff reads [it] and in a literal sense the way defendant reads [it]" it must evaluate the parties' positions considering "what was intended to be expressed when the words were set down, to be adduced from both the total contractual language and from the circumstances and practices of the parties when they entered into the formal writing." *See Nash v. Gay Apparel Corp.*, 9 A.D.2d 345, 347, 193 N.Y.S.2d 246, 247 (1st Dep't 1955). Here the "circumstances and practices" of the parties make clear the unreasonableness of Ehrlich's proposed construction of the Broker Agreement and the operative term "refund."

Nor is AXA's chosen contractual scheme unfair. Ehrlich will not, as he claims, be subject to potentially inconsistent outcomes should this lawsuit proceed and AXA lose in the Georgia Action. If AXA loses in the Georgia Action, it will be subject to an order providing that the Policies are valid and in force. Under the Broker Agreement, Ehrlich will then be entitled to commissions in connection with the Policies. (*See* Compl. Ex. 1.) If Ehrlich has returned these commissions to AXA, they will be reissued to him. Even if AXA refused future payment of the commissions (which it would not do), Ehrlich would be protected as

10

AXA would be bound by the collateral estoppel effect of the Georgia judgment given its status as a party to that litigation. *See United States Dept. of Justice v. Hudson,* 2007 WL 2461783, at * 2 (N.D.N.Y. Aug. 24, 2007) (citing *Ball v. A.O. Smith Corp.,* 451 F.3d 66 (2d Cir. 2006) ("[c]ollateral estoppel requires four elements: (1) that the identical issue was raised in the first proceeding; (2) that the issue was actually litigated and decided; (3) that the party to be precluded had a full and fair opportunity to litigate the issue; and (4) that resolution of the issue was necessary to support a final judgment")); *Pinnacle Consultants, Ltd. v. Leucadia Natl. Corp.,* 94 N.Y.2d 426, 432, 706 N.Y.S.2d 46 (2000) ("The doctrine [of collateral estoppel] applies if the issue in the second action was raised, necessarily decided and material in the first action, and if the party had a full and fair opportunity to litigate the issue in the earlier action") (citations omitted); *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir. 2002) ("there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel").

Drawing all reasonable inferences in AXA's favor, AXA has met its burden under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). *See Sweet v. Sheahan, 235 F.3d 80, 83* (2d Cir. 2000) (under 12(b)(1) "court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff"); *Moore v. Painewebber, Inc.*, 189 F.3d 165, 169, n.3 (2d Cir. 1999) (standard of review under Rules 12(b)(1) and 12(b)(6) "identical"). There exists now between the parties a "real and substantial controversy admitting of specific relief" sufficient to confer subject matter jurisdiction by this Court and sufficient to state a claim for relief under the Federal Rules of Civil Procedure. *See Valmonte v. Jo Bane*, 18 F.3d 992, 999 (2d Cir. 1994) (motion to dismiss denied because ripeness established by facts

11

alleging an existing controversy); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 191 (2d Cir. 1994) (complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

## II.    EHRLICH CANNOT JUSTIFY A STAY OF THIS LITIGATION.

In a tacit recognition of the weaknesses associated with his arguments in favor of dismissal, Ehrlich makes the alternative request to stay this lawsuit pending resolution of the Georgia Action. He does so, however, while ignoring the principles underlying such a powerful exercise of the Court's discretionary powers. An examination of his purported justifications for the stay reveals his request for what it is – nothing more than an improper attempt at delay with the ultimate aim of prejudicing AXA's ability to prosecute this lawsuit.

As Ehrlich concedes, the fundamental goal of a discretionary stay analysis is "to avoid prejudice." *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996). Even then, a stay is proper only where a balancing of the relevant interests weighs heavily in favor of preserving the economy of time and effort for the court, counsel, and the litigants. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *American Shipping Line, Inc. v. Massan Shipping Indus.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995). As such, five facts must be considered in determining the appropriateness of a stay request:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Kappel*, 914 F. Supp. at 1058.

12

Each of these factors favors a denial of Ehrlich's stay request. Respecting the first factor, AXA obviously has an interest in recovering the unearned commissions from Ehrlich. But more importantly, a delay in these proceedings will fundamentally and permanently prejudice AXA's ability to recover from Ehrlich.

If Ehrlich were permitted to relitigate issues related to the rescission action, the Koenigs' testimony would no doubt be relevant to a determination of those matters. Given their ages (currently 84 and 87), the need to secure the Keonigs' testimony in an admissible form is pressing. *See* Fed. R. Evid. 804(b)(1) (testimony from other proceeding admissible only if adverse party had an opportunity to participate). Should AXA be forced to delay its lawsuit against Ehrlich, there is a substantial likelihood that their testimony will become unavailable and that other necessary evidence will be lost or diminished. *See Securities and Exchange Comm'n v. Dresser Indus., Inc.*, 392 U.S. 40, 57, 88 S. Ct. 1889, 1899 (1968) (recognizing universal principle that "litigation is better conducted when the dispute is fresh and additional facts may, if necessary, be taken without substantial risk that witnesses will die or memories fade"). Additionally, as time passes, the likelihood that Ehrlich will be unable to return the requested commissions increases. As a result, AXA's ability to proceed with its request for a preliminary injunction preventing Ehrlich from dissipating or encumbering the commissions will be irreparably prejudiced if not mooted. (*See* Compl. 9.)

Respecting the second factor, there is no similar prejudice to Ehrlich should this lawsuit proceed. While Ehrlich may prefer to avoid litigation, there will be no permanent effect on his ability to earn a commission on the Policies if AXA loses the Georgia Action and he is found to be entitled to compensation under the Broker Agreement. Ehrlich will not

13

be bound by any negative judgments entered in the Georgia Action and a company like AXA Equitable will certainly be able to render his commissions if and when they become due.

Respecting the third and fifth factors, a stay of this litigation will not conserve scarce judicial resources over the long term or promote the general public interest inherent in the just and efficient resolution of disputes. In fact, the opposite is true. As demonstrated by the very language of his Motion, Ehrlich's stay request is not designed to promote judicial economy, but simply to delay these proceedings. He makes no promises to be bound by the Georgia Action:

> *If* AXA [wins the Georgia action], then AXA would *might* demand that Mr. Ehrlich refund the commissions he received [and] Mr. Ehrlich *might* (**or might not**) refuse to refund the commissions he received . . . .

> If AXA does not prevail in the Rescission Action, Mr. Ehrlich will have no obligation to refund his commissions. If AXA does prevail in the Rescission Action, AXA **may** obtain the commission refund it seeks under the terms of the Broker Agreement **without litigation**.

(Ehrlich Br. 11, 14-15 (italics in original).) A different result would be called for only if Ehrlich agreed the Georgia lawsuit would definitively resolve the instant litigation. Consideration of the last factor also weighs in favor of proceeding with this litigation. The burden on third-parties whose testimony and assistance will be necessary to resolve this litigation will only be increased if they are forced to recall the operative events months or years from now.

Faced with nearly identical circumstances and arguments, one court has already concluded that the existence of the Georgia Action does not justify a stay of AXA's concurrent efforts to recover its unearned commissions from the involved agents/brokers. As

14

the instant Complaint makes clear, a former AXA agent assisted Ehrlich with the submission of the applications for the Policies. (Compl. ¶¶ 14-15.)  That former agent, Gabriel Epstein, was subject to a contract that, like the Broker Agreement, provided for the return of commissions upon AXA's "refund" of policy premiums.[3]  As it was forced to do with Ehrlich, AXA sued Epstein in New York State Court when he refused to return the commissions paid to him following AXA's rescission of the Policies.  (Ex. E ¶ 1.)  Like Ehrlich, Epstein moved to stay the lawsuit against him arguing that resolution of the Georgia Action was necessary to determine a threshold issue in AXA's litigation with him and that proceeding with both cases would create the potential for inconsistent outcomes.  (Ex. F 3-4.)

In denying Epstein's request for a stay, the New York court held that the absence of overlapping claims between the proceedings meant judicial economy would not be furthered by a stay.  (*See id.* at 5.)  The court also noted specifically the absence of potentially inconsistent results between the two lawsuits, at least as far as the agent was concerned:

> Although he may ultimately be entitled to keep his commission if the federal court declares that AXA could not rescind the policies (and accordingly keeps the premiums paid by the Koenigs), Epstein does not state that if the policies are held to be void ab initio, he will return the commissions . . . .

(*Id.*)

The state court's analysis is compelling here.  Because Ehrlich seeks a delay of this litigation that will certainly prejudice AXA without the offsetting benefit of judicial economy, he cannot satisfy the elements necessary for this court to exercise its discretionary stay powers and his Motion should be denied.

---

[3] A true and accurate copy of the AXA's complaint against Epstein and the order denying the Epstein's motion to stay are attached as Exhibits E and F, respectively.

15

## CONCLUSION

For the foregoing reasons, AXA respectfully requests that the Court deny Defendant

Ehrlich's Motion to Dismiss or Alternatively to Stay in its entirety.

Dated: May 30, 2008
      New York, New York

Respectfully Submitted,

_____

Joseph Petersen (JP 9071)
Christopher Lick (CL 1391)
**KILPATRICK STOCKTON LLP**
31 West 52nd Street, 14th Floor
New York, NY 10019
Phone Number: (212) 775-8700
Fax Number: (212) 775-8815

George L. Murphy, Jr. (Georgia Bar No. 530376)
James J. Leonard (Georgia Bar No. 446655)
Michael A. Kaeding (Georgia Bar No. 405779)
(*pro hac vice* applications pending)
**KILPATRICK STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Phone: (404) 815-6500
Fax: (404) 815-6555

*ATTORNEYS FOR PLAINTIFFS*

16

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | CIVIL ACTION NO.: 1:07-cv-0512-MHS |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUSTS A and B 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUSTS A and B 05/11/06, | ) ) ) ) ) ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff AXA Equitable Life Insurance Company ("Equitable") and for its Second Amended Complaint states as follows.

## Nature of the Action

1.

This Second Amended Complaint seeks a declaratory judgment with respect to Plaintiff Equitable's rights and obligations under four life insurance policies issued by Equitable to Defendant Wells Fargo Bank, N.A. ("Wells Fargo") and an order voiding the policies due to misrepresentations in the applications for these

policies.  Equitable is in a position of legal uncertainty with respect to its rights and obligations as to the life insurance policies and requests the Court to declare the rights and obligations of the parties according to Georgia law.

## **Parties**

2.

Equitable issued the life insurance policies that are the subject of this action. Equitable is a New York corporation, with its principal place of business located in New York.  Accordingly, Equitable is a citizen of the State of New York.

3.

Defendant Wells Fargo is the Trustee of certain life insurance trusts which are the Owners and Beneficiaries of the subject life insurance policies.  Wells Fargo is a National Banking Association formed under the laws of the United States with its principal place of business located in either California or South Dakota.  Accordingly, Wells Fargo is a citizen of the State of California or South Dakota, and no other.  Wells Fargo is authorized to transact business in Georgia.

US2000 10318302.1

## **Jurisdiction and Venue**

### 4.

Equitable and Wells Fargo are citizens of different states.  Equitable seeks a declaratory judgment regarding its rights and obligations under insurance policies that total $40,000,000, so the amount in controversy exceeds $75,000.  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Likewise, this Court has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202.  Venue is appropriate in this district and division because the insurance policies, which are the subject of this action, were issued and delivered to Wells Fargo in this division.

## **Statement of Facts**

### 5.

Equitable is a life insurance company.

### 6.

On May 12, 2006, Mali Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "First Application").  A true and correct copy of the First Application, which was submitted by Mali Koenig and Wells Fargo, is attached hereto as Exhibit 1 and is incorporated herein fully by reference.  The First Application sought life insurance in the amount of ten million dollars ($10,000,000).  The Owner of the policy, as identified in Section 3 of the

-3-

First Application, was the "Mali Koenig Insurance Trust B 05/11/06." The Beneficiary of the policy, as identified in Section 3 of the First Application, is the "Mali Koenig Insurance Trust A 05/11/06." The Trustee identified in Section 3 of the First Application was Wells Fargo Bank, N.A. In Section 1, Line P of the First Application, both Mali Koenig and Wells Fargo represented that Mali Koenig had a net worth of "$26 million." Additionally, in Section 2, Line G1 of the First Application, both Mali Koenig and Wells Fargo represented that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market." The First Application included the following statement: "Each signer of this application agrees that (1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application." (See Ex. 1, p. 3.) Mali Koenig signed the First Application. Wells Fargo's employee, Elizabeth T. Wagner, signed the First Application, "as Trustee" of the "Mali Koenig Insurance Trust B 05/11/06," and as the Owner of the policy. (Id. at p. 6.)

7.

On May 25, 2006, Mali Koenig and Wells Fargo submitted an amendment to the First Application (hereinafter "Amendment to the First Application"). See Ex.

-4-

1, p. 1.)   The Amendment to the First Application contained additional representations that there was no intention to finance the policy premiums nor was there any inducement offered to obtain the requested insurance:

- Do you intend to finance any of the premium required to pay for this policy through a financing agreement or loan agreement? (If yes, submit a copy of the financing or loan agreement)  ☑ No  ☐ Yes

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)       ☐ Yes ☑ No

(Id.)

8.

On May 12, 2006, Mali Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "Second Application").  A true and correct copy of the Second Application submitted by Mali Koenig and Wells Fargo is attached hereto as Exhibit 2 and is incorporated herein fully by reference. The Second Application sought life insurance in the amount of ten million dollars ($10,000,000).  The Owner and Beneficiary of the policy, as identified in Section 3 of the Second Application, was the "Mali Koenig Insurance Trust B 05/11/06." The Trustee identified in Section 3 of the Second Application was Wells Fargo Bank, N.A.  In Section 1, Line P of the Second Application, both Mali Koenig and Wells Fargo represented that Mali Koenig had a net worth of "$26 million."

-5-

Additionally, in Section 2, Line G1 of the First Application, both Mali Koenig and Wells Fargo represented that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market."   The application included the following statement: "Each signer of this application agrees that (1) The statements and answers in all parts of this application are true and complete.  We (the Company checked on page 1 of this application) may rely on them in acting on this application."  (See Ex. 2, p. 3.) Mali Koenig signed the application.   Wells Fargo's employee, Elizabeth T. Wagner, signed the Second Application "as Trustee" of the "Mali Koenig Insurance Trust B 05/11/06," and as the Owner of the policy.  (Id. at p. 6.)

9.

On May 25, 2006, Mali Koenig and Wells Fargo submitted an amendment to the Second Application (hereinafter "Amendment to the Second Application"). (See Ex. 2, p. 1.)  The Amendment to the Second Application contained additional representations that there was no intention to finance the policy premiums nor was their any inducement offered to obtain the requested insurance:

- Do you intend to finance any of the premium required to pay for this policy through a financing agreement or loan agreement? (If yes, submit a copy of the financing or loan agreement)  ☑ No  ☐ Yes

-6-

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement) ☐ Yes ☒ No

(Id.)

10.

On May 12, 2006, Benzion Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "Third Application"). A true and correct copy of the Third Application submitted by Benzion Koenig and Wells Fargo is attached hereto as Exhibit 3 and is incorporated herein fully by reference. The Third Application sought life insurance in the amount of ten million dollars ($10,000,000). The Owner and Beneficiary of the policy, as identified in Section 3 of the Third Application, was the "Benzion Koenig Insurance Trust B 05/11/06." The Trustee identified in Section 3 of the Third Application was Wells Fargo Bank, N.A. In Section 1, Line P of the Third Application, both Benzion Koenig and Wells Fargo represented that Benzion Koenig had a net worth of "$26 million." Additionally, in Section 2, Line G1 of the Third Application, both Benzion Koenig and Wells Fargo represented that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market." The Third Application included the following statement: "Each signer of this

-7-

application agrees that (1) The statements and answers in all parts of this application are true and complete.  We (the Company checked on page 1 of this application) may rely on them in acting on this application."  (See Ex. 3, p. 3.) Benzion Koenig signed the Third Application.  Wells Fargo's employee, Elizabeth T. Wagner, signed the Third Application "as Trustee" of the "Benzion Koenig Insurance Trust B 05/11/06," and as the Owner of the policy.

<div align="center">11.</div>

On May 12, 2006, Benzion Koenig and Wells Fargo submitted an application to Equitable for a life insurance policy (hereinafter the "Fourth Application").  A true and correct copy of the Fourth Application submitted by Benzion Koenig and Wells Fargo is attached hereto as Exhibit 4 and is incorporated herein fully by reference.  The Fourth Application sought life insurance in the amount of ten million dollars ($10,000,000).  The Owner and Beneficiary of the policy, as identified in Section 3 of the Fourth Application, was the "Benzion Koenig Insurance Trust A 05/11/06."  The Trustee, as identified in Section 3 of the Application, was Wells Fargo Bank, N.A.  In Section 1, Line P of the Fourth Application, both Benzion Koenig and Wells Fargo represented that Benzion Koenig had a net worth of "$26 million."  Additionally, in Section 2, Line G1 of the Fourth Application, both Benzion Koenig and Wells Fargo represented

<div align="center">-8-</div>

that they had no intention to "transfer the policy for any type of pre-death financial settlement, such as . . . a life settlement, or for any other secondary market." The Fourth Application included the following statement: "Each signer of this application agrees that (1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application." (<u>See</u> Ex. 4, p. 3.) Benzion Koenig signed the Fourth Application. Wells Fargo's employee, Elizabeth T. Wagner, signed the Fourth Application "as Trustee" of the "Benzion Koenig Insurance Trust B 05/11/06," and as the Owner of the policy. Exhibits 1 through 4 are hereinafter referred to collectively as "the Applications."

<p style="text-align:center">12.</p>

Wells Fargo, as the Owner of the four policies and the Trustee of the four life insurance trusts, exercised complete control over the policies. Each of the four policies stipulated as follows: The Owner of the policy is "entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy." (<u>See</u> Exs. 5-8, p. 5.)

<p style="text-align:center">-9-</p>

13.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the First Application submitted by Mali Koenig and Wells Fargo.  Specifically, Equitable relied on the statements made by Mali Koenig and Wells Fargo set forth above in Paragraphs 6-7 regarding the net worth of Mali Koenig, the absence of any intent to transfer the policy or finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable. In reliance on that information, Equitable issued Policy No. 156 212 029, which had a limit of $10,000,000 and contained a register date of May 19, 2006.  The policy insured the life of Mali Koenig.  The Trustee and Owner of the policy is Wells Fargo.  A true and accurate copy of Policy No. 156 212 029 is attached hereto as Exhibit 5, and is incorporated herein fully by reference.

14.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the Second Application submitted by Mali Koenig and Wells Fargo.  Specifically, Equitable relied on the statements made by Mali Koenig and Wells Fargo set forth above in Paragraphs 8-9 regarding the net worth of Mali Koenig, the absence of

-10-

any intent to transfer the policy or finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable. In reliance on that information, Equitable issued Policy No. 156 212 030, which had a limit of $10,000,000 and contained a register date of May 19, 2006. The policy insured the life of Mali Koenig. The Trustee and Owner of the policy is Wells Fargo. A true and accurate copy of Policy No. 156 212 030 is attached hereto as <u>Exhibit 6</u>, and is incorporated herein fully by reference.

15.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the Third Application submitted by Benzion Koenig and Wells Fargo. Specifically, Equitable relied on the statements made by Benzion Koenig and Wells Fargo set forth above in Paragraph 10 regarding the net worth of Benzion Koenig and the absence of any intent to transfer the policy. In reliance on that information, Equitable issued Policy No. 156 212 032, which had a limit of $10,000,000 and a register date of April 8, 2006. This policy insured the life of Benzion Koenig. Wells Fargo is the Trustee and Owner of the policy. A true and accurate copy of Policy No. 156 212 032 is attached hereto as <u>Exhibit 7</u>, and incorporated herein fully by reference.

-11-

16.

Equitable relies on the information submitted in applications for life insurance when it issues those policies and specifically relied on the information in the Fourth Application submitted by Benzion Koenig and Wells Fargo. Specifically, Equitable relied on the statements made by Benzion Koenig and Wells Fargo set forth above in Paragraph 11 regarding the net worth of Benzion Koenig and the absence of any intent to transfer the policy. In reliance on that information, Equitable issued Policy No. 156 212 033, which had a limit of $10,000,000 and a register date of April 8, 2006. This policy insured the life of Benzion Koenig. Wells Fargo is the Trustee and Owner of the policy. A true and accurate copy of Policy No. 156 212 033 is attached hereto as <u>Exhibit 8</u>, and incorporated herein fully by reference.

17.

Each of the policies referenced in the preceding paragraphs provided that the contracts of insurance consisted of both the policies and their respective applications.

18.

Subsequent to issuing the policies, Equitable learned that Mali Koenig and Benzion Koenig (collectively the "Insureds") and Wells Fargo had misrepresented

-12-

the net worth of the Insureds on the Applications, the absence of their intent to finance the policy premiums, the absence of their intent to transfer the policies, and the absence of inducements for them to enter into a life insurance transaction with Equitable.

<div align="center">19.</div>

Upon information and belief, and in accordance with the pleading requirements set forth in Fed. R. Civ. P. 9, the Insureds and Wells Fargo have either intentionally misrepresented the net worth of each Insured, the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable, or they have knowingly made these representations with reckless disregard for the truth. Further, the Insureds and Wells Fargo made those misrepresentations in the Applications which were submitted to Equitable with the intent to induce Equitable to provide the life insurance policies.

<div align="center">20.</div>

Equitable reasonably relied on the representations by Wells Fargo and the Insureds on the Applications regarding the net worth of the Insureds, the absence of their intent to transfer the policy, the absence of their intent to finance the policy

<div align="center">-13-</div>

premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable. For instance, Equitable performed various levels of investigation, both before, and after, the policies were issued to ascertain the basis for the representations regarding the net worth of the Insureds that were made on the Applications. In fact, Equitable had obtained information regarding the Insureds' alleged net worth before issuing the policies. Prior to issuing the policies, Equitable's agent contacted attorneys for the Insureds, whose names had been provided by the Insureds. Upon information and belief, at least one of those attorneys had been involved with the creation of the trusts at issue in this litigation, and the other attorney had provided estate planning advice to the Insureds. The attorneys stated that the Insureds owned significant real estate holdings in Florida, New York, Connecticut and Israel. The value of that real estate as represented by the attorneys was consistent with the stated net worth as represented by Wells Fargo and the Insureds in the Applications.

<div align="center">21.</div>

Equitable did not learn of the misrepresentations in the Applications set forth above until after the policies were issued. Following further investigation into the real estate holdings, Equitable discovered that the net worth of the Insureds as represented by Wells Fargo and the Insureds in the Applications was untrue.

<div align="center">-14-</div>

Additionally, following further investigation into the financing of the policy premiums learned that the representations made by the Insureds and Wells Fargo concerning the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were also untrue.

22.

In an effort to ascertain the basis for the representations about the net worth made by the Insureds and Wells Fargo in the Applications, Equitable sought further information from the Insureds after the polices were issued. Requests for specific information about the Insureds' assets and net worth were refused by the Insureds and their representatives. Additionally, as a direct result of discovery obtained in this litigation from third-parties, Equitable discovered that, before the Insureds and Wells Fargo executed the Applications, they had entered into a Stranger Owned Life Insurance Program ("SOLIP") that involved, among other things, the financing of the policy premiums, a transfer of the policies, and numerous inducements to their life insurance transaction with Equitable.

23.

In light of the investigation performed prior to issuing the policies, Equitable reasonably and justifiably relied on the representations in the

-15-

Applications concerning the Insureds' net worth, the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable when analyzing the nature and risk of the policies. Equitable would not have issued the life insurance policies in the total amount of $40,000,000 but for these representations in the Applications. In reliance on the representations made by Wells Fargo and the Insureds in the Applications, Equitable issued policies that it would not otherwise have issued had the misrepresentations been known and has therefore suffered harm.

24.

Through December 22, 2006, the premiums paid for Policy Nos. 156 212 029 and 156 212 030 totaled $2,503,480.00.

25.

Through December 22, 2006, the premiums paid for Policy Nos. 156 212 032 and 156 212 033 totaled $3,031,704.00.

26.

On December 22, 2006, Equitable mailed notices of rescission to the Trustee and Owner of the policies, Wells Fargo. The notices of rescission specifically identified the material misrepresentations contained within the Applications and

-16-

known to Equitable at that time.   True and accurate copies of these notices of rescission are attached hereto as <u>Exhibits 9</u> and <u>10,</u> and incorporated herein fully by reference.   Equitable enclosed a full refund of all of the premiums paid by Wells Fargo for the subject life insurance policies, with interest.

<div align="center">27.</div>

The refund checks issued by the Equitable, in the total amount of $5,644,633.52, have not been cashed or deposited.

## COUNT I – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(1)

<div align="center">28.</div>

Equitable incorporates by reference paragraphs 1-27 above, as if fully set forth herein.

<div align="center">29.</div>

There is an actual and justiciable controversy between Equitable and Wells Fargo in this case growing out of the Equitable's rescission of the contracts of insurance on the basis of the Insureds' and Wells Fargo's false and material misrepresentations in the Applications.

<div align="center">30.</div>

The above representations of material fact made by the Insureds and Wells Fargo regarding the net worth of the Insureds, the absence of their intent to transfer

<div align="center">-17-</div>

the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were, upon information and belief, false. Upon information and belief, the Insureds and Wells Fargo knew, or alternatively should have known, that each such representation of material fact set forth above was false.

31.

Upon information and belief, Wells Fargo and the Insureds submitted the Applications and made the material misrepresentations with the intent to induce reliance by Equitable on such representations and to induce Equitable to issue the life insurance policies in the amount of $40,000,000 as described above.

32.

The misrepresentations and incorrect statements by Wells Fargo and the Insureds in the Applications were fraudulent and prevent recovery under the subject life insurance policies in accordance with O.C.G.A. § 33-24-7(b)(1) and applicable Georgia law.

33.

Although Equitable has sent Wells Fargo checks refunding the paid premiums with interest, Wells Fargo has refused to cash or deposit those funds. Based upon the foregoing, and upon information and belief, Equitable believes that

US2000 10318302.1

Wells Fargo, as Trustee of the subject Insurance Trusts, and as the Owner of the policies, disputes that rescission is valid or appropriate. Equitable seeks a declaration that the insurance policies as issued are void.

34.

The declaration of rights pursuant to 28 U.S.C. §§ 2201 and 2202 would alleviate the uncertainty facing Equitable as to whether the life insurance policies have been rescinded and are void *ab initio*, due to the misrepresentations.

## COUNT II – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(2)

35.

Equitable incorporates by reference paragraphs 1-27 above, as if fully set forth herein.

36.

There is an actual and justiciable controversy between Equitable and Wells Fargo in this case growing out of Equitable's rescission of the contracts of insurance on the basis of the Insureds' and Wells Fargo's false and material misrepresentations in the Applications.

37.

The above representations of material fact made by the Insureds and Wells Fargo regarding the net worth of the Insureds, the absence of their intent to transfer

-19-

the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were, upon information and belief, false.  Upon information and belief, the Insureds and Wells Fargo knew, or alternatively should have known, that each such representation of material fact set forth above was false.

38.

Upon information and belief, Wells Fargo and the Insureds submitted the Applications and made the material misrepresentations with the intent to induce reliance by Equitable on such representations and to induce Equitable to issue the life insurance policies in the amount of $40,000,000, as described above.

39.

The misrepresentations and incorrect statements by Wells Fargo and the Insureds were material either to the acceptance of the risk or to the hazard assumed by Equitable and prevent recovery under the subject life insurance policies in accordance with O.C.G.A. § 33-24-7(b)(2) and applicable Georgia law.

40.

Although Equitable has sent Wells Fargo checks refunding the paid premiums with interest, Wells Fargo has refused to cash or deposit those funds. Based upon the foregoing, and upon information and belief, Equitable believes that

Wells Fargo, as Trustee of the subject Insurance Trusts, and as the Owner of the Policies, disputes that rescission is valid or appropriate. Equitable seeks a declaration that the insurance policies as issued are void.

### COUNT III – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(3)

41.

Equitable incorporates by reference paragraphs 1-27 above as if fully set forth herein.

42.

There is an actual and justiciable controversy between Equitable and Wells Fargo in this case growing out of Equitable's rescission of the contracts of insurance on the basis of the Insureds' and Wells Fargo's false and material misrepresentations in the Applications.

43.

The above representations of material fact made by the Insureds and Wells Fargo regarding the net worth of the Insureds, the absence of their intent to transfer the policy, the absence of their intent to finance the policy premiums, and the absence of any inducement for them to enter into a life insurance transaction with Equitable were, upon information and belief, false. Upon information and belief,

-21-

the Insureds and Wells Fargo knew, or alternatively should have known, that each of such representations of material fact set forth above, was false.

44.

Upon information and belief, Wells Fargo and the Insureds submitted the Applications and made the material misrepresentations with the intent to induce reliance by Equitable on such representations and to induce Equitable to issue the life insurance policies in the amount of $40,000,000, as described above.

45.

Absent the misrepresentations and incorrect statements by Wells Fargo and the Insureds, Equitable would not have issued the policies, would not have issued the policies in as large an amount, would not have issued the policies at the premium rate as applied, and would not have provided coverage with respect to the hazard if the true facts had been known as required by the Applications. The misrepresentations and incorrect statements by Wells Fargo and the Insureds in the Applications prevent recovery under the subject life insurance policies in accordance with O.C.G.A. § 33-24-7(b)(3) and applicable Georgia law.

46.

Although Equitable has sent Wells Fargo checks refunding the paid premiums with interest, Wells Fargo has refused to cash or deposit those funds.

-22-

Based upon the foregoing, and upon information and belief, Equitable believes that Wells Fargo, as Trustee of the subject Insurance Trusts, and as the Owner of the policies, disputes that rescission is valid or appropriate.   Equitable seeks a declaration that the insurance policies as issued are void.

WHEREFORE, Plaintiff respectfully prays that:

1.     Judgment be entered on Plaintiff's behalf declaring that the subject life insurance policies have been rescinded and are void *ab initio*.

2.     Plaintiff be awarded such other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of November, 2007.

|  |  |
|---|---|
|  | /s/ James J. Leonard |
| KILPATRICK STOCKTON LLP | George L. Murphy, Jr. |
| Suite 2800, 1100 Peachtree Street | Georgia Bar No. 530376 |
| Atlanta, Georgia  30309-4530 | James J. Leonard |
| (404) 815-6500 | Georgia Bar No. 446655 |
| gmurphy@kilpatrickstockton.com | Michael A. Kaeding |
| jleonard@kilpatrickstockton.com | Georgia Bar No. 405779 |
| mkaeding@kilpatrickstockton.com | Adria L. Perez |
| aperez@kilpatrickstockton.com | Georgia Bar No. 141306 |
|  |  |
|  | Attorneys for Plaintiff |
|  | AXA Equitable Life Insurance Company |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | NO.: 1:07-cv-0512-MHS |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUSTS A and B 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUSTS A and B 05/11/06; | ) ) ) ) ) ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the within and foregoing **SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

> Jeffrey D. Horst, Esq.
> horst@khlawfirm.com
> David A. Sirna, Esq.
> sirna@khlawfirm.com
> Krevolin & Horst, LLC
> 1175 Peachtree Street, N.E.
> 100 Colony Square
> Suite 2150
> Atlanta, GA   30308

-24-

US2000 10318302.1

This 13th day of November, 2007.

KILPATRICK STOCKTON LLP                    /s/ James J. Leonard
1100 Peachtree Street, Suite 2800          James J. Leonard
Atlanta, Georgia  30309                    Georgia Bar No. 446655
Telephone: (404) 815-6500
Facsimile (404) 815-6555                   Attorney for Plaintiff
Email:  mkaeding@kilpatrickstockton.com    AXA Equitable Life Insurance Company

US2000 10318302.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) ) | CIVIL ACTION NO.: 1:07-cv-0512-MHS |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

**EXHIBIT 1 to Second Amended Complaint**

# AMENDMENT TO APPLICATION

| Name of Proposed Insured: | Mail | | Koenig | Application Dated: | 6/4/06 |
|---|---|---|---|---|---|
| | First | Middle Initial | Last | | |

**Policy or Contract No.:** 156 208 141

## TO THE AXA EQUITABLE LIFE INSURANCE COMPANY

**Your application is hereby amended by the undersigned in the following particulars:**

- Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)

  ☒ NO    ☐ Yes

  Check all of the following that apply and complete requested information:

  ☐ Loan_____(% of premium) Identify Source of Loan_____
  Loan Repayment Schedule_____
  Describe the collateral used_____

  ☐ Cash_____(% of premium)

  ☐ Existing life insurance policy or contract_____(% of premium)

  ☐ Existing Investments_____(% of premiums) Identify Investment
  Source_____

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)

  ☐ Yes    ☒ No

- Please state the reason you are purchasing this policy (i.e., estate planning, business insurance, etc.)

  **Estate Planning**

This amendment is to be taken as part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as part of the policy or contract. To the best of my (our) knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at ___Brooklyn___ ___NY___ on ___5/25/06___
　　　　　　　(City)　　　　(State)　　　　　　　　(Date)

_____    ___× Mail Koenig___
Signature of Purchaser, if other than Applicant    Signature of Applicant

**AGENT:**　　**ASU:**　　**AGENCY:**

156 212 029

# AMENDMENT TO APPLICATION

Name of
Proposed Insured    **MALI KOENIG**                                                 Application Dated    **MAY 12, 2006**
                              First            Middle Initial          Last

Policy No _____   **156 212 029**

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE WITH PLAN TO BE ATHENA UNIVERSAL LIFE II.

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the policy. To the best of my knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at _Brooklyn_     NY     on _5/25/06_
                    (City)           (State)

_Mali Koenig_

Signature of Purchaser if other than Applicant              Signature of Applicant

Agent: _____

Agency: _____

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
**Part I**
Form No. LIFEAPP GA/OR
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy) Please print in ink

Proposed Insured
A. Full Name First *M Ali*　　M.I. ____ Last *Koenig* _____ B. Gender ☐ Male ☒ Female

C. Home Address ____ Redacted ____ Redacted
　State

City/Municipality *Brooklyn*　County/Parish _____ State *N/Y* Zip + 4 Code __ Redacted
(If address is a P.O. Box or not actual residence, proof of residence required)

D. Home Phone No. ____ Redacted ____ Best time to Call _____ Best phone no. to be contacted _____

E. Date of Birth ____ Redacted ____ F. Place of Birth *Romania*
　　　　　　　　　　　　　　　　　　　　　　　(State/County)

G. Marital Status ☐ Single ☒ Married *NONE* ☐ Widowed ☐ Divorced ☐ Separated H. Soc Sec No. ____ Redacted

I. Driver's Lic No. _____ State: _____

J. U.S. Citizen? ☒ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. ____

K. Currently employed? ☐ Yes ☐ No ☒ Retired

L. Current Occupation(s): (1) Title *N/A Retired* (2) Duties _____ (3) How Long? _____
(If less than 1 year at current occupation, give previous in Remarks)

M. Employer Name ____ *N/A*

N. Employer Address _____
　No & Street　　　　　　　　City　　　　　　　　State　　　Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ *N/A* ____ P. Net Worth $ *26 million*
* If the Proposed Insured and/or policy owner is not a U.S Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❷ COVERAGE INFORMATION**

A. Plan of Insurance *VL II* _____ Amount of Insurance $ *10 million*
(If survivorship policy, complete an application for each Proposed Insured　(If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement　　　　　　　　　　　Supplement)
To select dividend options on EWL or Riders on all Non VUL Plans
complete Optional Benefits Supplement)

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A ☐ Option B
(2) Planned Periodic Premium $ *1,251,740*

C. Definition of Life Insurance Test Complete for AUL II, IL, IL COLI '04 ☒ Guideline Premium Test ☐ Cash Value Accumulation Test

D. Premium Mode ☒ Annual ☐ Semi Annual ☐ Quarterly ☐ Monthly
Or
System Matic (Complete S M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit No _____ (3) Unit Register Date _____
(Specify Allotter name if other than insured in Remarks)

F. Date Policy to save Insured Age? ☐ Yes ☒ No

G. 1 Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market? ☐ Yes ☒ No
2 Have you, the owner or any Proposed Insured in other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies amounts and policy numbers in Remarks)

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No　Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete (If additional room is needed, please use Remarks Section)

Amount $ _____ Company _____ Issue Year ____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity
Amount $ _____ Company _____ Issue Year ____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☐ No If "Yes", complete Term Policy/Rider or Purchase Option Supplement

K. Complete if Proposed Insured is under age 15　　　a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ _____
　　　　　　　　　　　　　　　　　　　　　　　　　　b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details _____

AMIGV 2005 A　　　　　　　　　　CAT# 133942　　　　　　　　　　　　　E6173_1 1
217433, 04-21-2006, 11 11:21

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary Mali Koenig Insurance Trust A 05/11/06 | | 100% |
| Contingent | | |

**B.** Owner (The Owner of this policy is the insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section

If the Owner is the Trust provide the name of the Trust.

Owner's Name Mali Koenig Insurance Trust B 05/11/06  Social Security # or TIN  Redacted

Address 5656 Wells Fargo BANK, N.A. 400 Northridge Rd.  Atlanta State Ga  Zip Code 30350
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U S Citizen? ☐ Yes ☐ No* If No, Country_____ U S Visa type_____ Passport # or U S Visa #_____ # of years in U S____

Relationship to Insured_____ Date of Birth_____

Name of Trustee Wells Fargo BANK, N.A.  Date of Trust Agreement 5.11.06

*If the policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

| | | Yes | No |
|---|---|---|---|
| **A.** | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks ) | ☐ | ☒ |
| **B.** | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement ) | ☐ | ☒ |
| **C.** | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ | ☒ |
| **D.** | In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) | ☐ | ☒ |
| **E.** | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement ) | ☐ | ☒ |
| **F.** | In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks ) | ☐ | ☒ |
| **G.** | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates ) | ☐ | ☒ |

| **H.** | Do you currently use any form of tobacco or nicotine product? | ☐ Yes ☒ No | Type_____ Avg Quantity # packs_____ Frequency_____ |
|---|---|---|---|
| **I.** | Have you ever used any form of tobacco or nicotine product? | ☐ Yes ☒ No | Type_____ Date Ceased_____ |

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height 5 Ft __ in, Weight 137 lbs

**B.** Personal Physician Name please see remarks

**C.** Address

**D.** Date and Reason for Last Visit in the Last 5 Years__ No change since medical exam in Feb 06

**E.** What treatment was given or recommended? (If none, so state)

Has Proposed Insured:

| | | Yes | No |
|---|---|---|---|
| **F.** | In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ | ☒ |
| **G.** | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years  Do not include colds, minor injuries or normal pregnancy ) | ☒ | ☐ |
| **H.** | In the last 10 years | | |
| | 1  Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives, marijuana, cocaine, hallucinogens or other mood altering drugs, heroin, methadone or other narcotics, amphetamines or other stimulants, or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ | ☒ |
| | 2  Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement ) | ☐ | ☒ |
| **I.** | In the last 10 years, been Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ | ☒ |

**J.**

| Family History | Age if Living | Cause of Death | | Age at Death |
|---|---|---|---|---|
| Father | | WW II | Death Camps | |
| Mother | | WW II | Death Camps | |
| Sibling | | | | |

AMIGV-2005 A

**❻ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION** (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks, (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.

(Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr. Kaiser 718-941-5600          Dr. Scheter 718-376-810
465 Ocean Pkwy                   2350 Ocean Pkwy
Brooklyn, NY 11218               Brooklyn NY

Dr. Coch 718-854-2144            Please See Contract
4815 14th Ave.                   # 156203466 for
Brooklyn NY 11215                Doctors info

**❼ COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application $ ___0___

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including

(i) the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii) the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☒ Yes  ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered

**AGREEMENT.** Each signer of this application agrees that

(1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

(2) The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3) Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application, and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid

(4) No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam)

(5) I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

☐ AXA Equitable Life Insurance Company        ☐ MONY Life Insurance Company of America

## ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

## AUTHORIZATIONS

### TO OBTAIN HEALTH INFORMATION

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

### TO OBTAIN NON-HEALTH INFORMATION

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

### PURPOSE OF AUTHORIZATIONS

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

### COVERAGE CONDITIONS

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

### ADDITIONAL AUTHORIZATIONS

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

### DURATION

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

### COPY OF AUTHORIZATIONS

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (II) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City _____    Signature of Proposed Insured, Applicant or parent or guardian
                                  (if Proposed Insured is a Child) (Issue Ages 0-14 & 15)

State _____            Signature of Owner of Applicant if not Proposed Insured
                                  (if corporation, print firm's name and signature of authorized officer)
                                  (if trust, signature of trustee)              VICE PRESIDENT

on 5/12/06

### Financial Professional to complete this section:

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?    ☐ Yes   ☒ No
(If "yes" give details _____)
I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.
☒ I have witnessed the signature required on fully completed Part 1    ☐ I have not witnessed the signature required on fully completed Part 1. (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name _____

AMIGV-2005 A                                                                    4

217433, 04-21-2006, 11:11:21

**Application Part 2 To:** ☐ AXA Equitable Life Insurance Company

US Redacted

☐ AXA Life and Annuity Company

Reason for submission of this form: ☐ New Policy ☐ Policy Change ☐ Reinstatement

Passport.

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height ft. in. c. Weight lbs. |
|---|---|---|---|---|
| | Mali | | Koenig | d. Birth Date e. ☐ Male ☐ Female Redacted |

2. a. Name and address of personal physician (or medical facility used instead): **Dr Kaysee - Bradley N Uy**

b. Date and reason last consulted if within the last 5 years? **4 mnago. routine check-up.**

c. What treatment was given or recommended? (If none, so state) **none**

(For all "Yes" answers to Questions 3-8, circle items that apply.)

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| 3. Has Proposed Insured ever had or been treated for: | | | 9. Other than as stated in answers to Questions 2-8, has Proposed Insured, within the last 5 years: | | |
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ | a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ | b. Had any illness, injury, or surgery? | ☐ | ☑ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ | c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ | d. Had electrocardiogram, X-ray, other diagnostic test? | ☑ | ☐ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ | e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☑ | 10. a. Has Proposed Insured, within the last 12 months: | | |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☑ | ☐ | (i) Smoked cigarettes? | ☐ | ☑ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ | (ii) Used any other form of tobacco (Give full details) | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ | b. Has Proposed Insured, within the last five years: | | |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ | (i) Smoked cigarettes? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ | (ii) Used any other form of tobacco (Give full details) | ☐ | ☑ |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | 80yr | S+P SIS | 70-80s |
| Mother | 79 | | 93 |
| Brothers/Sisters | Yes | ulcoru prostate | 178 170 |

| | Yes | No |
|---|---|---|
| 4. Is Proposed Insured now under observation or taking treatment? | ☑ | ☐ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substance? | ☐ | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑ |
| 7. Has Proposed Insured's weight changed by more than 10 pounds in the last 6 months? | ☐ | ☑ |

**DETAILS FOR "YES" ANSWERS.** Include: i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

3g + 9a + 9d DM borderline controlled with diet. occas. Metformin.
4 Baby ASA, Vit B.
8a Dr Kaysee - 9yr. routine check-up. address not available
8 d. 81 test, ECG - 9yr. normal mammogram in the past NL. Unsure if ultra sound causes of dead but no heart, cancer, DU.

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at **Miami Beach Fl** **2/6/06** X **Mali Koenig**
City State Mo. Day Yr. Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): **Mary O'Dea, MD**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
|     Plaintiff, | ) ) ) ) | CIVIL ACTION NO.: 1:07-cv-0512-MHS |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) ) | |
|     Defendant. | ) | |

**EXHIBIT 2 to Second Amended Complaint**

# AMENDMENT TO APPLICATION

| Name of Proposed Insured: | Mali | Koenig | Application Dated 8/4/06 |
|---|---|---|---|
| | First | Middle Initial | Last |

Policy or Contract No.: 156 208 141

## TO THE AXA EQUITABLE LIFE INSURANCE COMPANY

Your application is hereby amended by the undersigned in the following particulars:

- Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)
☒NO  ☐ Yes

Check all of the following that apply and complete requested information:

☐ Loan_____(% of premium) Identify Source of Loan_____
Loan Repayment Schedule_____
Describe the collateral used_____

☐ Cash_____(% of premium)

☐ Existing life insurance policy or contract_____(% of premium)

☐ Existing Investments_____(% of premium) Identify Investment
Source_____

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)
☐ Yes  ☒No

- Please state the reason you are purchasing this policy (i.e., estate planning, business insurance, etc.)

Estate Planning.

This amendment is to be taken as part of said application, subject to the agreement therein contained, said application and this amendment thus taken as a whole are to be considered as the basis for and as part of the policy or contract. To the best of my (our) knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at  Brooklyn  NY  on  5/25/06
(City)  (State)  (Date)

x Mali Koenig
_____  _____
Signature of Purchaser, if other than Applicant  Signature of Applicant

AGENT:  ASU:  AGENCY:

EV 237-401 / 180-237E Application Amendment
AMIGV-3006 App

156 212 030

# AMENDMENT TO APPLICATION

Name of
Proposed Insured __MALI KOENIG_____ Application Dated___MAY 12, 2006
                  First       Middle Initial     Last

Policy No _____156 212 030_____

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars·

**ISSUE WITH THE INSURED'S SOCIAL SECURITY NUMBER TO BE**    Redacted

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the policy. To the best of my knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at __Brooklyn____ NY_____ on __5/25/06____
               (City)        (State)

                  x _Mali Koenig_____

_____        Signature of Applicant
Signature of Purchaser if other than Applicant

Agent:_____

Agency:

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance
Part I**
Form No. LIFEAPP GAVOR
(2005)

---

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

**Proposed Insured**

A. Full Name First _Mali_ MI _____ Last _Koenig_    B. Gender ☐ Male ☒ Female

C. Home Address: _Redacted_    Redacted

   City/Municipality _Brooklyn_ (If address is a P O or not actual residence, proof of residence required) County/Parish _____ State _NY_ Zip + 4 Code _Redacted_

D. Home Phone No _Redacted_ Best time to Call _____ Best phone no to be contacted _____

E. Date of Birth _Redacted_ _____ F. Place of Birth _Romania_ (State/County)

G. Marital Status ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated   H. Soc Sec No _ Redacted

I. Driver's Lic No _None_ State _____

J. U S Citizen? ☒ Yes ☐ No* If No, Country _____ US Visa type _____ Passport # or U S Visa # _____ # of years in U S ____

K. Currently employed? ☐ Yes ☐ No ☐ Retired

L. Current Occupation(s) (1) Title _N/A_ (If less than 1 year at current occupation give previous in Remarks) (2) Duties _____ (3) How Long? _____

M. Employer Name _N/A_   N/A   Retired

N. Employer Address _____ No & Street _____ City _____ State _____ Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ _N/A_    P. Net Worth $ _30 million_

* If the Proposed Insured and/or policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a
state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

---

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _UL I_ Amount of Insurance $ _10,000,000_
(If survivorship policy, complete an application for each Proposed Insured
If VUL, must also complete VUL Supplement)
To select dividend options on EWL or Riders on all Non VUL Plans
complete Optional Benefits Supplement)    (If face amount is $2 million or larger complete Financial Supplement)

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A ☐ Option B
(2) Planned Periodic Premium $ _1,251,740_

C. Definition of Life Insurance Test Complete for AUL II, IL, IL COLI '04 ☒ Guideline Premium Test ☐ Cash Value Accumulation Test

D. Premium Mode ☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly
Or
System Matic (Complete S M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit No _____ (3) Unit Register Date _____
(Specify Allotter name, if other than insured, in Remarks)

F. Date Policy to save Insured Age? ☐ Yes ☒ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement,
or for any other secondary market? ☐ Yes ☒ No
2 Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market
provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies, amounts and policy numbers in Remarks)

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete (If additional room is needed, please use Remarks Section )

   Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity
   Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☒ No If "Yes", complete Term Policy/Rider or Purchase Option Supplement

K. Complete if Proposed Insured is under age 15    a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ _____
   b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No
   If "Yes" give details _____

---

AMIGV 2005 A      CAT# 133942      E6173_1 1

217433, 04-21-2006, 11:11:21

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary Information.)

Beneficiary Full Name     Relationship to Insured     Percentage

Primary _Phil, Koenig Insurance Trust B05/11/06_        _100 %_

Contingent: _____

**B.** Owner (The Owner of this policy is the insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section

If the Owner is the Trust provide the name of the Trust.

Owner's Name _Phil, Koenig Insurance Trust B05/11/06_    Social Security # or TIN _ Redacted_

Address, Street _C/o Wells Fargo bank N.A., 400 Northridge Rd., Atlanta_ State _Ge_   Zip Code _30350_
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U S Citizen? ☐ Yes ☐ No* If No, Country _____ U S Visa type _____ Passport # or U S Visa # _____ # of years in U S _____

Relationship to Insured _____ Date of Birth _____

Name of Trustee _Wells Fargo Bank, N.A._    Date of Trust Agreement _5-11-06_

* If the policy owner is not a U.S. Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section

| | | |
|---|---|---|
| **A.** Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks ) | ☐ Yes | ☒ No |
| **B.** Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement ) | ☐ Yes | ☒ No |
| **C.** Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| **D.** In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement ) | ☐ Yes | ☒ No |
| **E.** Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) | ☐ Yes | ☒ No |
| **F.** In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks ) | ☐ Yes | ☒ No |
| **G.** In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates ) | ☐ Yes | ☒ No |
| **H.** Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No Type _____ Avg Quantity # packs _____ Frequency _____ | | |
| **I.** Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No Type _____ Date Ceased _____ | | |

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note. Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height _5_ Ft _1_ in, Weight _137_ lbs

**B.** Personal Physician Name _please See remarks_

**C.** Address _____

**D.** Date and Reason for Last Visit in the Last 5 Years _No medical Changes since Feb 06 medical exam_

**E.** What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

| | | |
|---|---|---|
| **F.** In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| **G.** In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy ) | ☒ Yes | ☐ No |
| **H.** In the last 10 years | | |
|    1 Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives, marijuana, cocaine, hallucinogens or other mood altering drugs, heroin, methadone or other narcotics, amphetamines or other stimulants, or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement ) | ☐ Yes | ☒ No |
|    2 Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement ) | ☐ Yes | ☒ No |
| **I.** In the last 10 years, been Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |

**J.**

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | WW II Death Camps | |
| Mother | | WW II death Camps | |
| Sibling | | | |

AMIGV 2005 A

**❻ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION** (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.

(Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr. Kaiser  718-941-5600
465 Ocean Pkwy
Brooklyn, NY 11218

Dr. Coch  718-854-2144
4815 14th Ave
Brooklyn NY 11215

Dr. Scheter  718-376-8100
2350 Ocean Pkwy
Brooklyn NY

Please see Contract
# 196203466 for
Doctors info.

**❼ COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application $ ___0___

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including

(i)  the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)  the $1,000,000 insurance amount limitations, and

(iii)  that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?  ☒ Yes  ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that

(1)  The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam)

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

☐ AXA Equitable Life Insurance Company ☐ MONY Life Insurance Company of America

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**

**TO OBTAIN HEALTH INFORMATION**

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for the insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer any (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

**FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.**

**SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).**

CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

**THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.**

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City: Atlanta ____________________ [signature]
Signature of Proposed Insured, Applicant, or parent/guardian
If Proposed Insured is a Child, Issue Ages 0-14

State: Georgia ____________________ [signature]
Signature of Owner or Applicant if not Proposed Insured
(If corporation, print firm's name and signature of authorized officer.)
(If trust, signature of trustee.)

on: 5/12/06 ____________________

**Financial Professional to complete this section:**

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued? ☐ Yes ☒ No
(If yes, give details ____________________)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☒ I have witnessed the signature required on fully completed Part 1 ☐ I have not witnessed the signature required on fully completed Part 1. (Explain below)

____________________

Signature of Licensed Financial Professional/Insurance Broker [signature]
Print Licensed Financial Professional's Name

AMIGV-2005 A

217433 04-21-2006 11:11:21

**Application Part 2 To:** ☐ **AXA Equitable Life Insurance Company**

US   Redacted   ~~Passport.~~

☐ **AXA Life and Annuity Company**

Reason for submission of this form: ☐ New Policy ☐ Policy Change ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height ft. in.  c. Weight lbs.  d. Birth Date  e. Sex Male Female |
|---|---|---|---|---|

1. a. Proposed Insured: **Mali.** Last Name: **Koenig** — Redacted

2. a. Name and address of personal physician (or medical facility used instead; if none, so state): **Dr. Kaysee Brooklyn NY**

b. Date and reason last consulted if within the last 5 years: **4 mo ago, routine check-up.**

c. What treatment was given or recommended? (If none, so state): **none**

(For all "Yes" answers to Questions 3–8, circle items that apply.)

3. Has Proposed Insured ever had or been treated for:

| | Yes | No |
|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☑ | ☐ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |

4. Is Proposed Insured now under observation or taking treatment? ☑ ☐

5. Has Proposed Insured, within the last 10 years, been:

a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? ☐ ☑

6. Has Proposed Insured, within the last 10 years:

a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substance? ☐ ☑

b. Received counseling or treatment regarding the use of alcohol or drugs? ☐ ☑

7. Has Proposed Insured's weight changed by more than 10 pounds in the last 6 months? ☐ ☑

8. Other than as stated in answers to Questions 2–6, has Proposed Insured, within the last 5 years:

| | Yes | No |
|---|---|---|
| a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Had any illness, injury, or surgery? | ☐ | ☑ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☑ | ☐ |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |

8a. Has Proposed Insured, within the last 12 months:

| | Yes | No |
|---|---|---|
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | ☐ | ☑ |

b. Has Proposed Insured, within the last five years:

| | Yes | No |
|---|---|---|
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | ☐ | ☑ |

**10. Family History**

| | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Diabetes — 400 lbs | 24-35 |
| Mother | | | 73 |
| Brothers/Sisters | Yes 79 | Unknown | 73-89 |

DETAILS FOR "YES" ANSWERS. Include: i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

3g & part DM borderline controlled with diet. occas. Metformin.
4. Bub, ASA, Vit B.
8a. Dr. Kaysee - g.p. routine check-up. address not available.
8d. 8i test, ECG - g.p. normal mammogram in the past NL
10. Unsure siblings cause of dead but no heart, cancer, DM.

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at **Miami Beach FL** **2/6/06** X **Mali Koenig**

Witness (Must be Examiner or Nurse/Technician): **Alan O'Leary MD**

180-M205N-FL     E5722_S     CAT. #126095

# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO.: |
| | ) ) | 1:07-cv-0512-MHS |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) ) | |
| Defendant. | ) | |

**EXHIBIT 3 to Second Amended Complaint**

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York NY 10104

**Application For Life Insurance
Part I**
Form No LIFEAPP GA/OR
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy ) Please print in ink

**Proposed Insured**
A. Full Name First **Ben Zion**   MI ___   Last **Koenig**   B Gender ☒ Male  ☐ Female

C. Home Address ___ **Redacted** ___   **Redacted** ___

City/Municipality **Brooklyn**   County/Parish ___   State **N/A**   Zip + 4 Code **Redacted**
(If address is a PO or not actual residence, proof of residence required)

D. Home Phone No  **Redacted**   Best time to Call ___   Best phone no to be contacted ___

E. Date of Birth _ **Redacted** _   F. Place of Birth **Poland**
(State/County)

G. Marital Status  ☐ Single  ☒ Married  ☐ Widowed  ☐ Divorced  ☐ Separated   H. Soc Sec No ✓ **Redacted** ___

I. Driver's Lic No ___ **NONE** ___   State ___

J. U S Citizen? ☒ Yes  ☐ No* If No Country ___   U S Visa type ___   Passport # or U S Visa # ___   # of years in U S ___

K. Currently employed?  ☐ Yes  ☐ No  ☒ Retired

L. Current Occupation(s) (1) Title **N/A Retired**   (2) Duties **N/A**   (3) How Long? ___
(If less than 1 year at current occupation give previous in Remarks )

M. Employer Name **N/A**

N. Employer Address ___
No & Street ___   City ___   State ___   Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ **Retired**   P. Net Worth $ **26,000,000**
* If the Proposed Insured and/or policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W 8 BEN

**❷ COVERAGE INFORMATION**

A. Plan of Insurance **Athena VUL**   Amount of Insurance $ **10,000,000**
(If survivorship policy, complete an application for each Proposed Insured   (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement   Supplement )
To select dividend options on EWL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement )

B. Complete for UL or VUL only (1) Death Benefit Option  ☒ Option A  ☐ Option B
(2) Planned Periodic Premium $ **1,515,852**

C. Definition of Life Insurance Test  Complete for AUL II, IL, IL COLI '04   ☒ Guideline Premium Test   ☐ Cash Value Accumulation Test

D. Premium Mode  ☒ Annual   ☐ Semi Annual   ☐ Quarterly   ☐ Monthly
Or
System Matic (Complete S M form and check applicable box)   ☐ Quarterly (only available for UL and VUL)   ☐ Monthly

E. Salary Allotment (1) Unit Name ___   (2) Unit/Sub Unit  No ___   (3) Unit Register Date ___
(Specify Allotter name if other than insured in Remarks )

F. Date Policy to save Insured Age?  ☒ Yes   ☐ No

G. 1  Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or
for any other secondary market?  ☐ Yes   ☒ No
2  Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market
provider?  ☐ Yes   ☒ No

H. Any other life insurance now in effect or application now pending?  ☒ Yes   ☐ No
(Give companies, amounts and policy numbers in Remarks )

I. Will the coverage applied for replace or change any life insurance or annuities?  ☐ Yes   ☒ No   Is this a 1035 Exchange?  ☐ Yes   ☒
If "Yes", complete  (If additional room is needed, please use Remarks Section )

Amount $ ___   Company ___   Issue Year ___   Policy Number ___   ☐ Life  ☐ Group  ☐ Annuity
Amount $ ___   Company ___   Issue Year ___   Policy Number ___   ☐ Life  ☐ Group  ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option?  ☐ Yes   ☒ No   If "Yes", complete Term Policy/Rider or Purchase Option Supplement

K  Complete if Proposed Insured is under age 15   a) State total amount of insurance in force on the life of applicant or child's
parent, if greater $ ___
b) Are any other children in the family insured for a lesser amount?  ☐ Yes   ☐ No

If "Yes" give details ___

AMIGV 2005 A   CAT# 133942   E6173_1  1
217433, 04-21-2006, 11 11 21

**③ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary: Ben Zion Koenig Insurance Trust B 05/11/06 | | 100 |
| Contingent: | | |

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: Ben Zion Koenig Insurance Trust B 05/11/06   Social Security # or TIN **Redacted**

Address: Street Wells Fargo Bank, N.A. 400 Northridge Rd City Atlanta   State Ga   Zip Code 30350
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country_____ U.S. Visa type_____ Passport # or U.S. Visa #_____ # of years in U.S.____

Relationship to Insured_____ Date of Birth_____

Name of Trustee Wells Fargo Bank, N.A.   Date of Trust Agreement 5.11.06

If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**④ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

**A.** Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs?  ☐ Yes ☒ No
(If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.)

**B.** Any plans to travel or reside outside the United States?  ☐ Yes ☒ No
(If "Yes", complete Foreign Residence and Travel Supplement.)

**C.** Have you been disabled for 2 or more weeks within the last 2 years?  ☐ Yes ☒ No

**D.** In the last year flown other than as a passenger or plan to do so?  ☐ Yes ☒ No
(If "Yes", complete Aviation Supplement.)

**E.** Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies?  ☐ Yes ☒ No
(If "Yes", complete Avocation Supplement.)

**F.** In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification?  ☐ Yes ☒ No
(If "Yes", state companies and provide full details in Remarks.)

**G.** In the last 10 years, have you been convicted of, or pled "no contest" to a felony?  ☐ Yes ☒ No
(If "Yes" in "Remarks", state full details of offense and penalty, with dates.)

**H.** Do you currently use any form of tobacco or nicotine product?  ☐ Yes ☒ No   Type_____ Avg. Quantity # packs_____ Frequency_____

**I.** Have you ever used any form of tobacco or nicotine product?  ☐ Yes ☒ No   Type_____ Date Ceased_____

**⑤ MEDICAL INFORMATION (Proposed Insured)** Please Note: Complete this section even if a paramedical or medical exam is being ordered.

**A.** Height 5 Ft. 6 in.; Weight 166 lbs.

**B.** Personal Physician Name please see Special Remarks

**C.** Address

**D.** Date and Reason for Last Visit in the Last 5 Years no medical changes since Feb exam

**E.** What treatment was given or recommended? (If none, so state)

Has Proposed Insured:

**F.** In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder?  ☐ Yes ☒ No

**G.** In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility?  ☒ Yes ☐ No
(Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.)

**H.** In the last 10 years:

1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances?  ☐ Yes ☒ No
(If "Yes", complete Substance Usage Supplement.)

2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous?  ☐ Yes ☒ No
(If "Yes", complete Substance Usage Supplement.)

**I.** In the last 10 years, been:
Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession?  ☐ Yes ☒ No

**J.**

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | W W II death Camps | ? |
| Mother | | WW II death Camps | ? |
| Sibling | | | |

AMIGV-2005 A

217433,04-21-2006,11:11:21

2

**6** DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION     (Attach additional sheet of paper if necessary;
and it must be signed and dated by the Proposed Insured, Owner, and financial professional )

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks.
If the owner is a Qualified Plan, please indicate the qualified plan and type
here.

(Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional )

Dr. Albea Zucker          845 - 782 - 6092
305 Route  208
Manroe   NY  10950          Please  See  Contract
                            # 156 20 3466 for
Dr. Kaiser                  updated  medical file
465  Ocean Pkwy
Brooklyn    Ny   11218

**7**  COMPLETE IF MONEY IS PAID WITH THE POLICY:

Amount paid with this Application $ ____0____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including

(i)   the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)  the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?          ☒ Yes   ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered

**AGREEMENT.** Each signer of this application agrees that

(1)  The statements and answers in all parts of this application are true and complete  We (the Company checked on page 1 of this application) may rely on them in acting on this application

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered  Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application  (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living, (b) before any Registered Date specified in this application, and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement  Or to waive any of our rights or requirements  We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam)

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

AMIGV 2005 A

217433, 04-21-2006, 11 11 21

3

☐ AXA Equitable Life Insurance Company ☐ MONY Life Insurance Company of America

## ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

## AUTHORIZATIONS

### TO OBTAIN HEALTH INFORMATION

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

### TO OBTAIN NON-HEALTH INFORMATION

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

### PURPOSE OF AUTHORIZATIONS

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

### COVERAGE CONDITIONS

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

### ADDITIONAL AUTHORIZATIONS

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

### DURATION

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

### COPY OF AUTHORIZATIONS

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).

CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City ___Atlanta___

State: ___Georgia___

on ___5/12/08___

Signature of Proposed Insured, Applicant, or parent or guardian
(If proposed insured is under age 15) ___Preferred Life Ins Insurance Trust Bobby
by Wells Fargo Bank, N.A., as Trustee___

Signature of Owner or Applicant if not Proposed Insured
(If corporation, print firm's name and signature of authorized officer.)
(If trust, signature of trustee.)  ELIZABETH T. WAGNER  VICE PRESIDENT

### Financial Professional to complete this section:

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued? ☐ Yes ☒ No
(If "yes" give details.) _____

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☒ I have witnessed the signature required on fully completed Part 1  ☐ I have not witnessed the signature required on fully completed Part 1. (Explain below)

Signature of Licensed Financial Professional/Insurance Broker
Print Licensed Financial Professional's Name

**Application Part 2 To:** ☐ AXA Equitable Life Insurance Company    USA

☐ AXA Life and Annuity Company    Passport    Redacted

Reason for submission of this form: ☐ New Policy ☐ Policy Change ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name Benzion | Middle Initial — | Last Name Koenig | b. Height _ft _in. d. Birth Date: f. ☐ Male ☐ Female | c. _lbs Weight Redacted | lbs. |
|---|---|---|---|---|---|---|

2. a. Name and address of personal physician (or medical facility used instead): (If none, so state) Dr Albert Zucker (305) 845-782-954

b. Date and reason last consulted if within the last 5 years: 6m ago, routine. Montreal, NY 1050 (Apr 10,05) 305. Route 305 # 27

c. What treatment was given or recommended? (If none, so state) none

| (For all "Yes" answers to Questions 3–6, circle items that apply.) 3. Has Proposed Insured ever had or been treated for: | Yes | No | 10 pounds in the last 6 months? 7. Other than as stated in answers to Questions 2–6, has Proposed Insured, within the last 5 years: | Yes | No |
|---|---|---|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☐ | a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ | b. Had any illness, injury, or surgery? | ☐ | ☐ |
| c. Shortness of breath, blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ | c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| | | | d. Had electrocardiogram, X-ray, other diagnostic test? | ☐ | ☐ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ | e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ | 9. a. Has Proposed Insured, within the last 12 months: (i) Smoked cigarettes? (ii) Used any other form of tobacco (Give full details) | ☐ ☐ | ☑ ☑ |
| f. Sugar, albumin, blood or pus in urine, stone or other disease or disorder of kidney or bladder? | ☐ | ☑ | b. Has Proposed Insured, within the last five years: (i) Smoked cigarettes? (ii) Used any other form of tobacco (Give full details) | ☐ ☐ | ☑ ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☐ | ☑ | | | |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | 55 | Holocaust victim | 50's |
| Mother | | unsure / natural | 93 |
| Brothers/Sisters 3 | | Holocaust victim 50's | |

| 3. (cont.) | Yes | No |
|---|---|---|
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☑ | ☐ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑ |
| 7. Has Proposed Insured's weight changed by more than | ☐ | ☑ |

**DETAILS FOR "YES" ANSWERS.** Include: i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

4. ASA only (81 mg)
8a. Dr Kayser - Brooklyn NY.
routine check-up, 4mnths routine
81 test.
Dr Zucker - 4yr. also routine
8d 81 test test. ec6 routine eye-ex

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at Miami Beach FL on 2/6/06    X Benzion Koenig

       city    state     Mo Day Yr           Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician) _____

180-M205N-FL      E5722_5      CAT. #126995

# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office  1290 Avenue of the Americas, New York, New York 10104

> This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force  You may pay premiums while the insured person is living and is not yet attained age 100  The values provided by this policy are based on declared interest rates  This is a non-participating policy.

No. 04-100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AXA EQUITABLE LIFE INSURANCE )
COMPANY;                      )
                              )
        Plaintiff,            )
                              )          CIVIL ACTION NO.:
                              )          1:07-cv-0512-MHS
v.                            )
                              )
WELLS FARGO BANK, N.A., AS TRUSTEE )
OF THE MALI KOENIG INSURANCE TRUST )
05/11/06, AND AS TRUSTEE OF THE )
BENZION KOENIG INSURANCE      )
TRUST 05/11/06                )
                              )
        Defendant.            )

**EXHIBIT 4 to Second Amended Complaint**

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
**Part I**
Form No. LIFEAPP GA/OR
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink

**Proposed Insured**

A   Full Name First _Ben Zion_   MI ____   Last _Koenig_   B. Gender ☒ Male ☐ Female

C   Home Address   **Redacted**   **Redacted**

City/Municipality _Brooklyn_ (if address is a P.O. Box or not actual residence, proof of residence required)   County/Parish ____   State _NY_   Zip + 4 Code **Redacted**

D   Home Phone No. **Redacted**   Best time to Call _Poland_   Best phone no. to be contacted ____

E   Date of Birth   **Redacted**   F. Place of Birth ____ (State/County)

G   Marital Status ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated   H. Soc Sec No _ **Redacted**

I   Driver's Lic No _None_   State ____

J   U.S. Citizen? ☒ Yes ☐ No* If No Country ____   U.S. Visa type ____   Passport # or U.S Visa # ____   # of years in U.S ____

K   Currently employed? ☐ Yes ☐ No ☒ Retired

L   Current Occupation(s) (1) Title _N/A Retired_   (2) Duties _N/A_ (If less than 1 year at current occupation, give previous in Remarks)   (3) How Long? ____

M   Employer Name ____

N   Employer Address ____
No & Street        City        State        Zip + 4 Code

O   Annual Earned Income (Income from occupation) $ _Retired_   P  Net Worth $ _26,000,000_

If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❷ COVERAGE INFORMATION**

A   Plan of Insurance _Athena IIul_   Amount of Insurance $ _10,000,000_
(If survivorship policy, complete an application for each Proposed Insured   (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement   Supplement )
To select dividend options on EWL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement )

B   Complete for UL or VUL only (1) Death Benefit Option ☒ Option A   ☐ Option B
(2) Planned Periodic Premium $ _1,515,852_

C   Definition of Life Insurance Test  Complete for AUL II, IL, IL COLI '04   ☒ Guideline Premium Test   ☐ Cash Value Accumulation Test

D   Premium Mode ☒ Annual   ☐ Semi Annual   ☐ Quarterly   ☐ Monthly
Or
System-Matic (Complete S M form and check applicable box)   ☐ Quarterly (only available for UL and VUL)   ☐ Monthly

E   Salary Allotment (1) Unit Name ____   (2) Unit/Sub Unit. No ____   (3) Unit Register Date ____
(Specify Allottee name if other than insured in Remarks )

F   Date Policy to save Insured Age? ☒ Yes   ☐ No

G   1  Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or
for any other secondary market?   ☐ Yes ☒ No
2  Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market
provider?   ☐ Yes ☒ No

H   Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies  amounts and policy numbers in Remarks )

I   Will the coverage applied for replace or change any life insurance or annuities?   ☐ Yes ☒ No   Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete  (If additional room is needed, please use Remarks Section )

Amount $ ____   Company ____   Issue Year ____   Policy Number ____   ☐ Life ☐ Group ☐ Annuity

Amount $ ____   Company ____   Issue Year ____   Policy Number ____   ☐ Life ☐ Group ☐ Annuity

J   Is this a Term Policy/Rider Conversion or Purchase Option?   ☐ Yes ☒ No   If "Yes", complete Term Policy/Rider or Purchase Option Supplement

K   Complete if Proposed Insured is under age 15   a) State total amount of insurance in force on the life of applicant or child's
parent, if greater $ ____
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details ____

AMIGV 2005 A   CAT# 133942   E6173_1  1

217433, 04-21-2006, 11 11.21

**3** **BENEFICIARY/OWNER**

**A** Beneficiary (Total designation must be 100%  Use Remarks section for additional Beneficiary information )

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary Benzion Koenig Insurance Trust A 05/11/06 | | 100 |
| Contingent | | |

**B** Owner (The Owner of this policy is the insured unless otherwise specified below  Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the insured and Owner, in Remarks Section

If the Owner is the Trust provide the name of the Trust

Owner's Name Benzion Koenig Insurance Trust A 05/11/06 , Social Security # or TIN   **Redacted**

Address Street 500 Northridge Rd , City Atlanta , State Ga , Zip Code 30350
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section )

U S Citizen? ☐ Yes ☐ No* If No, Country_____ U S Visa type_____ Passport # or U S Visa # _____ # of years in U S ____

Relationship to Insured _____ Date of Birth _____

Name of Trustee Wells Fargo Bank, N.A , Date of Trust Agreement  5/11/06

If the policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W 8 BEN

**4** **GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section

| | | | |
|---|---|---|---|
| A. | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs?<br>(If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks ) | ☐ Yes | ☒ No |
| B. | Any plans to travel or reside outside the United States?<br>(If "Yes", complete Foreign Residence and Travel Supplement ) | ☐ Yes | ☒ No |
| C | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| D | In the last year flown other than as a passenger or plan to do so?<br>(If "Yes", complete Aviation Supplement ) | ☐ Yes | ☒ No |
| E. | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies?<br>(If "Yes", complete Avocation Supplement ) | ☐ Yes | ☒ No |
| F. | In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification?<br>(If "Yes", state companies and provide full details in Remarks ) | ☐ Yes | ☒ No |
| G. | In the last 10 years, have you been convicted of, or pled "no contest" to a felony?<br>(If "Yes" in "Remarks", state full details of offense and penalty, with dates ) | ☐ Yes | ☒ No |
| H. | Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No  Type_____ Avg Quantity # packs_____ Frequency____ |
| I. | Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No  Type_____ Date Ceased _____ |

**5** **MEDICAL INFORMATION (Proposed Insured)** Please Note: Complete this section even if a paramedical or medical exam is being ordered

A. Height 5 Ft 6 in, Weight 160 lbs

B. Personal Physician Name please  see  Special  Remarks

C. Address _____

D. Date and Reason for Last Visit in the Last 5 Years  No medical changes since Feb medical exam

E. What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

| | | | |
|---|---|---|---|
| F. | In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| G. | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility?<br>(Also include medical checkups in the last 2 years  Do not include colds, minor injuries or normal pregnancy) | ☒ Yes | ☐ No |
| H | In the last 10 years | | |
| | 1  Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives, marijuana, cocaine, hallucinogens or other mood altering drugs, heroin, methadone or other narcotics, amphetamines or other stimulants, or any other illegal or controlled substances?<br>(If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| | 2  Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous?<br>(If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| I. | In the last 10 years, been<br>Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |

J

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | WWII | WW II death camps | ? |
| Mother | | WW II death camps | ? |
| Sibling | WW | | |

AMIGV-2005 A

**❻ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**     (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional )

| Question No | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks if the owner is a Qualified Plan, please indicate the qualified plan and type here.

(Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr. Albea Zucker    845-782-6092
305 Route 208    Please see Contract
Manroe Ny 10950    # 86203466 for
   updated medical file

Dr. Kaiser
465 Ocean Pkwy
Brooklyn Ny 11218

**❼ COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application $ _____ 6 _____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including

(i)   the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)   the $1,000,000 insurance amount limitations, and

(iii)   that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?       ☒ Yes    ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered

**AGREEMENT.** Each signer of this application agrees that

(1)   The statements and answers in all parts of this application are true and complete We (the Company checked on page 1 of this application) may rely on them in acting on this application

(2)   The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege

(3)   Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living, (b) before any Registered Date specified in this application, and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid

(4)   No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement Or to waive any of our rights or requirements We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam)

(5)   I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

☐ AXA Equitable Life Insurance Company ☐ MONY Life Insurance Company of America

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**
I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**
**TO OBTAIN HEALTH INFORMATION**
I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator; and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**
I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**
I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**
I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**
You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy, I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**
Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization. If you revoke this authorization and a claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**
I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

**FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.**

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (i) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (ii) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING; AND (iii) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City _____ Atlanta

State _____ Georgia

on _____ 5/17/06

Signature of Proposed Insured, Applicant, or parent or guardian _____

Signature of Owner or Applicant if not Proposed Insured _____
(if Corporation, print firm's name and title of officer signing)
(if Trust, signature of Trustee) _____

**Financial Professional to complete this section**
Was any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued? ☐ Yes ☐ No
(If "yes" give details) _____

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1 and I know of nothing affecting the risk that has not been recorded herein.
☐ I have witnessed the signature required on fully completed Part 1 ☐ I have not witnessed the signature required on fully completed Part 1 (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name _____

AMIGV 2005-A

**Application Part 2 To:** ☐ AXA Equitable Life Insurance Company     USA

☐ AXA Life and Annuity Company     Passport # Redacted

Reason for submission of this form: ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

| 1 a. Proposed Insured (Please Print) | First Name: Beuziae | Middle Initial: - | Last Name: Koenig | b. Height: ft. in. c. Weight: Redacted d. Birth Date: e. ☐ Male ☐ Female |
|---|---|---|---|---|

2. a. Name and address of personal physician (or medical facility used instead): *(if none, so state)* Dr Albert Zucker (305) 895-782-9541

b. Date and reason last consulted if within the last 5 years. 6m Ago. routine. Monroe, NY

c. What treatment was given or recommended? *(if none, so state)* none       05, 8 #

*(For all "Yes" answers to Questions 3-9, circle items that apply.)*

| 3. Has Proposed Insured ever had or been treated for: | Yes | No |
|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| b. Dizziness, fainting, convulsions, paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ |
| c. Shortness of breath, blood spitting, bronchitis, asthma, emphysema, tuberculosis or other chronic respiratory disease or disorder? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine, stone or other disease or disorder of kidney or bladder? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☐ | ☑ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☑ | ☐ |

5. Has Proposed Insured, within the last 10 years, been:
a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection?  ☐ ☑

6. Has Proposed Insured, within the last 10 years:
a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances?  ☐ ☑

b. Received counseling or treatment regarding the use of alcohol or drugs?  ☐ ☑

7. Has Proposed Insured's weight changed by more than  ☐ ☑

| 8. Other than as stated in answers to Questions 2–6, has Proposed Insured, within the last 5 years: | Yes | No |
|---|---|---|
| a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Had any illness, injury, or surgery? | ☐ | ☑ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☑ | ☐ |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |

9. a. Has Proposed Insured, within the last 12 months:
(i) Smoked cigarettes?  ☐ ☑
(ii) Used any other form of tobacco (Give full details)  ☐ ☑

b. Has Proposed Insured, within the last five years:
(i) Smoked cigarettes?  ☐ ☑
(ii) Used any other form of tobacco (Give full details)  ☐ ☑

10. Family History:

| | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Holocaust victim 505 | |
| Mother | | unsure / natural | 97 |
| Brothers/Sisters 3 | | Holocaust victims | |

**DETAILS FOR "YES" ANSWERS:** Include: I. Question Number. II. Diagnosis and Treatment. III. Results. IV. Dates and Duration. V. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

4. ASA ONLY (81mg)
8a. Dr Kayser - Brooklyn NY. routine check-up, 9mlAgo routine B1 test.
Dr Zucker - 4yr. also routine
8d B1 test test. ECG routine 4yr-M

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at Miami Beach on 2/6/06 x _Beuzia Koenig_
City   State   Mo Day Yr   Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): _____ M

180-M206N-FL     E5722_5     CAT. #126995

# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy The Insurance Benefit is payable upon the death of the insured person while this policy is in force You may pay premiums while the insured person is living and is not yet attained age 100 The values provided by this policy are based on declared interest rates. This is a non-participating policy

No. 04-100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) ) | 1:07-cv-0512-MHS |
| v. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 5 to Second Amended Complaint**

*INSURED PERSON    MALI KOENIG*



*POLICY OWNER     MALI KOENIG INS TRUST 20060511*

# UNIVERSAL LIFE INSURANCE POLICY

*POLICY NUMBER    156 212 029*

### AXA EQUITABLE LIFE INSURANCE COMPANY
### HOME OFFICE: 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK

**We agree** to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

### Flexible Premium Universal Life Insurance Policy

This is a flexible premium universal life insurance policy. You can, within limits:
- make premium payments at any time and in any amount;
- change the Death Benefit Option; and
- reduce the face amount of insurance

These rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We put your net premiums into your Policy Account. Your Policy Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 3% per year.

This is a non-participating policy.

**Right to Examine Policy. You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.**

**Read Your Policy Carefully.** It is a legal contract between you and AXA Equitable Life Insurance Company.

*Pauline Sherman*

Pauline Sherman, Senior Vice President,
Secretary and Associate General Counsel

Christopher M. Condron
Chairman and Chief Executive Officer

04-100

# Contents

*Policy Information* **3**

*Table of Maximum Monthly Charges
for Benefits* **4**

*Those Who Benefit from this Policy* **5**

*The Insurance Benefit We Pay* **5**

*Reducing the Face Amount of the Base
Policy or Changing the Death Benefit
Option* **6**

*The Premiums You Pay* **7**

*Your Policy Account and How it
Works* **8**

*The Cash Surrender Value of this
Policy* **9**

*How a Loan Can Be Made* **10**

*Our Annual Report to You* **11**

*How Benefits are Paid* **11**

*Other Important Information* **11**

### In this policy:

*"We," "our,"* and *"us"* mean AXA Equitable Life Insurance Company.

*"You"* and *"your"* mean the owner of this policy at the time an owner's right is exercised.

Unless otherwise stated, all references to interest in this policy are effective annual rates of interest.

Attained age means age on the birthday nearest to the beginning of the current policy year.

### Administrative Office

The address of our Administrative Office is shown on Page 3. You should send correspondence to that office. Premium payments should be sent to the address listed on your billing notice.

*Copies of the application for this policy and any additional benefit riders are attached to the policy.*

# INTRODUCTION

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information sectio n, are put into your Policy Account. Amounts in your Policy Account earn interest at rates we declare periodically; these rates will not be less than 3% on an effective annual basis.

If Death Benefit Option A is in effect, the Death Benefit is the base policy face amount. If Death Benefit Option B is in effect, the Death Benefit is the base policy face amount *plus* the amount in your Policy Account. Under either option, the Death Benefit will never be less than a percentage of your Policy Account as stated in the "Death Benefit" provision.

The Insurance Benefit of this policy is payable upon the death of the insured person while the policy is in force.

We make monthly deductions from your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value or reduce the base policy face amount, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

## POLICY INFORMATION

INSURED PERSON    MALI KOENIG

POLICY OWNER    MALI KOENIG INS TRUST 20060511

FACE AMOUNT
OF BASE POLICY    $10,000,000

DEATH BENEFIT    OPTION A (SEE PAGE 6)

POLICY NUMBER    156 212 029             ISSUE AGE    83
                                                SEX FEMALE

BENEFICIARY    MALI KOENIG INS TRUST 05/11/06

REGISTER DATE    MAY 19, 2006

                                    RATING CLASS:   STANDARD
DATE OF ISSUE    FEB 20, 2007                            NON-TOBACCO USER

A MINIMUM INITIAL PREMIUM PAYMENT OF $86,722.83 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $1,251,740.00 IS PAYABLE ANNUALLY.

THE ADDITIONAL BENEFIT RIDERS LISTED BELOW, IF ANY, ARE INCLUDED IN THIS POLICY:

THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY; (4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

POLICY INFORMATION CONTINUED—POLICY NUMBER   156 212 029

———————   TABLE OF EXPENSE CHARGES   ———————

DEDUCTION FROM PREMIUM PAYMENTS:

PREMIUM CHARGE:

WE DEDUCT AN AMOUNT NOT TO EXCEED 8% FROM EACH PREMIUM PAYMENT. WE RESERVE THE RIGHT TO INCREASE THIS PERCENTAGE LIMIT AS A RESULT OF CHANGES IN THE TAX LAWS WHICH INCREASE OUR EXPENSES.

DEDUCTIONS FROM YOUR POLICY ACCOUNT:

ADMINISTRATIVE CHARGE:

FIRST POLICY YEAR: WE DEDUCT $20.00 AT THE BEGINNING OF EACH POLICY MONTH.

SECOND AND SUBSEQUENT POLICY YEARS (BUT NOT BEYOND THE POLICY ANNIVERSARY WHEN THE INSURED PERSON IS ATTAINED AGE 100): WE DEDUCT AN AMOUNT NOT TO EXCEED $10.00 AT THE BEGINNING OF EACH POLICY MONTH.

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 212 029

————— TABLE OF SURRENDER CHARGES —————
FOR THE INITIAL BASE POLICY FACE AMOUNT

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 01 | $464,242.14 | 09 | $229,144.80 |
| 02 | $437,152.49 | 10 | $196,041.96 |
| 03 | $410,146.80 | 11 | $162,934.46 |
| 04 | $383,141.12 | 12 | $129,742.98 |
| 05 | $356,051.46 | 13 | $96,640.14 |
| 06 | $328,541.96 | 14 | $63,532.64 |
| 07 | $295,434.45 | 15 | $30,341.16 |
| 08 | $262,238.31 | 16 AND LATER | $0.00 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS
POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE WITHIN THE FIRST
FIFTEEN POLICY YEARS.  THE SURRENDER CHARGE IN THE FIRST POLICY MONTH
OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE.  DURING THE FIRST FIVE
POLICY YEARS THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY
AMOUNTS UNTIL IT REACHES $331,298.97 IN THE TWELFTH MONTH OF POLICY
YEAR FIVE.  STARTING IN POLICY YEAR SIX, THE SURRENDER CHARGE DECLINES
UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES ZERO IN THE TWELFTH
MONTH OF POLICY YEAR FIFTEEN.

IF THE BASE POLICY FACE AMOUNT IS REDUCED WITHIN THE FIRST FIFTEEN
POLICY YEARS, A PROPORTIONATE SHARE OF THE APPLICABLE SURRENDER CHARGE AT
THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT.  SEE SURRENDER
CHARGES PROVISION FOR A DESCRIPTION OF THE PROPORTIONATE SURRENDER CHARGE.

ADMINISTRATIVE OFFICE:

AXA EQUITABLE LIFE INSURANCE COMPANY

NATIONAL OPERATIONS CENTER
10840 BALLANTYNE COMMONS PARKWAY
CHARLOTTE, NC 28277
(800) 777-6510

POLICY INFORMATION CONTINUED - POLICY NUMBER 156 212 029

————— TABLE OF MAXIMUM MONTHLY CHARGES FOR BENEFITS —————

| BENEFITS | MONTHLY DEDUCTION FROM POLICY ACCOUNT | PERIOD |
|---|---|---|
| BASE POLICY LIFE INSURANCE | MAXIMUM MONTHLY COST OF INSURANCE RATE FOR THE BASE POLICY (SEE PAGE 4 - CONTINUED) TIMES THOUSANDS OF NET AMOUNT AT RISK.  NO DEDUCTION IS MADE AFTER AGE 100 OF THE INSURED PERSON. | 17 YEARS |

POLICY INFORMATION CONTINUED—POLICY NUMBER   156 212 029

TABLE OF MAXIMUM MONTHLY COST OF INSURANCE RATES
PER $1,000 OF NET AMOUNT AT RISK FOR THE BASE POLICY

| INSURED PERSON'S ATTAINED AGE | RATE |
|---|---|
| 83 | 7.98833 |
| 84 | 9.02000 |
| 85 | 10.16417 |
| 86 | 11.40333 |
| 87 | 12.74917 |
| 88 | 14.19083 |
| 89 | 15.75500 |
| 90 | 17.44583 |
| 91 | 19.30500 |
| 92 | 21.39667 |
| 93 | 23.84000 |
| 94 | 26.92583 |
| 95 | 31.31000 |
| 96 | 38.50417 |
| 97 | 52.27500 |
| 98 | 83.33250 |
| 99 | 83.33250 |
| 100 AND OVER | 0.00000 |

PAGE 4—CONTINUED

POLICY INFORMATION CONTINUED – POLICY NUMBER  156 212 029

———————    TABLE OF PERCENTAGES    ———————

| INSURED PERSON'S ATTAINED AGE | PERCENTAGE | INSURED PERSON'S ATTAINED AGE | PERCENTAGE |
|---|---|---|---|
| 40 and under | 250% | 61 | 128% |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70 | 115 |
| 50 | 185 | 71 | 113 |
| 51 | 178 | 72 | 111 |
| 52 | 171 | 73 | 109 |
| 53 | 164 | 74 | 107 |
| 54 | 157 | 75-90 | 105 |
| 55 | 150 | 91 | 104 |
| 56 | 146 | 92 | 103 |
| 57 | 142 | 93 | 102 |
| 58 | 138 | 94 and above | 101 |
| 59 | 134 | | |
| 60 | 130 | | |

Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"), gives a definition of life insurance which limits the amounts that may be paid into a life insurance policy relative to the benefits it provides. Even if this policy states otherwise, at no time will the "future benefits" under this policy be less than an amount such that the "premiums paid" do not exceed the Code's "guideline premium limitations." We may adjust the amount of premium paid to meet these limitations. Also, at no time will the "death benefit" under the policy be less than the "applicable percentage" of the "cash surrender value" of the policy. The above terms are as defined in the Code. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes -Applicable Tax Law" for more information.

## *Those Who Benefit from this Policy*

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice in a form satisfactory to us. You can get such a form from your financial professional or by writing to us at our Administrative Office. The change will take effect on the date you sign the notice; however, it will not apply to any payment we make or other action we take before we receive the notice.

**Assignment.** You may assign this policy, if we agree; however, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

## *The Insurance Benefit We Pay*

We will pay the Insurance Benefit of this policy to the beneficiary upon the death of the insured person when we receive at our Administrative Office (1) proof that the insured person died while this policy was in force; and (2) all other requirements we deem necessary. The Insurance Benefit includes the following amounts, which we will determine as of the date of death of the insured person:

- the Death Benefit described in the "Death Benefit" provision;
- **plus** any other benefits then due from riders to this policy;
- **minus** any policy loan and accrued interest, or liens;
- **minus** any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount in accordance with applicable law. We will compute the interest at a rate we determine, but not less than the rate required by any applicable law. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See the "Other Important Information" section of this policy, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Additional exclusions or limitations (if any) are listed in the Policy Information section.

**Death Benefit.** The Death Benefit of this policy will be determined under either Option A or Option B, whichever you have chosen and is in effect on the date of death of the insured person.

Under Option A, the Death Benefit is the greater of (a) the base policy face amount; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

Under Option B, the Death Benefit is the greater of (a) the base policy face amount *plus* the amount in your Policy Account on the date of death of the insured person; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

The percentages referred to above are the percentages from the "Table of Percentages" shown on Page 4-Continued of this policy for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

**Coverage After Age 100.** If the policy is in force on the policy anniversary when the insured person reaches age 100, it will remain in force subject to the policy loan provision. However, no premium payments, partial withdrawals, changes in face amount or changes in Death Benefit Option will be permitted after age 100 of the insured person; policy loans and loan repayments may continue to be made, subject to our normal rules as stated in other provisions of the policy pertaining to these items. No deductions for cost of insurance or administrative charges will be made after age 100 of the insured person.

## *Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option*

You may reduce the face amount of the base policy or change the death benefit option by written request to us at our Administrative Office, subject to the following conditions:

1. After the second policy year while this policy is in force, you may ask us to reduce the base policy face amount but not to less than $50,000. Any such reduction in the face amount may not be less than $10,000. If you reduce the base policy face amount before the end of the twentieth policy year, we will deduct a proportionate amount of any applicable surrender charge from your Policy Account.

2. After the second policy year while this policy is in force, you can change your death benefit option. Any requested change to death benefit Option B must be made while the insured person is not more than attained age 90. If you ask us to change from Option A to Option B, we will decrease the base policy face amount by the amount in your Policy Account on the date the change takes effect. However, we will decline to make such change if it would reduce the base policy face amount to less than $50,000. If you ask us to change from Option B to Option A, we will increase the base policy face amount by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the base policy face amount are made so that the death benefit remains the same on the date the change takes effect.

3. The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

4. We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

5. You may ask for a change by completing an application for change, which you can get from your financial professional or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

# *The Premiums You Pay*

The minimum initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before a premium at least equal to the minimum initial premium is paid. Other premiums may be paid at our Administrative Office at any time prior to attained age 100 of the insured person while this policy is in force. We will furnish you with a premium receipt, signed by one of our officers, upon request.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the Death Benefit and your policy's values. We will assume that any payment you make to us is a premium payment, unless you tell us in writing that it is a loan repayment.

If you stop paying premiums, insurance coverage will continue for as long as the Net Policy Account Value is sufficient to cover the monthly deductions described in the "Monthly Deductions" provision, with a further extension of coverage as described in the "Grace Period" provision.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make if they would immediately result in more than a dollar for dollar increase in the Death Benefit (which would happen if the Death Benefit is determined as a percentage of the Policy Account, as described in the "Death Benefit" provision), unless you provide satisfactory evidence of insurability of the insured person.

We also reserve the right not to accept premium payments or to return excess amounts that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

**Grace Period.** At the beginning of each policy month, we compare the Net Policy Account Value (this is equal to the amount in your Policy Account minus any policy loan and accrued loan interest) to the total monthly deductions described in the "Monthly Deductions" provision. If the Net Policy Account Value is sufficient to cover the total monthly deductions, this policy is not in default.

If the Net Policy Account Value at the beginning of any policy month is not sufficient to cover the total monthly deductions, the policy is in default as of the first day of such policy month.

If the policy is in default, we will send you and any assignee on our records at last known addresses written notice stating that a grace period of 61 days has begun starting with the date the notice is mailed. The notice will also state the amount of payment that is due.

The payment required will not be more than an amount sufficient to increase the Net Policy Account Value to cover all monthly deductions for 3 months, calculated assuming no interest was credited to the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we receive the requested amount before the end of the grace period, but the Net Policy Account Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61 day grace period has begun and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 5.

04-100-7                                                                 Page 7

**Restoring Your Policy Benefits.** If this policy has ended without value and was not given up for its Net Cash Surrender Value, you may restore policy benefits while the insured person is alive. In order to restore benefits, you must:

1.  Ask for restoration of policy benefits within 5 years from the end of the grace period; and

2.  Provide evidence of insurability satisfactory to us; and

3.  Make a required payment. The required payment will not be more than an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the premium charge. We will determine the amount of this required payment as if no interest was credited to your Policy Account.

We must receive the required payment while the insured person is alive. We will deduct the premium charge from the required payment. The policy account on the date of restoration will be equal to the balance of the required payment.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request. We will start to make monthly charges again as of the effective date of restoration. The schedule of surrender charges that was applicable on the date of default will also be applicable to the restored policy.

We reserve the right to decline to restore this policy if in our opinion it would cause this policy to fail to qualify as life insurance under applicable tax law.

# *Your Policy Account and How it Works*

**Premium Payments.** When we receive your premium payments, we subtract the premium charge shown in the table in the "Policy Information" section and any overdue monthly deductions We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the minimum initial premium payment, as shown in the "Policy Information" section, is received at our Administrative Office.

We credit interest to your Policy Account at effective annual rates we determine periodically. We make deductions from your Policy Account as described in the "Monthly Deductions" provision. We also subtract from your Policy Account any partial Net Cash Surrender Value withdrawals you ask for; more details are given in the Cash Surrender Value section of this policy.

**Monthly Deductions.** At the beginning of each policy month we make a deduction from your Policy Account to cover the charges described below. If you do not submit the full minimum initial premium with your application, and the minimum initial premium is paid upon delivery, your monthly charges commence as of the Register Date. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

*   the monthly administrative charge;

*   the monthly cost of insurance for the insured person; and

*   the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of (a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; *plus* (b) any flat extra charge shown in the "Policy Information" section. The net amount at risk at any time is the Death Benefit (calculated as of that time) minus the amount in your Policy Account at that time.

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision. They will never be more than those shown in the Table of Maximum Monthly Cost of Insurance Rates Per $1000 of Net Amount at Risk for the Base Policy on Page 4-Continued.

No monthly deductions are made after age 100 of the insured person.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

- We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value or you reduce the base policy face amount.

**How We Add Interest.** We will credit the amount in your Policy Account with interest at rates we determine. We will determine such interest rates periodically in advance for unloaned and loaned amounts. The rates may be different for unloaned and loaned amounts. Any change in the interest rates we determine will be as described in the "Changes in Policy Cost Factors" provision. Such interest rates will not be less than 3% per year. Interest accrues and is credited on unloaned amounts in your Policy Account daily. However, we will credit interest on the initial net premium from the Register Date if it is later than the date of receipt provided the initial premium is at least equal to the minimum initial premium shown on Page 3 of the policy.

We credit interest on the loaned portion of your Policy Account daily. The interest rate we credit to the loaned portion of your Policy Account will be at an annual rate up to 2% less than the loan interest rate we charge. However, we reserve the right to credit a lower rate than this if in the future tax laws change such that our taxes on policy loans or policy loan interest are increased. In no event will we credit less than 3% per year.

On each policy anniversary and at any time you repay all of a policy loan, we will transfer the interest that has been credited to the loaned portion of your Policy Account to the unloaned portion of your Policy Account.

# The Cash Surrender Value of this Policy

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. Your written request for cancellation or surrender must include the following:

1. A statement that makes it clear that you intend to surrender the contract;

2. The policy number of the policy to be surrendered;

3. The name of the insured person and your name (if other than the insured person) and address where proceeds should be mailed;

4. Your signature and, if required by the policy or by a legally binding document of which we have an actual notice, the signature of a collateral assignee or other person having an interest in the policy through the legally binding document.

If this policy has a Cash Surrender Value and is being given up for its Net Cash Surrender Value, a completed withholding authorization must also be included with your written request. If this form is not provided to us with your written request for surrender, we will withhold income tax on the taxable portion of your distribution at the mandated federal and state tax rates. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. If the policy has been lost, stolen or destroyed, you must include a statement in the written request that the policy was lost, stolen or destroyed with an approximate date of when the policy was lost, stolen or destroyed. All insurance coverage under this policy ends on the date we receive your written request.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of surrender charges for the initial base policy face amount is in the "Policy Information" section.

If the base policy face amount is reduced before the end of the fifteenth policy year, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. We will send you a new Policy Information section in the event of a reduction in the base policy face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year, and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount of $500.00. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal if this would cause the policy to fail to qualify as life insurance under applicable tax law, as interpreted by us. We will decline a request for a partial Net Cash Surrender Value withdrawal if this would cause a decrease in the base policy face amount to less than $50,000. A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your Death Benefit. If the Death Benefit is Option A, the withdrawal may also result in a decrease in the face amount; there will be no proportionate surrender charge due to such a decrease.

Such withdrawal and resulting reduction in the Death Benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

## *How a Loan Can Be Made*

**Policy Loans.** You can take a loan on this policy while it has a loan value. This policy will be the only security for the loan. The initial loan and each additional loan must be for at least $500.00. Any amount on loan is part of your Policy Account. We refer to this as the loaned portion of your Policy Account.

**Carry Over Loans.** If this policy was issued based, in whole or part, upon an exchange of another life insurance policy, any transferred existing loan from the exchanged policy as approved by us will be put into the loaned portion of your Policy Account. If a refund is made under the "Right to Examine Policy" provision, we will subtract any policy loan and accrued loan interest from that refund.

**Loan Value.** The loan value on any date is the Cash Surrender Value on that date discounted at the loan interest rate we charge to the next policy anniversary. The amount of any new loan you take may not be more than the loan value, less any existing loan and accrued loan interest. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination or (2) 4%. "Published Monthly Average" means the Moody's Corporate Bond Yield Average - Monthly Average Corporates published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than $\frac{1}{2}$ of 1% per year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph exceeds the rate being charged by $\frac{1}{2}$ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by $\frac{1}{2}$ of 1% or more.

We will notify you of the initial loan interest rate when you take out a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and bear interest at the loan rate then in effect.

**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Policy Account Value is less than the total monthly deduction then due. In that case, the "Grace Period" provision will apply.

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

## Our Annual Report to You

For each policy year we will send you without charge a report for this policy that shows the current Death Benefit, the value of your Policy Account, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

## How Benefits Are Paid

The Insurance Benefit or your Net Cash Surrender Value withdrawals are paid immediately in one sum. Amounts paid will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

## Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of a premium at least equal to the minimum initial premium payment shown in the "Policy Information" section. This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Code or successor law. Therefore, we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change Death Benefit Options, to decline to change the face amount, or to decline to make partial withdrawals that, in our opinion, would cause this policy to fail to qualify as life insurance under applicable tax law. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages in the "Death Benefit" provision) or to require additional premium payments, or to make distributions from this policy or to change the face amount to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the earlier of the Register Date or date of issue shown in the Policy Information section.

We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change or restoration. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the lifetime of the insured person.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What if Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the earlier of the Register Date or the date of issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the Death Benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase.

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**When We May Defer Payment.** We may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except when used to pay premiums to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% per year, on any Net Cash Surrender Value payment that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. We compute reserves under this policy by the Commissioners' Reserve Valuation Method.

We use the 1980 Commissioners' Standard Ordinary Male or Female Mortality Tables at attained ages 0-17, and the 1980 Commissioners' Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables at attained ages 18 and over, as the basis for determining maximum insurance costs and minimum cash surrender values. We take account of the sex, attained age, and class of risk of the insured person. For attained ages 18 and over, we also take account of the tobacco user status of the insured person. We use a minimum effective annual interest rate of 3%.

For policies issued at attained ages 0-17, an insured person's cost of insurance rate is not based on that person's status as a tobacco user or non-tobacco user. Effective with the policy anniversary when that insured person reaches attained age 18, non-tobacco user cost of insurance rates will be charged for that person. For policies issued at attained ages 18 or over, an insured person's cost of insurance rate takes account of that person's status as a tobacco user or non-tobacco user.

**Change from Tobacco User Rates to Non-Tobacco User Rates.** Any insured person attained age 18 or over being charged tobacco user rates may be eligible for non-tobacco user rates. The change, if approved, may result in lower future cost of insurance rates beginning on the effective date of change to non-tobacco user rates.

Upon request made to our Administrative Office, we will provide forms and instructions as to how you may apply for non-tobacco user rates. The change will be based upon our general underwriting rules in effect at the time of application, and may include criteria other than tobacco use status as well as a definition of tobacco use different from that applicable at the time this policy was issued.

The change to non-tobacco user rates, if approved, will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request. A copy of your application for the change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become part of this policy. We may require you to return this policy to our Administrative Office to make the change. This change may have adverse tax consequences.

The change to non-tobacco rates will be contestable; however, we will not contest the change after it has been in effect for two years during the lifetime of the insured person. In the event of a successful contest, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at tobacco user rates.

**Policy Illustrations.** Upon request we will give you an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

**Conversion Privilege.** You may, with the written consent of the insured person, request that we convert this policy to a variable life insurance policy we are then offering. You may request this at any time after the first policy year but not later than the fifth policy year after the register date of this policy. The new policy will be subject to its own issue age and face amount limits. If the insured person is less than attained age 65 at the time of the request, we will not require any evidence of insurability except as specifically noted below. If the insured person is attained age 65 or over at the time of the request, we will require evidence of insurability satisfactory to us. In all cases, this request is also subject to all of the following conditions:

1. This policy must be in force on the date of conversion. The insured person may not then be disabled under the terms of any disability waiver rider in effect under this policy.

2. The new policy will have a face amount of insurance equal to the face amount of insurance under this policy on the date of conversion. In order for the new policy to qualify as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us, it may be necessary to increase the face amount of the new policy. If so, any increase in the face amount of the new policy to assure that the new policy meets the definition of life insurance will be subject to evidence of insurability satisfactory to us.

3. The register date and issue date of the new policy will be the same as the date of conversion. Premiums and charges for the new policy will be based on the company's rates in effect for the new policy for the then current issue age of the insured person and the same class of risk or the closest comparable class as under this policy. You may request a more favorable risk classification for the insured person; however, this will be subject to evidence of insurability satisfactory to us.

4. Any additional benefit riders in effect under this policy will be included with the new policy only if they are then available with the new policy as of its issue date. You may request to add new additional benefit riders to the new policy; however, this will be subject to evidence of insurability satisfactory to us.

5. Any policy loan and accrued loan interest under this policy must be repaid prior to conversion.

The suicide exclusion and contestable periods of the new policy will be determined from the date of issue of this policy rather than the date of issue of the new policy, except to the extent evidence of insurability was required as noted in the first paragraph of this provision and in items 2, 3, and 4.

04-100-13                                                                                    Page 13

We will waive the surrender charge applicable to this policy on the date of conversion up to, but not to exceed, the amount of the first year surrender charge for the new policy. We will retain the excess, if any, over this amount and deduct it from this policy's Policy Account on the date of conversion. We will transfer the balance of your Policy Account Value to the new policy. Your Policy Account Value for the new policy will be allocated to the investment options under the new policy as directed by you on the application completed for the conversion, and in accordance with the terms of the new policy. The initial premium and deduction allocation percentages that you specify on the application will continue to apply unless later changed by you. Monthly deductions for the new policy, including any additional benefit riders, will start on the register date of the new policy. The new policy will be subject to all charges according to its terms. Coverage under this policy will terminate on the conversion date.

You may examine the new policy and cancel it if you are not satisfied with it; you will have as many days after the conversion date to do this as you had to cancel this policy after it was delivered to you originally. You must send a written request for cancellation within this time period to our Administrative Office. If you do this, we will (1) reinstate this policy and the same additional benefit riders, if any, that you had originally and (2) refund any premium payments made under the new policy.

THIS ENDORSEMENT IS PART OF THIS POLICY.


NOTICE


THE LAWS OF THE STATE OF GEORGIA PROHIBIT INSURERS FROM UNFAIRLY DISCRIMINATING AGAINST ANY PERSON BASED UPON HIS OR HER STATUS AS A VICTIM OF FAMILY VIOLENCE.

S.41-1

# AMENDMENT TO APPLICATION

| Name of Proposed Insured: | Mali | | Koenig | Application Dated: | 4/4/06 |
|---|---|---|---|---|---|
| | First | Middle Initial | Last | | |

**Policy or Contract No.:  156 208 141**

## TO THE AXA EQUITABLE LIFE INSURANCE COMPANY

### Your application is hereby amended by the undersigned in the following particulars:

- Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)

  ☒ NO   ☐ Yes

  Check all of the following that apply and complete requested information:

  ☐ Loan_____(% of premium) Identify Source of Loan_____
  Loan Repayment Schedule_____
  Describe the collateral used_____

  ☐ Cash_____(% of premium)

  ☐ Existing life insurance policy or contract_____(% of premium)

  ☐ Existing Investments_____(% of premiums) Identify Investment
  Source_____

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)

  ☐ Yes   ☒ No

- Please state the reason you are purchasing this policy (i.e., estate planning, business insurance, etc.)

  <u>Estate Planning.</u>

This amendment is to be taken as part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as part of the policy or contract. To the best of my (our) knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at  <u>Brooklyn  NY</u>      on  <u>5/25/06</u>
       (City)     (State)              (Date)

_____     _X_ _Mali Koenig_ _____
Signature of Purchaser, if other than Applicant     Signature of Applicant

AGENT:     ASU:     AGENCY:

EV 237-401 / 180-237E  Application Amendment
AMIGV-2005 App

156 212 029

# AMENDMENT TO APPLICATION

Name of
Proposed Insured __MALI KOENIG_____ Application Dated__MAY 12, 2006__
                        First          Middle Initial     Last

Policy No _____156 212 029_____

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE WITH PLAN TO BE ATHENA UNIVERSAL LIFE II.

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the policy. To the best of my knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at___Brooklyn_____NY_____ on __5/25/06__
                (City)              (State)

_____          _____Mali Koenig_____
Signature of Purchaser if other than Applicant          Signature of Applicant

Agent:_____

Agency:_____

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance
Part I**
Form No LIFEAPP-GA/OR
(2005)

---

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy) Please print in ink

**Proposed Insured**
A. Full Name First _MAli_ MI ___ Last _Koenig_ B. Gender ☐ Male ☒ Female

C. Home Address _Redacted_ _Redacted_

City/Municipality _Brooklyn_ County/Parish ___ State _NY_ Zip + 4 Code _Redacted_
(If address is a PO Box or not actual residence, proof of residence required )

D. Home Phone No _Redacted_ Best time to Call ___ Best phone no to be contacted ___

E. Date of Birth __ _Redacted_ F. Place of Birth _Rom ania_
(State/County)

G. Marital Status ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated H. Soc Sec No . _Redacted_

I. Driver's Lic No _NoNE_ State ___

J. U S Citizen? ☒ Yes ☐ No* If No Country ___ U S Visa type ___ Passport # or US Visa # ___ # of years in U S ___

K. Currently employed? ☐ Yes ☐ No ☒ Retired

L. Current Occupation(s) (1) Title _N/A Retired_ (2) Duties ___ (3) How Long? ___
(If less than 1 year at current occupation, give previous in Remarks )

M. Employer Name _N/A_

N. Employer Address ___
No & Street / City / State / Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ _N/A_ P. Net Worth $ _26 Million_
If the Proposed Insured and/or policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W 8 BEN

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _UL II_ Amount of Insurance $ _10 million_
(If survivorship policy, complete an application for each Proposed Insured (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement Supplement )
To select dividend options on EWL or Riders on all Non VUL Plans
complete Optional Benefits Supplement )

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A ☐ Option B
(2) Planned Periodic Premium $ _1,251,940_

C. Definition of Life Insurance Test Complete for AUL II, IL, COLI '04 ☒ Guideline Premium Test ☐ Cash Value Accumulation Test

D. Premium Mode ☒ Annual ☐ Semi Annual ☐ Quarterly ☐ Monthly
Or
System Matic (Complete S M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name ___ (2) Unit/Sub Unit No ___ (3) Unit Register Date ___
(Specify Allottee name if other than insured in Remarks )

F. Date Policy to save Insured Age? ☐ Yes ☒ No

G. 1 Do you, the owner, intend to use or transfer the policy for any type of pre death financial settlement, such as viatical settlement, senior settlement, life settlement, or
for any other secondary market? ☐ Yes ☒ No
2 Have you, the owner or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market
provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies amounts and policy numbers in Remarks )

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete (if additional room is needed, please use Remarks Section )

Amount $ ___ Company ___ Issue Year ___ Policy Number ___ ☐ Life ☐ Group ☐ Annuity

Amount $ ___ Company ___ Issue Year ___ Policy Number ___ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☐ No If "Yes", complete Term Policy/Rider or Purchase Option Supplement

K. Complete if Proposed Insured is under age 15 a) State total amount of insurance in force on the life of applicant or child's
parent, if greater $ ___
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No
If "Yes" give details ___

AMIGV-2005 A CAT# 133942 E6173_1 1

217433,04-21-2006,11:11 21

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

Beneficiary Full Name     Relationship to Insured     Percentage

Primary Mal: Koenig Insurance Trust A 05/11/06 _____ _____ 100%

Contingent: _____ _____ _____

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section

If the Owner is the Trust provide the name of the Trust.

Owner's Name Mal: Koenig Insurance Trust b 05/11/06   Social Security # or TIN   Redacted

Address See Wells Fargo Bank, NA 400 Northridge Rd.   Atlanta State Ga  Zip Code 30350
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

Relationship to Insured _____ Date of Birth _____

Name of Trustee Wells Fargo Bank, N.A.   Date of Trust Agreement 5·11·06

If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section

| | | Yes | No |
|---|---|---|---|
| **A.** | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) | ☐ Yes | ☒ No |
| **B.** | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.) | ☐ Yes | ☒ No |
| **C.** | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| **D.** | In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) | ☐ Yes | ☒ No |
| **E.** | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) | ☐ Yes | ☒ No |
| **F.** | In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.) | ☐ Yes | ☒ No |
| **G.** | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates.) | ☐ Yes | ☒ No |
| **H.** | Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No Type _____ Avg Quantity # packs _____ Frequency _____ | | |
| **I.** | Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No Type _____ Date Ceased _____ | | |

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height 5 Ft. 1 in. Weight 137 lbs

**B.** Personal Physician Name please see remarks

**C.** Address _____

**D.** Date and Reason for Last Visit in the Last 5 Years No change since medical exam in Feb 06

**E.** What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured

| | | Yes | No |
|---|---|---|---|
| **F.** | In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| **G.** | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.) | ☒ Yes | ☐ No |
| **H.** | In the last 10 years | | |
| | 1 Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives, marijuana, cocaine, hallucinogens or other mood altering drugs, heroin, methadone or other narcotics, amphetamines or other stimulants, or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| | 2 Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| **I.** | In the last 10 years, been | | |
| **J.** | Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |

| Family History | Age if Living | Cause of Death | | Age at Death |
|---|---|---|---|---|
| Father | | WW II | Death Camps | |
| Mother | | WW II | Death Camps | |
| Sibling | | | | |

AMIGV-2005 A

217433,04-21-2006,11 11.21

2

**6** DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION    (Attach additional sheet of paper if necessary;
and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks, (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr. Kaiser   718-941-5600
465 Ocean Pkwy
Brooklyn, N.Y. 11218

Dr. Coch   718-854-2144
4815  14th Ave.
Brooklyn   NY   11215

Dr. Scheter 718-376-810
2350 ocean Pkwy
Brooklyn   NY

Please See Contract
# 156203466 for
Doctors info

**7** COMPLETE IF MONEY IS PAID WITH THE POLICY:

Amount paid with this Application $ ___0___

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including

(i)   the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)  the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☒ Yes   ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered

**AGREEMENT.** Each signer of this application agrees that

(1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application

(2) The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege

(3) Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application, and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid

(4) No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5) I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

☐ AXA Equitable Life Insurance Company    ☐ MONY Life Insurance Company of America

## ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

## AUTHORIZATIONS

### TO OBTAIN HEALTH INFORMATION

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

### TO OBTAIN NON-HEALTH INFORMATION

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

### PURPOSE OF AUTHORIZATIONS

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

### COVERAGE CONDITIONS

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

### ADDITIONAL AUTHORIZATIONS

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

### DURATION

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization. this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

### COPY OF AUTHORIZATIONS

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION —UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).

CERTIFICATION INSTRUCTIONS: You must cross out item (II) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return. THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including but not limited to the Acknowledgement and Authorization.

Dated at City _____

State _____

on _____

### Financial Professional to complete this section:

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?   ☐ Yes  ☐ No
(If 'yes' give details)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.
☐ I have witnessed the signature required on fully completed Part 1    ☐ I have not witnessed the signature required on fully completed Part 1 (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name _____

AMIGV-2008 A

**Application Part 2 To:** ☐ AXA Equitable Life Insurance Company

☐ AXA Life and Annuity Company

US Redacted

Passport.

Reason for submission of this form:  ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height ___ ft. ___ in. | c. Birth Date | d. Male ☐ Female ☐ | e. Weight ___ lbs. |
|---|---|---|---|---|---|---|---|
| | Mali | | Koenig | | Redacted | | Redacted |

2. a. Name and address of personal physician (or medical facility used instead): (if none, so state)  Dr Kayser - Broddn N NY.

b. Date and reason last consulted if within the last 5 years:  4mnago, routine check-up.

c. What treatment was given or recommended? (if none, so state)  none

| (For all "Yes" answers to Questions 3–8, circle items that apply.) | Yes | No |
|---|---|---|
| 3. Has Proposed Insured ever had or been treated for: | | |
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbances; mental or nervous disease or disorder? | ☐ | ☑ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☑ | ☐ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☐ | ☑ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizer, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑ |
| 7. Has Proposed Insured's weight changed by more than | ☐ | ☐ |

| 10 pounds in the last 6 months? | | | Yes | No |
|---|---|---|---|---|
| 8. Other than as stated in answers to Questions 2–6, has Proposed Insured, within the last 5 years: | | | | |
| a. Consulted or been examined or treated by any physician or practitioner? | | | ☑ | ☐ |
| b. Had any illness, injury, or surgery? | | | ☐ | ☑ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | | | ☐ | ☑ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | | | ☑ | ☐ |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | | | ☐ | ☑ |
| 9. a. Has Proposed Insured, within the last 12 months: | | | | |
| (i) Smoked cigarettes? | | | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | | | ☐ | ☑ |
| b. Has Proposed Insured, within the last five years: | | | | |
| (i) Smoked cigarettes? | | | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | | | ☐ | ☑ |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Redacted - young | 55 |
| Mother | 93 | | |
| Brothers/Sisters | Yes ☐ No ☐ NY | | |

DETAILS FOR "YES" ANSWERS.  Include: i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (if additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

3g. 4. pett DM borderline controlled with diet. occas. Metformin. 4 Baby ASA, Vit B.

8a. Dr Kayser - G.p. routine check-up, address not available 8d. 8f test, ECG - g.p. normal. mammogram in the past NL unsure if this causes of dread but no heart, cancer, BU.

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at  Miami Beach Fl   2/6/06   X  Mali Koenig

City State  Mo. Day Yr.   Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician):  Maryan Q Rios, MD

180-M205N-FL    E5722_5    CAT. #128995

# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| | ) | 1:07-cv-0512-MHS |
| v. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 6 to Second Amended Complaint**

INSURED PERSON    *MALI KOENIG*

 **AXA EQUITABLE**

POLICY OWNER    *MALI KOENIG INS TRUST 20060511*

**UNIVERSAL LIFE INSURANCE POLICY**

POLICY NUMBER    *156 212 030*

**AXA EQUITABLE LIFE INSURANCE COMPANY**
**HOME OFFICE: 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK**

**We agree** to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

### Flexible Premium Universal Life Insurance Policy

This is a flexible premium universal life insurance policy. You can, within limits:
- make premium payments at any time and in any amount;
- change the Death Benefit Option; and
- reduce the face amount of insurance

These rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We put your net premiums into your Policy Account. Your Policy Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 3% per year.

This is a non-participating policy.

**Right to Examine Policy. You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.**

**Read Your Policy Carefully.** It is a legal contract between you and AXA Equitable Life Insurance Company.

*Pauline Sherman*

Pauline Sherman, Senior Vice President,
Secretary and Associate General Counsel

Christopher M. Condron
Chairman and Chief Executive Officer

04-100

# Contents

*Policy Information*   **3**

*Table of Maximum Monthly Charges
for Benefits*   **4**

*Those Who Benefit from this Policy*   **5**

*The Insurance Benefit We Pay*   **5**

*Reducing the Face Amount of the Base
Policy or Changing the Death Benefit
Option*   **6**

*The Premiums You Pay*   **7**

*Your Policy Account and How it
Works*   **8**

*The Cash Surrender Value of this
Policy*   **9**

*How a Loan Can Be Made*   **10**

*Our Annual Report to You*   **11**

*How Benefits are Paid*   **11**

*Other Important Information*   **11**

### In this policy:

*"We," "our,"* and *"us"* mean AXA Equitable Life Insurance Company.

*"You"* and *"your"* mean the owner of this policy at the time an owner's right is exercised.

Unless otherwise stated, all references to interest in this policy are effective annual rates of interest.

Attained age means age on the birthday nearest to the beginning of the current policy year.

### Administrative Office

The address of our Administrative Office is shown on Page 3. You should send correspondence to that office. Premium payments should be sent to the address listed on your billing notice.

*Copies of the application for this policy and any additional benefit riders are attached to the policy.*

# INTRODUCTION

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information sectio n, are put into your Policy Account. Amounts in your Policy Account earn interest at rates we declare periodically; these rates will not be less than 3% on an effective annual basis.

If Death Benefit Option A is in effect, the Death Benefit is the base policy face amount. If Death Benefit Option B is in effect, the Death Benefit is the base policy face amount *plus* the amount in your Policy Account. Under either option, the Death Benefit will never be less than a percentage of your Policy Account as stated in the "Death Benefit" provision.

The Insurance Benefit of this policy is payable upon the death of the insured person while the policy is in force.

We make monthly deductions from your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value or reduce the base policy face amount, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

## POLICY INFORMATION

| | |
|---|---|
| INSURED PERSON | MALI KOENIG |
| POLICY OWNER | MALI KOENIG INS TRUST 20060511 |
| FACE AMOUNT OF BASE POLICY | $10,000,000 |
| DEATH BENEFIT | OPTION A (SEE PAGE 6) |

POLICY NUMBER   156 212 030                    ISSUE AGE      83
                                                                        SEX FEMALE

BENEFICIARY   MALI KOENIG INS TRUST 05/11/06

REGISTER DATE   MAY 19, 2006

DATE OF ISSUE   FEB 20, 2007          RATING CLASS:  STANDARD
                                                            NON-TOBACCO USER

A MINIMUM INITIAL PREMIUM PAYMENT OF $86,722.83 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $1,251,740.00 IS PAYABLE ANNUALLY.

THE ADDITIONAL BENEFIT RIDERS LISTED BELOW, IF ANY, ARE INCLUDED IN THIS POLICY:

THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY; (4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

POLICY INFORMATION CONTINUED–POLICY NUMBER    156 212 030

———    TABLE OF EXPENSE CHARGES    ———

DEDUCTION FROM PREMIUM PAYMENTS:

PREMIUM CHARGE:

WE DEDUCT AN AMOUNT NOT TO EXCEED 8% FROM EACH PREMIUM PAYMENT. WE RESERVE THE RIGHT TO INCREASE THIS PERCENTAGE LIMIT AS A RESULT OF CHANGES IN THE TAX LAWS WHICH INCREASE OUR EXPENSES.

DEDUCTIONS FROM YOUR POLICY ACCOUNT:

ADMINISTRATIVE CHARGE:

FIRST POLICY YEAR: WE DEDUCT $20.00 AT THE BEGINNING OF EACH POLICY MONTH.

SECOND AND SUBSEQUENT POLICY YEARS (BUT NOT BEYOND THE POLICY ANNIVERSARY WHEN THE INSURED PERSON IS ATTAINED AGE 100): WE DEDUCT AN AMOUNT NOT TO EXCEED $10.00 AT THE BEGINNING OF EACH POLICY MONTH.

POLICY INFORMATION CONTINUED—POLICY NUMBER 156 212 030

———— TABLE OF SURRENDER CHARGES ————
FOR THE INITIAL BASE POLICY FACE AMOUNT

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 01 | $464,242.14 | 09 | $229,144.80 |
| 02 | $437,152.49 | 10 | $196,041.96 |
| 03 | $410,146.80 | 11 | $162,934.46 |
| 04 | $383,141.12 | 12 | $129,742.98 |
| 05 | $356,051.46 | 13 | $96,640.14 |
| 06 | $328,541.96 | 14 | $63,532.64 |
| 07 | $295,434.45 | 15 | $30,341.16 |
| 08 | $262,238.31 | 16 AND LATER | $0.00 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE WITHIN THE FIRST FIFTEEN POLICY YEARS. THE SURRENDER CHARGE IN THE FIRST POLICY MONTH OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE. DURING THE FIRST FIVE POLICY YEARS THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES $331,298.97 IN THE TWELFTH MONTH OF POLICY YEAR FIVE. STARTING IN POLICY YEAR SIX, THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES ZERO IN THE TWELFTH MONTH OF POLICY YEAR FIFTEEN.

IF THE BASE POLICY FACE AMOUNT IS REDUCED WITHIN THE FIRST FIFTEEN POLICY YEARS, A PROPORTIONATE SHARE OF THE APPLICABLE SURRENDER CHARGE AT THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT. SEE SURRENDER CHARGES PROVISION FOR A DESCRIPTION OF THE PROPORTIONATE SURRENDER CHARGE.

ADMINISTRATIVE OFFICE:

AXA EQUITABLE LIFE INSURANCE COMPANY

NATIONAL OPERATIONS CENTER
10840 BALLANTYNE COMMONS PARKWAY
CHARLOTTE, NC 28277
(800) 777-6510

POLICY INFORMATION CONTINUED - POLICY NUMBER 156 212 030

———————— TABLE OF MAXIMUM MONTHLY CHARGES FOR BENEFITS ————————

| BENEFITS | MONTHLY DEDUCTION FROM POLICY ACCOUNT | PERIOD |
|---|---|---|
| BASE POLICY LIFE INSURANCE | MAXIMUM MONTHLY COST OF INSURANCE RATE FOR THE BASE POLICY (SEE PAGE 4 - CONTINUED) TIMES THOUSANDS OF NET AMOUNT AT RISK.  NO DEDUCTION IS MADE AFTER AGE 100 OF THE INSURED PERSON. | 17 YEARS |

PAGE 4
(CONTINUED ON NEXT PAGE)

POLICY INFORMATION CONTINUED—POLICY NUMBER 156 212 030

——————          TABLE OF MAXIMUM MONTHLY COST OF INSURANCE RATES          ——————
                PER $1,000 OF NET AMOUNT AT RISK FOR THE BASE POLICY

| INSURED PERSON'S ATTAINED AGE | RATE |
|---|---|
| 83 | 7.98833 |
| 84 | 9.02000 |
| 85 | 10.16417 |
| 86 | 11.40333 |
| 87 | 12.74917 |
| 88 | 14.19083 |
| 89 | 15.75500 |
| 90 | 17.44583 |
| 91 | 19.30500 |
| 92 | 21.39667 |
| 93 | 23.84000 |
| 94 | 26.92583 |
| 95 | 31.31000 |
| 96 | 38.50417 |
| 97 | 52.27500 |
| 98 | 83.33250 |
| 99 | 83.33250 |
| 100 AND OVER | 0.00000 |

POLICY INFORMATION CONTINUED—POLICY NUMBER   156 212 030

———————            TABLE OF PERCENTAGES            ———————

| INSURED PERSON'S ATTAINED AGE | PERCENTAGE | INSURED PERSON'S ATTAINED AGE | PERCENTAGE |
|---|---|---|---|
| 40 and under | 250% | 61 | 128% |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70 | 115 |
| 50 | 185 | 71 | 113 |
| 51 | 178 | 72 | 111 |
| 52 | 171 | 73 | 109 |
| 53 | 164 | 74 | 107 |
| 54 | 157 | 75-90 | 105 |
| 55 | 150 | 91 | 104 |
| 56 | 146 | 92 | 103 |
| 57 | 142 | 93 | 102 |
| 58 | 138 | 94 and above | 101 |
| 59 | 134 | | |
| 60 | 130 | | |

Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"), gives a definition of life insurance which limits the amounts that may be paid into a life insurance policy relative to the benefits it provides. Even if this policy states otherwise, at no time will the "future benefits" under this policy be less than an amount such that the "premiums paid" do not exceed the Code's "guideline premium limitations." We may adjust the amount of premium paid to meet these limitations. Also, at no time will the "death benefit" under the policy be less than the "applicable percentage" of the "cash surrender value" of the policy. The above terms are as defined in the Code. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes -Applicable Tax Law" for more information.

## *Those Who Benefit from this Policy*

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice in a form satisfactory to us. You can get such a form from your financial professional or by writing to us at our Administrative Office. The change will take effect on the date you sign the notice; however, it will not apply to any payment we make or other action we take before we receive the notice.

**Assignment.** You may assign this policy, if we agree; however, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

## *The Insurance Benefit We Pay*

We will pay the Insurance Benefit of this policy to the beneficiary upon the death of the insured person when we receive at our Administrative Office (1) proof that the insured person died while this policy was in force; and (2) all other requirements we deem necessary. The Insurance Benefit includes the following amounts, which we will determine as of the date of death of the insured person:

- the Death Benefit described in the "Death Benefit" provision;

- **plus** any other benefits then due from riders to this policy;

- **minus** any policy loan and accrued interest, or liens;

- **minus** any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount in accordance with applicable law. We will compute the interest at a rate we determine, but not less than the rate required by any applicable law. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See the "Other Important Information" section of this policy, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Additional exclusions or limitations (if any) are listed in the Policy Information section.

**Death Benefit.** The Death Benefit of this policy will be determined under either Option A or Option B, whichever you have chosen and is in effect on the date of death of the insured person.

Under Option A, the Death Benefit is the greater of (a) the base policy face amount; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

Under Option B, the Death Benefit is the greater of (a) the base policy face amount *plus* the amount in your Policy Account on the date of death of the insured person; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

The percentages referred to above are the percentages from the "Table of Percentages" shown on Page 4-Continued of this policy for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

**Coverage After Age 100.** If the policy is in force on the policy anniversary when the insured person reaches age 100, it will remain in force subject to the policy loan provision. However, no premium payments, partial withdrawals, changes in face amount or changes in Death Benefit Option will be permitted after age 100 of the insured person; policy loans and loan repayments may continue to be made, subject to our normal rules as stated in other provisions of the policy pertaining to these items. No deductions for cost of insurance or administrative charges will be made after age 100 of the insured person.

# Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option

You may reduce the face amount of the base policy or change the death benefit option by written request to us at our Administrative Office, subject to the following conditions:

1. After the second policy year while this policy is in force, you may ask us to reduce the base policy face amount but not to less than $50,000. Any such reduction in the face amount may not be less than $10,000. If you reduce the base policy face amount before the end of the twentieth policy year, we will deduct a proportionate amount of any applicable surrender charge from your Policy Account.

2. After the second policy year while this policy is in force, you can change your death benefit option. Any requested change to death benefit Option B must be made while the insured person is not more than attained age 90. If you ask us to change from Option A to Option B, we will decrease the base policy face amount by the amount in your Policy Account on the date the change takes effect. However, we will decline to make such change if it would reduce the base policy face amount to less than $50,000. If you ask us to change from Option B to Option A, we will increase the base policy face amount by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the base policy face amount are made so that the death benefit remains the same on the date the change takes effect.

3. The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

4. We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

5. You may ask for a change by completing an application for change, which you can get from your financial professional or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

# *The Premiums You Pay*

The minimum initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before a premium at least equal to the minimum initial premium is paid. Other premiums may be paid at our Administrative Office at any time prior to attained age 100 of the insured person while this policy is in force. We will furnish you with a premium receipt, signed by one of our officers, upon request.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the Death Benefit and your policy's values. We will assume that any payment you make to us is a premium payment, unless you tell us in writing that it is a loan repayment.

If you stop paying premiums, insurance coverage will continue for as long as the Net Policy Account Value is sufficient to cover the monthly deductions described in the "Monthly Deductions" provision, with a further extension of coverage as described in the "Grace Period" provision.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make if they would immediately result in more than a dollar for dollar increase in the Death Benefit (which would happen if the Death Benefit is determined as a percentage of the Policy Account, as described in the "Death Benefit" provision), unless you provide satisfactory evidence of insurability of the insured person.

We also reserve the right not to accept premium payments or to return excess amounts that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

**Grace Period.** At the beginning of each policy month, we compare the Net Policy Account Value (this is equal to the amount in your Policy Account minus any policy loan and accrued loan interest) to the total monthly deductions described in the "Monthly Deductions" provision. If the Net Policy Account Value is sufficient to cover the total monthly deductions, this policy is not in default.

If the Net Policy Account Value at the beginning of any policy month is not sufficient to cover the total monthly deductions, the policy is in default as of the first day of such policy month.

If the policy is in default, we will send you and any assignee on our records at last known addresses written notice stating that a grace period of 61 days has begun starting with the date the notice is mailed. The notice will also state the amount of payment that is due.

The payment required will not be more than an amount sufficient to increase the Net Policy Account Value to cover all monthly deductions for 3 months, calculated assuming no interest was credited to the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we receive the requested amount before the end of the grace period, but the Net Policy Account Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61 day grace period has begun and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 5.

**Restoring Your Policy Benefits.** If this policy has ended without value and was not given up for its Net Cash Surrender Value, you may restore policy benefits while the insured person is alive. In order to restore benefits, you must:

1.  Ask for restoration of policy benefits within 5 years from the end of the grace period; and

2.  Provide evidence of insurability satisfactory to us; and

3.  Make a required payment. The required payment will not be more than an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the premium charge. We will determine the amount of this required payment as if no interest was credited to your Policy Account.

We must receive the required payment while the insured person is alive. We will deduct the premium charge from the required payment. The policy account on the date of restoration will be equal to the balance of the required payment.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request. We will start to make monthly charges again as of the effective date of restoration. The schedule of surrender charges that was applicable on the date of default will also be applicable to the restored policy.

We reserve the right to decline to restore this policy if in our opinion it would cause this policy to fail to qualify as life insurance under applicable tax law.

## *Your Policy Account and How it Works*

**Premium Payments.** When we receive your premium payments, we subtract the premium charge shown in the table in the "Policy Information" section and any overdue monthly deductions. We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the minimum initial premium payment, as shown in the "Policy Information" section, is received at our Administrative Office.

We credit interest to your Policy Account at effective annual rates we determine periodically. We make deductions from your Policy Account as described in the "Monthly Deductions" provision. We also subtract from your Policy Account any partial Net Cash Surrender Value withdrawals you ask for; more details are given in the Cash Surrender Value section of this policy.

**Monthly Deductions.** At the beginning of each policy month we make a deduction from your Policy Account to cover the charges described below. If you do not submit the full minimum initial premium with your application, and the minimum initial premium is paid upon delivery, your monthly charges commence as of the Register Date. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

*   the monthly administrative charge;

*   the monthly cost of insurance for the insured person; and

*   the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of (a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; *plus* (b) any flat extra charge shown in the "Policy Information" section. The net amount at risk at any time is the Death Benefit (calculated as of that time) minus the amount in your Policy Account at that time.

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision. They will never be more than those shown in the Table of Maximum Monthly Cost of Insurance Rates Per $1000 of Net Amount at Risk for the Base Policy on Page 4-Continued.

No monthly deductions are made after age 100 of the insured person.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

- We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value or you reduce the base policy face amount.

**How We Add Interest.** We will credit the amount in your Policy Account with interest at rates we determine. We will determine such interest rates periodically in advance for unloaned and loaned amounts. The rates may be different for unloaned and loaned amounts. Any change in the interest rates we determine will be as described in the "Changes in Policy Cost Factors" provision. Such interest rates will not be less than 3% per year. Interest accrues and is credited on unloaned amounts in your Policy Account daily. However, we will credit interest on the initial net premium from the Register Date if it is later than the date of receipt provided the initial premium is at least equal to the minimum initial premium shown on Page 3 of the policy.

We credit interest on the loaned portion of your Policy Account daily. The interest rate we credit to the loaned portion of your Policy Account will be at an annual rate up to 2% less than the loan interest rate we charge. However, we reserve the right to credit a lower rate than this if in the future tax laws change such that our taxes on policy loans or policy loan interest are increased. In no event will we credit less than 3% per year.

On each policy anniversary and at any time you repay all of a policy loan, we will transfer the interest that has been credited to the loaned portion of your Policy Account to the unloaned portion of your Policy Account.

---

# The Cash Surrender Value of this Policy

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. Your written request for cancellation or surrender must include the following:

1. A statement that makes it clear that you intend to surrender the contract;
2. The policy number of the policy to be surrendered;
3. The name of the insured person and your name (if other than the insured person) and address where proceeds should be mailed;
4. Your signature and, if required by the policy or by a legally binding document of which we have an actual notice, the signature of a collateral assignee or other person having an interest in the policy through the legally binding document.

If this policy has a Cash Surrender Value and is being given up for its Net Cash Surrender Value, a completed withholding authorization must also be included with your written request. If this form is not provided to us with your written request for surrender, we will withhold income tax on the taxable portion of your distribution at the mandated federal and state tax rates. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. If the policy has been lost, stolen or destroyed, you must include a statement in the written request that the policy was lost, stolen or destroyed with an approximate date of when the policy was lost, stolen or destroyed. All insurance coverage under this policy ends on the date we receive your written request.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of surrender charges for the initial base policy face amount is in the "Policy Information" section.

If the base policy face amount is reduced before the end of the fifteenth policy year, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. We will send you a new Policy Information section in the event of a reduction in the base policy face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year, and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount of $500.00. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal if this would cause the policy to fail to qualify as life insurance under applicable tax law, as interpreted by us. We will decline a request for a partial Net Cash Surrender Value withdrawal if this would cause a decrease in the base policy face amount to less than $50,000. A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your Death Benefit. If the Death Benefit is Option A, the withdrawal may also result in a decrease in the face amount; there will be no proportionate surrender charge due to such a decrease.

Such withdrawal and resulting reduction in the Death Benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

## *How a Loan Can Be Made*

**Policy Loans.** You can take a loan on this policy while it has a loan value. This policy will be the only security for the loan. The initial loan and each additional loan must be for at least $500.00. Any amount on loan is part of your Policy Account. We refer to this as the loaned portion of your Policy Account.

**Carry Over Loans.** If this policy was issued based, in whole or part, upon an exchange of another life insurance policy, any transferred existing loan from the exchanged policy as approved by us will be put into the loaned portion of your Policy Account. If a refund is made under the "Right to Examine Policy" provision, we will subtract any policy loan and accrued loan interest from that refund.

**Loan Value.** The loan value on any date is the Cash Surrender Value on that date discounted at the loan interest rate we charge to the next policy anniversary. The amount of any new loan you take may not be more than the loan value, less any existing loan and accrued loan interest. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination or (2) 4%. "Published Monthly Average" means the Moody's Corporate Bond Yield Average - Monthly Average Corporates published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than $\frac{1}{2}$ of 1% per year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph exceeds the rate being charged by $\frac{1}{2}$ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by $\frac{1}{2}$ of 1% or more.

We will notify you of the initial loan interest rate when you take out a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and bear interest at the loan rate then in effect.

**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Policy Account Value is less than the total monthly deduction then due. In that case, the "Grace Period" provision will apply.

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

## Our Annual Report to You

For each policy year we will send you without charge a report for this policy that shows the current Death Benefit, the value of your Policy Account, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

## How Benefits Are Paid

The Insurance Benefit or your Net Cash Surrender Value withdrawals are paid immediately in one sum. Amounts paid will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

## Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of a premium at least equal to the minimum initial premium payment shown in the "Policy Information" section. This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Code or successor law. Therefore, we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change Death Benefit Options, to decline to change the face amount, or to decline to make partial withdrawals that, in our opinion, would cause this policy to fail to qualify as life insurance under applicable tax law. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages in the "Death Benefit" provision) or to require additional premium payments, or to make distributions from this policy or to change the face amount to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the earlier of the Register Date or date of issue shown in the Policy Information section.

We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change or restoration. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the lifetime of the insured person.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What if Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the earlier of the Register Date or the date of issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the Death Benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase.

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**When We May Defer Payment.** We may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except when used to pay premiums to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% per year, on any Net Cash Surrender Value payment that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. We compute reserves under this policy by the Commissioners' Reserve Valuation Method.

We use the 1980 Commissioners' Standard Ordinary Male or Female Mortality Tables at attained ages 0-17, and the 1980 Commissioners' Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables at attained ages 18 and over, as the basis for determining maximum insurance costs and minimum cash surrender values. We take account of the sex, attained age, and class of risk of the insured person. For attained ages 18 and over, we also take account of the tobacco user status of the insured person. We use a minimum effective annual interest rate of 3%.

For policies issued at attained ages 0-17, an insured person's cost of insurance rate is not based on that person's status as a tobacco user or non-tobacco user. Effective with the policy anniversary when that insured person reaches attained age 18, non-tobacco user cost of insurance rates will be charged for that person. For policies issued at attained ages 18 or over, an insured person's cost of insurance rate takes account of that person's status as a tobacco user or non-tobacco user.

**Change from Tobacco User Rates to Non-Tobacco User Rates.** Any insured person attained age 18 or over being charged tobacco user rates may be eligible for non-tobacco user rates. The change, if approved, may result in lower future cost of insurance rates beginning on the effective date of change to non-tobacco user rates.

Upon request made to our Administrative Office, we will provide forms and instructions as to how you may apply for non-tobacco user rates. The change will be based upon our general underwriting rules in effect at the time of application, and may include criteria other than tobacco use status as well as a definition of tobacco use different from that applicable at the time this policy was issued.

04-100-11

The change to non-tobacco user rates, if approved, will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request. A copy of your application for the change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become part of this policy. We may require you to return this policy to our Administrative Office to make the change. This change may have adverse tax consequences.

The change to non-tobacco rates will be contestable; however, we will not contest the change after it has been in effect for two years during the lifetime of the insured person. In the event of a successful contest, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at tobacco user rates.

**Policy Illustrations.** Upon request we will give you an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

**Conversion Privilege.** You may, with the written consent of the insured person, request that we convert this policy to a variable life insurance policy we are then offering. You may request this at any time after the first policy year but not later than the fifth policy year after the register date of this policy. The new policy will be subject to its own issue age and face amount limits. If the insured person is less than attained age 65 at the time of the request, we will not require any evidence of insurability except as specifically noted below. If the insured person is attained age 65 or over at the time of the request, we will require evidence of insurability satisfactory to us. In all cases, this request is also subject to all of the following conditions:

1. This policy must be in force on the date of conversion. The insured person may not then be disabled under the terms of any disability waiver rider in effect under this policy.

2. The new policy will have a face amount of insurance equal to the face amount of insurance under this policy on the date of conversion. In order for the new policy to qualify as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us, it may be necessary to increase the face amount of the new policy. If so, any increase in the face amount of the new policy to assure that the new policy meets the definition of life insurance will be subject to evidence of insurability satisfactory to us.

3. The register date and issue date of the new policy will be the same as the date of conversion. Premiums and charges for the new policy will be based on the company's rates in effect for the new policy for the then current issue age of the insured person and the same class of risk or the closest comparable class as under this policy. You may request a more favorable risk classification for the insured person; however, this will be subject to evidence of insurability satisfactory to us.

4. Any additional benefit riders in effect under this policy will be included with the new policy only if they are then available with the new policy as of its issue date. You may request to add new additional benefit riders to the new policy; however, this will be subject to evidence of insurability satisfactory to us.

5. Any policy loan and accrued loan interest under this policy must be repaid prior to conversion.

The suicide exclusion and contestable periods of the new policy will be determined from the date of issue of this policy rather than the date of issue of the new policy, except to the extent evidence of insurability was required as noted in the first paragraph of this provision and in items 2, 3, and 4.

We will waive the surrender charge applicable to this policy on the date of conversion up to, but not to exceed, the amount of the first year surrender charge for the new policy. We will retain the excess, if any, over this amount and deduct it from this policy's Policy Account on the date of conversion. We will transfer the balance of your Policy Account Value to the new policy. Your Policy Account Value for the new policy will be allocated to the investment options under the new policy as directed by you on the application completed for the conversion, and in accordance with the terms of the new policy. The initial premium and deduction allocation percentages that you specify on the application will continue to apply unless later changed by you. Monthly deductions for the new policy, including any additional benefit riders, will start on the register date of the new policy. The new policy will be subject to all charges according to its terms. Coverage under this policy will terminate on the conversion date.

You may examine the new policy and cancel it if you are not satisfied with it; you will have as many days after the conversion date to do this as you had to cancel this policy after it was delivered to you originally. You must send a written request for cancellation within this time period to our Administrative Office. If you do this, we will (1) reinstate this policy and the same additional benefit riders, if any, that you had originally and (2) refund any premium payments made under the new policy.

THIS ENDORSEMENT IS PART OF THIS POLICY.

NOTICE

THE LAWS OF THE STATE OF GEORGIA PROHIBIT INSURERS FROM UNFAIRLY DISCRIMINATING AGAINST ANY PERSON BASED UPON HIS OR HER STATUS AS A VICTIM OF FAMILY VIOLENCE.

S.41-1

# AMENDMENT TO APPLICATION

| Name of Proposed Insured: | Mali | | Koenig | Application Dated | 4/4/06 |
|---|---|---|---|---|---|
| | First | Middle Initial | Last | | |

**Policy or Contract No.:**  156 208 141

## TO THE AXA EQUITABLE LIFE INSURANCE COMPANY

### Your application is hereby amended by the undersigned in the following particulars:

- Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)

  ☒ NO    ☐ Yes

  Check all of the following that apply and complete requested information:

  ☐ Loan_____(% of premium) Identify Source of Loan_____
  Loan Repayment Schedule_____
  Describe the collateral used_____

  ☐ Cash_____(% of premium)

  ☐ Existing life insurance policy or contract_____(% of premium)

  ☐ Existing Investments_____(% of premiums) Identify Investment
  Source_____

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)

  ☐ Yes    ☒ No

- Please state the reason you are purchasing this policy (i.e., estate planning, business insurance, etc.)

  Estate Planning.

This amendment is to be taken as part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as part of the policy or contract. To the best of my (our) knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at  **Brooklyn    NY**    on  **5/25/06**
      (City)      (State)            (Date)

                      X _Mali Koenig_

_____    _____
Signature of Purchaser, if other than Applicant    Signature of Applicant

**AGENT:**    **ASU:**    **AGENCY:**

156 212 030

# AMENDMENT TO APPLICATION

**Name of
Proposed Insured** ___MALI KOENIG___ _____ ____ **Application Dated** __MAY 12, 2006__
                       First      Middle Initial    Last

**Policy No** _____ ___156 212 030___ _____

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE WITH THE INSURED'S SOCIAL SECURITY NUMBER TO BE    Redacted

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the policy. To the best of my knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at _Brooklyn  NY_ _____ on _5/25/06_
                  (City)        (State)

                                _x Mali Koenig_

_____         _____
**Signature of Purchaser if other than Applicant**        **Signature of Applicant**

Agent: _____

Agency:

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
**Part I**
Form No LIFEAPP-GA/OR
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy) Please print in ink

**Proposed Insured**
A. Full Name First  _Mali_   MI   Last _Koenig_   B. Gender ☐ Male ☒ Female
C. Home Address  _Redacted_   Redacted
   Bldg/Apt/Suite
   City/Municipality _Brooklyn_   County/Parish   State _NY_  Zip + 4 Code _Redacted_
   (If address is a PO Box or not actual residence proof of residence required)
D. Home Phone No_ Redacted   Best time to Call   Best phone no to be contacted
E. Date of Birth _ Redacted   _   F. Place of Birth _Romania_
   (State/County)
G. Marital Status ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated  H. Soc Sec No _ Redacted
I. Driver's Lic No _None_   State
J. U S Citizen? ☒ Yes ☐ No* If No, Country   U S Visa type   Passport # or U S Visa #   # of years in U S
K. Currently employed?  ☐ Yes ☐ No  ☐ Retired
L. Current Occupation(s) (1) Title _N/A_   (2) Duties   (3) How Long?
   (If less than 1 year at current occupation, give previous in Remarks)
M. Employer Name _N/A_
N. Employer Address  _N/A_  _retired_
   No & Street   City   State   Zip + 4 Code
O. Annual Earned Income (Income from occupation) $ _N/A_   P. Net Worth $ _30 million_
*  If the Proposed Insured and/or policy owner is not a U S Person (U.S. Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❷ COVERAGE INFORMATION**
A. Plan of Insurance _UL II_   Amount of Insurance $ _10,000,000_
   (If survivorship policy, complete an application for each Proposed Insured   (If face amount is $2 million or larger complete Financial
   If VUL, must also complete VUL Supplement   Supplement )
   To select dividend options on EWL or Riders on all Non VUL Plans
   complete Optional Benefits Supplement )
B. Complete for UL or VUL only  (1) Death Benefit Option ☒ Option A  ☐ Option B
   (2) Planned Periodic Premium $ _1,251,940_
C. Definition of Life Insurance Test. Complete for AUL II, IL, IL COLI '04   ☒ Guideline Premium Test   ☐ Cash Value Accumulation Test
D. Premium Mode ☒ Annual  ☐ Semi Annual  ☐ Quarterly  ☐ Monthly
   Or
   System-Matic (Complete S-M form and check applicable box)  ☐ Quarterly (only available for UL and VUL)  ☐ Monthly
E. Salary Allotment (1) Unit Name   (2) Unit/Sub Unit No   (3) Unit Register Date
   (Specify Allottee name, if other than insured, in Remarks)
F. Date Policy to save Insured Age?  ☐ Yes  ☒ No
G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market?  ☐ Yes ☒ No
   2  Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider?  ☐ Yes ☒ No
H. Any other life insurance now in effect or application now pending?  ☒ Yes  ☐ No
   (Give companies amounts and policy numbers in Remarks)
I. Will the coverage applied for replace or change any life insurance or annuities?  ☐ Yes  ☒ No  Is this a 1035 Exchange? ☐ Yes  ☒ No
   If "Yes", complete  (If additional room is needed, please use Remarks Section )
   Amount $   Company   Issue Year   Policy Number   ☐ Life ☐ Group ☐ Annuity
   Amount $   Company   Issue Year   Policy Number   ☐ Life ☐ Group ☐ Annuity
J. Is this a Term Policy/Rider Conversion or Purchase Option?  ☐ Yes ☒ No  If "Yes", complete Term Policy/Rider or Purchase Option Supplement
K. Complete if Proposed Insured is under age 15   a) State total amount of insurance in force on the life of applicant or child's parent, if greater $
   b) Are any other children in the family insured for a lesser amount?  ☐ Yes  ☐ No
   If "Yes" give details

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary Information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary _Phil Koenig Insurance Trust 05/11/06_ | _____ | _100 %_ |
| Contingent _____ | _____ | _____ |

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section

If the Owner is the Trust provide the name of the Trust

Owner's Name _Phil Koenig Insurance Trust 05/11/06_   Social Security # or TIN _ **Redacted**

Address Street _c/o Wells Fargo bank, N.A. 400 North Ridge Rd. Atlanta_ State _Ga_   Zip Code _30350_
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section)

U S Citizen? ☐ Yes ☐ No* If No, Country _____ US Visa type _____ Passport # or US Visa # _____ # of years in U S ____

Relationship to Insured _____   Date of Birth _____

Name of Trustee _Wells Fargo bank, N.A._   Date of Trust Agreement _5-11-06_

* If the policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

| | | |
|---|---|---|
| **A.** Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks ) | ☐ Yes | ☒ No |
| **B.** Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement ) | ☐ Yes | ☒ No |
| **C.** Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| **D.** In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement ) | ☐ Yes | ☒ No |
| **E.** Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement ) | ☐ Yes | ☒ No |
| **F.** In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks ) | ☐ Yes | ☒ No |
| **G.** In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates ) | ☐ Yes | ☒ No |
| **H.** Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No  Type_____ Avg Quantity # packs_____ Frequency _____ | | |
| **I** Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No  Type_____ Date Ceased _____ | | |

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note· Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height _5_ Ft _1_ in, Weight _137_ lbs

**B.** Personal Physician Name _please See remarks_

**C.** Address _____

**D.** Date and Reason for Last Visit in the Last 5 Years _No medical changes since Feb 06 medical year_

**E.** What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

| | | |
|---|---|---|
| **F** In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| **G.** In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years  Do not include colds, minor injuries or normal pregnancy ) | ☒ Yes | ☐ No |
| **H** In the last 10 years | | |
| 1  Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives, marijuana, cocaine, hallucinogens or other mood altering drugs, heroin, methadone or other narcotics, amphetamines or other stimulants, or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| 2  Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement ) | ☐ Yes | ☒ No |
| **I** In the last 10 years, been | | |
| Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |

| Family History | Age if Living | Cause of Death | | | Age at Death |
|---|---|---|---|---|---|
| Father | | WW II | Death | Camps | |
| Mother | | WW II | death | Camps | |
| Sibling | | | | | |

AMIGV 2005 A

217433,04-21-2006,11 11 21

pH

**6** DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr. Kaiser   718-941-5600
465 Ocean Pkwy
Brooklyn, NY 11218

Dr. Coch  718-854-2144
4815 14th Ave
Brooklyn NY 11215

Dr. Scheter  718-376-8100
2350 Ocean Pkwy
Brooklyn NY

Please see contract
# 156203466 for
Doctors info.

**7** COMPLETE IF MONEY IS PAID WITH THE POLICY:

Amount paid with this Application  $ ___0___

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including

(i)    the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)   the $1,000,000 insurance amount limitations, and

(iii)  that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?       ☒ Yes   ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered

**AGREEMENT.** Each signer of this application agrees that

(1)   The statements and answers in all parts of this application are true and complete  We (the Company checked on page 1 of this application) may rely on them in acting on this application

(2)   The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect  If money is paid before the policy is delivered  Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege

(3)   Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application  (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living, (b) before any Registered Date specified in this application, and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid

(4)   No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement  Or to waive any of our rights or requirements  We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam)

(5)   I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

**Application Part 2 To:** ☐ AXA Equitable Life Insurance Company

US Redacted    Passport.

☐ AXA Life and Annuity Company

Reason for submission of this form: ☐ New Policy ☐ Policy Change ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height ___ ft. ___ in. | d. SSN/Tax c. Phone Number | e. Weight ___ lbs. |
|---|---|---|---|---|---|---|
| | Mali | | Koenig | Redacted | Redacted | |

2. a. Name and address of personal physician (or medical facility used instead): (if none, so state) Dr. Kayser-Brodek N 114

b. Date and reason last consulted if within the last 5 years: 4mlago., routine check-up.

c. What treatment was given or recommended? (if none, so state) none

(For all "Yes" answers to Questions 3-8, circle items that apply.)

| 3. Has Proposed Insured ever had or been treated for: | Yes | No |
|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☑ | ☐ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☑ | ☐ |

5. Has Proposed Insured, within the last 10 years, been:

a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection?

6. Has Proposed Insured, within the last 10 years:

a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☑

b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑

7. Has Proposed Insured's weight changed by more than | ☐ | ☑

| 10 pounds in the last 6 months? | | |
|---|---|---|
| 8. Other than as stated in answers to Questions 2-4, has Proposed Insured, within the last 5 years: | Yes | No |
| a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Had any illness, injury, or surgery? | ☐ | ☑ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☐ | ☑ |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |
| 9. a. Has Proposed Insured, within the last 12 months: | | |
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | ☐ | ☑ |
| b. Has Proposed Insured, within the last five years: | | |
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | ☐ | ☑ |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Stroke - Young? | 50-55 |
| Mother | | | 63 |
| Brothers/Sisters | Yes / No | unknown | ? |

DETAILS FOR "YES" ANSWERS: Include i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (if additional space is needed, please attach a separate sheet, dated, signed and witnessed as below)

3g. type II DM borderline controlled with diet. occas. Metformin.
4 Baby ASA, Vit B.
8a. Dr Kayser - g.p. routine check-up. address not available
8 d. B1 test, ECG g.p. normal
10 no prior siblings cause of dead but no heart, cancer, BU.

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at Miami Beach FL 2/6/06 X Mali Koenig

city    state    Mo. Day. Yr.    Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): Narip Q Rose, MD

# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) ) | CIVIL ACTION NO.: 1:07-cv-0512-MHS |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) | |
| Defendant. | ) ) | |

**EXHIBIT 7 to Second Amended Complaint**

*INSURED PERSON*    BENZION KOENIG



*POLICY OWNER*    BENZION KOENIG INS TRT 20060511

*POLICY NUMBER*    156 212 032

# UNIVERSAL LIFE INSURANCE POLICY

## AXA EQUITABLE LIFE INSURANCE COMPANY
### HOME OFFICE: 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK

**We agree** to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

### Flexible Premium Universal Life Insurance Policy

This is a flexible premium universal life insurance policy. You can, within limits:

- make premium payments at any time and in any amount;
- change the Death Benefit Option; and
- reduce the face amount of insurance

These rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We put your net premiums into your Policy Account. Your Policy Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 3% per year.

This is a non-participating policy.

**Right to Examine Policy. You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.**

**Read Your Policy Carefully.** It is a legal contract between you and AXA Equitable Life Insurance Company.

*Pauline Sherman*

Pauline Sherman, Senior Vice President,
Secretary and Associate General Counsel

*Christopher M. Condron*

Christopher M. Condron
Chairman and Chief Executive Officer

04-100

# Contents

*Policy Information*  **3**

*Table of Maximum Monthly Charges
for Benefits*  **4**

*Those Who Benefit from this Policy*  **5**

*The Insurance Benefit We Pay*  **5**

*Reducing the Face Amount of the Base
Policy or Changing the Death Benefit
Option*  **6**

*The Premiums You Pay*  **7**

*Your Policy Account and How it
Works*  **8**

*The Cash Surrender Value of this
Policy*  **9**

*How a Loan Can Be Made*  **10**

*Our Annual Report to You*  **11**

*How Benefits are Paid*  **11**

*Other Important Information*  **11**

### In this policy:

*"We," "our,"* and *"us"* mean AXA Equitable Life Insurance Company.

*"You"* and *"your"* mean the owner of this policy at the time an owner's right is exercised.

Unless otherwise stated, all references to interest in this policy are effective annual rates of interest.

Attained age means age on the birthday nearest to the beginning of the current policy year.

### Administrative Office

The address of our Administrative Office is shown on Page 3. You should send correspondence to that office. Premium payments should be sent to the address listed on your billing notice.

*Copies of the application for this policy and any additional benefit riders are attached to the policy.*

# INTRODUCTION

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information sectio n, are put into your Policy Account. Amounts in your Policy Account earn interest at rates we declare periodically; these rates will not be less than 3% on an effective annual basis.

If Death Benefit Option A is in effect, the Death Benefit is the base policy face amount. If Death Benefit Option B is in effect, the Death Benefit is the base policy face amount *plus* the amount in your Policy Account. Under either option, the Death Benefit will never be less than a percentage of your Policy Account as stated in the "Death Benefit" provision.

The Insurance Benefit of this policy is payable upon the death of the insured person while the policy is in force.

We make monthly deductions from your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value or reduce the base policy face amount, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

## POLICY INFORMATION

| | |
|---|---|
| INSURED PERSON | BENZION KOENIG |
| POLICY OWNER | BENZION KOENIG INS TRT 20060511 |
| FACE AMOUNT OF BASE POLICY | $10,000,000 |
| DEATH BENEFIT | OPTION A (SEE PAGE 6) |
| POLICY NUMBER | 156 212 032 |
| BENEFICIARY | BENZION KOENIG INS TRT 05/11/06 |
| REGISTER DATE | APR 8, 2006 |
| DATE OF ISSUE | FEB 20, 2007 |

ISSUE AGE     85
SEX MALE

RATING CLASS:  STANDARD
NON-TOBACCO USER

A MINIMUM INITIAL PREMIUM PAYMENT OF $143,597.84 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $1,515,852.00 IS PAYABLE ANNUALLY.

THE ADDITIONAL BENEFIT RIDERS LISTED BELOW, IF ANY, ARE INCLUDED IN THIS POLICY:

THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY; (4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

04-100-3

PAGE 3
(CONTINUED ON NEXT PAGE)

POLICY INFORMATION CONTINUED—POLICY NUMBER    156 212 032

———————    TABLE OF EXPENSE CHARGES    ———————

DEDUCTION FROM PREMIUM PAYMENTS:

PREMIUM CHARGE:

WE DEDUCT AN AMOUNT NOT TO EXCEED 8% FROM EACH PREMIUM PAYMENT. WE RESERVE THE RIGHT TO INCREASE THIS PERCENTAGE LIMIT AS A RESULT OF CHANGES IN THE TAX LAWS WHICH INCREASE OUR EXPENSES.

DEDUCTIONS FROM YOUR POLICY ACCOUNT:

ADMINISTRATIVE CHARGE:

FIRST POLICY YEAR: WE DEDUCT $20.00 AT THE BEGINNING OF EACH POLICY MONTH.

SECOND AND SUBSEQUENT POLICY YEARS (BUT NOT BEYOND THE POLICY ANNIVERSARY WHEN THE INSURED PERSON IS ATTAINED AGE 100): WE DEDUCT AN AMOUNT NOT TO EXCEED $10.00 AT THE BEGINNING OF EACH POLICY MONTH.

POLICY INFORMATION CONTINUED – POLICY NUMBER  156 212 032

———— TABLE OF SURRENDER CHARGES ————
FOR THE INITIAL BASE POLICY FACE AMOUNT

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 01 | $464,484.72 | 09 | $239,015.94 |
| 02 | $440,278.04 | 10 | $204,424.97 |
| 03 | $416,085.35 | 11 | $169,917.96 |
| 04 | $391,883.33 | 12 | $135,322.32 |
| 05 | $367,690.64 | 13 | $100,815.32 |
| 06 | $342,718.89 | 14 | $66,224.34 |
| 07 | $308,118.59 | 15 | $31,717.34 |
| 08 | $273,527.61 | 16 AND LATER | $0.00 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS
POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE WITHIN THE FIRST
FIFTEEN POLICY YEARS.  THE SURRENDER CHARGE IN THE FIRST POLICY MONTH
OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE.  DURING THE FIRST FIVE
POLICY YEARS THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY
AMOUNTS UNTIL IT REACHES $345,601.86 IN THE TWELFTH MONTH OF POLICY
YEAR FIVE.  STARTING IN POLICY YEAR SIX, THE SURRENDER CHARGE DECLINES
UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES ZERO IN THE TWELFTH
MONTH OF POLICY YEAR FIFTEEN.

IF THE BASE POLICY FACE AMOUNT IS REDUCED WITHIN THE FIRST FIFTEEN
POLICY YEARS, A PROPORTIONATE SHARE OF THE APPLICABLE SURRENDER CHARGE AT
THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT.  SEE SURRENDER
CHARGES PROVISION FOR A DESCRIPTION OF THE PROPORTIONATE SURRENDER CHARGE.

ADMINISTRATIVE OFFICE:

AXA EQUITABLE LIFE INSURANCE COMPANY

NATIONAL OPERATIONS CENTER
10840 BALLANTYNE COMMONS PARKWAY
CHARLOTTE, NC 28277
(800) 777-6510

POLICY INFORMATION CONTINUED - POLICY NUMBER 156 212 032

———— TABLE OF MAXIMUM MONTHLY CHARGES FOR BENEFITS ————

| BENEFITS | MONTHLY DEDUCTION FROM POLICY ACCOUNT | PERIOD |
|---|---|---|
| BASE POLICY LIFE INSURANCE | MAXIMUM MONTHLY COST OF INSURANCE RATE FOR THE BASE POLICY (SEE PAGE 4 - CONTINUED) TIMES THOUSANDS OF NET AMOUNT AT RISK.  NO DEDUCTION IS MADE AFTER AGE 100 OF THE INSURED PERSON. | 15 YEARS |

PAGE 4
(CONTINUED ON NEXT PAGE)

POLICY INFORMATION CONTINUED—POLICY NUMBER   156 212 032

——————        TABLE OF MAXIMUM MONTHLY COST OF INSURANCE RATES        ——————
                PER $1,000 OF NET AMOUNT AT RISK FOR THE BASE POLICY

| INSURED PERSON'S ATTAINED AGE | RATE |
|---|---|
| 85 | 13.37417 |
| 86 | 14.69833 |
| 87 | 16.08083 |
| 88 | 17.49667 |
| 89 | 18.96583 |
| 90 | 20.51167 |
| 91 | 22.16500 |
| 92 | 23.98667 |
| 93 | 26.06583 |
| 94 | 28.78417 |
| 95 | 32.81750 |
| 96 | 39.64250 |
| 97 | 53.06583 |
| 98 | 83.33250 |
| 99 | 83.33250 |
| 100 AND OVER | 0.00000 |

PAGE 4—CONTINUED

POLICY INFORMATION CONTINUED—POLICY NUMBER   156 212 032

——————    TABLE OF PERCENTAGES    ——————

| INSURED PERSON'S ATTAINED AGE | PERCENTAGE | INSURED PERSON'S ATTAINED AGE | PERCENTAGE |
|---|---|---|---|
| 40 and under | 250% | 61 | 128% |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70 | 115 |
| 50 | 185 | 71 | 113 |
| 51 | 178 | 72 | 111 |
| 52 | 171 | 73 | 109 |
| 53 | 164 | 74 | 107 |
| 54 | 157 | 75-90 | 105 |
| 55 | 150 | 91 | 104 |
| 56 | 146 | 92 | 103 |
| 57 | 142 | 93 | 102 |
| 58 | 138 | 94 and above | 101 |
| 59 | 134 | | |
| 60 | 130 | | |

Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"), gives a definition of life insurance which limits the amounts that may be paid into a life insurance policy relative to the benefits it provides. Even if this policy states otherwise, at no time will the "future benefits" under this policy be less than an amount such that the "premiums paid" do not exceed the Code's "guideline premium limitations." We may adjust the amount of premium paid to meet these limitations. Also, at no time will the "death benefit" under the policy be less than the "applicable percentage" of the "cash surrender value" of the policy. The above terms are as defined in the Code. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes -Applicable Tax Law" for more information.

# Those Who Benefit from this Policy

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice in a form satisfactory to us. You can get such a form from your financial professional or by writing to us at our Administrative Office. The change will take effect on the date you sign the notice; however, it will not apply to any payment we make or other action we take before we receive the notice.

**Assignment.** You may assign this policy, if we agree; however, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

# The Insurance Benefit We Pay

We will pay the Insurance Benefit of this policy to the beneficiary upon the death of the insured person when we receive at our Administrative Office (1) proof that the insured person died while this policy was in force; and (2) all other requirements we deem necessary. The Insurance Benefit includes the following amounts, which we will determine as of the date of death of the insured person:

- the Death Benefit described in the "Death Benefit" provision;
- plus any other benefits then due from riders to this policy;
- minus any policy loan and accrued interest, or liens;
- minus any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount in accordance with applicable law. We will compute the interest at a rate we determine, but not less than the rate required by any applicable law. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See the "Other Important Information" section of this policy, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Additional exclusions or limitations (if any) are listed in the Policy Information section.

**Death Benefit.** The Death Benefit of this policy will be determined under either Option A or Option B, whichever you have chosen and is in effect on the date of death of the insured person.

Under Option A, the Death Benefit is the greater of (a) the base policy face amount; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

Under Option B, the Death Benefit is the greater of (a) the base policy face amount *plus* the amount in your Policy Account on the date of death of the insured person; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

The percentages referred to above are the percentages from the "Table of Percentages" shown on Page 4-Continued of this policy for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

**Coverage After Age 100.** If the policy is in force on the policy anniversary when the insured person reaches age 100, it will remain in force subject to the policy loan provision. However, no premium payments, partial withdrawals, changes in face amount or changes in Death Benefit Option will be permitted after age 100 of the insured person; policy loans and loan repayments may continue to be made, subject to our normal rules as stated in other provisions of the policy pertaining to these items. No deductions for cost of insurance or administrative charges will be made after age 100 of the insured person.

## *Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option*

You may reduce the face amount of the base policy or change the death benefit option by written request to us at our Administrative Office, subject to the following conditions:

1. After the second policy year while this policy is in force, you may ask us to reduce the base policy face amount but not to less than $50,000. Any such reduction in the face amount may not be less than $10,000. If you reduce the base policy face amount before the end of the twentieth policy year, we will deduct a proportionate amount of any applicable surrender charge from your Policy Account.

2. After the second policy year while this policy is in force, you can change your death benefit option. Any requested change to death benefit Option B must be made while the insured person is not more than attained age 90. If you ask us to change from Option A to Option B, we will decrease the base policy face amount by the amount in your Policy Account on the date the change takes effect. However, we will decline to make such change if it would reduce the base policy face amount to less than $50,000. If you ask us to change from Option B to Option A, we will increase the base policy face amount by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the base policy face amount are made so that the death benefit remains the same on the date the change takes effect.

3. The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

4. We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

5. You may ask for a change by completing an application for change, which you can get from your financial professional or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

04-100-5                                                                                    Page 6

# The Premiums You Pay

The minimum initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before a premium at least equal to the minimum initial premium is paid. Other premiums may be paid at our Administrative Office at any time prior to attained age 100 of the insured person while this policy is in force. We will furnish you with a premium receipt, signed by one of our officers, upon request.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the Death Benefit and your policy's values. We will assume that any payment you make to us is a premium payment, unless you tell us in writing that it is a loan repayment.

If you stop paying premiums, insurance coverage will continue for as long as the Net Policy Account Value is sufficient to cover the monthly deductions described in the "Monthly Deductions" provision, with a further extension of coverage as described in the "Grace Period" provision.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make if they would immediately result in more than a dollar for dollar increase in the Death Benefit (which would happen if the Death Benefit is determined as a percentage of the Policy Account, as described in the "Death Benefit" provision), unless you provide satisfactory evidence of insurability of the insured person.

We also reserve the right not to accept premium payments or to return excess amounts that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

**Grace Period.** At the beginning of each policy month, we compare the Net Policy Account Value (this is equal to the amount in your Policy Account minus any policy loan and accrued loan interest) to the total monthly deductions described in the "Monthly Deductions" provision. If the Net Policy Account Value is sufficient to cover the total monthly deductions, this policy is not in default.

If the Net Policy Account Value at the beginning of any policy month is not sufficient to cover the total monthly deductions, the policy is in default as of the first day of such policy month.

If the policy is in default, we will send you and any assignee on our records at last known addresses written notice stating that a grace period of 61 days has begun starting with the date the notice is mailed. The notice will also state the amount of payment that is due.

The payment required will not be more than an amount sufficient to increase the Net Policy Account Value to cover all monthly deductions for 3 months, calculated assuming no interest was credited to the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we receive the requested amount before the end of the grace period, but the Net Policy Account Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61 day grace period has begun and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 5.

**Restoring Your Policy Benefits.** If this policy has ended without value and was not given up for its Net Cash Surrender Value, you may restore policy benefits while the insured person is alive. In order to restore benefits, you must:

1. Ask for restoration of policy benefits within 5 years from the end of the grace period; and

2. Provide evidence of insurability satisfactory to us; and

3. Make a required payment. The required payment will not be more than an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the premium charge. We will determine the amount of this required payment as if no interest was credited to your Policy Account.

We must receive the required payment while the insured person is alive. We will deduct the premium charge from the required payment. The policy account on the date of restoration will be equal to the balance of the required payment.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request. We will start to make monthly charges again as of the effective date of restoration. The schedule of surrender charges that was applicable on the date of default will also be applicable to the restored policy.

We reserve the right to decline to restore this policy if in our opinion it would cause this policy to fail to qualify as life insurance under applicable tax law.

## *Your Policy Account and How it Works*

**Premium Payments.** When we receive your premium payments, we subtract the premium charge shown in the table in the "Policy Information" section and any overdue monthly deductions. We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the minimum initial premium payment, as shown in the "Policy Information" section, is received at our Administrative Office.

We credit interest to your Policy Account at effective annual rates we determine periodically. We make deductions from your Policy Account as described in the "Monthly Deductions" provision. We also subtract from your Policy Account any partial Net Cash Surrender Value withdrawals you ask for; more details are given in the Cash Surrender Value section of this policy.

**Monthly Deductions.** At the beginning of each policy month we make a deduction from your Policy Account to cover the charges described below. If you do not submit the full minimum initial premium with your application, and the minimum initial premium is paid upon delivery, your monthly charges commence as of the Register Date. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

- the monthly administrative charge;

- the monthly cost of insurance for the insured person; and

- the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of (a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; *plus* (b) any flat extra charge shown in the "Policy Information" section. The net amount at risk at any time is the Death Benefit (calculated as of that time) minus the amount in your Policy Account at that time.

04-100-7

Page 8

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision. They will never be more than those shown in the Table of Maximum Monthly Cost of Insurance Rates Per $1000 of Net Amount at Risk for the Base Policy on Page 4-Continued.

No monthly deductions are made after age 100 of the insured person.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

- We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value or you reduce the base policy face amount.

**How We Add Interest.** We will credit the amount in your Policy Account with interest at rates we determine. We will determine such interest rates periodically in advance for unloaned and loaned amounts. The rates may be different for unloaned and loaned amounts. Any change in the interest rates we determine will be as described in the "Changes in Policy Cost Factors" provision. Such interest rates will not be less than 3% per year. Interest accrues and is credited on unloaned amounts in your Policy Account daily. However, we will credit interest on the initial net premium from the Register Date if it is later than the date of receipt provided the initial premium is at least equal to the minimum initial premium shown on Page 3 of the policy.

We credit interest on the loaned portion of your Policy Account daily. The interest rate we credit to the loaned portion of your Policy Account will be at an annual rate up to 2% less than the loan interest rate we charge. However, we reserve the right to credit a lower rate than this if in the future tax laws change such that our taxes on policy loans or policy loan interest are increased. In no event will we credit less than 3% per year.

On each policy anniversary and at any time you repay all of a policy loan, we will transfer the interest that has been credited to the loaned portion of your Policy Account to the unloaned portion of your Policy Account.

## *The Cash Surrender Value of this Policy*

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. Your written request for cancellation or surrender must include the following:

1. A statement that makes it clear that you intend to surrender the contract;
2. The policy number of the policy to be surrendered;
3. The name of the insured person and your name (if other than the insured person) and address where proceeds should be mailed;
4. Your signature and, if required by the policy or by a legally binding document of which we have an actual notice, the signature of a collateral assignee or other person having an interest in the policy through the legally binding document.

If this policy has a Cash Surrender Value and is being given up for its Net Cash Surrender Value, a completed withholding authorization must also be included with your written request. If this form is not provided to us with your written request for surrender, we will withhold income tax on the taxable portion of your distribution at the mandated federal and state tax rates. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. If the policy has been lost, stolen or destroyed, you must include a statement in the written request that the policy was lost, stolen or destroyed with an approximate date of when the policy was lost, stolen or destroyed. All insurance coverage under this policy ends on the date we receive your written request.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of surrender charges for the initial base policy face amount is in the "Policy Information" section.

04-100-9GA                                                                                   Page 9

If the base policy face amount is reduced before the end of the fifteenth policy year, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. We will send you a new Policy Information section in the event of a reduction in the base policy face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year, and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount of $500.00. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal if this would cause the policy to fail to qualify as life insurance under applicable tax law, as interpreted by us. We will decline a request for a partial Net Cash Surrender Value withdrawal if this would cause a decrease in the base policy face amount to less than $50,000. A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your Death Benefit. If the Death Benefit is Option A, the withdrawal may also result in a decrease in the face amount; there will be no proportionate surrender charge due to such a decrease.

Such withdrawal and resulting reduction in the Death Benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

# How a Loan Can Be Made

**Policy Loans.** You can take a loan on this policy while it has a loan value. This policy will be the only security for the loan. The initial loan and each additional loan must be for at least $500.00. Any amount on loan is part of your Policy Account. We refer to this as the loaned portion of your Policy Account.

**Carry Over Loans.** If this policy was issued based, in whole or part, upon an exchange of another life insurance policy, any transferred existing loan from the exchanged policy as approved by us will be put into the loaned portion of your Policy Account. If a refund is made under the "Right to Examine Policy" provision, we will subtract any policy loan and accrued loan interest from that refund.

**Loan Value.** The loan value on any date is the Cash Surrender Value on that date discounted at the loan interest rate we charge to the next policy anniversary. The amount of any new loan you take may not be more than the loan value, less any existing loan and accrued loan interest. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination or (2) 4%. "Published Monthly Average" means the Moody's Corporate Bond Yield Average - Monthly Average Corporates published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than $\frac{1}{2}$ of 1% per year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph exceeds the rate being charged by $\frac{1}{2}$ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by $\frac{1}{2}$ of 1% or more.

We will notify you of the initial loan interest rate when you take out a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and bear interest at the loan rate then in effect.

**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Policy Account Value is less than the total monthly deduction then due. In that case, the "Grace Period" provision will apply.

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

## Our Annual Report to You

For each policy year we will send you without charge a report for this policy that shows the current Death Benefit, the value of your Policy Account, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

## How Benefits Are Paid

The Insurance Benefit or your Net Cash Surrender Value withdrawals are paid immediately in one sum. Amounts paid will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

## Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of a premium at least equal to the minimum initial premium payment shown in the "Policy Information" section. This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Code or successor law. Therefore, we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change Death Benefit Options, to decline to change the face amount, or to decline to make partial withdrawals that, in our opinion, would cause this policy to fail to qualify as life insurance under applicable tax law. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages in the "Death Benefit" provision) or to require additional premium payments, or to make distributions from this policy or to change the face amount to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the earlier of the Register Date or date of issue shown in the Policy Information section.

We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change or restoration. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the lifetime of the insured person.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What if Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the earlier of the Register Date or the date of issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the Death Benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase.

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**When We May Defer Payment.** We may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except when used to pay premiums to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% per year, on any Net Cash Surrender Value payment that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. We compute reserves under this policy by the Commissioners' Reserve Valuation Method.

We use the 1980 Commissioners' Standard Ordinary Male or Female Mortality Tables at attained ages 0-17, and the 1980 Commissioners' Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables at attained ages 18 and over, as the basis for determining maximum insurance costs and minimum cash surrender values. We take account of the sex, attained age, and class of risk of the insured person. For attained ages 18 and over, we also take account of the tobacco user status of the insured person. We use a minimum effective annual interest rate of 3%.

For policies issued at attained ages 0-17, an insured person's cost of insurance rate is not based on that person's status as a tobacco user or non-tobacco user. Effective with the policy anniversary when that insured person reaches attained age 18, non-tobacco user cost of insurance rates will be charged for that person. For policies issued at attained ages 18 or over, an insured person's cost of insurance rate takes account of that person's status as a tobacco user or non-tobacco user.

**Change from Tobacco User Rates to Non-Tobacco User Rates.** Any insured person attained age 18 or over being charged tobacco user rates may be eligible for non-tobacco user rates. The change, if approved, may result in lower future cost of insurance rates beginning on the effective date of change to non-tobacco user rates.

Upon request made to our Administrative Office, we will provide forms and instructions as to how you may apply for non-tobacco user rates. The change will be based upon our general underwriting rules in effect at the time of application, and may include criteria other than tobacco use status as well as a definition of tobacco use different from that applicable at the time this policy was issued.

The change to non-tobacco user rates, if approved, will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request. A copy of your application for the change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become part of this policy. We may require you to return this policy to our Administrative Office to make the change. This change may have adverse tax consequences.

The change to non-tobacco rates will be contestable; however, we will not contest the change after it has been in effect for two years during the lifetime of the insured person. In the event of a successful contest, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at tobacco user rates.

**Policy Illustrations.** Upon request we will give you an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

**Conversion Privilege.** You may, with the written consent of the insured person, request that we convert this policy to a variable life insurance policy we are then offering. You may request this at any time after the first policy year but not later than the fifth policy year after the register date of this policy. The new policy will be subject to its own issue age and face amount limits. If the insured person is less than attained age 65 at the time of the request, we will not require any evidence of insurability except as specifically noted below. If the insured person is attained age 65 or over at the time of the request, we will require evidence of insurability satisfactory to us. In all cases, this request is also subject to all of the following conditions:

1. This policy must be in force on the date of conversion. The insured person may not then be disabled under the terms of any disability waiver rider in effect under this policy.

2. The new policy will have a face amount of insurance equal to the face amount of insurance under this policy on the date of conversion. In order for the new policy to qualify as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us, it may be necessary to increase the face amount of the new policy. If so, any increase in the face amount of the new policy to assure that the new policy meets the definition of life insurance will be subject to evidence of insurability satisfactory to us.

3. The register date and issue date of the new policy will be the same as the date of conversion. Premiums and charges for the new policy will be based on the company's rates in effect for the new policy for the then current issue age of the insured person and the same class of risk or the closest comparable class as under this policy. You may request a more favorable risk classification for the insured person; however, this will be subject to evidence of insurability satisfactory to us.

4. Any additional benefit riders in effect under this policy will be included with the new policy only if they are then available with the new policy as of its issue date. You may request to add new additional benefit riders to the new policy; however, this will be subject to evidence of insurability satisfactory to us.

5. Any policy loan and accrued loan interest under this policy must be repaid prior to conversion.

The suicide exclusion and contestable periods of the new policy will be determined from the date of issue of this policy rather than the date of issue of the new policy, except to the extent evidence of insurability was required as noted in the first paragraph of this provision and in items 2, 3, and 4.

We will waive the surrender charge applicable to this policy on the date of conversion up to, but not to exceed, the amount of the first year surrender charge for the new policy. We will retain the excess, if any, over this amount and deduct it from this policy's Policy Account on the date of conversion. We will transfer the balance of your Policy Account Value to the new policy. Your Policy Account Value for the new policy will be allocated to the investment options under the new policy as directed by you on the application completed for the conversion, and in accordance with the terms of the new policy. The initial premium and deduction allocation percentages that you specify on the application will continue to apply unless later changed by you. Monthly deductions for the new policy, including any additional benefit riders, will start on the register date of the new policy. The new policy will be subject to all charges according to its terms. Coverage under this policy will terminate on the conversion date.

You may examine the new policy and cancel it if you are not satisfied with it; you will have as many days after the conversion date to do this as you had to cancel this policy after it was delivered to you originally. You must send a written request for cancellation within this time period to our Administrative Office. If you do this, we will (1) reinstate this policy and the same additional benefit riders, if any, that you had originally and (2) refund any premium payments made under the new policy.

04-100-13

Page 14

THIS ENDORSEMENT IS PART OF THIS POLICY.

NOTICE

THE LAWS OF THE STATE OF GEORGIA PROHIBIT INSURERS FROM UNFAIRLY DISCRIMINATING AGAINST ANY PERSON BASED UPON HIS OR HER STATUS AS A VICTIM OF FAMILY VIOLENCE.

S.41-1

☐ AXA Equitable Life Insurance Company,
1290 Avenue of the Americas
New York NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance
Part I**
Form No. LIFEAPP GA/OR
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy ) Please print in ink

**Proposed Insured**
A. Full Name  First _Ben  Zion_  MI _____  Last _Koenig_  B. Gender ☒ Male  ☐ Female

C. Home Address  **Redacted**  **Redacted**

City/Municipality _Brooklyn_  County/Parish _____  State _NY_  Zip + 4 Code **Redacted**
(if address is a P O Box or not actual residence proof of residence required)

D. Home Phone No.  **Redacted**  Best time to Call _____  Best phone no to be contacted _____

E. Date of Birth  **Redacted**  F. Place of Birth _Poland_  [State/County]

G. Marital Status  ☐ Single  ☒ Married  ☐ Widowed  ☐ Divorced  ☐ Separated  H. Soc Sec No. **Redacted**

I. Driver's Lic No _NONE_  State _____

J. U S Citizen? ☒ Yes  ☐ No* If No Country _____  U S Visa type _____  Passport # or U S Visa # _____  # of years in U S _____

K. Currently employed?  ☐ Yes  ☐ No  ☒ Retired

L. Current Occupation(s)  (1) Title _N/A  Retired_  (2) Duties _N/A_  (3) How Long? _____
(If less than 1 year at current occupation give previous in Remarks )

M. Employer Name _N/A_

N. Employer Address _____
No & Street          City          State          Zip + 4 Code

O. Annual Earned Income (income from occupation) $ _Retired_  P. Net Worth $ _26,000,000_
*  If the Proposed Insured and/or policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W 8 BEN

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _Athena IIuL_  Amount of Insurance $ _10,000,000_
(If survivorship policy, complete an application for each Proposed Insured  (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement  Supplement )
To select dividend options on EWL or Riders on all Non VUL Plans
complete Optional Benefits Supplement )

B. Complete for UL or VUL only  (1) Death Benefit Option  ☒ Option A  ☐ Option B
(2) Planned Periodic Premium $ _1,515,852_

C. Definition of Life Insurance Test  Complete for AUL II, IL, IL COLI '04  ☒ Guideline Premium Test  ☐ Cash Value Accumulation Test

D. Premium Mode  ☒ Annual  ☐ Semi Annual  ☐ Quarterly  ☐ Monthly
   Or
System Matic (Complete S-M form and check applicable box)  ☐ Quarterly (only available for UL and VUL)  ☐ Monthly

E. Salary Allotment (1) Unit Name _____  (2) Unit/Sub Unit  No _____  (3) Unit Register Date _____
(Specify Allotter name if other than insured in Remarks )

F. Date Policy to save insured Age?  ☒ Yes  ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market?  ☐ Yes  ☒ No
   2 Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider?  ☐ Yes  ☒ No

H. Any other life insurance now in effect or application now pending?  ☒ Yes  ☐ No
(Give companies amounts and policy numbers in Remarks )

I. Will the coverage applied for replace or change any life insurance or annuities?  ☐ Yes  ☒ No  Is this a 1035 Exchange? ☐ Yes  ☒ No
If "Yes", complete  (If additional room is needed, please use Remarks Section )

Amount $ _____  Company _____  Issue Year _____  Policy Number _____  ☐ Life  ☐ Group  ☐ Annuity

Amount $ _____  Company _____  Issue Year _____  Policy Number _____  ☐ Life  ☐ Group  ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option?  ☐ Yes  ☒ No  If "Yes", complete Term Policy/Rider or Purchase Option Supplement

K. Complete if Proposed Insured is under age 15  a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ _____
   b) Are any other children in the family insured for a lesser amount?  ☐ Yes  ☐ No

If "Yes" give details _____

AMIGV 2005 A  CAT# 133942  E6173_1 1
217433, 04-21-2006, 11 11 21

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary Information.)

Beneficiary Full Name _____  Relationship to Insured _____  Percentage

Primary: _Benzion Koenig Insurance Trust B 05/11/06_ _____  _100_

Contingent: _____

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: _Benzion Koenig Insurance Trust B 05/11/06_  Social Security # or TIN _Redacted_

Address: Street _Wells Fargo Bank, N.A. 400 Northridge Rd_ City _Atlanta_ State _Ga_ Zip Code _30350_
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country_____ U.S. Visa type_____ Passport # or U.S. Visa # _____ # of years in U.S._____

Relationship to Insured_____ Date of Birth _____

Name of Trustee _Wells Fargo Bank, N.A._  Date of Trust Agreement _5-11-06_

If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

**A.** Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs?  ☐ Yes ☒ No
(If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.)

**B.** Any plans to travel or reside outside the United States?  ☐ Yes ☒ No
(If "Yes", complete Foreign Residence and Travel Supplement.)

**C.** Have you been disabled for 2 or more weeks within the last 2 years?  ☐ Yes ☒ No

**D.** In the last year flown other than as a passenger or plan to do so?  ☐ Yes ☒ No
(If "Yes", complete Aviation Supplement.)

**E.** Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies?  ☐ Yes ☒ No
(If "Yes", complete Avocation Supplement.)

**F.** In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification?  ☐ Yes ☒ No
(If "Yes", state companies and provide full details in Remarks.)

**G.** In the last 10 years, have you been convicted of, or pled "no contest" to a felony?  ☐ Yes ☒ No
(If "Yes" in "Remarks", state full details of offense and penalty, with dates.)

**H.** Do you currently use any form of tobacco or nicotine product?  ☐ Yes ☒ No  Type_____ Avg. Quantity # packs_____ Frequency _____

**I.** Have you ever used any form of tobacco or nicotine product?  ☐ Yes ☒ No  Type_____ Date Ceased _____

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height _5_ Ft._6_ in.; Weight _166_ lbs.

**B.** Personal Physician Name _please see special Remarks_

**C.** Address _____

**D.** Date and Reason for Last Visit in the Last 5 Years _no medical changes since Feb exam_

**E.** What treatment was given or recommended?  (If none, so state)_____

Has Proposed Insured:

**F.** In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder?  ☐ Yes ☒ No

**G.** In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility?  ☒ Yes ☐ No
(Also include medical checkups in the last 2 years.  Do not include colds, minor injuries or normal pregnancy.)

**H.** In the last 10 years:

1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances?  ☐ Yes ☒ No
(If "Yes", complete Substance Usage Supplement.)

2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous?  ☐ Yes ☒ No
(If "Yes", complete Substance Usage Supplement.)

**I.** In the last 10 years, been:
Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession?  ☐ Yes ☒ No

**J.**

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | W W II death Camps | ? |
| Mother | | WW II death Camps | ? |
| Sibling | | | |

AMIGV-2005 A

217433,04-21-2006,11:11:21

2

**❻ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION** (Attach additional sheet of paper if necessary;
and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks
If the owner is a Qualified Plan, please indicate the qualified plan and type
here

(Attach additional sheet of paper if necessary; and it must be
signed and dated by the Proposed Insured, Owner, and financial
professional.)

Dr. Albea Zucker          845 - 782 - 6092
305 Route 208
Manroe NY 10950          Please See Contract
                          # 156 203466 For
Dr. Kaiser                updated medical file
465 Ocean Pkwy
Brooklyn NY 11218

**❼ COMPLETE IF MONEY IS PAID WITH THE POLICY**

Amount paid with this Application $ ___0___

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary
Insurance Agreement, including
(i)   the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and
(ii)  the $1,000,000 insurance amount limitations, and
(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?   ☒ Yes   ☐ No
If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome
(AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or
had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered

**AGREEMENT** Each signer of this application agrees that

(1) The statements and answers in all parts of this application are true and complete We (the Company checked on page 1 of this application) may rely on them in
acting on this application

(2) The Temporary Insurance Agreement states the conditions that must be met before insurance takes effect if money is paid before the policy is delivered
Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege

(3) Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application (a) until a policy is delivered and the full initial premium
for it is paid while the person(s) proposed for insurance is (are) living, (b) before any Registered Date specified in this application, and (c) unless to the best of my
(our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the
full initial premium is paid

(4) No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement Or to waive any of our rights or
requirements We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam)

(5) I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

☐ AXA Equitable Life Insurance Company     ☐ MONY Life Insurance Company of America

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**

**TO OBTAIN HEALTH INFORMATION**

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so will result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy, I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT: (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (II) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application including, but not limited to, the Acknowledgement and Authorization.

Dated at City _____

State: _Georgia_

on _5/12/00_

Signature of Proposed Insured/Applicant, or parent or guardian.
(if under the age of 14, parent or guardian)

Signature of Owner or Applicant (if Proposed Insured
if corporation, print firm's name and signature of authorized officer)
(if trust, signature of trustee.)
ELIZABETH T. WAGNER
VICE PRESIDENT

**Financial Professional to complete this section:**

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?  ☐ Yes  ☒ No
(if "yes" give details_____)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.
☒ I have witnessed the signature required on fully completed Part 1  ☐ I have not witnessed the signature required on fully completed Part 1. (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name _____

AM(GV-2008-A

**Application Part 2 To:** ☐ **AXA Equitable Life Insurance Company**    USA

☐ **AXA Life and Annuity Company**    Passport # Redacted

Reason for submission of this form: ☐ New Policy ☐ Policy Change ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height: __ ft __ in. | c. Weight: __ lbs. |
|---|---|---|---|---|---|
| | Benzion | | Koenig | d. Birth Date: Redacted | e. Sex: ☐ Male ☐ Fem__ |

2. a. Name and address of personal physician (or medical facility used instead): (If none, so state) Dr Albert Zucker (305) 845-782-954?

b. Date and reason last consulted if within the last 5 years: 6m Ago. routine. Hoover, NY 10850

c. What treatment was given or recommended? (If none, so state) none   Zucker, MD 305. Route208 # 7.

| (For all "Yes" answers to Questions 3-9, circle items that apply.) | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| 3. Has Proposed Insured ever had or been treated for: | | | 10 pounds in the last 6 months? | | |
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ | 8. Other than as stated in answers to Questions 2-6, has Proposed Insured, within the last 5 years: | | |
| b. Dizziness, fainting, convulsions, paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ | a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| c. Shortness of breath; blood spitting, bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ | b. Had any illness, injury, or surgery? | ☐ | ☑ |
| | | | c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☑ | ☐ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ | d. Had electrocardiogram, X-ray, other diagnostic test? | ☑ | ☐ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ | e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine, stone or other disease or disorder of kidney or bladder? | ☐ | ☑ | 9. a. Has Proposed Insured, within the last 12 months: | | |
| | | | (i) Smoked cigarettes? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☐ | ☑ | (ii) Used any other form of tobacco (Give full details)? | ☐ | ☑ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ | b. Has Proposed Insured, within the last five years: | | |
| i. Deformity, lameness or amputation? | ☐ | ☑ | (i) Smoked cigarettes? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ | (ii) Used any other form of tobacco (Give full details) | ☐ | ☑ |

| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
|---|---|---|
| 4. Is Proposed Insured now under observation or taking treatment? | ☑ | ☐ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑ |
| 7. Has Proposed Insured's weight changed by more than | ☐ | ☑ |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | 55? | Holocaust victims | 50's |
| Mother | | wound/natural? | 92 |
| Brother/Sister 3 | | Holocaust victims | |

DETAILS FOR "YES" ANSWERS. Include: i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

4. ASA only (EKG)
8a Dr Kayser - @Brooklyn NY. routine check-up, 4m Ago routine
B1 test.
Dr Zucker - 4 yr. Also routine
8d. B1 test test. ECG routine 4yr-EKG

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at Miami Beach FL on 2/6/06 X _Benzion Koenig_
city   state   Mo Day Yr   Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): _____

# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) ) | CIVIL ACTION NO.: 1:07-cv-0512-MHS |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

**EXHIBIT 8 to Second Amended Complaint**

*INSURED PERSON*   BENZION KOENIG



*POLICY OWNER*   BENZION KOENIG INS TRT 20060511

# UNIVERSAL LIFE INSURANCE POLICY

*POLICY NUMBER*   156 212 033

## AXA EQUITABLE LIFE INSURANCE COMPANY
### HOME OFFICE: 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK

**We agree** to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

### Flexible Premium Universal Life Insurance Policy

This is a flexible premium universal life insurance policy. You can, within limits:
- make premium payments at any time and in any amount;
- change the Death Benefit Option; and
- reduce the face amount of insurance

These rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We put your net premiums into your Policy Account. Your Policy Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 3% per year.

This is a non-participating policy.

**Right to Examine Policy. You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.**

**Read Your Policy Carefully.** It is a legal contract between you and AXA Equitable Life Insurance Company.

Pauline Sherman, Senior Vice President,
Secretary and Associate General Counsel

Christopher M. Condron
Chairman and Chief Executive Officer

04-100

# *Contents*

*Policy Information*   3

*Table of Maximum Monthly Charges for Benefits*   4

*Those Who Benefit from this Policy*   5

*The Insurance Benefit We Pay*   5

*Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option*   6

*The Premiums You Pay*   7

*Your Policy Account and How it Works*   8

*The Cash Surrender Value of this Policy*   9

*How a Loan Can Be Made*   10

*Our Annual Report to You*   11

*How Benefits are Paid*   11

*Other Important Information*   11

*In this policy:*

*"We," "our,"* and *"us"* mean AXA Equitable Life Insurance Company.

*"You"* and *"your"* mean the owner of this policy at the time an owner's right is exercised.

Unless otherwise stated, all references to interest in this policy are effective annual rates of interest.

Attained age means age on the birthday nearest to the beginning of the current policy year.

*Administrative Office*

The address of our Administrative Office is shown on Page 3. You should send correspondence to that office. Premium payments should be sent to the address listed on your billing notice.

*Copies of the application for this policy and any additional benefit riders are attached to the policy.*

# *INTRODUCTION*

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information sectio n, are put into your Policy Account. Amounts in your Policy Account earn interest at rates we declare periodically; these rates will not be less than 3% on an effective annual basis.

If Death Benefit Option A is in effect, the Death Benefit is the base policy face amount. If Death Benefit Option B is in effect, the Death Benefit is the base policy face amount *plus* the amount in your Policy Account. Under either option, the Death Benefit will never be less than a percentage of your Policy Account as stated in the "Death Benefit" provision.

The Insurance Benefit of this policy is payable upon the death of the insured person while the policy is in force.

We make monthly deductions from your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value or reduce the base policy face amount, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

## POLICY INFORMATION

| | |
|---|---|
| INSURED PERSON | BENZION KOENIG |
| POLICY OWNER | BENZION KOENIG INS TRT 20060511 |
| FACE AMOUNT OF BASE POLICY | $10,000,000 |
| DEATH BENEFIT | OPTION A (SEE PAGE 6) |
| POLICY NUMBER | 156 212 033 |
| BENEFICIARY | BENZION KOENIG INS TRT 05/11/06 |
| REGISTER DATE | APR 8, 2006 |
| DATE OF ISSUE | FEB 20, 2007 |

ISSUE AGE    85
SEX MALE

RATING CLASS:  STANDARD
NON-TOBACCO USER

A MINIMUM INITIAL PREMIUM PAYMENT OF $143,597.84 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $1,515,852.00 IS PAYABLE ANNUALLY.

THE ADDITIONAL BENEFIT RIDERS LISTED BELOW, IF ANY, ARE INCLUDED IN THIS POLICY:

THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY; (4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

POLICY INFORMATION CONTINUED—POLICY NUMBER    156 212 033

————————    TABLE OF EXPENSE CHARGES    ————————

DEDUCTION FROM PREMIUM PAYMENTS:

PREMIUM CHARGE:

WE DEDUCT AN AMOUNT NOT TO EXCEED 8% FROM EACH PREMIUM PAYMENT. WE RESERVE THE RIGHT TO INCREASE THIS PERCENTAGE LIMIT AS A RESULT OF CHANGES IN THE TAX LAWS WHICH INCREASE OUR EXPENSES.

DEDUCTIONS FROM YOUR POLICY ACCOUNT:

ADMINISTRATIVE CHARGE:

FIRST POLICY YEAR: WE DEDUCT $20.00 AT THE BEGINNING OF EACH POLICY MONTH.

SECOND AND SUBSEQUENT POLICY YEARS (BUT NOT BEYOND THE POLICY ANNIVERSARY WHEN THE INSURED PERSON IS ATTAINED AGE 100): WE DEDUCT AN AMOUNT NOT TO EXCEED $10.00 AT THE BEGINNING OF EACH POLICY MONTH.

04-100-3    PAGE 3—CONTINUED

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 212 033

——— TABLE OF SURRENDER CHARGES ———
FOR THE INITIAL BASE POLICY FACE AMOUNT

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 01 | $464,484.72 | 09 | $239,015.94 |
| 02 | $440,278.04 | 10 | $204,424.97 |
| 03 | $416,085.35 | 11 | $169,917.96 |
| 04 | $391,883.33 | 12 | $135,322.32 |
| 05 | $367,690.64 | 13 | $100,815.32 |
| 06 | $342,718.89 | 14 | $66,224.34 |
| 07 | $308,118.59 | 15 | $31,717.34 |
| 08 | $273,527.61 | 16 AND LATER | $0.00 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS
POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE WITHIN THE FIRST
FIFTEEN POLICY YEARS.  THE SURRENDER CHARGE IN THE FIRST POLICY MONTH
OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE.  DURING THE FIRST FIVE
POLICY YEARS THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY
AMOUNTS UNTIL IT REACHES $345,601.86 IN THE TWELFTH MONTH OF POLICY
YEAR FIVE.  STARTING IN POLICY YEAR SIX, THE SURRENDER CHARGE DECLINES
UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES ZERO IN THE TWELFTH
MONTH OF POLICY YEAR FIFTEEN.

IF THE BASE POLICY FACE AMOUNT IS REDUCED WITHIN THE FIRST FIFTEEN
POLICY YEARS, A PROPORTIONATE SHARE OF THE APPLICABLE SURRENDER CHARGE AT
THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT.  SEE SURRENDER
CHARGES PROVISION FOR A DESCRIPTION OF THE PROPORTIONATE SURRENDER CHARGE.

ADMINISTRATIVE OFFICE:

AXA EQUITABLE LIFE INSURANCE COMPANY

NATIONAL OPERATIONS CENTER
10840 BALLANTYNE COMMONS PARKWAY
CHARLOTTE, NC 28277
(800) 777-6510

POLICY INFORMATION CONTINUED - POLICY NUMBER 156 212 033

———————— TABLE OF MAXIMUM MONTHLY CHARGES FOR BENEFITS ————————

| BENEFITS | MONTHLY DEDUCTION FROM POLICY ACCOUNT | PERIOD |
|---|---|---|
| BASE POLICY LIFE INSURANCE | MAXIMUM MONTHLY COST OF INSURANCE RATE FOR THE BASE POLICY (SEE PAGE 4 - CONTINUED) TIMES THOUSANDS OF NET AMOUNT AT RISK.  NO DEDUCTION IS MADE AFTER AGE 100 OF THE INSURED PERSON. | 15 YEARS |

POLICY INFORMATION CONTINUED—POLICY NUMBER   156 212 033

TABLE OF MAXIMUM MONTHLY COST OF INSURANCE RATES
PER $1,000 OF NET AMOUNT AT RISK FOR THE BASE POLICY

| INSURED PERSON'S ATTAINED AGE | RATE |
|---|---|
| 85 | 13.37417 |
| 86 | 14.69833 |
| 87 | 16.08083 |
| 88 | 17.49667 |
| 89 | 18.96583 |
| 90 | 20.51167 |
| 91 | 22.16500 |
| 92 | 23.98667 |
| 93 | 26.06583 |
| 94 | 28.78417 |
| 95 | 32.81750 |
| 96 | 39.64250 |
| 97 | 53.06583 |
| 98 | 83.33250 |
| 99 | 83.33250 |
| 100 AND OVER | 0.00000 |

POLICY INFORMATION CONTINUED—POLICY NUMBER   156 212 033

———————   TABLE OF PERCENTAGES   ———————

| INSURED PERSON'S ATTAINED AGE | PERCENTAGE | INSURED PERSON'S ATTAINED AGE | PERCENTAGE |
|---|---|---|---|
| 40 and under | 250% | 61 | 128% |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70 | 115 |
| 50 | 185 | 71 | 113 |
| 51 | 178 | 72 | 111 |
| 52 | 171 | 73 | 109 |
| 53 | 164 | 74 | 107 |
| 54 | 157 | 75-90 | 105 |
| 55 | 150 | 91 | 104 |
| 56 | 146 | 92 | 103 |
| 57 | 142 | 93 | 102 |
| 58 | 138 | 94 and above | 101 |
| 59 | 134 | | |
| 60 | 130 | | |

Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"), gives a definition of life insurance which limits the amounts that may be paid into a life insurance policy relative to the benefits it provides. Even if this policy states otherwise, at no time will the "future benefits" under this policy be less than an amount such that the "premiums paid" do not exceed the Code's "guideline premium limitations." We may adjust the amount of premium paid to meet these limitations. Also, at no time will the "death benefit" under the policy be less than the "applicable percentage" of the "cash surrender value" of the policy. The above terms are as defined in the Code. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes -Applicable Tax Law" for more information.

## *Those Who Benefit from this Policy*

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice in a form satisfactory to us. You can get such a form from your financial professional or by writing to us at our Administrative Office. The change will take effect on the date you sign the notice; however, it will not apply to any payment we make or other action we take before we receive the notice.

**Assignment.** You may assign this policy, if we agree; however, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

## *The Insurance Benefit We Pay*

We will pay the Insurance Benefit of this policy to the beneficiary upon the death of the insured person when we receive at our Administrative Office (1) proof that the insured person died while this policy was in force; and (2) all other requirements we deem necessary. The Insurance Benefit includes the following amounts, which we will determine as of the date of death of the insured person:

- the Death Benefit described in the "Death Benefit" provision;

- **plus** any other benefits then due from riders to this policy;

- **minus** any policy loan and accrued interest, or liens;

- **minus** any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount in accordance with applicable law. We will compute the interest at a rate we determine, but not less than the rate required by any applicable law. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See the "Other Important Information" section of this policy, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Additional exclusions or limitations (if any) are listed in the Policy Information section.

**Death Benefit.** The Death Benefit of this policy will be determined under either Option A or Option B, whichever you have chosen and is in effect on the date of death of the insured person.

Under Option A, the Death Benefit is the greater of (a) the base policy face amount; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

Under Option B, the Death Benefit is the greater of (a) the base policy face amount *plus* the amount in your Policy Account on the date of death of the insured person; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

The percentages referred to above are the percentages from the "Table of Percentages" shown on Page 4-Continued of this policy for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

**Coverage After Age 100.** If the policy is in force on the policy anniversary when the insured person reaches age 100, it will remain in force subject to the policy loan provision. However, no premium payments, partial withdrawals, changes in face amount or changes in Death Benefit Option will be permitted after age 100 of the insured person; policy loans and loan repayments may continue to be made, subject to our normal rules as stated in other provisions of the policy pertaining to these items. No deductions for cost of insurance or administrative charges will be made after age 100 of the insured person.

## *Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option*

You may reduce the face amount of the base policy or change the death benefit option by written request to us at our Administrative Office, subject to the following conditions:

1. After the second policy year while this policy is in force, you may ask us to reduce the base policy face amount but not to less than $50,000. Any such reduction in the face amount may not be less than $10,000. If you reduce the base policy face amount before the end of the twentieth policy year, we will deduct a proportionate amount of any applicable surrender charge from your Policy Account.

2. After the second policy year while this policy is in force, you can change your death benefit option. Any requested change to death benefit Option B must be made while the insured person is not more than attained age 90. If you ask us to change from Option A to Option B, we will decrease the base policy face amount by the amount in your Policy Account on the date the change takes effect. However, we will decline to make such change if it would reduce the base policy face amount to less than $50,000. If you ask us to change from Option B to Option A, we will increase the base policy face amount by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the base policy face amount are made so that the death benefit remains the same on the date the change takes effect.

3. The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

4. We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

5. You may ask for a change by completing an application for change, which you can get from your financial professional or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

# *The Premiums You Pay*

The minimum initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before a premium at least equal to the minimum initial premium is paid. Other premiums may be paid at our Administrative Office at any time prior to attained age 100 of the insured person while this policy is in force. We will furnish you with a premium receipt, signed by one of our officers, upon request.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the Death Benefit and your policy's values. We will assume that any payment you make to us is a premium payment, unless you tell us in writing that it is a loan repayment.

If you stop paying premiums, insurance coverage will continue for as long as the Net Policy Account Value is sufficient to cover the monthly deductions described in the "Monthly Deductions" provision, with a further extension of coverage as described in the "Grace Period" provision.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make if they would immediately result in more than a dollar for dollar increase in the Death Benefit (which would happen if the Death Benefit is determined as a percentage of the Policy Account, as described in the "Death Benefit" provision), unless you provide satisfactory evidence of insurability of the insured person.

We also reserve the right not to accept premium payments or to return excess amounts that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

**Grace Period.** At the beginning of each policy month, we compare the Net Policy Account Value (this is equal to the amount in your Policy Account minus any policy loan and accrued loan interest) to the total monthly deductions described in the "Monthly Deductions" provision. If the Net Policy Account Value is sufficient to cover the total monthly deductions, this policy is not in default.

If the Net Policy Account Value at the beginning of any policy month is not sufficient to cover the total monthly deductions, the policy is in default as of the first day of such policy month.

If the policy is in default, we will send you and any assignee on our records at last known addresses written notice stating that a grace period of 61 days has begun starting with the date the notice is mailed. The notice will also state the amount of payment that is due.

The payment required will not be more than an amount sufficient to increase the Net Policy Account Value to cover all monthly deductions for 3 months, calculated assuming no interest was credited to the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we receive the requested amount before the end of the grace period, but the Net Policy Account Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61 day grace period has begun and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 5.

**Restoring Your Policy Benefits.** If this policy has ended without value and was not given up for its Net Cash Surrender Value, you may restore policy benefits while the insured person is alive. In order to restore benefits, you must:

1. Ask for restoration of policy benefits within 5 years from the end of the grace period; and

2. Provide evidence of insurability satisfactory to us; and

3. Make a required payment. The required payment will not be more than an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the premium charge. We will determine the amount of this required payment as if no interest was credited to your Policy Account.

We must receive the required payment while the insured person is alive. We will deduct the premium charge from the required payment. The policy account on the date of restoration will be equal to the balance of the required payment.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request. We will start to make monthly charges again as of the effective date of restoration. The schedule of surrender charges that was applicable on the date of default will also be applicable to the restored policy.

We reserve the right to decline to restore this policy if in our opinion it would cause this policy to fail to qualify as life insurance under applicable tax law.

# *Your Policy Account and How it Works*

**Premium Payments.** When we receive your premium payments, we subtract the premium charge shown in the table in the "Policy Information" section and any overdue monthly deductions. We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the minimum initial premium payment, as shown in the "Policy Information" section, is received at our Administrative Office.

We credit interest to your Policy Account at effective annual rates we determine periodically. We make deductions from your Policy Account as described in the "Monthly Deductions" provision. We also subtract from your Policy Account any partial Net Cash Surrender Value withdrawals you ask for; more details are given in the Cash Surrender Value section of this policy.

**Monthly Deductions.** At the beginning of each policy month we make a deduction from your Policy Account to cover the charges described below. If you do not submit the full minimum initial premium with your application, and the minimum initial premium is paid upon delivery, your monthly charges commence as of the Register Date. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

- the monthly administrative charge;

- the monthly cost of insurance for the insured person; and

- the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of (a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; *plus* (b) any flat extra charge shown in the "Policy Information" section. The net amount at risk at any time is the Death Benefit (calculated as of that time) minus the amount in your Policy Account at that time.

04-100-7                                                                                          Page 8

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision. They will never be more than those shown in the Table of Maximum Monthly Cost of Insurance Rates Per $1000 of Net Amount at Risk for the Base Policy on Page 4-Continued.

No monthly deductions are made after age 100 of the insured person.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

- We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value or you reduce the base policy face amount.

**How We Add Interest.** We will credit the amount in your Policy Account with interest at rates we determine. We will determine such interest rates periodically in advance for unloaned and loaned amounts. The rates may be different for unloaned and loaned amounts. Any change in the interest rates we determine will be as described in the "Changes in Policy Cost Factors" provision. Such interest rates will not be less than 3% per year. Interest accrues and is credited on unloaned amounts in your Policy Account daily. However, we will credit interest on the initial net premium from the Register Date if it is later than the date of receipt provided the initial premium is at least equal to the minimum initial premium shown on Page 3 of the policy.

We credit interest on the loaned portion of your Policy Account daily. The interest rate we credit to the loaned portion of your Policy Account will be at an annual rate up to 2% less than the loan interest rate we charge. However, we reserve the right to credit a lower rate than this if in the future tax laws change such that our taxes on policy loans or policy loan interest are increased. In no event will we credit less than 3% per year.

On each policy anniversary and at any time you repay all of a policy loan, we will transfer the interest that has been credited to the loaned portion of your Policy Account to the unloaned portion of your Policy Account.

## *The Cash Surrender Value of this Policy*

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. Your written request for cancellation or surrender must include the following:

1. A statement that makes it clear that you intend to surrender the contract;

2. The policy number of the policy to be surrendered;

3. The name of the insured person and your name (if other than the insured person) and address where proceeds should be mailed;

4. Your signature and, if required by the policy or by a legally binding document of which we have an actual notice, the signature of a collateral assignee or other person having an interest in the policy through the legally binding document.

If this policy has a Cash Surrender Value and is being given up for its Net Cash Surrender Value, a completed withholding authorization must also be included with your written request. If this form is not provided to us with your written request for surrender, we will withhold income tax on the taxable portion of your distribution at the mandated federal and state tax rates. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. If the policy has been lost, stolen or destroyed, you must include a statement in the written request that the policy was lost, stolen or destroyed with an approximate date of when the policy was lost, stolen or destroyed. All insurance coverage under this policy ends on the date we receive your written request.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of surrender charges for the initial base policy face amount is in the "Policy Information" section.

If the base policy face amount is reduced before the end of the fifteenth policy year, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. We will send you a new Policy Information section in the event of a reduction in the base policy face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year, and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount of $500.00. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal if this would cause the policy to fail to qualify as life insurance under applicable tax law, as interpreted by us. We will decline a request for a partial Net Cash Surrender Value withdrawal if this would cause a decrease in the base policy face amount to less than $50,000. A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your Death Benefit. If the Death Benefit is Option A, the withdrawal may also result in a decrease in the face amount; there will be no proportionate surrender charge due to such a decrease.

Such withdrawal and resulting reduction in the Death Benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

# *How a Loan Can Be Made*

**Policy Loans.** You can take a loan on this policy while it has a loan value. This policy will be the only security for the loan. The initial loan and each additional loan must be for at least $500.00. Any amount on loan is part of your Policy Account. We refer to this as the loaned portion of your Policy Account.

**Carry Over Loans.** If this policy was issued based, in whole or part, upon an exchange of another life insurance policy, any transferred existing loan from the exchanged policy as approved by us will be put into the loaned portion of your Policy Account. If a refund is made under the "Right to Examine Policy" provision, we will subtract any policy loan and accrued loan interest from that refund.

**Loan Value.** The loan value on any date is the Cash Surrender Value on that date discounted at the loan interest rate we charge to the next policy anniversary. The amount of any new loan you take may not be more than the loan value, less any existing loan and accrued loan interest. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination or (2) 4%. "Published Monthly Average" means the Moody's Corporate Bond Yield Average - Monthly Average Corporates published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than $\frac{1}{2}$ of 1% per year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph exceeds the rate being charged by $\frac{1}{2}$ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by $\frac{1}{2}$ of 1% or more.

We will notify you of the initial loan interest rate when you take out a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and bear interest at the loan rate then in effect.

**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Policy Account Value is less than the total monthly deduction then due. In that case, the "Grace Period" provision will apply.

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

# Our Annual Report to You

For each policy year we will send you without charge a report for this policy that shows the current Death Benefit, the value of your Policy Account, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

# How Benefits Are Paid

The Insurance Benefit or your Net Cash Surrender Value withdrawals are paid immediately in one sum. Amounts paid will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

# Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of a premium at least equal to the minimum initial premium payment shown in the "Policy Information" section. This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Code or successor law. Therefore, we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change Death Benefit Options, to decline to change the face amount, or to decline to make partial withdrawals that, in our opinion, would cause this policy to fail to qualify as life insurance under applicable tax law. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages in the "Death Benefit" provision) or to require additional premium payments, or to make distributions from this policy or to change the face amount to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the earlier of the Register Date or date of issue shown in the Policy Information section.

We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change or restoration. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the lifetime of the insured person.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What if Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the earlier of the Register Date or the date of issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the Death Benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase.

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**When We May Defer Payment.** We may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except when used to pay premiums to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% per year, on any Net Cash Surrender Value payment that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. We compute reserves under this policy by the Commissioners' Reserve Valuation Method.

We use the 1980 Commissioners' Standard Ordinary Male or Female Mortality Tables at attained ages 0-17, and the 1980 Commissioners' Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables at attained ages 18 and over, as the basis for determining maximum insurance costs and minimum cash surrender values. We take account of the sex, attained age, and class of risk of the insured person. For attained ages 18 and over, we also take account of the tobacco user status of the insured person. We use a minimum effective annual interest rate of 3%.

For policies issued at attained ages 0-17, an insured person's cost of insurance rate is not based on that person's status as a tobacco user or non-tobacco user. Effective with the policy anniversary when that insured person reaches attained age 18, non-tobacco user cost of insurance rates will be charged for that person. For policies issued at attained ages 18 or over, an insured person's cost of insurance rate takes account of that person's status as a tobacco user or non-tobacco user.

**Change from Tobacco User Rates to Non-Tobacco User Rates.** Any insured person attained age 18 or over being charged tobacco user rates may be eligible for non-tobacco user rates. The change, if approved, may result in lower future cost of insurance rates beginning on the effective date of change to non-tobacco user rates.

Upon request made to our Administrative Office, we will provide forms and instructions as to how you may apply for non-tobacco user rates. The change will be based upon our general underwriting rules in effect at the time of application, and may include criteria other than tobacco use status as well as a definition of tobacco use different from that applicable at the time this policy was issued.

The change to non-tobacco user rates, if approved, will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request. A copy of your application for the change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become part of this policy. We may require you to return this policy to our Administrative Office to make the change. This change may have adverse tax consequences.

The change to non-tobacco rates will be contestable; however, we will not contest the change after it has been in effect for two years during the lifetime of the insured person. In the event of a successful contest, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at tobacco user rates.

**Policy Illustrations.** Upon request we will give you an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

**Conversion Privilege.** You may, with the written consent of the insured person, request that we convert this policy to a variable life insurance policy we are then offering. You may request this at any time after the first policy year but not later than the fifth policy year after the register date of this policy. The new policy will be subject to its own issue age and face amount limits. If the insured person is less than attained age 65 at the time of the request, we will not require any evidence of insurability except as specifically noted below. If the insured person is attained age 65 or over at the time of the request, we will require evidence of insurability satisfactory to us. In all cases, this request is also subject to all of the following conditions:

1. This policy must be in force on the date of conversion. The insured person may not then be disabled under the terms of any disability waiver rider in effect under this policy.

2. The new policy will have a face amount of insurance equal to the face amount of insurance under this policy on the date of conversion. In order for the new policy to qualify as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us, it may be necessary to increase the face amount of the new policy. If so, any increase in the face amount of the new policy to assure that the new policy meets the definition of life insurance will be subject to evidence of insurability satisfactory to us.

3. The register date and issue date of the new policy will be the same as the date of conversion. Premiums and charges for the new policy will be based on the company's rates in effect for the new policy for the then current issue age of the insured person and the same class of risk or the closest comparable class as under this policy. You may request a more favorable risk classification for the insured person; however, this will be subject to evidence of insurability satisfactory to us.

4. Any additional benefit riders in effect under this policy will be included with the new policy only if they are then available with the new policy as of its issue date. You may request to add new additional benefit riders to the new policy; however, this will be subject to evidence of insurability satisfactory to us.

5. Any policy loan and accrued loan interest under this policy must be repaid prior to conversion.

The suicide exclusion and contestable periods of the new policy will be determined from the date of issue of this policy rather than the date of issue of the new policy, except to the extent evidence of insurability was required as noted in the first paragraph of this provision and in items 2, 3, and 4.

We will waive the surrender charge applicable to this policy on the date of conversion up to, but not to exceed, the amount of the first year surrender charge for the new policy. We will retain the excess, if any, over this amount and deduct it from this policy's Policy Account on the date of conversion. We will transfer the balance of your Policy Account Value to the new policy. Your Policy Account Value for the new policy will be allocated to the investment options under the new policy as directed by you on the application completed for the conversion, and in accordance with the terms of the new policy. The initial premium and deduction allocation percentages that you specify on the application will continue to apply unless later changed by you. Monthly deductions for the new policy, including any additional benefit riders, will start on the register date of the new policy. The new policy will be subject to all charges according to its terms. Coverage under this policy will terminate on the conversion date.

You may examine the new policy and cancel it if you are not satisfied with it; you will have as many days after the conversion date to do this as you had to cancel this policy after it was delivered to you originally. You must send a written request for cancellation within this time period to our Administrative Office. If you do this, we will (1) reinstate this policy and the same additional benefit riders, if any, that you had originally and (2) refund any premium payments made under the new policy.

THIS ENDORSEMENT IS PART OF THIS POLICY.

NOTICE

THE LAWS OF THE STATE OF GEORGIA PROHIBIT INSURERS FROM UNFAIRLY DISCRIMINATING AGAINST ANY PERSON BASED UPON HIS OR HER STATUS AS A VICTIM OF FAMILY VIOLENCE.

S.41-1

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance
Part I**
Form No. LIFEAPP GA/OR
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy) Please print in ink

**Proposed Insured**

A. Full Name  First _Ben Zion_  MI ____  Last _Koenig_  B. Gender ☒ Male ☐ Female

C. Home Address __ Redacted __          Redacted

City/Municipality _Brooklyn_ (if address is a P O Box or not actual residence proof of residence required)  County/Parish _____  State _N.Y_  Zip + 4 Code _Redacted_

D. Home Phone No  Redacted  Best time to Call _Poland_  Best phone no to be contacted ____

E. Date of Birth  Redacted          F. Place of Birth _____
                                                    (State/County)

G. Marital Status  ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated  H. Soc Sec No _ Redacted _ ____

I. Driver's Lic No _None_          State _____

J. U S Citizen? ☒ Yes ☐ No* If No Country _____  U S Visa type_____ Passport # or U S Visa # _____ # of years in U S ____

K. Currently employed?  ☐ Yes ☐ No  ☒ Retired

L. Current Occupation(s) (1) Title _N/A Retired_  (2) Duties _N/A_  (3) How Long? _____
(if less than 1 year at current occupation, give previous in Remarks)

M. Employer Name _____

N. Employer Address _____
                        No & Street                    City                    State            Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ _Retired_  P. Net Worth $ _26,000,000_

* If the Proposed Insured and/or policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _Athena IIul_  Amount of Insurance $ _10,000,000_
(If survivorship policy, complete an application for each Proposed Insured  (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement  Supplement )
To select dividend options on EWL or Riders on all Non VUL Plans
complete Optional Benefits Supplement )

B. Complete for UL or VUL only  (1) Death Benefit Option ☒ Option A  ☐ Option B
(2) Planned Periodic Premium $ _1,515,852_

C. Definition of Life Insurance Test  Complete for AUL II, IL, IL COLI '04  ☒ Guideline Premium Test  ☐ Cash Value Accumulation Test

D. Premium Mode ☒ Annual  ☐ Semi-Annual  ☐ Quarterly  ☐ Monthly
Or
System-Matic (Complete S-M form and check applicable box)  ☐ Quarterly (only available for UL and VUL)  ☐ Monthly

E. Salary Allotment (1) Unit Name _____  (2) Unit/Sub Unit No _____  (3) Unit Register Date _____
(Specify Allottee name if other than insured, in Remarks)

F. Date Policy to save Insured Age?  ☒ Yes  ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market?  ☐ Yes ☒ No
2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider?  ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending?  ☒ Yes  ☐ No
(Give companies amounts and policy numbers in Remarks )

I. Will the coverage applied for replace or change any life insurance or annuities?  ☐ Yes ☒ No  Is this a 1035 Exchange?  ☐ Yes ☒ No
If "Yes", complete  (If additional room is needed, please use Remarks Section )

Amount $_____ Company_____  Issue Year_____ Policy Number_____ ☐ Life ☐ Group ☐ Annuity

Amount $_____ Company_____  Issue Year_____ Policy Number_____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☒ No  If "Yes", complete Term Policy/Rider or Purchase Option Supplement

K. Complete if Proposed Insured is under age 15  a) State total amount of insurance in force on the life of applicant or child's parent, if greater $_____
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details_____

AMIGV 2005 A                    CAT# 133942                    E6173_1  1
217433, 04-21-2006, 11-11.21

**❸ BENEFICIARY/OWNER**

**A** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary Benzion Koenig Insurance Trust A 05/11/06 | | 100 |
| Contingent | | |

**B** Owner (The Owner of this policy is the insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section

If the Owner is the Trust provide the name of the Trust

Owner's Name Benzion Koenig Insurance Trust A 05/11/06 Social Security # or TIN **Redacted**

Address Street 5700 Northridge Rd (Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section) City Atlanta State Ga Zip Code 30350

U S Citizen? ☐ Yes ☐ No* If No, Country_____ U S Visa type_____ Passport # or U S Visa # _____ # of years in U S ____

Relationship to Insured _____ Date of Birth _____

Name of Trustee Wells Fargo Bank, N.A Date of Trust Agreement 5/11/06

If the policy owner is not a U S Person (U S Citizen or U S Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W 8 BEN

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section

| | | | |
|---|---|---|---|
| **A** | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks ) | ☐ Yes | ☒ No |
| **B** | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement ) | ☐ Yes | ☒ No |
| **C.** | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| **D** | In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement ) | ☐ Yes | ☒ No |
| **E.** | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement ) | ☐ Yes | ☒ No |
| **F.** | In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks ) | ☐ Yes | ☒ No |
| **G** | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates ) | ☐ Yes | ☒ No |
| **H.** | Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No Type_____ Avg Quantity # packs_____ Frequency _____ | | |
| **I.** | Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No Type_____ Date Ceased _____ | | |

**❺ MEDICAL INFORMATION (Proposed Insured)** Please Note: Complete this section even if a paramedical or medical exam is being ordered

**A.** Height 5 Ft 6 in, Weight 160 lbs

**B.** Personal Physician Name Please See Special Remarks

**C.** Address _____

**D** Date and Reason for Last Visit in the Last 5 Years No medical changes Since Feb medical exam

**E.** What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

| | | | |
|---|---|---|---|
| **F.** | In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| **G.** | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years Do not include colds, minor injuries or normal pregnancy ) | ☒ Yes | ☐ No |
| **H** | In the last 10 years | | |
| | 1 Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives, marijuana, cocaine, hallucinogens or other mood altering drugs, heroin, methadone or other narcotics, amphetamines or other stimulants, or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| | 2 Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement ) | ☐ Yes | ☒ No |
| **I.** | In the last 10 years, been Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |
| **J** | | | |

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | WW II | WW II death camps | ? |
| Mother | | WW II death camps | ? |
| Sibling | | WW | |

AMIGV-2005 A

217433,04-21-2006,11 11.21

2

**⑥ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**  (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional )

| Question No | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
**Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.**  (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional )

Dr. Albea Zucker          845 — 782 — 6092
305 Route 208             Please see Contract
Manroe NY 10950           # 156203466 for
                          updated medical file
Dr. Kaiser
465 Ocean Pkwy
Brooklyn NY 11218

**⑦ COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application $ ____6____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including

(i)   the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)  the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?   ☑ Yes   ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered

**AGREEMENT.** Each signer of this application agrees that

(1)  The statements and answers in all parts of this application are true and complete  We (the Company checked on page 1 of this application) may rely on them in acting on this application

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered  Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application  (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living, (b) before any Registered Date specified in this application, and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement  Or to waive any of our rights or requirements  We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam)

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable

☐ AXA Equitable Life Insurance Company          ☐ MONY Life Insurance Company of America

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**
I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**
**TO OBTAIN HEALTH INFORMATION**
I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**
I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**
I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**
I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**
You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy, I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**
Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy. If issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**
I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT: (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING; AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City _____ Atlanta _____

State _____ Georgia _____

on _____ 5/12/06 _____

X _____
Signature of Proposed Insured, Applicant, or parent or guardian.
If Proposed Insured is a Child, Issue Age 0-14

X _____
Signature of Owner or Applicant (not Proposed Insured)
If corporation, print firm's name and signature of authorized official.
(II) TRUST: Signature of Trustee.

Bergman Koenig Insurance
Trust A 05/12/06 by Wells
Fargo Bank, N.A., as
Trustee
ELIZABETH A. WASSER
VICE PRESIDENT

**Financial Professional to complete this section**

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?   ☐ Yes   ☐ No
(If "yes" give details) _____

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.
☐ I have witnessed the signature required on fully completed Part 1   ☐ I have not witnessed the signature required on fully completed Part 1. (Explain below)

_____

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name _____

AMLGV-2005-A                                                                                          4

217483, 04-21-2005, 11:11:21

**Application Part 2 To:** ☐ AXA Equitable Life Insurance Company    USA

☐ AXA Life and Annuity Company    Passport # Redacted

Reason for submission of this form: ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height: ___ ft ___ in. c. Weight ___ lbs d. Birth Date: e. ☐ Male ☐ Female |
| | Benzion | | Koenig | Redacted |

2. a. Name and address of personal physician (or medical facility used instead): *(if none, so state)* — Dr Albert Zucker (305) 845-782-9541

b. Date and reason last consulted if within the last 5 years: 6m Ago, routine. Monsey, NY

c. What treatment was given or recommended? *(if none, so state)* none

(For all "Yes" answers to Questions 3–8, circle items that apply.)

| 3. Has Proposed Insured ever had or been treated for: | Yes | No |
|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| b. Dizziness, fainting, convulsions, paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ |
| c. Shortness of breath, blood spitting, bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding, jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine, stone or other disease or disorder of kidney or bladder? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☐ | ☑ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia, other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☐ | ☑ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑ |
| 7. Has Proposed Insured's weight changed by more than | ☐ | ☑ |

| 8. Other than as stated in answers to Questions 2–8, has Proposed Insured, within the last 5 years: | Yes | No |
|---|---|---|
| a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Had any illness, injury, or surgery? | ☐ | ☑ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☑ | ☐ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☑ | ☐ |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |
| 9. a. Has Proposed Insured, within the last 12 months: | | |
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details) | ☐ | ☑ |
| b. Has Proposed Insured, within the last five years: | | |
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details) | ☐ | ☑ |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Holocaust victims | 50's |
| Mother | | cancer / natural | 92 |
| Brothers/Sisters 3 | | Holocaust victims | |

DETAILS FOR "YES" ANSWERS: Include. I. Question Number. II. Diagnosis and Treatment. III. Results. IV. Dates and Duration. V. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

4 ASA ONLY (81 mg)
8a Dr Kayser - Brooklyn NY. routine check-up, 4m Ago routine. 81 test.
Dr Zucker - 4yr. also routine
8d 81 test, ECG routine 4yr-M

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at Miami Beach FL on 8/6/06  X _Benzion Koenig_

Witness (Must be Examiner or Nurse/Technician): _Oleg Ilog_ MD

180-M20SN-FL    E5722_5    CAT. #126995

# AXA EQUITABLE

**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY; | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) ) | CIVIL ACTION NO.: 1:07-cv-0512-MHS |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUST 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUST 05/11/06 | ) ) ) ) ) ) | |
| Defendant. | ) | |

**EXHIBIT 9 to Second Amended Complaint**



December 22, 2006

Elizabeth Wagner, VP
Wells Fargo Bank, N.A.
400 Northridge, Suite 600
Atlanta, GA 30350

**NOTICE OF RESCISSION**
Policy Nos.: 156 212 029 & 156 212 030
Insured·    Mali Koenig

**Statement of Account**
Premium:        $ 2,503,480.00
Interest.       $     43,416 52
Total Refund    $ 2,546,896 52

Dear Ms Wagner

The above numbered policies were issued in reliance upon the statements and answers in the Applications for Insurance Part 1, for each policy, dated May 12, 2006  Copies of the Applications are enclosed for your review

We have now learned that the assets and net worth reported by the insured were overstated  Furthermore, we have established that assets claimed to be owned by the insured are actually owned by another party

Had we known this information, the policies would not have been issued  In view of this and in accordance with our contractual rights, AXA Equitable has rescinded the coverage under the policies numbered 156 212 029 and 156 212 030 and deny any liability under them

Our check in refund of all amounts paid as premiums, including interest, is enclosed  Your cashing this check will indicate that you agree with our decision

If you have any questions concerning this matter, please direct them to this office

Sincerely,

Henry C Lower
Assistant Vice President

Enclosures

BCC  Martha Verscaj – Law Dept @ 1290/12ᵗʰ Fl

AXA Equitable Life Insurance Company

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AXA EQUITABLE LIFE INSURANCE        )
COMPANY;                             )
                                     )
    Plaintiff,                       )
                                     )          CIVIL ACTION NO.:
                                     )          1:07-cv-0512-MHS
v.                                   )
                                     )
WELLS FARGO BANK, N.A., AS TRUSTEE   )
OF THE MALI KOENIG INSURANCE TRUST   )
05/11/06, AND AS TRUSTEE OF THE      )
BENZION KOENIG INSURANCE             )
TRUST 05/11/06                       )
                                     )
    Defendant.                       )


**EXHIBIT 10 to Second Amended Complaint**



December 22, 2006

Elizabeth Wagner, VP
Wells Fargo Bank, N A
400 Northridge, Suite 600
Atlanta, GA  30350

<div align="center">

**NOTICE OF RESCISSION**

Policy Nos   156 212 032 & 156 212 033
Insured·      Benzion Koenig

**Statement of Account**
Premium        $ 3,031,704 00
Interest.      $      66,033 00
Total Refund   $ 3,097,737 00

</div>

Dear Ms  Wagner

The above numbered policies were issued in reliance upon the statements and answers in the
Applications for Insurance Part 1, for each policy, dated May 12, 2006  Copies of the
Applications are enclosed for your review

We have now learned that the assets and net worth reported by the insured were overstated
Furthermore, we have established that assets claimed to be owned by the insured are actually
owned by another party

Had we known this information, the policies would not have been issued  In view of this and in
accordance with our contractual rights, AXA Equitable has rescinded the coverage under the
policies numbered 156 212 032 and 156 212 033 and deny any liability under them.

Our check in refund of all amounts paid as premiums, including interest, is enclosed  Your
cashing this check will indicate that you agree with our decision

If you have any questions concerning this matter  please direct them to this office

                    Sincerely,

                    Henry C  Lewer
                    Assistant Vice President

Enclosures

Bcc  Martha Verscaj – Law Dept @ 1290/12ᵗʰ Fl

**Gugliuzza, Dianne**

| | |
|---|---|
| **From:** | ganddb_efile_notice@gand.uscourts.gov |
| **Sent:** | Tuesday, November 13, 2007 12:08 PM |
| **To:** | CourtMail@gand.uscourts.gov |
| **Subject:** | Activity in Case 1:07-cv-00512-MHS AXA Equitable Life Insurance Company v. Wells Fargo Bank, N.A. Amended Complaint |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Northern District of Georgia

## Notice of Electronic Filing

The following transaction was entered by Leonard, James on 11/13/2007 at 12:07 PM EST and filed on 11/13/2007

**Case Name:**        AXA Equitable Life Insurance Company v. Wells Fargo Bank, N.A.
**Case Number:**     1:07-cv-512
**Filer:**               AXA Equitable Life Insurance Company
**Document Number:** 47

**Docket Text:**
**Second AMENDED COMPLAINT against Wells Fargo Bank, N.A., filed by AXA Equitable Life Insurance Company. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4, # (5) Exhibit 5, # (6) Exhibit 6, # (7) Exhibit 7, # (8) Exhibit 8, # (9) Exhibit 9, # (10) Exhibit 10)(Leonard, James) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions.**


**1:07-cv-512 Notice has been electronically mailed to:**

Jeffrey D. Horst     Horst@khlawfirm.com, debbie@khlawfirm.com

Michael A. Kaeding     mkaeding@kilpatrickstockton.com, dgugliuzza@kilpatrickstockton.com

James J. Leonard     jleonard@kilpatrickstockton.com, cswindle@kilpatrickstockton.com

George L. Murphy , Jr     gmurphy@kilpatrickstockton.com, lwilkerson@kilpatrickstockton.com

Adria Lourdes Perez     aperez@kilpatrickstockton.com, cbuford@kilpatrickstockton.com

David Anthony Sirna    sirna@khlawfirm.com

**1:07-cv-512 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-0] [adeb0f5e1c7a08c825b514d8516b80b5c60abf4b746fcc99c647f0e202004b76b8 3125dd226bb60d132a0ff5c17cf663b7c7c8bdaf5abceda8183e6fd9df6225]]
**Document description:**Exhibit 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-1] [434ed2ec4c857c0a6aa37897cf9e66b65568863dd5963484c1a4d66317e1265670 93f8ae969e114108df09b172efdee6b53d054b379ee79f5d1742fe5baaccac]]
**Document description:**Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-2] [46479bbf51b562c64087772dc30fe8fed7183541960f9b7b3209367358866f4144 579ff45b89736e5b50e4174bf7305e7b08550e3d9ee9dc7264995023b846dd]]
**Document description:**Exhibit 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-3] [5643a1db3123b94e8cb9871c0290dca38b4dbd3f32b3ea05526c330022a50f3d97 60b32431d76f4b93c27b4c71d0f6e1450a2cae775424aa235986f4c5bc0e74]]
**Document description:**Exhibit 4
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-4] [86d6757bf18495d903a85af6253e1a027e20e52c3968225e4f8da61945a75d1127 487024ffe70ad66e456eff1762f8d01997755040b2adb43c52b5c680262344]]
**Document description:**Exhibit 5
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-5] [000198c65778a2b7010a166e5008109764486ae854fabbec0a7b7b123a5150219e be15a53efa5f08bf43410421e538a708d261a581ed5398e0a525a0b322e5da]]
**Document description:**Exhibit 6
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-6] [958fbf25c68139a0110c340ba020d0521e0a41c168a800566f4b427bdb89ef4a68 74372971b3220259b54d72ce1a57d6adde7078cb25151449950b9378ac094d]]
**Document description:**Exhibit 7
**Original filename:**n/a
**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-7] [726e5d40bc166add2878b48dab702c591265d213a764e031fec9d62a9f8fae11eb ca3961eb02679031bed6fc723a9d3535b3b139e7ca51431ae8dab4c0c02830]]

**Document description:**Exhibit 8
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-8] [9f66a750598d34688a228704b113ef9f4f0aef030c1880add507bea89493efd735 8dc9facba28ce9e3cea010a8533b1bfd4bc9adbb0f3aae5edfc58608334c4f]]

**Document description:**Exhibit 9
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-9] [3a80c32a00ab1346070d14f9f1360be11fce15d9ff94bddbf81b0bd3bfa9e3b6f8 e4e359b5b63f18c16539745296f619e28c8468762fb4adef2052b021c0730b]]

**Document description:**Exhibit 10
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=11/13/2007] [FileNumber=2119976-10] [77845e848411b6326272d579b37aad9283a068fd0f314a79f5907c4f21b98b739 0e8d2f29b2652a745e086a0a71ab00b52bc4dab0b5e8b27a3930a9254a0026c]]

# EXHIBIT "B"



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTIRCT OF GEORGIA
ATLANTA DIVISION

- - - - - - - - - - - - - - - - -x
                          :
AXA EQUITABLE LIFE INSURANCE    :
COMPANY,
                          :
       Plaintiff,            :
                          :
   vs.                    :
                          :
WELLS FARGO BANK, N.A., as      :
Trustee of the MALI KOENIG      :
INSURANCE TRUSTS A and B        :
05/11/06, and as Trustee of the   :
BENZION KOENIG INSURANCE TRUSTS, :
A and B 05/11/06,             :
                          :
       Defendant.           :
                          :
- - - - - - - - - - - - - - - - -x


VIDEOTAPED DEPOSITION of BENZION KOENIG, taken

by the Plaintiff, at the offices of Kilpatrick

Stockton, LLP, 31 West 52nd Street, New York, New

York, on Wednesday, November 21, 2007, commencing at

10:36 a.m., before Jamie I. Moskowitz, CSR, RPR, CRR,

a Certified Shorthand (Stenotype) Reporter and Notary

Public within and for the State of New Jersey.

1                        B. Koenig

2          A      No.

3          Q      Okay.  As of May 12, 2006, did you

4    have assets worth $26 million?

5          A      No, no.

6          Q      Okay.  Did you own any real estate

7    on May 12, 2006 that had -- please.

8          A      No, no.

9          Q      Approximately how much cash did you

10   have on May 12, 2006, just an estimate.

11         A      Cash means what's saved in a bank?

12   What exactly -- what is cash?

13         Q      Yes, cash in a bank or cash on hand?

14         A      In the hand -- in hand I have

15   nothing.  I had about $120,000 -- in the area of

16   $120,000 is what I had, maybe 130, I don't

17   remember for sure, I'm not counting.  It's money

18   that I use to add to whatever I need to live.  To

19   add that I have insurance policy that I took out

20   in 1965 that I have to add to that, that I have to

21   make payments.

22                I have -- it's the $20,000, the

23   policy then.  I have health insurance policy that

24   I have to pay for, and the rest I have to add to

25   what I need to eat, food that I need to eat.

Page 19

1                          B. Koenig

2          Q       You also mentioned Blue Cross/Blue

3    Shield?

4          A       It pays for the Blue Cross/Blue

5    Shield, and the rest is what I need to pay for

6    what I have to eat.

7          Q       Do you own any -- did you own any

8    stocks as of May 12, 2006?

9          A       No.

10         Q       Did you own any other assets which

11   totalled more than $500,000?

12                 THE INTERPRETER:   500,000?

13         Q       500,000.

14         A       No.

15                 MR. RUBIN:   You have answered his

16         question.

17         Q       No assets of any kind?

18         A       Nothing, nothing.

19         Q       Do you recall how you came to sign

20   this page AXA 00422?

21         A       It could be the insurance man came

22   and brought me a paper saying everything is okay

23   and he told me to sign.

24         Q       Who is that insurance man?

25         A       Gabe Epstein I think.   Gabe Epstein.

Page 33

1                          B. Koenig

2       you ever had income, have you ever had annual

3       income of more than $100,00?

4              A      Never.

5              Q      In the past five years, have you

6       ever owned assets worth more than $500,000?

7              A      No.

8              Q      Has your wife, to your knowledge,

9       ever had income annual income in the past five

10      years greater than $100,000?

11             A      My assets combined, none of us

12      didn't have any income of more than $100,000.  No

13      secrets between my wife and me.

14             Q      And your wife, I take it, then, did

15      not have any assets of any kind in the past five

16      years greater than $500,000 in value?

17             A      No.

18                    (Whereupon, Exhibit 2 was received

19                    and marked for Identification.)

20      BY MR. LEONARD:

21             Q      Mr. Koenig, would you please look at

22      Exhibit 2, and in particular, please look at page

23      AXA 397 and page 398.  Are those your signatures

24      on those two pages?

25             A      Yes, the same.  Yes.  I think so.

1           B. Koenig

2       Q    But you know you didn't tell the

3   lawyer that you had $26 million, correct?

4       A    No.  Not one word to the lawyer.

5       Q    You didn't say one word to the

6   lawyer?

7       A    I didn't talk to the lawyer about

8   millions.  We made the will only on this little

9   apartment.  Only about this little apartment that

10  we bought for -- I bought it for $47,000 and today

11  it's worth $100,000.

12      Q    But I thought that at that time you

13  had already given the apartment to your children?

14      A    Right.  Sure.

15      Q    So why did you need a will for

16  purposes of --

17      A    I don't remember what happened

18  first.  I don't know what happened.

19           MR. RUBIN:  You're just trying to

20           introduce logic into the situation, David.

21           Stop trying to have fun.

22      A    Maybe I made a mistake.  I don't

23  know.  I don't know what it is.

24      Q    You mentioned that you met with

25  another lawyer at some point other than your

db46d96b-41f5-4283-930f-00e2cd57b528

Page 185

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK   )

4                        ) ss.

5    COUNTY OF NEW YORK )

6                    I, Jamie I. Moskowitz, CSR,

7         RPR, CRR, a Shorthand (Stenotype)

8         Reporter and Notary Public of the

9         State of New York, do hereby certify

10        that the foregoing Deposition, of the

11        witness, BENZION KOENIG, taken at the

12        time and place aforesaid, is a true

13        and correct transcription of my

14        shorthand notes.

15                    I further certify that I am

16        neither counsel for nor related to any

17        party to said action, nor in any way

18        interested in the result or outcome

19        thereof.

20                    IN WITNESS WHEREOF, I have

21        hereunto set my hand this 21st day of

22        November 2007.

23        _____ *Jamie Ilyse Moskowitz* _____

24        Jamie Ilyse Moskowitz, CSR, RPR, CRR
          License No. XI01658

25

EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION



- - - - - - - - - - - - - - - - -x
                 :

AXA EQUITABLE LIFE INSURANCE  :
COMPANY,

                 :

       Plaintiff,     :

                 :

   vs.             :

                 :

WELLS FARGO BANK, N.A., as   :
Trustee of the MALI KOENIG   :
INSURANCE TRUSTS A and B    :
05/11/06, and as Trustee of the :
BENZION KOENIG INSURANCE TRUSTS, :
A and B 05/11/06,        :

                 :

       Defendant.     :

                 :

- - - - - - - - - - - - - - - - -x


      VIDEOTAPED DEPOSITION of MALI KOENIG, taken by

the Plaintiff, at the offices of Kilpatrick Stockton,

LLP, 31 West 52nd Street, New York, New York, on

Tuesday, November 20, 2007, commencing at 11:46 a.m.,

before Jamie I. Moskowitz, CSR, RPR, CRR, a Certified

Shorthand (Stenotype) Reporter and Notary Public

within and for the State of New Jersey.

1                          M. Koenig

2    daughter?

3          A      Very nice children.  Honest

4    children.

5          Q      And what are their names, please?

6          A      Their names?  Sammy Koenig is the

7    oldest.  He's honest.  He was a stockbroker.  He

8    never stole anything from anyone.  If you put

9    $10 million on the table, the neighbors will say

10   that a penny won't be missing.

11                And Yaakov the lawyer knows.

12   They're all religious.  They are polite.  They're

13   good.  All of them are.  In fact, the lawyer knows

14   one of my children.

15         Q      Names, please.

16         A      Shmueli Koenig, Morris Koenig, Jacob

17   Koenig and Dr. Liba Zucker -- her husband is a

18   doctor, she is a manager.

19         Q      And your daughter's name is what?

20         A      My daughter is Liba Zucker.  She has

21   eight children.

22         Q      Do you and your husband give any

23   money to your children?

24         A      We don't have any money.

25         Q      Okay.  Do your children give you any

1                    M. Koenig

2  money?

3        A    My son -- my son pays my rent.

4        Q    Have you been employed since the

5  time you came to the United States?

6        A    I worked very hard.  When the

7  children were small I tried to educate them.  My

8  husband didn't have time and I watched over the

9  children until 12 o'clock at night.  They went to

10 college, big boys.

11       Q    Which one of your sons pays your

12 rent currently?

13       A    Sammy Koenig.

14       Q    Have you been involved with any

15 businesses since you came to the United States?

16       A    I don't own any business.  My

17 husband doesn't own any business.  We don't know

18 anything about business.  We don't even have our

19 own house.

20             MR. LIPSIUS:  She said some

21       additional stuff you didn't translate.

22             THE INTERPRETER:  We are poor

23       people.  We don't have -- I did say that.

24       A    We don't have any business.  We are

25 poor people and we don't even own our own house.

296caf41-7a8f-4cdf-a98a-d39338d2e851

1                      M. Koenig

2          Q      Has your financial condition changed

3    in the past two years?

4          A      No.  I take Social Security $490 and

5    IRA, and I have a few dollars, so I just add it,

6    you know, to just get by.

7                I have $6,000 Blue Cross, just

8    20 percent, in the health insurance, Medicare.  We

9    are short of money, but I add the few dollars I

10   have.  And if not, I take from my son.

11         Q      Have you ever had a net worth of

12   more than $100,000?

13         A      I don't remember.

14         Q      In the past two years, have you had

15   a net worth of more than $1 million?

16         A      I didn't have 200.  I never had

17   money.  My husband worked like a slave, and then

18   when the children were getting married I went to

19   work because he didn't have work when the children

20   were getting married.

21         Q      As of May 12, 2006 was your -- what

22   was your net worth as of May 12, 2006?

23                THE WITNESS:  Wedding, one dress.

24         So my wedding, one dress.

25                MR. LIPSIUS:  Don't you translate,

Page 14

1                    M. Koenig

2          just ask her the questions.

3               THE INTERPRETER:  I don't understand

4          what the word net worth means.  Can

5          someone explain it to her?

6               MR. LIPSIUS:  Then say, "I never

7          heard what net worth means."

8          A    I never heard of net worth.  I don't

9     know what net worth means.

10         Q    Do you currently own any real

11    estate?

12         A    I wish I would have.  Nothing.  I

13    don't need it.  I'm close to the other world.  I

14    just wanted to enjoy a little bit.  I was never

15    anywhere in my life.  All for the children.

16              I was a girl.  I was pretty.  I just

17    didn't have good luck.

18         Q    What was your net worth -- I'm

19    sorry.

20              As far as any real estate that you

21    owned -- scratch that.  Let me try again.

22         A    I don't have no real estate.

23         Q    Let me break it down further.

24              Did you own any real estate in May

25    of 2006?

Page 15

1                    M. Koenig

2              THE WITNESS:  Never, never.  I never

3         had it.

4              THE INTERPRETER:  I never had it.

5         A     I forget.  I'm with old time

6    disease.  I forgot.  I forget because I'm used to

7    talking to the kids in English.

8         Q     Does your husband own any real

9    estate?

10        A     No.  My husband is like a shlimazel.

11             THE INTERPRETER:  You know what that

12        means?  A shlimazel is like an unlucky

13        person.

14   BY MR. LEONARD:

15        Q     Did your husband own any real estate

16   in May of 2006?

17             THE WITNESS:  My husband --

18             MR. LIPSIUS:  Yiddish.

19        A     My husband can't be a business man.

20   He needs a synagogue and then the books, a Bible.

21   He's a holy man.

22             He doesn't need money, either.  I

23   wanted, but today I don't want anymore.  I wanted

24   to enjoy a little bit, but if it didn't go, it

25   didn't go.

296caf41-7a8f-4cdf-a98a-d39338d2e851

1                    M. Koenig

2         Q     Mrs. Koenig, what we're trying to do

3    today is create a clear record for the Court.

4                    THE WITNESS:  I will tell everything

5         to you.

6         A     I'm telling you everything the

7    truth.  I never lied.

8         Q     I understand that.  But it would be

9    very helpful for the record --

10        A     I say the truth.  Let them go look

11   in all of America.

12        Q     If you could answer the question

13   that I ask, that will make the record clearer.

14        A     Okay.

15        Q     Do I understand correctly that

16   neither you nor your husband owned any real estate

17   in May of 2006?

18        A     No.

19        Q     In May of 2006, did you or your

20   husband own any stocks?

21        A     No.

22        Q     In May of 2006, did you or your

23   husband have more than $500,000 in cash?

24        A     No.

25        Q     In May of 2006, did you or your

1              M. Koenig

2 husband own $500,000 or more of any mutual funds?

3              MR. LIPSIUS:  One second.  I just

4        would like you to ask her if she

5        understands the word "mutual funds."

6              THE WITNESS:  I have heard from my

7        son.  He's a stockbroker.

8              MR. LEONARD:  And so she understands

9        the term?

10              THE WITNESS:  It's a stock.

11 BY MR. LEONARD:

12        Q    And the answer was no?

13        A    I never had stocks.

14        Q    As of May 12, 2006, did you or your

15 husband have more than $50,000 of any type of

16 asset?

17              MR. LIPSIUS:  Let her finish.

18        A    Yes, $50,000 a person shouldn't

19 have.  I mean, I eat of all of this money.  I have

20 some Social Security and if that same person

21 becomes ill and if you have to pay bills...

22              MR. LIPSIUS:  I think the answer is

23        yes.

24        Q    The answer was that you had $50,000

25 in cash as of May 12, 2006?

Page 29

1                        M. Koenig

2              The witness has already explained

3         she doesn't know what the word net worth

4         means.

5         A      $29 million.

6              THE WITNESS:  I think I would go out

7         of my mind.

8    BY MR. LEONARD:

9         Q      Did you have any assets worth

10   $26 million?

11        A      I worked hard all my life like black

12   work.  If I had assets would I -- would I raise

13   four children in three bedrooms, as small, small

14   babies?

15        Q      Did you have $26 million in assets

16   on May 12, 2006; yes or no?

17             THE WITNESS:  No.

18        A      I didn't have no 5,000.

19             MR. LIPSIUS:  She said she didn't

20        make --

21             THE WITNESS:  I didn't make 5,000.

22             MR. LIPSIUS:  I'm just going to

23        do -- I'm not trying to disrupt your

24        deposition, but I want to get an answer

25        first.

296caf41-7a8f-4cdf-a98a-d39338d2e851

Page 30

1                      M. Koenig

2                      Did you have, and listen and let her

3          translate -- did you have objects, the

4          khosn, things worth $26 million on May

5          2006; yes or no?

6                      THE WITNESS:  No, no, no.

7          A      No.

8    BY MR. LEONARD:

9          Q      Take a look at page AXA 346.  It's

10   three more pages.

11                     THE WITNESS:  This is mine.

12         Q      Do you recognize that as your

13   signature?

14         A      Something yes, something not.

15   Somewhat yes.

16                     MR. LIPSIUS:  Yiddish, Yiddish.

17         A      I think it's possible that, yes, I'm

18   not lying.  I think that it's mine, but I don't

19   remember exactly.

20         Q      Do you -- did you read this document

21   before you signed it?

22         A      He didn't give me a single piece of

23   paper.

24                     THE WITNESS:  He said, "Mali, don't

25          worry, you're going to be rich."

Page 35

1                          M. Koenig

2    that means currently?

3          A     Assets means someone who has houses,

4    land.

5                MR. LIPSIUS:  Yiddish.

6          A     I didn't know what means assets.

7          Q     Did Mr. --

8          A     Then I knew land, whatever.

9          Q     Did Mr. Epstein ask you whether you

10   owned any land?

11         A     No.  He said that they found land.

12         Q     Can you explain what he meant by

13   that?

14               What was your understanding of what

15   he meant by that?

16         A     Then I realized that he's going to

17   cheat me.

18         Q     Did you sign the document after he

19   told you that?

20         A     I don't remember.  He pulled me --

21   he shlepped me to the drugstore.  My son, my

22   husband.

23               MR. LIPSIUS:  One second, one

24               second.  Let her translate.

25         A     He shlepped me to the drugstore and

296caf41-7a8f-4cdf-a98a-d39338d2e851

Page 94

M. Koenig

1   I don't know.  No.

2          Q    I also take it from your earlier

3   testimony that in the past five years you have

4   never had more than $1 million in assets.

5          A    Maybe it was my son's, but mine it

6   wasn't for sure.

7          Q    So your son may have had $1 million

8   or more --

9          A    I don't know.

10         Q    -- in assets in the past?

11         MR. LIPSIUS:  Wait.

12         Q    Assets in the past five years.

13         A    I don't know.  My son doesn't tell

14  me anything.

15         Q    And that's your son, Sam?

16         A    I have three sons.  I'm not sure

17  which son you mean.

18         Q    That's why I was asking when you

19  said it may belong to your son.

20         Which son were you referring to?

21         A    All sons.

22         Q    But to your knowledge, you have

23  never had more than $1 million in assets in the

24  past five years?

Page 214

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK   )

4                        ) ss.

5    COUNTY OF NEW YORK )

6                    I, Jamie I. Moskowitz, CSR,

7         RPR, CRR, a Shorthand (Stenotype)

8         Reporter and Notary Public of the

9         State of New York, do hereby certify

10        that the foregoing Deposition, of the

11        witness, MALI KOENIG, taken at the

12        time and place aforesaid, is a true

13        and correct transcription of my

14        shorthand notes.

15                   I further certify that I am

16        neither counsel for nor related to any

17        party to said action, nor in any way

18        interested in the result or outcome

19        thereof.

20                   IN WITNESS WHEREOF, I have

21        hereunto set my hand this 20th day of

22        November 2007.

23        _____ *Jamie Ilyse Moskowitz* _____

24        Jamie Ilyse Moskowitz, CSR, RPR, CRR
          License No. XI01658

25

# EXHIBIT "D"

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **AXA EQUITABLE LIFE INSURANCE COMPANY,** | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE |
| | : | **NO. 1:07-cv-0512-MHS** |
| **v.** | : | |
| | : | |
| **WELLS FARGO BANK, N.A., AS TRUSTEE OF THE MALI KOENIG INSURANCE TRUSTS A and B 05/11/06, AND AS TRUSTEE OF THE BENZION KOENIG INSURANCE TRUSTS A and B 05/11/06,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## ANSWER AND DEFENSES TO SECOND AMENDED AND RESTATED COMPLAINT

Defendant Wells Fargo Bank N.A., as Trustee of the Mali Koenig Insurance Trusts A and B 05/11/06, and as Trustee of the Benzion Koenig Insurance Trusts A and B 05/11/06 ("Trustee" or "Defendant"), files its Answer and Defenses to Plaintiff's Second Amended and Restated Complaint (the "Complaint") as follows:

### FIRST DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff's purported claims are barred in whole or in part by the doctrine of waiver.

## THIRD DEFENSE

Plaintiff's purported claims are barred in whole or in part by the doctrine of estoppel.

## FOURTH DEFENSE

Plaintiff's purported claims are barred in whole or in part by the doctrine of laches.

## FIFTH DEFENSE

Plaintiff's purported claims are barred in whole or in part because Plaintiff consented to, authorized, approved, acquiesced to, and/or ratified the actions about which it now complains.

## SIXTH DEFENSE

Plaintiff's Complaint is barred by the doctrine of unclean hands.

## SEVENTH DEFENSE

Plaintiff's purported claims are barred because it has not sustained any damage for which Defendant is responsible.

### EIGHTH DEFENSE

The injuries alleged by Plaintiff were not caused by any action of, or attributable to, Defendant.

### NINTH DEFENSE

Plaintiff's purported claims are barred because Defendant was acting with privilege.

### TENTH DEFENSE

Plaintiff's purported claims are barred by Federal Rule of Civil Procedure 12(b)(7) and failure to join a party under Federal Rule of Civil Procedure 19.

### ELEVENTH DEFENSE

Plaintiff has failed to join one or more necessary and indispensable parties.

### TWELFTH DEFENSE

Plaintiff's purported claims are barred by Plaintiff's own negligence.

### THIRTEENTH DEFENSE

Plaintiff's purported claims are barred by the doctrine of *in pari delicto*.

### FOURTEENTH DEFENSE

Plaintiff's purported claims are barred by the doctrine of assumption of the risk.

## FIFTEENTH DEFENSE

Plaintiff's purported claims are barred because at all times Defendant acted in good faith and did not directly or indirectly commit, control or induce any wrongful acts or omissions and did no unlawful act or thing directly or indirectly through or by means of any other person.

## SIXTEENTH DEFENSE

Any injury allegedly suffered by Plaintiff arising out of the conduct of Defendant was caused by the intervening acts or omissions of persons other than Defendant, and these acts or omissions superseded any action or omission of Defendant for which it might be considered liable.

## SEVENTEENTH DEFENSE

Plaintiff's purported claims are barred because Defendant did not act with or have the requisite intent.

## EIGHTEENTH DEFENSE

Plaintiff's purported claims are barred because Defendant did not intentionally misrepresent anything to Plaintiff.

## RESPONSES TO NUMBERED PARAGRAPHS

Subject to and incorporating herein by reference the foregoing affirmative defenses, Defendant responds to the numbered paragraphs of Plaintiff's Complaint as follows:

### Nature of the Action

1.

Defendant admits that Plaintiff seeks a declaratory judgment and an order voiding certain life insurance policies it issued, but denies that Plaintiff is entitled to such relief or any other relief. Defendant denies that it made any misrepresentations to Plaintiff. Defendant is without sufficient information or knowledge to form a belief as to the remainder of the allegations contained in Paragraph 1 of the Complaint, and therefore denies same.

### Parties

2.

Defendant admits the allegations contained in Paragraph 2 of the Complaint.

3.

Defendant admits it is the Trustee of certain life insurance trusts which are the owners and beneficiaries of the life insurance policies that are the subject of this action. Defendant admits that it is a National Banking Association formed

under the laws of the United States, its principal place of business is located in California, and it is registered to transact business within the State of Georgia. Defendant denies the remaining allegations contained in Paragraph 3 of the Complaint.

## **Jurisdiction and Venue**

4.

Defendant admits the allegations contained in Paragraph 4 of the Complaint.

5.

Defendant admits the allegations contained in Paragraph 5 of the Complaint.

6.

Defendant admits that Exhibit 1 is attached to the Complaint. To the extent that the allegations contained in Paragraph 6 of the Complaint purport to restate, characterize, or summarize the terms of Exhibit 1, Defendant states that Exhibit 1 speaks for itself, and Defendant denies the allegations contained in Paragraph 6 to the extent that they are inconsistent with Exhibit 1.

7.

Defendant admits that the document described in paragraph 7 is attached to the Complaint. To the extent that the allegations contained in Paragraph 7 of the Complaint purport to restate, characterize, or summarize the terms of this

document, or characterize the document described in paragraph 7 as part of any

Application or any policy of insurance, Defendant states that the document speaks

for itself, and Defendant denies the allegations contained in Paragraph 7 to the

extent that they are inconsistent with that document.

8.

Defendant admits that Exhibit 2 is attached to the Complaint.  To the extent

that the allegations contained in Paragraph 8 of the Complaint purport to restate,

characterize, or summarize the terms of Exhibit 2, Defendant states that Exhibit 2

speaks for itself, and Defendant denies the allegations contained in Paragraph 8 to

the extent that they are inconsistent with Exhibit 2.

9.

Defendant admits that the document described in paragraph 9 is attached to

the Complaint.  To the extent that the allegations contained in Paragraph 9 of the

Complaint purport to restate, characterize, or summarize the terms of this

document, or characterize the document described in paragraph 9 as part of any

Application or any policy of insurance, Defendant states that the document speaks

for itself, and Defendant denies the allegations contained in Paragraph 9 to the

extent that they are inconsistent with that document.

10.

Defendant admits that Exhibit 3 is attached to the Complaint.  To the extent that the allegations contained in Paragraph 10 of the Complaint purport to restate, characterize, or summarize the terms of Exhibit 3, Defendant states that Exhibit 3 speaks for itself, and Defendant denies the allegations contained in Paragraph 10 to the extent that they are inconsistent with Exhibit 3.

11.

Defendant admits that Exhibit 4 is attached to the Complaint.  To the extent that the allegations contained in Paragraph 11 of the Complaint purport to restate, characterize, or summarize the terms of Exhibit 4, Defendant states that Exhibit 4 speaks for itself, and Defendant denies the allegations contained in Paragraph 11 to the extent that they are inconsistent with Exhibit 4.

12.

Paragraph 12 of the Complaint contains a legal conclusion to which Defendant need not respond.  Defendant admits that Exhibits 5 through 8 are attached to the Complaint.  To the extent that the allegations contained in Paragraph 12 of the Complaint purport to restate, characterize, or summarize the terms of Exhibits 5 through 8, Defendant states that Exhibits 5 through 8 speak for themselves, and Defendant denies the allegations contained in Paragraph 12 to the extent that they are inconsistent with Exhibits 5 through 8.

13.

Defendant admits that Exhibit 5 is attached to the Complaint.  To the extent

that the allegations contained in Paragraph 13 of the Complaint purport to restate,

characterize, or summarize the terms of Exhibit 5, Defendant states that Exhibit 5

speaks for itself, and Defendant denies the allegations contained in Paragraph 13 to

the extent that they are inconsistent with Exhibit 5.  Defendant admits that Plaintiff

issued Policy no. 156 212 029 which had a limit of $10,000,000, contained a

register date of May 19, 2006, insured the life of Mali Koenig, and that Defendant

is the trustee and owner of the policy.  Defendant is without sufficient information

or knowledge to either admit or deny the remaining allegations contained in

Paragraph 13 of the Complaint, and therefore denies same.

14.

Defendant admits that Exhibit 6 is attached to the Complaint.  To the extent

that the allegations contained in Paragraph 14 of the Complaint purport to restate,

characterize, or summarize the terms of Exhibit 6, Defendant states that Exhibit 6

speaks for itself, and Defendant denies the allegations contained in Paragraph 14 to

the extent that they are inconsistent with Exhibit 6.  Defendant admits that Plaintiff

issued Policy no. 156 212 030 which had a limit of $10,000,000, contained a

register date of May 19, 2006, insured the life of Mali Koenig, and that Defendant

is the trustee and owner of the policy.  Defendant is without sufficient information

or knowledge to either admit or deny the remaining allegations contained in

Paragraph 14 of the Complaint, and therefore denies same.

### 15.

Defendant admits that Exhibit 7 is attached to the Complaint.  To the extent

that the allegations contained in Paragraph 15 of the Complaint purport to restate,

characterize, or summarize the terms of Exhibit 7, Defendant states that Exhibit 7

speaks for itself, and Defendant denies the allegations contained in Paragraph 13 to

the extent that they are inconsistent with Exhibit 7.  Defendant admits that Plaintiff

issued Policy no. 156 212 032 which had a limit of $10,000,000, contained a

register date of April 8, 2006, insured the life of Benzion Koenig, and that

Defendant is the trustee and owner of the policy.  Defendant is without sufficient

information or knowledge to either admit or deny the remaining allegations

contained in Paragraph 15 of the Complaint, and therefore denies same.

### 16.

Defendant admits that Exhibit 8 is attached to the Complaint.  To the extent

that the allegations contained in Paragraph 14 of the Complaint purport to restate,

characterize, or summarize the terms of Exhibit 8, Defendant states that Exhibit 8

speaks for itself, and Defendant denies the allegations contained in Paragraph 16 to

the extent that they are inconsistent with Exhibit 8.  Defendant admits that Plaintiff

issued Policy no. 156 212 033 which had a limit of $10,000,000, contained a

register date of April 8, 2006, insured the life of Benzion Koenig, and that

Defendant is the trustee and owner of the policy.  Defendant is without sufficient

information or knowledge to either admit or deny the remaining allegations

contained in Paragraph 16 of the Complaint, and therefore denies same.

17.

To the extent that the allegations contained in Paragraph 17 of the Complaint

purport to restate, characterize, or summarize the terms of Exhibits 5 through 8,

Defendant states that Exhibits 5 through 8 speak for themselves, and Defendant

denies the allegations contained in Paragraph 17 to the extent that they are

inconsistent with Exhibits 5 through 8.

18.

Defendant denies intentionally, knowingly, or recklessly making any

misrepresentations to Plaintiff or engaging in any other wrongful conduct.

Defendant denies making any misrepresentations with the intent to induce Plaintiff

to issue the life insurance policies that are the subject of this action.  Defendant is

without sufficient information or knowledge to form a belief as to the remaining

allegations contained in Paragraph 18 of the Complaint and therefore denies same.

19.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations to Plaintiff or engaging in any other wrongful conduct. Defendant is without sufficient information or knowledge to form a belief as to the remaining allegations contained in Paragraph 19 of the Complaint and therefore denies same.

20.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations to Plaintiff or engaging in any other wrongful conduct. Defendant is without sufficient information or knowledge to form a belief as to the remaining allegations contained in Paragraph 20 of the Complaint and therefore denies same.

21.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations to Plaintiff or engaging in any other wrongful conduct. Defendant is without sufficient information or knowledge to form a belief as to the remaining allegations contained in Paragraph 21 of the Complaint and therefore denies same.

22.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations to Plaintiff or engaging in any other wrongful conduct. Defendant is without sufficient information or knowledge to form a belief as to the remaining allegations contained in Paragraph 22 of the Complaint and therefore denies same.

<div align="center">23.</div>

Denied.

<div align="center">24.</div>

Defendant admits the allegations contained in Paragraph 24 of the Complaint.

<div align="center">25.</div>

Defendant admits the allegations contained in Paragraph 25.

<div align="center">26.</div>

Defendant admits that Exhibits 9 and 10 are attached to the Complaint. To the extent that the allegations in Paragraph 26 of the Complaint purport to restate, characterize, or summarize the terms of Exhibits 9 and 10, Defendant states that Exhibits 9 and 10 speak for themselves, and Defendant denies the allegations contained in Paragraph 26 to the extent that they are inconsistent with Exhibits 9 and 10. Defendant admits that Plaintiff mailed and Defendant received Exhibits 9

<div align="center">13</div>

and 10 as well as a check purporting to refund all of the premiums paid by

Defendant for the life insurance policies that are the subject of this action, with

interest. Defendant denies intentionally, knowingly, or recklessly making any

misrepresentations to Plaintiff or engaging in any other wrongful conduct.

27.

Defendant admits the allegations contained in Paragraph 27.

**COUNT I – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(1)**

28.

Defendant incorporates by reference its responses to Paragraphs 1 through

27 above, as if fully set forth herein.

29.

Paragraph 29 contains legal conclusions to which Defendant need not

respond. Defendant denies intentionally, knowingly, or recklessly making any

misrepresentations to Plaintiff or engaging in any other wrongful conduct.

Defendant is without sufficient information or knowledge to form a belief as to the

remaining allegations contained in Paragraph 29 of the Complaint and therefore

denies same.

30.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations or false representations to Plaintiff or engaging in any other wrongful conduct.  Defendant denies making any false representations of material fact to Plaintiff.  Defendant denies the remaining allegations contained in Paragraph 30 of the Complaint.

31.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations, material or otherwise, to Plaintiff or engaging in any other reckless conduct.  Defendant denies making any misrepresentations, material or otherwise, with the intent to induce Plaintiff to issue the life insurance policies that are the subject of this action.  Defendant denies the remaining allegations contained in Paragraph 31 of the Complaint.

32.

Defendant denies it made any fraudulent misrepresentations.  To the extent Paragraph 32 of the Complaint purports to state a legal conclusion, Defendant need not respond.  Defendant denies the remaining allegations contained in Paragraph 32 of the Complaint.

33.

15

Defendant admits it has not cashed or deposited the funds sent to it by Plaintiff. Defendant admits Plaintiff seeks a declaration that the insurance policies as issued are void, but denies that Plaintiff is entitled to such relief or any other relief. Defendant is without knowledge denies the remaining allegations contained in Paragraph 33 of the Complaint.

<div align="center">34.</div>

Defendant denies it made any fraudulent misrepresentations, and denies that the life insurance policies have been rescinded and are *void ab initio*. To the extent the allegations contained in Paragraph 34 of the Complaint purport to state a legal conclusion, Defendant need not respond.

### COUNT II – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(2)

<div align="center">35.</div>

Defendant incorporates by reference its responses to Paragraphs 1 through 27 above, as if fully set forth herein.

<div align="center">36.</div>

Paragraph 36 contains a legal conclusion to which Defendant need not respond. Defendant denies intentionally, knowingly, or recklessly making any misrepresentations or false representations, material or otherwise, to Plaintiff or engaging in any other wrongful conduct. Defendant is without sufficient

<div align="center">16</div>

information or knowledge to form a belief as to the remaining allegations contained in Paragraph 36 of the Complaint and therefore denies same.

37.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations, material or otherwise, to Plaintiff or engaging in any other wrongful conduct.  Defendant denies the remaining allegations contained in Paragraph 37 of the Complaint.

38.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations, material or otherwise, to Plaintiff or engaging in any other wrongful conduct.  Defendant denies making any misrepresentations, material or otherwise, with the intent to induce Plaintiff to issue the life insurance policies that are the subject of this action.  Defendant denies the remaining allegations contained in Paragraph 38 of the Complaint.

39.

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations or incorrect statements to Plaintiff or engaging in any other wrongful conduct.  To the extent the allegations contained in Paragraph 39 of the Complaint purport to state a legal conclusion, Defendant need not respond.

Defendant denies the remaining allegations contained in Paragraph 39 of the Complaint.

<center>40.</center>

Defendant admits it has not cashed or deposited the funds sent to it by Plaintiff.  Defendant admits Plaintiff seeks a declaration that the insurance policies as issued are void, but denies that Plaintiff is entitled to such relief or any other relief.  Defendant is without sufficient knowledge or information to form a belief as to the remaining allegations contained in Paragraph 40 of the Complaint, and therefore denies same.

## **COUNT III – Declaratory Relief Pursuant to O.C.G.A. § 33-24-7(b)(3)**

<center>41.</center>

Defendant incorporates by reference its responses to Paragraphs 1 through 27 above, as if fully set forth herein.

<center>42.</center>

Paragraph 42 contains a legal conclusion to which Defendant need not respond.  Defendant denies intentionally, knowingly, or recklessly making any misrepresentations or false representations, material or otherwise, to Plaintiff or engaging in any other wrongful conduct.  Defendant is without sufficient

<center>18</center>

information or knowledge to form a belief as to the remaining allegations contained in Paragraph 42 of the Complaint and therefore denies same.

<div align="center">43.</div>

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations, material or otherwise, to Plaintiff or engaging in any other wrongful conduct.  Defendant denies the remaining allegations contained in Paragraph 43 of the Complaint.

<div align="center">44.</div>

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations, material or otherwise, to Plaintiff or engaging in any other wrongful conduct.  Defendant denies making any misrepresentations, material or otherwise, with the intent to induce Plaintiff to issue the life insurance policies that are the subject of this action.  Defendant denies the remaining allegations contained in Paragraph 44 of the Complaint.

<div align="center">45.</div>

Defendant denies intentionally, knowingly, or recklessly making any misrepresentations or incorrect statements, material or otherwise, to Plaintiff or engaging in any other wrongful conduct.  To the extent Paragraph 45 of the Complaint purports to state a legal conclusion, Defendant need not respond.

<div align="center">19</div>

Defendant is without sufficient information or knowledge to form a belief as to the remaining allegations contained in Paragraph 45 of the Complaint and therefore denies same.

46.

Defendant admits it has not cashed or deposited the funds sent to it by Plaintiff.  Defendant admits Plaintiff seeks a declaration that the insurance policies as issued are void, but denies that Plaintiff is entitled to such relief or any other relief.  Defendant is without sufficient information or knowledge to form a belief as to the remaining allegations contained in Paragraph 43 of the Complaint and therefore denies same.

47.

Defendant denies any allegations in Plaintiff's Complaint not specifically admitted, denied, or controverted above, including, but not limited to, any and all damages and/or other relief claimed in the *ad dumdum* clause.

48.

Defendant denies that Plaintiff is entitled to any relief it seeks against Defendant and Defendant denies that it is or may be liable to Plaintiff in any way, manner, or amount whatsoever.

WHEREFORE, having fully responded to Plaintiff's Second Amended and Restated Complaint, Defendant requests that Plaintiff's Second Amended and Restated Complaint be dismissed with prejudice and that all costs be taxed to Plaintiff.

Respectfully submitted this 3rd day of December, 2007

 /s  *J. David Hopkins*
J. David Hopkins, Esq.
Georgia Bar No. 366505
DHopkins@lockelord.com
John F. Kane, Esq.
Georgia Bar No. 297443
Jkane@lockelord.com
Locke Lord Bissell & Liddell LLP
1170 Peachtree Street, N.E.
The Proscenium, Suite 1900
Atlanta, Georgia 30309
Phone (404) 870-4600
Fax (404) 870-5547


 /s  *Jeffrey D. Horst*
Jeffrey D. Horst
Georgia Bar No. 367834
horst@khlawfirm.com
David A. Siena
Georgia Bar No. 613513
sirna@khlawfirm.com
Krevolin & Horst, LLC
1175 Peachtree Street, N.E.
Suite 2150, 100 Colony Square
Atlanta, GA 30361
(404) 888-9700
*Attorneys for Defendant*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 3, 2007, I electronically filed the within

and foregoing ***TO SECOND AMENDED AND RESTATED COMPLAINT*** with

the Clerk of Court using the CM/ECF system which will automatically send email

notification of such filing to all attorneys of record.

<div style="text-align: right">

*/s   John F. Kane*
John F. Kane, Esq.
jkane@lockelord.com
Locke Lord Bissell & Liddell LLP
1170 Peachtree Street, N.E.
The Proscenium, Suite 1900
Atlanta, Georgia 30309
Phone (404) 870-4600
Fax (404) 870-5547

</div>

# EXHIBIT "E"

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

AXA EQUITABLE LIFE INSURANCE COMPANY,
AXA NETWORK, LLC & AXA ADVISORS, LLC,

<div align="center">Plaintiffs,</div>

- against -

GABRIEL EPSTEIN,

<div align="center">Defendant.</div>

---

Index No. 07/601618

**COMPLAINT**

NEW YORK
COUNTY CLERK'S OFFICE

MAY 15 2007

NOT COMPARED
WITH COPY FILE

---

Plaintiffs AXA Equitable Insurance Company ("AXA Equitable"), AXA Network, LLC ("AXA Network") and AXA Advisors, LLC ("AXA Advisors") (AXA Network, Equitable and AXA Advisors, collectively "AXA"), by their attorneys, Kilpatrick Stockton LLP, for their complaint against defendant Gabriel Epstein ("Mr. Epstein") allege upon knowledge as to their own acts and upon information and belief as to all other matters, as follows:

<div align="center"><u>NATURE OF THE ACTION</u></div>

1.     AXA brings the instant action in order to recover commission payments, plus interest, wrongfully retained by Mr. Epstein, an independent contractor agent ("financial professional") for AXA. Mr. Epstein acted as an insurance producer on certain life insurance policies issued by AXA to two married individuals, Mali and Benzion Koenig (the "Koenigs"), in a total amount of $40,000,000. AXA determined soon after issuing the policies that the Koenigs' applications materially misrepresented their net worth and assets. Because of these material misrepresentations, AXA duly rescinded the policies issued to the Koenigs. AXA then demanded that Mr. Epstein, as he is contractually obligated to do, return the $1,035,726 in commission paid to him in connection with the issuance of the policies to the Koenigs, plus

interest. Notwithstanding the clear dictates of the agreement between AXA and Mr. Epstein, Mr. Epstein has refused to repay the commission with interest.

2.      Accordingly, AXA brings this action for breach of contract, unjust enrichment, conversion, breach of the covenant of good faith and fair dealing and replevin. AXA seeks injunctive relief, damages, pre-judgment and post-judgment interest and other relief.

## THE PARTIES

3.      Plaintiff AXA Equitable Insurance Company is a company organized under the laws of New York, with a principal place of business of 1290 Avenue of the Americas, New York, New York 10104.

4.      Plaintiff AXA Network, LLC is a limited liability company organized under the laws of Delaware and authorized to do business in New York, with its principal place of business at 4251 Crums Mill Road, Harrisburg, Pennsylvania 17112.

5.      Plaintiff AXA Advisors, LLC is a limited liability company organized under the laws of Delaware and authorized to do business in New York, with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

6.      Defendant Mr. Epstein is an individual who resides at 1740 Ocean Avenue #3L, Brooklyn, New York 11230.

## JURISDICTION AND VENUE

7.      This case involves a matter in controversy exceeding $100,000, not including costs, attorneys' fees and interest.

8.      Venue is proper in New York County pursuant to New York Civil Practice Law and Rules Section 503(a).

2

## FACTUAL BACKGROUND

### I.    THE AGENCY AGREEMENT

9.    AXA Equitable is a life insurance provider, and its affiliates AXA Network and AXA Advisors are a life and health insurance brokerage and a financial services company, respectively.

10.    In or around April 2005, Mr. Epstein entered into an agreement with AXA that provides that Mr. Epstein "shall be allowed commissions…on premiums, and considerations for insurance policies…secured under this Agreement" (the "April 2005 Agreement"). Annexed hereto as Exhibit 1 is a true and correct copy of the April 2005 Agreement, *see* ¶ III.

11.    By its terms, the April 2005 Agreement is subject to AXA rules and regulations Nos. 06-198R, issued on April 24, 2006, and 00-014, issued on October 27, 2000.  Annexed hereto as Exhibit 2 and Exhibit 3 respectively are true and correct copies of AXA rules and regulations Nos. 00-014 and 06-198R.  The April 2005 Agreement and rules and regulations Nos. 06-198R and 00-014 are collectively referred to hereafter as the "Agency Agreement."

12.    The Agency Agreement provides in relevant part that if AXA "refunds any premium or consideration…any compensation paid or prepaid with respect to such premium will be unearned." Exhibit 2 at p. 2.

13.    The Agency Agreement also provides that "[i]nterest is charged on recovery plan balances of $1,000 or more that are outstanding for at least 30 days" and that "[i]nterest is calculated and charged at the annual rate of one percent above the current prime rate," with "simple interest [being] charged on a weekly basis." Exhibit 3 at p. 3.

### II.    THE KOENIG APPLICATIONS

14.    On or about May 12, 2006, Mr. Epstein, an independent financial professional, submitted to AXA four life insurance applications, as well as other financial documentation, on

3

behalf of the Koenigs. Annexed hereto as Exhibit 4 are true and correct copies of the Koenigs' applications. Mr. Epstein also completed, signed and submitted the Financial Professional/Broker Certification detailing the Koenigs' net worth.

15.    Based upon the submissions by Mr. Epstein, AXA issued four separate life insurance policies to the Koenigs, two to Mali Koenig and two to Benzion Koenig, for $10,000,000 each, for a total of $40,000,000 in life insurance coverage between the Koenigs.

16.    In issuing the life insurance policies to the Koenigs, AXA reasonably relied upon representations of the Koenigs' net worth and assets set forth in their applications.

17.    In or around June 2006, AXA paid Mr. Epstein $1,035,726 in first-year commission in connection with the issuance of the life insurance policies to the Koenigs.

18.    AXA later determined that the representations made in the Koenigs' life insurance policy applications regarding their net worth and assets were materially false and untrue.

19.    Specifically, the Koenigs' applications and related financial documents submitted by Mr. Epstein represented that the Koenigs' net worth and assets was $26,000,000, that they owned a condominium in Miami, a rental home in Brooklyn, property in Connecticut worth $30,000,000 and real property in Israel worth $3,000,000, and that the Koenigs possessed $1,000,000 in liquid assets. AXA discovered that the Koenigs do not own either a condominium in Miami or a rental home in Brooklyn, and AXA has been unable to locate any property in Connecticut titled to the Koenigs.

20.    On December 22, 2006, AXA informed Wells Fargo Bank, N.A. ("Wells Fargo"), the trustee of the insurance policies issued to the Koenigs, of the material misrepresentations contained within the subject life insurance policies' applications and duly rescinded the insurance policies issued to the Koenigs. Annexed hereto as Exhibit 5 are true and correct copies

4

of the notices of rescission. AXA enclosed with the notices of rescission a full refund of all premiums paid by Wells Fargo as trustee as of that date, with interest, on each of the four policies issued to the Koenigs.

21.    AXA informed Mr. Epstein of the rescission of the insurance policies issued to the Koenigs because of the material misrepresentations regarding the Koenigs' net worth and assets contained within the applications, and in accordance with the Agency Agreement, demanded that Mr. Epstein return the $1,035,726 commission he had received, with interest, in connection with his role as the financial professional on the insurance policies issued to the Koenigs.

22.    Mr. Epstein refused AXA's demands and Mr. Epstein continues to withhold wrongfully $1,035,726 of AXA's money, plus interest.

### FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

23.    AXA repeats and incorporates by reference the foregoing allegations as if fully set forth herein.

24.    AXA and Mr. Epstein are parties to the Agency Agreement, which is a valid and binding.

25.    The Agency Agreement provides for the recovery by AXA, with interest, of the commission paid to Mr. Epstein in connection with the issuance of the life insurance policies to the Koenigs.

26.    AXA has fully performed all of its obligations under the Agency Agreement with respect to Mr. Epstein.

27.    Mr. Epstein has materially breached the Agency Agreement by failing to: (i) return to AXA the $1,035,726 in commission paid to Mr. Epstein by AXA in connection with the

5

issuance of the life insurance policies to the Koenigs and (ii) pay AXA interest at the rate set forth in the Agency Agreement on the $1,035,726 in commission paid to Mr. Epstein by AXA in connection with the issuance of the life insurance policies to the Koenigs.

28.    AXA has suffered damages as a result of Mr. Epstein's breaches of the Agency Agreement in an amount to be determined at trial but in no event less than $1,035,726 plus interest at the rate set forth in the Agency Agreement.

## SECOND CAUSE OF ACTION FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

29.    AXA repeats and incorporates by reference the foregoing allegations as if fully set forth herein.

30.    The Agency Agreement contains implied covenants of good faith and fair dealing.

31.    Mr. Epstein materially breached the implied covenants of good faith and fair dealing by failing to return to AXA, with interest, the $1,035,726 in commission paid to Mr. Epstein by AXA in connection with the issuance of the life insurance policies to the Koenigs.

32.    As a direct and proximate result of Mr. Epstein's material breaches of the implied covenants of good faith and fair dealing in the Agency Agreement, AXA has sustained damages in an amount to be determined at trial but in no event less than $1,035,726 plus interest at the rate set forth in the Agency Agreement.

## THIRD CAUSE OF ACTION FOR UNJUST ENRICHMENT

33.    AXA repeats and incorporates by reference the foregoing allegations as if fully set forth herein.

34.    As set forth above, Mr. Epstein has unjustly enriched himself at AXA's expense by, inter alia, wrongfully refusing to return to AXA, with interest, the $1,035,726 in commission

paid to Mr. Epstein by AXA in connection with the issuance of the life insurance policies to the Koenigs.

35.     Mr. Epstein is currently wrongfully in possession of $1,035,726 in commission paid to him by AXA, and has received substantial benefits from the wrongful possession of these monies.

36.     Equity and good conscience require Mr. Epstein to return to AXA the $1,035,726 in commission paid to him by AXA.

37.     By reason of the foregoing, Mr. Epstein has unfairly and improperly obtained, and is continuing to obtain unfairly and improperly obtain, substantial benefits at the expense of AXA.  Mr. Epstein has been unjustly enriched by virtue of his improper usurpation of such benefits, and is liable to AXA in an amount to be determined at trial but in no event less than $1,035,726 plus interest at the rate set forth in the Agency Agreement.

## FOURTH CAUSE OF ACTION FOR CONVERSION

38.     AXA repeats and incorporates by reference the foregoing allegations as if fully set forth herein.

39.     Since receiving AXA's demand to return, with interest, the $1,035,726 in commission paid to Mr. Epstein by AXA in connection with the issuance of the insurance policies to the Koenigs, Mr. Epstein has wrongfully withheld these monies and converted these monies to his own use and benefit.

40.     Despite AXA's demands, Mr. Epstein has refused to return the commission with interest to AXA.

7

41.    Mr. Epstein's wrongful withholding of the commission payment and/or interest payments on the monies at issue constitutes an intentional interference with the ownership right of AXA to these monies, which has deprived AXA of the right to possess these monies.

42.    By reason of the above, AXA has sustained damages in an amount to be determined at trial but in no event less than $1,035,726 plus interest at the rate set forth in the Agency Agreement.

<div align="center">

**FIFTH CAUSE OF ACTION FOR REPLEVIN**

</div>

43.    AXA repeats and incorporates by reference the foregoing allegations as if fully set forth herein.

44.    The $1,035,726 in commission paid to Mr. Epstein is the rightful property of AXA.

45.    By reason of the above, AXA has sustained damages in an amount to be determined at trial but in no event less than $1,035,726 plus interest at the rate set forth in the Agency Agreement.

<div align="center">

**REQUEST FOR RELIEF**

</div>

**WHEREFORE**, AXA requests judgment in its favor and against Mr. Epstein as follows:

1.    Issuing an Order preliminarily enjoining Mr. Epstein from dissipating, transferring, conveying or otherwise encumbering the commission received by Mr. Epstein in connection with AXA's issuance of policies of life insurance to the Koenigs.

2.    Awarding to AXA all compensatory damages as suffered by AXA as a result of Mr. Epstein's unlawful actions in an amount to be determined at trial but in no event less than $1,035,726.

<div align="center">

8

</div>

3.      Awarding to AXA interest, including pre and post-judgment interest, on the foregoing sums.

4.      Awarding AXA its costs and attorneys' fees in this civil action.

5.      Ordering that AXA shall have such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         May 14, 2007

                                KILPATRICK STOCKTON LLP

                                By: _____
                                    Joseph Petersen
                                    Christopher Lick
                                    31 West 52nd Street, 14th Floor
                                    New York, New York 10019
                                    Tel: (212) 775-8700
                                    Fax: (212) 775-8800

                                *Attorneys for AXA Network, LLC, AXA Equitable
                                Insurance Company and AXA Advisors, LLC*

9

# EXHIBIT 1

AGREEMENT BETWEEN

AXA NETWORK, LLC, Its subsidiaries and AXA Network of Texas, Inc.,
hereinafter collectively called "AXA Network"
and the undersigned, hereinafter called the ASSOCIATE

IT IS MUTUALLY AGREED, that

I.      Authority. The Associate, when properly licensed, shall canvass on behalf of AXA Network for applications for insurance policies and annuity contracts to be issued by The Equitable Life Assurance Society of the United States (hereinafter "The Equitable"), or any insurance company affiliate thereof as may be provided by agreement between The Equitable and/or AXA Network and such insurance company affiliate, and the Associate shall collect the first premiums and considerations thereon.

Notwithstanding the foregoing, the Associate shall canvass on behalf of AXA Network for such applications only in jurisdictions in which AXA Network is properly licensed to distribute such policies and contracts.

II.     Territory.    The Associate may canvass for applications for insurance policies and annuity contracts and otherwise operate within any jurisdiction and territory where both the Associate and AXA Network are properly licensed to sell such policies and contracts, but is assigned no exclusive rights in any territory.

III.    Commissions and Service Fees. The Associate shall be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under this Agreement in accordance with the Schedules of Commissions (issued by AXA Network with notice to the Associate) in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid.  If the Associate held an Equitable agent's agreement immediately prior to entering into this Agreement, the Associate shall continue to be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under such prior agent's agreement in accordance with the applicable schedules of commissions in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid.  Upon termination of this Agreement, however, service fees and additional compensation, if any, shall no longer be allowed, and renewal commissions shall be allowed only as provided in the Vesting Provisions of Paragraph IV below.

IV,     Vesting of Commissions. Renewal commissions on premiums for insurance policies and considerations for annuity contracts secured by the Associate under this Agreement, or under any prior agent's agreement between the Associate and The Equitable in effect immediately prior to this Agreement, to the extent allowable under the applicable schedules of commissions in force on the date of the application for the policy or contract, shall become vested on the occurrence of the earliest of the following events:

A.  Completion of 12 years of continuous service with AXA Network and/or The Equitable, or 10 years of continuous service with AXA Network and/or The Equitable and the attainment of 120,000 production credits.  Any period under agreement as an Associate with, or in the service of, The Equitable or any of its insurance company affiliates, or AXA Network immediately preceding this Agreement or immediately following the termination of this Agreement shall be deemed part of such service.

B.  The Associate's 65th birthday, if this Agreement is then in full force and effect, or if immediately following the termination of this Agreement the Associate continues under agreement with or in the service of AXA Network and/or The Equitable or any of their insurance company affiliates until age 65.

C.  The death of the Associate, if this Agreement is then in full force and effect, or if immediately following the termination of this Agreement the Associate continues under agreement with or in the service of AXA Network and/or The Equitable or any of their insurance company affiliates until death.

If this Agreement shall terminate, a collection charge, as specified in the Schedules of Commissions, shall be deducted from payments of vested renewal commissions, except where such commissions have vested as provided in Sub-paragraphs B or C.

V.      Assignments. No assignment of this Agreement shall be valid.  No assignment of commissions or other payments due or to become due under this Agreement shall be recognized unless written acknowledgment of its receipt and filing is issued by AXA Network.

VI.     Limitations on Associate's Authority.    The Associate shall have no authority with respect to AXA Network and/or The Equitable or any of their insurance company affiliates other than as expressly stated in this Agreement.  Without limiting the generality of the foregoing, the Associate shall not:

*   make, alter or discharge contracts,
*   waive forfeitures,
*   grant permits,
*   name special rates or guarantee dividends,
*   make any endorsements on policies and annuity contracts,
*   accept or issue receipts for deferred or renewal premiums or considerations,
*   receive any moneys due or to become due except as specified in Paragraph I of this Agreement or as

DOCSNY1:616028.2

specifically authorized in writing by an officer of AXA Network, provided, however, that any existing written authorizations to receive any moneys due or to become due, specifically issued to the Associate by an officer of The Equitable under any prior agent's agreement between the Associate and The Equitable, shall remain in full force and effect,

- deliver a policy of life insurance or accident and health insurance unless payment of the premium shall have been made during the applicant's good health, or

- bind AXA Network and/or The Equitable or any of their insurance company affiliates in any way.

**VII.    Regulations.** This Agreement is subject to such rules and regulations as AXA Network has established or may hereafter establish covering the conduct of its business.

**VIII.    Rejections.** The Equitable and/or any of its insurance company affiliates shall at all times have the right in their sole discretion to reject any applications for their policies of insurance and annuity contracts.

**IX.    Reservation of Rights** The rights reserved to AXA Network and/or The Equitable in this Agreement or in any prior agent's agreement between the Associate and The Equitable, including without limitation those contained in Paragraphs X, XI, and XIV, and Subparagraph B of Paragraph XIII, shall survive the termination of this Agreement.

**X.    Collections and Return of Property.** All collections made by the Associate hereunder shall be kept in trust entirely separate and distinct from other funds, and shall forthwith be paid over in cash to AXA Network. Any and all property of AXA Network held by the Associate shall be returned to AXA Network at an appointed time, or on demand. All unpaid policies or contracts and all other property of The Equitable or any insurance company affiliate thereof held by the Associate shall be delivered to AXA Network at an appointed time, or on demand.

**XI.    Indebtedness.** AXA Network may offset as a first lien against any claim for compensation under this Agreement any debt due or to become due, hereunder or otherwise, from the Associate to AXA Network or any of its affiliates. Debt not fully satisfied by such offset is a personal debt of the Associate recoverable at any time with interest under AXA Network's rules. "Debt" as used herein includes, but is not limited to, paid but unearned commissions attributable to refunded termination values or to premiums wholly or partially unpaid or refunded, loans, and amounts claimed by AXA Network or any of its affiliates under any account with the Associate.

**XII.    Bond.** The Associate hereby agrees to furnish, on request, a bond of indemnity satisfactory to AXA Network and maintain the same in force, in such an amount and with such sureties as AXA Network may require. Any bond of indemnity furnished to The Equitable or any of its affiliates shall continue to be maintained by the Associate.

**XIII.    Termination.**

A.    This Agreement shall be terminable forthwith if the Associate shall enter under contract with or into the service of any insurance company other than The Equitable or any insurance company affiliate thereof, or if the Associate shall fail to comply with any of the provisions or conditions of this Agreement, or if the Associate shall violate any law in force in the territory in which the Associate is doing business.

B.    If this Agreement is terminated by reason of violation of Paragraph X or Sub-paragraphs A and B of Paragraph XIV or Paragraph XV, or if after termination of this Agreement the Associate engages in acts or practices proscribed by Paragraph X or Sub-paragraphs A and B of Paragraph XIV, the Associate shall forfeit all commission interest which might otherwise have been acquired under any agreement with AXA Network or under any prior agreement between the Associate and The Equitable.

C.    This Agreement shall be terminable by AXA Network upon 30 days prior written notice to the Associate where the Associate in the sole discretion of the Branch Manager has failed to achieve applicable production standards.

D.    Unless otherwise terminated, this Agreement may be terminated by either party with or without cause, by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination.

**XIV.    Unauthorized Practices.**

A.    **Twisting.** The Associate shall not at any time induce or endeavor to induce policyowners of The Equitable or any insurance company affiliates thereof to relinquish their policies or contracts.

B.    **Proselyting.** The Associate shall not at any time induce or endeavor to induce associates of AXA Network to terminate their relationship with AXA Network in order to become sales representatives or sales managers with another insurance company, agency, or broker.

C.    **Rebates.** The Associate shall under no circumstances pay or allow, or offer to pay or allow, any rebate of premium or consideration in any manner whatsoever, directly or indirectly.

**XV.    Adverse Activity.** The Associate shall not violate any law in force in any territory in which the Associate is doing business. Additionally, the Associate shall not engage or become involved in any activity or other conduct or association, whether or not lawful, which affects or tends to affect adversely the reputation of AXA Network and/or The

2

Equitable, or their affiliates, or of any of their associates or employees generally or specifically in their community, or which casts odium on them or on the officers or directors of AXA Network and/or The Equitable, or their affiliates or which might otherwise be detrimental to the business of AXA Network and/or The Equitable or their affiliates.

XVI.  **Associate Benefit Program.** The Associate may participate in the Associate Benefit Program as now or hereafter provided by AXA Network to the extent for which such Associate is qualified. The Associate shall not be eligible for workers' compensation benefits.

XVII.  **Independent Contractor.** Nothing contained herein shall be construed to create the relationship of employer and employee between AXA Network or The Equitable and the Associate. The Associate shall be free to exercise independent judgment as to the persons from whom applications for policies and annuity contracts will be solicited and the time and place of solicitation.

The Associate shall abide by the rules and regulations of AXA Network in accordance with Paragraph VII hereof but such rules and regulations shall not be construed so as to interfere with the freedom of action of the Associate as described in this Paragraph.

XVIII.  **Violations.** Without prejudice to AXA Network's right of termination under Paragraph XIII hereof, AXA Network shall have the right, if the Associate shall violate any of the terms of this Agreement, to suspend and withhold payment of any commission or service fee otherwise payable hereunder or under any prior agreement between the Associate and The Equitable, until satisfied that such violation has ceased or been cured.

XIX.  **AXA Network's Prior Right.** While this contract is in effect, the Associate shall not, and shall not agree to, solicit, obtain or submit any application to any company other than The Equitable or any insurance company affiliate thereof, for any insurance policy or annuity contract, nor shall the Associate in any other way assist in obtaining or providing any such insurance or annuity from any such other company, unless specifically authorized in writing by AXA Network, provided, however, that any existing, written authorizations issued by an officer of The Equitable shall remain in full force and effect.

XX.  **Sole Agreement.** This Agreement is intended to be the entire and final understanding of the parties hereto, with respect to the Associate's authority as specified in Paragraph I of this Agreement, and shall supersede all prior agreements if any, of the parties hereto with respect to such Associate's authority only. In addition, as of the date on which AXA Network becomes properly licensed in a particular jurisdiction to distribute insurance policies and annuity contracts of The Equitable or any of its insurance company affiliates, this Agreement shall supersede any agent's agreement between the Associate and The Equitable, to the extent then in effect, for the sale of such policies and contracts in that particular

jurisdiction. This Agreement may not be modified other than by a writing approved by an officer of AXA Network. It is understood, however, that all existing obligations to AXA Network and/or The Equitable heretofore incurred or assumed by the Associate, and existing liens created in connection therewith, shall continue to exist, and the Associate's rights under any prior contracts and agreements, with AXA Network and/or The Equitable are not impaired, provided, however, that any rights under any prior agent's agreement between the Associate and The Equitable are not impaired, provided, however, that any rights under any prior agent's agreement between the Associate and The Equitable and/or AXA Network shall not be in addition to any rights accorded the Associate under this Agreement.

XXI.  **Effective Date.** This Agreement shall take effect in any jurisdiction where the Associate is properly licensed to sell insurance policies and annuity contracts of The Equitable or any of its insurance company affiliates, as of the later of (a) January 1, 2000, (b) the date on which AXA Network becomes properly licensed to distribute such policies and contracts in that particular jurisdiction or (c) the date this Agreement is duly signed by the Associate and countersigned by an authorized representative of AXA Network.

IN WITNESS WHEREOF, the parties to this Agreement have subscribed their names this ___1___ day of __April__, 2005.

EXECUTED IN DUPLICATE

_____
ASSOCIATE

1740 Ocean Ave #3L
STREET ADDRESS

Bklyn, NY 11230.
CITY (COUNTY) STATE

AXA NETWORK, LLC
for itself and its subsidiaries and as
agent of AXA Network of Texas, Inc.

By: _____
AUTHORIZED REPRESENTATIVE

116684

(219-1405-91-8)
14A Edition

IDOCSNY1:610028.1

3

# EXHIBIT 2

 **✓AXA ADVISORS**

**FINANCIAL PROFESSIONAL
INFORMATION**

October 27, 2000
No. 00-014

Subject:    Commission Recovery Plan/Commission Prepayment

Summary:    Commission recovery rates, the differences between the three recovery plan
balances, interest charges and commission prepayment procedures are restated
and updated.

**Key Points:**
- The basis of commission recovery rates is changing from prepaid/non-prepaid to first-year/renewal, effective November 3, 2000.
- Self-employed status financial professionals must pay off employee earnings recovery plan balances with personal checks.
- Compensation on business produced by financial professionals while at self-employed status will never generate benefits-bearing earnings.
- Interest at the rate of one percent above the prime rate is charged on recovery plan balances exceeding $1,000 for more than 30 days.
- Financial professionals receive prepaid commissions on non-annual mode Equitable life and health policies unless they elect otherwise or are restricted by management.

*This Financial Professional Information (FPI #00-014) supercedes Associate Information
Guides (AIGs) #87-3, #92-78 and #99-55 which are now recinded.*

**Commission Recovery Rates**

Effective November 3, 2000, the basis of commission recoveries is being changed from a
prepaid/non-prepaid commission basis to a first-year/renewal (including service fees)
commission basis.

-2-

Standard recovery rates are 50% of first-year commissions and 10% of renewals. All available commissions are applied against Not Taken Out (NTO) commission recoveries. Commissions on policies that had recoveries in the previous 100 days are applied at the rate of 100%, up to the amount of the policy specific recovery. Such situations are frequently seen as pluses and minuses for the same policy in the same payroll period. Financial professionals may request, through their branch operations manager, that their recovery rates be increased, permanently or for a limited time, to reduce recovery plan balances more quickly.

AXA Advisors reserves the right to increase commission recovery rates for any financial professional when his or her total balance exceeds $10,000 or the balance is not likely to be paid off in the next 12 months at the financial professional's current production level.

**Commission Recovery Balances**

Depending on benefits-eligibility status, a financial professional may have up to three separate commission recovery plan balances:

**Employee Earnings Recovery Plan Balance**

The employee earnings balance is derived from commission recoveries on policies or contracts with register dates that fall within a period when the financial professional was benefits eligible.

Self-employed financial professionals who do not receive retirement benefits (see Associate Information Guide #00-37 or the current annual benefit plan eligibility document) cannot pay off an employee earnings balance with current commission earnings (first year or renewal). Therefore, in such instances, a personal check must be used to make the payment. *Checks made payable to AXA Advisors should be sent to:*

> *Recovery Plan Administration/Human Resources*
> *7th Floor - Area C 1290 Avenue of the Americas*
> *New York, NY 10104*

Financial professionals who receive retirement benefits will have renewal compensation on business produced prior to retirement applied to their outstanding employee earnings balances.

**Self-employed/AXA Advisors Earnings Recovery Plan Balance**

The self-employed earnings balance is derived from commission recoveries generated on insurance and annuity business that was produced while the financial professional was at self-employed status, and all securities business (except that produced under a 20th Edition contract). (Financial professionals who receive retirement benefits through the benefits program – or financial professionals who are ineligible to participate in the benefits program – are considered self-employed). Only self-employed and securities earnings can be applied to this balance. Therefore, the compensation generated on insurance and annuity business that was produced while the financial professional was at employee status (benefits eligible) cannot be applied to this balance.

-3-

A financial professional with a large self-employed balance should consider payment by personal check or increasing the recovery rate, as indicated above, to avoid interest charges.

*It should be understood that compensation on business produced while at self-employed status will never generate benefits-bearing earnings, even if benefits-eligible status is achieved during a later period.*

FICA/Non-benefit Earnings Recovery Plan Balance

The FICA/non-benefit balance is derived from commission recoveries that occur on business that was produced while the financial professional was benefits eligible (employee status) and was paid during a period in which the financial professional was considered to be self-employed.

Self-employed financial professionals will seldom have such a balance, which will usually be paid off by the renewals on business placed as a benefits-eligible financial professional.

**Recovery Plan Interest Charges**

Interest is charged on recovery plan balances of $1,000 or more that are outstanding for at least 30 days according to the following procedures/provisions:

- Interest is calculated and charged at the annual rate of one percent above the current prime rate. The rate will be updated whenever there is a change, up or down, in the published prime rate.
- Simple interest is charged on a weekly basis. If the previous, most recent closing balance at least 30 days prior or the current balance is less than $1,000, no interest is charged for the current week.
- Interest is deducted automatically from commissions, after recovery plan items, taxes and other mandatory items, but before voluntary deductions. If there are insufficient commissions to pay the interest, any interest balance is carried forward until satisfied.
- Interest balances are not subject to interest charges and are not added to the recovery plan balances.
- Uncollected interest and the current week interest calculation are printed on a separate statement support document.

**First-Year Commission Prepayment**

Unless otherwise elected or restricted by management, financial professionals will receive prepaid (annualized) commissions and production credits subject to certain limits for variable life policies (see AIG #00-72) on Equitable life and health policies with non-annual premium payment modes.

Prepayment is based on 97.5% of the full commission. Production credits are also allowed at the same rate.

-4-

AXA Advisors reserves the right to revoke a financial professional's prepayment privilege or to restrict or defer the disbursement of prepaid commissions on a case-by-case basis.

Commissions will not be prepaid for policies on a financial professional's own life, or the life of a member of his or her immediate family or when he or she is personally responsible for the payment of the premium.

Financial professionals may elect not to receive prepaid commissions on all future business or on a specific case.  The local branch operations manager should be consulted to implement such an election.

For additional information, contact the Regional Support Group at (212) 314-4408, option 3.

Release approved by:                                        (I/R Code: 1850)
Patrick J. Caulfield
Senior Vice President
AXA Client Solutions

EXHIBIT 3



**AXA**
FINANCIAL
PROTECTION
— Be Life Confident —

# Field Bulletin

April 24, 2006
**FB 06-198R**
*Revised*

*See revisions under "For More Info."*

*This bulletin supersedes FB 04-454, which is now rescinded.*

## Audience:

AXA Advisors Financial Professionals

## Re:

Revised Schedule of Commissions and Service Fees

## What's New:

- Revised Schedule of Commissions and Service Fees for FPs and brokers, applicable to products listed below.

## When:

The attached commission schedule is effective immediately, is part of all current and future FP and broker agreements with AXA Network and/or its affiliates, and should be filed with current contracts.

## For More Info:

See details on the following pages. For more information, contact your branch operations manager.

| Revision | Details |
|---|---|
| Revised commission schedule for Athena Universal Life II policies for issue ages 70 and older, effective August 14, 2006. | FB 06-374 |
| IL '06 commission rate revision effective with applications dated September 8, 2006 and later. | FB 06-380 |
| Commission change for Accumulator and EQUI-VEST® IRA and NQ markets on contributions for annuitants ages 76 through 80, effective September 18, 2006. | FB 06-409 |

FOR INTERNAL USE ONLY

**If the future income stream from the TSA book of business is sold by the Original Service/Commission Financial Professional, the buyer will assume all vesting rights.

When the TSA Advantage Account Value equals or exceeds $15,000, the renewal service fee to the beneficiary will be discontinued and replaced with an asset-based trail (without PCs) made payable to the beneficiary/estate.

Any rollovers or increased contribution to a TSA Advantage contract during the first 10 contract years when an asset-based trail is paid will result in an increase of the account value and corresponding asset-based trail to the beneficiary. No additional compensation will be paid to the Assigned Service/Commission Financial Professional(s). After the 10th contract year, the asset-based trail (with 40% PCs) will be paid to the Assigned Service/Commission Financial Professional(s).

If the premium or consideration on any policy or contract secured hereunder is not paid on or before the end of any grace period, pursuant to the terms of the policy or contract, AXA Equitable will not be liable to the Financial Professional for further commissions or service fees thereon, except as defined from time to time in AXA Equitable's rules.

AXA Equitable may, under its rules, pay commissions on a pre-payment (i.e., annualization) basis, in advance of the date a premium becomes due and is paid to AXA Equitable or its subsidiary.

If any premium or consideration is not paid to AXA Equitable or its subsidiary, or if AXA Equitable or its subsidiary refunds any premium or consideration, including a termination value in the nature of a pro-rata part of a premium, any compensation paid or prepaid with respect to such premium will be unearned. As a result, AXA Equitable may offset the same against any claim for compensation, to the extent the compensation is not offset, the same will, upon termination of the Financial Professional's or Broker's Agreement, become a personal indebtedness of the Financial Professional or broker, which AXA Equitable may recover from the Financial Professional or broker, personally.

The Financial Professional's rights to any additional or special compensation of any kind under independent contractor (other than 12th Edition) agreements entered into after February 1, 1974, will be governed by AXA Equitable's rules, in effect at the time of payment. Examples of such compensation include, but are not limited to, increased service fees for policy years 11th and later.

First-year and renewal rates (including service fees) on policies that include additional benefit provisions will be the same as the rates for the basic policy, unless otherwise noted in the Schedules.

No commissions or service fees will be allowed on premiums charged for any extra hazard except as determined by AXA Equitable under its rules. First-year commissions of 10% will be paid on any temporary extra premiums on Equitable Whole Life (EWL) and AXA Equitable term products, only.

The commissions and service fees shown in the accompanying Schedules will not apply if the premium is a result of an internal replacement. Internal replacement guidelines and compensation can be changed by AXA Equitable at its discretion. Refer to Associate Product News (APNs) #92-7, #92-8, #92-20, #92-21, #92-31, #97-5, #97-18, #98-1, Field Bulletins #02-299RR (Revised), #02-300RR (Revised), #03-252, #03-253,#03-543, #04-173, #04-235 and Associate Information Guide (AIG) #96-13 for the rules on Financial Professionals' compensation involving internal replacements. Commissions are not paid on the amount of any loan carried over to the new policy as part of a Section 1035 exchange.

If a policy is issued as a result of a Term Conversion and the Term Conversion Credit applied to the new policy is commissionable under AXA Equitable's rules, the first-year commission on the portion of the new premium equal to the Term Conversion Credit will be at a rate equal to one-half of the applicable first-year rate for the new permanent policy. If a policy is issued as a result of a Term Conversion, and the Term Conversion Credit applied to the new policy is non-commissionable under AXA Equitable's rules, no compensation will be paid on the portion of the new premium that equals the Term Conversion Credit.

The service fees shown in the Schedules, unless otherwise noted, will be allowable only while service to the policyowner satisfies both the policyowner and AXA Equitable and in the judgment of AXA Equitable, no other Financial Professional, non-affiliated Financial Professional or AXA Equitable is rendering any service to the policyowner. Except for Equitable Life Account (ELA), Transferable Service Fees and Service Fees are split among all active Financial Professionals/brokers in proportion to the Financial Professionals'/Brokers' commission interests. Transferable Service Fees for ELA are paid to the Financial Professional designated to receive all Transferable Service Fees. Service fees are subject to vesting rules; Transferable Service Fees are not. Transferable Service Fees and Asset-Based Compensation, if available, for all life products are not subject to vesting rules and will be paid to the Financial Professional(s)/broker(s) assigned to service the policy.

# EXHIBIT 4

# AMENDMENT TO APPLICATION

| Name of Proposed Insured: | Mak | | Koenig | Application Dated: | 4/4/06 |
|---|---|---|---|---|---|
| | First | Middle Initial | Last | | |

Policy or Contract No.:    156 208 141

## TO THE AXA EQUITABLE LIFE INSURANCE COMPANY

Your application is hereby amended by the undersigned in the following particulars:

- Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)  ☒ NO   ☐ Yes

  Check all of the following that apply and complete requested information:

  ☐ Loan_____(% of premium) Identify Source of Loan_____
  Loan Repayment Schedule_____
  Describe the collateral used_____

  ☐ Cash_____(% of premium)

  ☐ Existing life insurance policy or contract_____(% of premium)

  ☐ Existing Investments_____(% of premiums) Identify Investment Source_____

- Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)    ☐ Yes   ☒ No

- Please state the reason you are purchasing this policy (i.e., estate planning, business insurance, etc.)

  Estate Planning.

This amendment is to be taken as part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as part of the policy or contract. To the best of my (our) knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at   Brooklyn   Ny   on   5/25/06
            (City)        (State)              (Date)

_____         ✗ _Mak Koenig_____
Signature of Purchaser, if other than Applicant        Signature of Applicant

AGENT:        ASU:        AGENCY:

EV 237-401 / 138-237E  Application Amendment
AMIGV-2005 App

156 212 029

# AMENDMENT TO APPLICATION

Name of
Proposed Insured  **MALI KOENIG**                          Application Dated  **MAY 12, 2006**
                         First          Middle Initial      Last

Policy No  156 212 029

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE WITH PLAN TO BE ATHENA UNIVERSAL LIFE II.

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the policy. To the best of my knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at  Brooklyn        NY                   on  5|25|06
               (City)             (State)

_____        ↙ Mali Koenig
Signature of Purchaser if other than Applicant        Signature of Applicant

Agent: _____

Agency: _____

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
**Part 1**
Form No. LIFEAPP-GA/OR
(2005)

---

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

**Proposed Insured**

A. Full Name: First _Mali_ _____ M.I. ____ Last _Koenig_ _____ B. Gender: ☐ Male ☒ Female

C. Home Address: _Redacted_ _____ Redacted
(If address is a P.O. Box or not actual residence, proof of residence required.)

City/Municipality _Brooklyn_ _____ County/Parish _____ State _NY_ Zip + 4 Code _Redacted_

State

D. Home Phone No. _Redacted_ _____ Best time to Call: _____ Best phone no. to be contacted: _____

E. Date of Birth: _Redacted_ _____ F. Place of Birth: _Romania_
(State/County)

G. Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated H. Soc. Sec. No. _Redacted_

I. Driver's Lic. No.: _None_ _____ State: _____

J. U.S. Citizen? ☒ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

K. Currently employed? ☐ Yes ☐ No ☒ Retired

L. Current Occupation(s): (1) Title: _N/A Retired_ _____ (2) Duties _____ (3) How Long? _____
(If less than 1 year at current occupation, give previous in Remarks.)

M. Employer Name: _N/A_

N. Employer Address: _____
No. & Street _____ City _____ State _____ Zip + 4 Code

O. Annual Earned Income (from occupation) $ _N/A_ _____ P. Net Worth $ _26 million_

* If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _UL II_ _____ Amount of Insurance $ _10 million_
(If survivorship policy, complete an application for each Proposed Insured.
If VUL, must also complete VUL Supplement.
To select dividend options on EWL or Riders on all Non-VUL Plans complete Optional Benefits Supplement.)
(If face amount is $2 million or larger complete Financial Supplement.)

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A ☐ Option B
(2) Planned Periodic Premium $ _1,251,740_

C. Definition of Life Insurance Test: Complete for AUL II, IL, IL COLI '04 ☒ Guideline Premium Test ☐ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly
· Or
System-Matic (Complete S-M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit. No. _____ (3) Unit Register Date _____
(Specify Allotter name, if other than insured, in Remarks.)

F. Date Policy to save Insured Age? ☐ Yes ☒ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market? ☐ Yes ☒ No
2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete: (If additional room is needed, please use Remarks Section.)

Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☐ No If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:
a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ _____
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details: _____

217433, 04-21-2006, 11:11:21

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary: Mali Koenig Insurance Trust A 05/11/06 | | 100% |
| Contingent: | | |

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: Mali Koenig Insurance Trust B 05/11/06   Social Security # or TIN   **Redacted**

Address: Street Wells Fargo BANK, N.A. 100 Northridge Rd.   Atlanta   State GA   Zip Code 30350
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country_____ U.S. Visa type_____ Passport # or U.S. Visa #_____ # of years in U.S._____

Relationship to Insured_____ Date of Birth_____

Name of Trustee Wells Fargo BANK, N.A.   Date of Trust Agreement 5.11.06

* If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

| | | | |
|---|---|---|---|
| **A.** | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) | ☐ Yes | ☒ No |
| **B.** | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.) | ☐ Yes | ☒ No |
| **C.** | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| **D.** | In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) | ☐ Yes | ☒ No |
| **E.** | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) | ☐ Yes | ☒ No |
| **F.** | In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.) | ☐ Yes | ☒ No |
| **G.** | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates.) | ☐ Yes | ☒ No |
| **H.** | Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No   Type_____ Avg. Quantity # packs_____ Frequency_____ | | |
| **I.** | Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No   Type_____ Date Ceased_____ | | |

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height 5 Ft. 1 in.; Weight 137 lbs.

**B.** Personal Physician Name please see remarks

**C.** Address

**D.** Date and Reason for Last Visit in the Last 5 Years no change since medical exam in Feb 06

**E.** What treatment was given or recommended? (If none, so state)

Has Proposed Insured:

| | | | |
|---|---|---|---|
| **F.** | In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| **G.** | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.) | ☒ Yes | ☐ No |
| **H.** | In the last 10 years: | | |
| | 1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| | 2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| **I.** | In the last 10 years, been: Diagnosed with or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |
| **J.** | | | |

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | WW II   Death camps | |
| Mother | | WW II   Death camps | |
| Sibling | | | |

AMIGV-2005 A

**❻ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION** (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks, (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.   (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr Kaiser  718-941-5600          Dr. Scheter 718-376-81
465 Ocean Pkwy                   2350 Ocean Pkwy
Brooklyn, N.Y 11218              Brooklyn  NY
Dr. Coch 718-854-2144           Please See Contract
4815 14th. Ave.                 # 156203466 for
Brooklyn NY 11215               Doctors info.

**❼ COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application: $ _____O_____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:

(i)    the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)   the $1,000,000 insurance amount limitations, and

(iii)  that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?          ☒ Yes  ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that:

(1)  The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

☐ AXA Equitable Life Insurance Company                    ☐ MONY Life Insurance Company of America

## ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

## AUTHORIZATIONS

### TO OBTAIN HEALTH INFORMATION

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

### TO OBTAIN NON-HEALTH INFORMATION

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

### PURPOSE OF AUTHORIZATIONS

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

### COVERAGE CONDITIONS

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

### ADDITIONAL AUTHORIZATIONS

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy, I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

### DURATION

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

### COPY OF AUTHORIZATIONS

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City ___Atlanta___

Signature of Proposed Insured, Applicant, or parent or guardian
If Proposed Insured is a Child (issue Ages 0-14 )

State ___Georgia___    _Chattanooga_    by Wells Fargo BANK, N.A., as Trustee

Signature of Owner or Applicant if not Proposed Insured
(If corporation, print firm's name and signature of authorized officer.)
(If trust, signature of trustee.)

on ___5/12/06___    ELIZABETH F. WAGNER    VICE PRESIDENT

### Financial Professional to complete this section:

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?    ☐ Yes  ☒ No
(If "yes" give details_____)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☒ have witnessed the signature required on fully completed Part 1    ☐ I have not witnessed the signature required on fully completed Part 1, (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name ___Gabriel East___

AMGV-2005 A                                                                                            4

217433,04-21-2006,11:11:21

**Application Part 2 To:** ☐ **AXA Equitable Life Insurance Company**

US    Redacted                    *Passport*

☐ **AXA Life and Annuity Company**

Reason for submission of this form:  ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

| 1. a. Proposed Insured *(Please Print)* | First Name **Mali** | Middle Initial | Last Name **Koenig** | b. Height ___ ft ___ in. | c. Weight ___ lbs. |
| | | | | d. Birth Date | Redacted |
| | | | | e. ☐ Male ☐ Female | |

2. a. Name and address of personal physician (or medical facility used instead): *(if none, so state)* **Dr. Kaysee - Brooklyn NY.**

b. Date and reason last consulted if within the last 5 years: **4 miago. routine check-up.**

c. What treatment was given or recommended? *(if none, so state)* **none**

(For all "Yes" answers to Questions 3–9, circle items that apply.)

| 3. Has Proposed Insured ever had or been treated for: | Yes | No |
|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☑ | ☐ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ |
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☑ | ☐ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑ |
| 7. Has Proposed Insured's weight changed by more than | ☐ | ☑ |

| | Yes | No |
|---|---|---|
| 10 pounds in the last 6 months? | | |
| 8. Other than as stated in answers to Questions 2–6, has Proposed Insured, within the last 5 years: | | |
| a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Had any illness, injury, or surgery? | ☐ | ☑ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☑ | ☐ |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |
| 9. a. Has Proposed Insured, within the last 12 months: | | |
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | ☐ | ☑ |
| b. Has Proposed Insured, within the last five years: | | |
| (i) Smoked cigarettes? | ☐ | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | ☐ | ☑ |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Sepsis - 400N | 30-85 |
| Mother | | | 43 |
| Brothers/Sisters | 79 | Missing Patient | 78 Told |

DETAILS FOR "YES" ANSWERS: Include: I. Question Number. II. Diagnosis and Treatment. III. Results. IV. Dates and Duration. V. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

3g. type II DM borderline controlled with diet. occas. Metformin.
4. Bab. ASA, Vit B.
8a. Dr Kayser - g.y.p. routine check-up. address not available
8 d. EKG test, ECG g.y.p. normal
mammogram in the past Dr unsure siblings cause of dead but No heart, concer, DM.

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at **Miami Beach FL** 2/6/06 X **Mali Koenig**
city    state    Mo. Day Yr.    Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): **Maria R Roser, MD**

180-M205N-FL    E5722_5    CAT. #126995

# AMENDMENT TO APPLICATION

Name of Proposed
Insured:         **Mali**              **Koenig**          Application
Dated      4/4/06

                    First   Middle Initial   Last

Policy or Contract No.:  **156 208 141**

## TO THE AXA EQUITABLE LIFE INSURANCE COMPANY

Your application is hereby amended by the undersigned in the following particulars:

* Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)    ☒ NO   ☐ Yes

    Check all of the following that apply and complete requested information:

    ☐ Loan _____(% of premium) Identify Source of Loan _____
       Loan Repayment Schedule _____
       Describe the collateral used _____

    ☐ Cash _____(% of premium)

    ☐ Existing life insurance policy or contract _____(% of premium)

    ☐ Existing Investments_____(% of premium) Identify Investment
       Source _____

* Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If yes, describe the inducement)    ☐ Yes  ☒ No

* Please state the reason you are purchasing this policy (i.e., estate planning, business insurance, etc.)

Estate Planning.

This amendment is to be taken as part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as part of the policy or contract. To the best of my (our) knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at __**Brooklyn NY**_____ on __**5/25/06**_____
           (City)        (State)             (Date)

                                     × *Mali Koenig*

_____       _____
Signature of Purchaser, if other than Applicant    Signature of Applicant

AGENT:    ASU:    AGENCY:

EV 237-401 / 150-237E Application Amendment
AMIGV-3005 App

156212 030

# AMENDMENT TO APPLICATION

Name of
Proposed Insured    MALI KOENIG                                Application Dated    MAY 12, 2006
                        First        Middle Initial    Last

Policy No _____    156 212 030

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE WITH THE INSURED'S SOCIAL SECURITY NUMBER TO BE        Redacted

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said
application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the
policy. To the best of my knowledge and belief, in all other respects the statements and answers in the
application continue to be, without material change, true and complete as of the date of this amendment.

Dated at   Brooklyn   NY                on   5/25/06
              (City)        (State)

x Mali Koenig

Signature of Purchaser if other than Applicant                    Signature of Applicant

Agent: _____

Agency:

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance Part I**
Form No. LIFEAPP-GA/OR
(2005)

---

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

**Proposed Insured**

A. Full Name: First _Mali_    M.I. ____ Last _Koenig_    B. Gender: ☐ Male ☒ Female

C. Home Address: _Redacted_    _Redacted_    2dy/Apt/Suite

City/Municipality _Brooklyn_    County/Parish ____ State _NY_ Zip + 4 Code _Redacted_
(If address is a P.O. Box or not actual residence, proof of residence required.)

D. Home Phone No. _Redacted_    Best time to Call: ____ Best phone no. to be contacted: ____

E. Date of Birth: _Redacted_    F. Place of Birth: _Romania_ (State/County)

G. Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated  H. Soc. Sec. No. _Redacted_

I. Driver's Lic. No.: _None_    State: ____

J. U.S. Citizen? ☒ Yes ☐ No* If No, Country ____ U.S. Visa type ____ Passport # or U.S. Visa # ____ # of years in U.S. ____

K. Currently employed? ☐ Yes ☐ No ☐ Retired

L. Current Occupation(s): (1) Title: _N/A_    (2) Duties ____ (3) How Long? ____
(If less than 1 year at current occupation, give previous in Remarks.)

M. Employer Name: _N/A_    _N/A_    _Retired_

N. Employer Address: ____    ____    ____    ____
No.& Street    City    State    Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ _N/A_    P. Net Worth $ _30 million_

* If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

---

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _UL II_    Amount of Insurance $ _10,000,000_
(If survivorship policy, complete an application for each Proposed Insured.
If VUL, must also complete VUL Supplement.
To select dividend options on EWL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement.)    (If face amount is $2 million or larger complete Financial Supplement.)

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A ☐ Option B
(2) Planned Periodic Premium $ _1,251,740_

C. Definition of Life Insurance Test: Complete for AUL II, IL, IL COLI '04 ☒ Guideline Premium Test ☐ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly
Or
System-Matic (Complete S-M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name ____ (2) Unit/Sub Unit. No. ____ (3) Unit Register Date ____
(Specify Allottee name, if other than insured, in Remarks.)

F. Date Policy to save Insured Age? ☐ Yes ☒ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market? ☐ Yes ☒ No
2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete: (If additional room is needed, please use Remarks Section.)

Amount $ ____ Company ____ Issue Year ____ Policy Number ____ ☐ Life ☐ Group ☐ Annuity

Amount $ ____ Company ____ Issue Year ____ Policy Number ____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☒ No If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:
a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ ____
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details ____

---

AMIGV-2005 A    CAT# 133942    E6173_1  1

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

Beneficiary Full Name | Relationship to Insured | Percentage

Primary: Mai, Koenig Insurance Trust B05/11/06 _____ _____ 100 %

Contingent: _____ _____ _____

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: Mai, Koenig Insurance Trust B05/11/06 _____ Social Security # or TIN **Redacted**

Address: Street c/o Wells Fargo Bank, N.A, 100 North Greenfield Rd, Atlanta State Ga Zip Code 30350
(Billing notices will be Sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport or U.S. Visa # _____ # of years in U.S. _____

Relationship to Insured _____ Date of Birth _____

Name of Trustee Wells Fargo Bank, N.A. _____ Date of Trust Agreement 5-11-06

If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States)
then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

**A.** Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) — ☐ Yes ☒ No

**B.** Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.) — ☐ Yes ☒ No

**C.** Have you been disabled for 2 or more weeks within the last 2 years? — ☐ Yes ☒ No

**D.** In the last year have you flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) — ☐ Yes ☒ No

**E.** Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) — ☐ Yes ☒ No

**F.** In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.) — ☐ Yes ☒ No

**G.** In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates.) — ☐ Yes ☒ No

**H.** Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No Type _____ Avg. Quantity # packs _____ Frequency _____

**I.** Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No Type _____ Date Ceased _____

**❺ MEDICAL INFORMATION (Proposed Insured)** Please Note: Complete this section even if a paramedical or medical exam is being ordered.

**A.** Height 5 Ft. 1 in.; Weight 137 lbs.

**B.** Personal Physician Name please See remarks

**C.** Address _____

**D.** Date and Reason for Last Visit in the Last 5 Years No medical Changes Since Feb 06 medical exam

**E.** What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

**F.** In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? — ☐ Yes ☒ No

**G.** In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.) — ☒ Yes ☐ No

**H.** In the last 10 years:

   1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) — ☐ Yes ☒ No

   2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.) — ☐ Yes ☒ No

**I.** In the last 10 years, been: Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? — ☐ Yes ☒ No

**J.**

| Family History | Age if Living | Cause of Death | | Age at Death |
|---|---|---|---|---|
| Father | | WW II | Death Camps | |
| Mother | | WW II | death Camps | |
| Sibling | | | | |

**6** **DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr. Kaiser  718-941-5600        Dr. Scheter  718-376-8100
465  Ocean  Pkwy              2350  Ocean  Pkwy
Brooklyn,  NY  11218          Brooklyn  NY

Dr  Coch  718-854-2144       Please  see  Contract
4815  14th  Ave.             # 156203466  for
Brooklyn  NY  11215          Doctors  info.

**7** **COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application: $ _____ 0 _____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:

(i)    the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)   the $1,000,000 insurance amount limitations, and

(iii)  that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☒ Yes    ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that:

(1)    The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

(2)    The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3)    Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.

(4)    No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5)    I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

AMIGV-2005 A                    217433,04-21-2006,11:11:21                    3

☐ AXA Equitable Life Insurance ...ny                ☐ MONY Life Insurance Company ...erica

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**

**TO OBTAIN HEALTH INFORMATION**

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy, I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City _____5/17/06 Atlanta_____    Signature of Proposed Insured, Applicant, or parent or guardian

_If Proposed Insured is a Child (Issue Ages 0-14)_    Mati Koenig Insurance Trust A 05/...

State _____Georgia_____    Signature of Owner or Applicant if not Proposed Insured
(If corporation, print firm's name and signature of authorized officer.)

on _____5/12/06_____    by Wells Fargo Bank, NA, as Trust...
(If trust, signature of trustee.)

**Financial Professional to complete this section:**

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?    ☐ Yes   ☒ No
(If "yes" give details _____)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☒ I have witnessed the signature required on fully completed Part 1    ☐ I have not witnessed the signature required on fully completed Part 1, (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name _____G-Brian Epst..._____

AMIGV-2005 A                                                                        4

217433,04-21-2006,11:11:21

Passport.

**Application Part 2 To:** ☐ **AXA Equitable Life Insurance Company**

vs     Redacted

☐ **AXA Life and Annuity Company**

Reason for submission of this form: ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height ft. in. | c. Weight lbs. |
|---|---|---|---|---|---|
| | Mali. | | Koenig | d. Birth Date: e. ☐ Male ☐ Female | Redacted |

2. a. Name and address of personal physician (or medical facility used instead): (If none, so state) Dr Kaysee - Brooklyn NY.

b. Date and reason last consulted if within the last 5 years: 4mi ago, routine check-up.

c. What treatment was given or recommended? (If none, so state) none

(For all "Yes" answers to Questions 3–8, circle items that apply.)

| | Yes | No |
|---|---|---|
| 3. Has Proposed Insured ever had or been treated for: | | |
| a. Disease or disorder of eyes, ears, nose or throat? | | ☑ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | | ☑ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | | ☑ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☑ | |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | | ☑ |
| i. Deformity, lameness or amputation? | | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | | ☑ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | | ☑ |
| 7. Has Proposed Insured's weight changed by more than | | ☑ |

| | Yes | No |
|---|---|---|
| 10 pounds in the last 6 months? | | |
| 8. Other than as stated in answers to Questions 2–6, has Proposed Insured, within the last 5 years: | | |
| a. Consulted or been examined or treated by any physician or practitioner? | ☑ | |
| b. Had any illness, injury, or surgery? | | ☑ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | | ☑ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☑ | |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | | ☑ |
| 9. a. Has Proposed Insured, within the last 12 months: | | |
| (i) Smoked cigarettes? | | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | | ☑ |
| b. Has Proposed Insured, within the last five years: | | |
| (i) Smoked cigarettes? | | ☑ |
| (ii) Used any other form of tobacco (Give full details)? | | ☑ |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Sepsis - young | 30-39 |
| Mother | | | 93 |
| Brothers/Sisters | | Vascular Problem | |

DETAILS FOR "YES" ANSWERS. Include: i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

3g Hypert DM borderline controlled with diet. occas. Metformin.
4 Baby ASA, Vit B.

8a Dr Kaysee- G.P. routine check up. address not available
8 d. Bl test, ECG G.P. normal
mammogram in the past NL

Unsure siblings cause of dead but no heart, cancer, DM.

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at Miami Beach FL 2/6/06 X Mali Koenig
City     State     Mo. Day Yr.     Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): _____ MD

# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

☐ AXA Equitable Life Insurance Company,
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
**Part I**
Form No. LIFEAPP-GA/OR
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

**Proposed Insured**
A. Full Name: First _Ben Zion_    M.I. ___ Last _Koenig_    B. Gender: ☒ Male ☐ Female

C. Home Address: _Redacted_    _Redacted_

City/Municipality _Brooklyn_    County/Parish _____ State _NY_ Zip + 4 Code _Redacted_
(If address is an R.D. Rte or annual residence, proof of residence required.)

D. Home Phone No. _Redacted_    Best time to Call: _____    Best phone no. to be contacted: _____

E. Date of Birth: _Redacted_    F. Place of Birth: _Poland_
(State/County)

G. Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated   H. Soc. Sec. No. ⟋ _Redacted_

I. Driver's Lic. No.: _NONE_    State: _____

J. U.S. Citizen? ☒ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

K. Currently employed? ☐ Yes ☐ No ☒ Retired

L. Current Occupation(s): (1) Title: _N/A Retired_    (2) Duties _N/A_    (3) How Long? _____
(If less than 1 year at current occupation, give previous in Remarks.)

M. Employer Name: _N/A_

N. Employer Address: _____
No. & Street    City    State    Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ _Retired_    P. Net Worth $ _26,000,000_
* If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _Athena IIUL_    Amount of Insurance $ _10,000,000_
(If survivorship policy, complete an application for each Proposed Insured.    (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement.    Supplement.)
To select dividend options on EWL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement.)

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A    ☐ Option B
(2) Planned Periodic Premium $ _1,515,852_

C. Definition of Life Insurance Test: Complete for AUL II, IL, IL COLI '04    ☒ Guideline Premium Test    ☐ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly
Or
System-Matic (Complete S-M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit. No. _____ (3) Unit Register Date _____
(Specify M/other name, if other than insured, in Remarks.)

F. Date Policy to save Insured Age? ☒ Yes ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market? ☐ Yes ☒ No
2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No   Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete: (If additional room is needed, please use Remarks Section.)

Amount $_____ Company _____ Issue Year_____ Policy Number_____ ☐ Life ☐ Group ☐ Annuity
Amount $_____ Company _____ Issue Year_____ Policy Number_____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☐ No   If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:   a) State total amount of insurance in force on the life of applicant or child's parent, if greater $_____
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No
If "Yes" give details _____

**❸ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation n... e 100%. Use Remarks section for additional Beneficiary ...nation.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary: ~~████████~~ Benzion Phoenix Insurance Trust B 05/11/06 | | 100 |
| Contingent: | | |

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: Benzion Koenig Insurance Trust B 05/11/06    Social Security # or TIN    **Redacted**

Address: Street W/S Wells Fargo Bank, N.A., 400 Northridge Rd City Atlanta    State Ga    Zip Code 30350
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country_____ U.S. Visa type_____ Passport # or U.S. Visa #_____ # of years in U.S._____

Relationship to Insured_____ Date of Birth_____

Name of Trustee Wells Fargo Bank, N.A.    Date of Trust Agreement 5-11-06

If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then, he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

|   |   | Yes | No |
|---|---|---|---|
| **A.** | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) | ☐ Yes | ☒ No |
| **B.** | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.) | ☐ Yes | ☒ No |
| **C.** | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| **D.** | In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) | ☐ Yes | ☒ No |
| **E.** | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) | ☐ Yes | ☒ No |
| **F.** | In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.) | ☐ Yes | ☒ No |
| **G.** | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates.) | ☐ Yes | ☒ No |
| **H.** | Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No Type_____ Avg. Quantity # packs_____ Frequency_____ | | |
| **I.** | Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No Type_____ Date Ceased_____ | | |

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height 5 Ft. 6 in.; Weight 166 lbs.

**B.** Personal Physician Name Please - see Special Remarks

**C.** Address_____

**D.** Date and Reason for Last Visit in the Last 5 Years no medical changes since Feb exam

**E.** What treatment was given or recommended? (If none, so state)_____

Has Proposed Insured:

|   |   | Yes | No |
|---|---|---|---|
| **F.** | In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| **G.** | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.) | ☒ Yes | ☐ No |
| **H.** | In the last 10 years: | | |
| | 1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| | 2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| **I.** | In the last 10 years, been: Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |

**J.**

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | WW II death Camps | ? |
| Mother | | WW II death Camps | ? |
| Sibling | | | |

**❻ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**   (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.   (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

Dr. Albea Zucker          845 - 782 - 6092
305 Route 208
Manroe NY 10950          Please See Contract
                          # 156 203466 for
Dr. Kaiser               updated medical file
465 Ocean Pkwy
Brooklyn NY 11218

**❼ COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application: $ _____0_____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:

(i)   the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)  the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?   ☒ Yes   ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that:

(1)  The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

☐ AXA Equitable Life Insurance Con                    ☐ MONY Life Insurance Company of        a

## ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

## AUTHORIZATIONS

### TO OBTAIN HEALTH INFORMATION

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

### TO OBTAIN NON-HEALTH INFORMATION

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

### PURPOSE OF AUTHORIZATIONS

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

### COVERAGE CONDITIONS

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

### ADDITIONAL AUTHORIZATIONS

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

### DURATION

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

### COPY OF AUTHORIZATIONS

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City _Atlanta_

State _Georgia_

on _5/12/00_

Signature of Proposed Insured, Applicant, or parent or guardian.
(Proposed Insured(s) 12½ & Issue Ages 0-14) _Brazos Koenig Insurance Trust B a_
X _by Wells Fargo Bank, N.A. as Trustee_
Signature of Owner or Applicant (if not Proposed Insured
(If corporation, print firm's name and signature of authorized officer.)
(If trust, signature of trustee.)                    ELIZABETH T. WAGNER
                                                     VICE PRESIDENT

### Financial Professional to complete this section:

| Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued? | ☐ Yes ☒ No |
|---|---|

(If "yes" give details _____ )

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☒ I have witnessed the signature required on fully completed Part 1       ☐ I have not witnessed the signature required on fully completed Part 1, (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____

Print Licensed Financial Professional's Name _Gabriel Epstein_

AMIGV-2005 A                                                                    4

**Application Part 2 To:** ☐ **AXA Equitable Life Insurance Company**

☐ **AXA Life and Annuity Company**

*USA*

*Passport* **Redacted**

Reason for submission of this form: ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name *Benzion* | Middle Initial | Last Name *Koenig* | b. Height: ft. in. | c. Weight lbs. **Redacted** |
|---|---|---|---|---|---|

b. Birth Date: **Redacted**  ☒ Male ☐ Female

2. a. Name and address of personal physician (or medical facility used instead): (If none, so state) *Dr Albert Zucker (305) 845-782-9541  Monsee, NY 10950*

b. Date and reason last consulted if within the last 5 years: *6m Ago, routine* *(x/10/11)* *50's, Route 208 # 8?*

c. What treatment was given or recommended? (If none, so state) *none*

(For all "Yes" answers to Questions 3–9, circle items that apply.)

| 3. Has Proposed Insured ever had or been treated for: | Yes | No |
|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☒ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☒ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☒ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☒ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☒ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☐ | ☒ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☒ |
| i. Deformity, lameness or amputation? | ☐ | ☒ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☒ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☒ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☒ | ☐ |
| 5. Has Proposed Insured, within the last 10 years, been: | | |
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☒ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☒ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☒ |
| 7. Has Proposed Insured's weight changed by more than | | |

| | Yes | No |
|---|---|---|
| 10 pounds in the last 6 months? | ☐ | ☒ |
| 8. Other than as stated in answers to Questions 2–8, has Proposed Insured, within the last 5 years: | | |
| a. Consulted or been examined or treated by any physician or practitioner? | ☒ | ☐ |
| b. Had any illness, injury, or surgery? | ☐ | ☒ |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☒ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☒ | ☐ |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☒ |
| 9. a. Has Proposed Insured, within the last 12 months: | | |
| (i) Smoked cigarettes? | ☐ | ☒ |
| (ii) Used any other form of tobacco (Give full details) | ☐ | ☒ |
| b. Has Proposed Insured, within the last five years: | | |
| (i) Smoked cigarettes? | ☐ | ☒ |
| (ii) Used any other form of tobacco (Give full details) | ☐ | ☒ |

| 10. Family History | Age If Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | *52* | *Holocaust victims* | *50's* |
| Mother | | *Prostate / natural* | *93* |
| Brothers/Sisters *3* | | *Holocaust victims* | |

DETAILS FOR "YES" ANSWERS. Include: I. Question Number. II. Diagnosis and Treatment. III. Results. IV. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

*4. ASA ONG (Blood)
8a. Dr Kuyser - Brooklyn NY.
routine check-up, 4m/Ago. routine
B1 test.
Dr Rucker - 4 yr. also routine
8d. B1 test test. ECG routine 4yr-rt*

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at *Miami Beach* on *2/6/06* x *[signature] Benzion Koenig*
city  state  Mo. Day Yr.  Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): *[signature]*

180-M20SN-FL    E5722_5    CAT. #126895



**AXA EQUITABLE**
LIFE INSURANCE COMPANY

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable
upon the death of the insured person while this policy is in force. You may pay premiums
while the insured person is living and is not yet attained age 100. The values provided by this
policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

| ☐ AXA Equitable Life Insurance Company<br>1290 Avenue of the Americas<br>New York, NY 10104 | ☐ MONY Life Insurance Company of America<br>1290 Avenue of the Americas<br>New York, NY 10104 | **Application For Life Insurance**<br>Part I<br>Form No. LIFEAPP-GA/OR<br>(2005) |
|---|---|---|

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

**Proposed Insured**

A. Full Name: First _Ben Zion_   M.I. ___   Last _Koenig_        B. Gender: ☒ Male ☐ Female

C. Home Address: **Redacted**                                    **Redacted**

City/Municipality _Brooklyn_ _____ County/Parish _____ State _N/_ Zip + 4 Code **Redacted**
(If address is a P.O. Box or not actual residence, proof of residence required.)

D. Home Phone No. **Redacted**   Best time to Call: _Poland_   Best phone no. to be contacted: _____

E. Date of Birth: __Redacted__        F. Place of Birth: _____
                                                              (State/County)

G. Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated H. Soc. Sec. No. **Redacted** _____

I. Driver's Lic. No.: _NONE_____ State: _____

J. U.S. Citizen? ☒ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

K. Currently employed? ☐ Yes ☐ No ☒ Retired

L. Current Occupation(s): (1) Title: _N/A Retired_ (2) Duties _N/A_ (3) How Long? _____
(If less than 1 year at current occupation, give previous in Remarks.)

M. Employer Name: _____

N. Employer Address: _____
                       No.& Street                City                State        Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ _Retired_   P. Net Worth $ _26,000,000_____
* If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _Athena IIul_        Amount of Insurance $ _10,000,000_
(If survivorship policy, complete an application for each Proposed Insured.        (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement.                                         Supplement.)
To select dividend options on EWL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement.)

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A   ☐ Option B
(2) Planned Periodic Premium $ _1,515,852_

C. Definition of Life Insurance Test: Complete for AUL II, IL, IL COLI '04      ☒ Guideline Premium Test      ☐ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual   ☐ Semi-Annual   ☐ Quarterly   ☐ Monthly
                Or
System-Matic (Complete S-M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit No. _____ (3) Unit Register Date _____
(Specify Allotter name, if other than Insured, in Remarks.)

F. Date Policy to save Insured Age? ☒ Yes   ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market? ☐ Yes ☒ No

2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☒ Yes ☐ No
(Give companies, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No   Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete: (If additional room is needed, please use Remarks Section.)

Amount $_____ Company _____ Issue Year____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

Amount $_____ Company _____ Issue Year____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☒ No   If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:
a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ _____

b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details _____

**③ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary: Benzion Koenig Insurance Trust A 05/11/06 | | 100 |
| Contingent: | | |

**B.** Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: Benzion Koenig Insurance Trust A 05/11/06    Social Security # or TIN    **Redacted**

Address: Street 500 Northridge Rd    City Atlanta    State Ga    Zip Code 30350
(Billing notices will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country _____ U.S. Visa type_____ Passport # or U.S. Visa # _____ # of years in U.S._____

Relationship to Insured _____ Date of Birth _____

Name of Trustee Wells Fargo Bank, N.A.    Date of Trust Agreement 5.11.06

If the policy owner is not a U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States)
then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**④ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

| | | Yes | No |
|---|---|---|---|
| **A.** | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) | ☐ Yes | ☒ No |
| **B.** | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.) | ☐ Yes | ☒ No |
| **C.** | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes | ☒ No |
| **D.** | In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) | ☐ Yes | ☒ No |
| **E.** | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) | ☐ Yes | ☒ No |
| **F.** | In the last 10 years Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.) | ☐ Yes | ☒ No |
| **G.** | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates) | ☐ Yes | ☒ No |
| **H.** | Do you currently use any form of tobacco or nicotine product? ☐ Yes ☒ No Type_____ Avg. Quantity # packs_____ Frequency _____ | | |
| **I.** | Have you ever used any form of tobacco or nicotine product? ☐ Yes ☒ No Type_____ Date Ceased_____ | | |

**⑤ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height 5 Ft. 6 in.; Weight 160 lbs.

**B.** Personal Physician Name Please see Special Remarks

**C.** Address _____

**D.** Date and Reason for Last Visit in the Last 5 Years No medical changes since Feb medical exam

**E.** What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

| | | Yes | No |
|---|---|---|---|
| **F.** | In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ Yes | ☒ No |
| **G.** | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.) | ☒ Yes | ☐ No |
| **H.** | In the last 10 years: | | |
| | 1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| | 2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.) | ☐ Yes | ☒ No |
| **I.** | In the last 10 years, been: | | |
| **J.** | Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ Yes | ☒ No |

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | WW II | WW II death Camps | 8 |
| Mother | | WW II death Camps | 2 |
| Sibling | WW II | | |

**❻** DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION    (Attach additional sheet of paper if necessary;
and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks.    (Attach additional sheet of paper if necessary; and it must be
If the owner is a Qualified Plan, please indicate the qualified plan and type    signed and dated by the Proposed Insured, Owner, and financial
here.    professional.)

Dr. Albea Zucker    845-782-6092
305 Route 208    Please see contract
Manroe Ny 10950    #186203466 for
updated medical file
Dr. Kaiser
465 Ocean Pkwy
Brooklyn Ny 11218

**❼** COMPLETE IF MONEY IS PAID WITH THE POLICY:

Amount paid with this Application: $ _____6_____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:

(i)    the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)   the $1,000,000 insurance amount limitations, and

(iii)  that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☒ Yes  ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that:

(1)  The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

☐ AXA Equitable Life Insurance C      f          ☐ MONY Life Insurance Company      rica

## ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

## AUTHORIZATIONS

### TO OBTAIN HEALTH INFORMATION

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

### TO OBTAIN NON-HEALTH INFORMATION

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

### PURPOSE OF AUTHORIZATIONS

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

### COVERAGE CONDITIONS

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

### ADDITIONAL AUTHORIZATIONS

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

### DURATION

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorization at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

### COPY OF AUTHORIZATIONS

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

**FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.**

**SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION---UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, and (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).**

**CERTIFICATION INSTRUCTIONS: You must cross out item (ii) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.**
**THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.**

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City _____Atlanta_____

State _____Georgia_____

on _____5/12/06_____

Signature of Proposed Insured, Applicant or parent or guardian
if Proposed Insured is a child (Issue Ages 0-14)

_Benzion Koenig Insuran_

Signature of Owner if Applicant if not Proposed Insured
(If corporation, print firm's name and signature of authorized officer.)
(If trust, signature of trustee.) ELIZABETH T. WAGNER
VICE PRESIDENT

_Trust A 05/11/06; by Well_
_Fargo Bank, N.A., as_
_trustee_

## Financial Professional to complete this section:

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?    ☐ Yes    ☒ No
(If "yes" give details _____)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☒ I have witnessed the signature required on fully completed Part 1    ☐ I have not witnessed the signature required on fully completed Part 1, (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____

Print Licensed Financial Professional's Name _____Guttepri_____

AMIGV-2005 A

4

**Application Part 2 To:**  ☐ AXA Equitable Life Insurance Company        USA

☐ AXA Life and Annuity Company        Passport # Redacted

Reason for submission of this form: ☐ New Policy ☐ Policy Change ☐ Reinstatement

| | |
|---|---|
| 1. a. Proposed Insured (Please Print)  First Name  Middle Initial  Last Name | d. Height __ ft __ in. g. Weight lbs |
| Benzion — Koenig | e. Birth Date: |
| | f. ☑ Male ☐ Female    Redacted |

2. a. Name and address of personal physician (or medical facility used instead): (if none, so state) Dr Albert Zucker (305) 845-782-9541

b. Date and reason last consulted if within the last 5 years: ~6m ago, routine.  Monsey, NY 10850

c. What treatment was given or recommended? (if none, so state) none  (ay 10,08)  50s, Route 208 # 21

(For all "Yes" answers to Questions 3–9, circle items that apply.)

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| **3. Has Proposed Insured ever had or been treated for:** | | | **10.** Other than as stated in answers to Questions 3–6, has Proposed Insured, within the last 5 years: | | |
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☑ | a. Consulted or been examined or treated by any physician or practitioner? | ☑ | ☐ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | ☐ | ☑ | b. Had any illness, injury, or surgery? | ☐ | ☑ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis and other chronic respiratory disease or disorder? | ☐ | ☑ | c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| | | | d. Had electrocardiogram, X-ray, other diagnostic test? | ☐ | ☑ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☑ | e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | ☐ | ☑ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ | **9.** a. Has Proposed Insured, within the last 12 months: | | |
| | | | (i) Smoked cigarettes? | ☐ | ☑ |
| | | | (ii) Used any other form of tobacco (Give full details) | ☐ | ☑ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☑ | b. Has Proposed Insured, within the last five years: | | |
| | | | (i) Smoked cigarettes? | ☐ | ☑ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☐ | ☑ | (ii) Used any other form of tobacco (Give full details) | ☐ | ☑ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☑ | | | |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | 5? | Holocaust victims 50's | |
| Mother | | dispair/natural | 97 |
| Brothers/Sisters 3 | | Holocaust victims 30s | |

| | Yes | No |
|---|---|---|
| i. Deformity, lameness or amputation? | ☐ | ☑ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☑ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☑ |
| 4. Is Proposed Insured now under observation or taking treatment? | ☐ | ☑ |

**DETAILS FOR "YES" ANSWERS:** Include: I. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (if additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

4. ASA only (81 mg)
8a. Dr. Kuyser — @Brooklyn NY.
routine check-up; 4m/ago. routine
BI test.
   Dr. Zucker — 4 yr. also routine
8d. BI test test. ECG routine 4 yr. ↑

| 5. Has Proposed Insured, within the last 10 years, been: | Yes | No |
|---|---|---|
| a. Tested positive for exposure to the human immunodeficiency virus (HIV) or been diagnosed as having acquired immune deficiency syndrome (AIDS) or AIDS-related Complex (ARC) caused by the (HIV) infection or other sickness or condition derived from such infection? | ☐ | ☑ |
| 6. Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | ☐ | ☑ |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☑ |
| 7. Has Proposed Insured's weight changed by more than | | |

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at Miami Beach FL  on  2/6/06 X  _Benzion Koenig_
          city  state           Mo. Day Yr.        Signature of Proposed Insured

Witness (Must be Examiner or Nurse/Technician): _____  M.D.

180-M205N-FL      E5722_5      CAT. #126995



# AXA EQUITABLE
**LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

# EXHIBIT 5



December 22, 2006

Elizabeth Wagner, VP
Wells Fargo Bank, N.A.
400 Northridge, Suite 600
Atlanta, GA  30350

**NOTICE OF RESCISSION**
Policy Nos.: 156 212 029 & 156 212 030
Insured:    Mali Koenig

**Statement of Account**
Premium:      $ 2,503,480.00
Interest:     $     43,416.52
Total Refund: $ 2,546,896.52

Dear Ms. Wagner:

The above numbered policies were issued in reliance upon the statements and answers in the Applications for Insurance Part 1, for each policy, dated May 12, 2006.  Copies of the Applications are enclosed for your review.

We have now learned that the assets and net worth reported by the insured were overstated.  Furthermore, we have established that assets claimed to be owned by the insured are actually owned by another party.

Had we known this information, the policies would not have been issued.  In view of this and in accordance with our contractual rights, AXA Equitable has rescinded the coverage under the policies numbered 156 212 029 and 156 212 030 and deny any liability under them.

Our check in refund of all amounts paid as premiums, including interest, is enclosed.  Your cashing this check will indicate that you agree with our decision.

If you have any questions concerning this matter, please direct them to this office.

Sincerely,

Henry C. Lewer
Assistant Vice President

Enclosures

BCC: Martha Verscaj – Law Dept @ 1290/12th Fl

AXA Equitable Life Insurance Company
P.O. Box 1047, Charlotte, NC 28201-1047

———— Be Life Confident ————



**AXA EQUITABLE**

December 22, 2006

Elizabeth Wagner, VP
Wells Fargo Bank, N.A.
400 Northridge, Suite 600
Atlanta, GA 30350

**NOTICE OF RESCISSION**
Policy Nos.: 156 212 032 & 156 212 033
Insured:    Benzion Koenig

**Statement of Account**
Premium:      $ 3,031,704.00
Interest:     $     66,033.00
Total Refund: $ 3,097,737.00

Dear Ms. Wagner:

The above numbered policies were issued in reliance upon the statements and answers in the Applications for Insurance Part 1, for each policy, dated May 12, 2006. Copies of the Applications are enclosed for your review.

We have now learned that the assets and net worth reported by the insured were overstated. Furthermore, we have established that assets claimed to be owned by the insured are actually owned by another party.

Had we known this information, the policies would not have been issued. In view of this and in accordance with our contractual rights, AXA Equitable has rescinded the coverage under the policies numbered 156 212 032 and 156 212 033 and deny any liability under them.

Our check in refund of all amounts paid as premiums, including interest, is enclosed. Your cashing this check will indicate that you agree with our decision.

If you have any questions concerning this matter, please direct them to this office.

Sincerely,

Henry C. Lewer
Assistant Vice President

Enclosures

Bcc: Martha Verscaj – Law Dept @ 1290/12th Fl

AXA Equitable Life Insurance Company
PO Box 1047 Charlotte, NC 28201-1047

Be Life Confident

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

AXA EQUITABLE LIFE INSURANCE
COMPANY, AXA NETWORK, LLC &
AXA ADVISORS, LLC

                    Plaintiffs,

    - against -

GABRIEL EPSTEIN,

                   Defendant.

**Index No. 07/**_601618_

---

## SUMMONS AND COMPLAINT

---

**KILPATRICK STOCKTON LLP**
31 West 52nd Street, 14th Floor
New York, NY 10019
Tel: (212) 775-8700
Fax: (212) 775-8800

*Attorneys for Plaintiffs*

NEW YORK
COUNTY CLERK'S OFFICE

MAY 15 2007

NOT COMPARED
WITH COPY FILE